# EXHIBIT 36

# SUBCONTRACTOR AGREEMENT

This Subcontractor Agreement (the "**Agreement**"), effective as of February 2, 2022 ("**Effective Date**"), sets forth the terms of the provision of services (collectively, the "**Services**") by Collateral Damage, LLC ("**Subcontractor**") to Quantasy, LLC including its affiliates and subsidiaries ("**Agency**") on behalf of Agency's client, Root Insurance Agency, LLC  ("**Client**").

1. **SERVICES**

    (a) <u>General</u>.  The parties may enter into one or more written work orders (each, a "**Work Order**").  Subcontractor agrees that this Agreement shall not give rise to any payment obligations, minimum volume commitment, or any other guarantee of business by Agency unless the parties have mutually executed a Work Order.

    (b) <u>Representations and Warranties</u>.  Subcontractor represents and warrants that: (i) Subcontractor has the requisite skill and expertise necessary to provide the Services; (ii) all Services will be performed in a professional and workmanlike manner with due care; (iii) the Services and any Deliverables will conform to the specifications set forth in the applicable Work Order or otherwise provided in writing by Agency; (iv) it shall comply with all laws, rules, regulations, terms of use, and applicable third-party agreements, relating to the Deliverables, or performance of the Services hereunder and obtain all necessary applicable licenses, permits, releases, permissions, etc; (v) time is of the essence in performing the Services; (vi) it will use reasonable physical and electronic security measures in association with the performance of the Services and in handling any Agency or Client information appropriate to the nature of such information disclosed to or accessible by Subcontractor in order to protect such information from unauthorized access, destruction, use, modification or disclosure, and it shall promptly notify Agency in writing in the event any unauthorized access to information is suspected and permit Agency to control any public notifications, with the reasonable assistance of Subcontractor, and at Subcontractor's expense, (vii) the Services, Deliverables, and Subcontractor materials and intellectual property shall not infringe the rights of any third party including, without limitation, any patent, copyright, trademark, trade secret, right or privacy or publicity right, (viii) except as disclosed to Agency in advance in writing, Agency and Client shall have no obligation to pay any third party any fees, royalties or other payments for Agency's use of any third party materials embedded within the applicable Deliverables, (ix) Subcontractor shall not act directly or indirectly, in any way likely to damage or disparage the goodwill or reputation of Agency or Client or their products or services, and (x) none of the Deliverables or any other software or materials provided by Subcontractor include or incorporate any computer viruses, bugs, backdoors, stops, corruptions, or other intentionally disabling code of any kind.

    (d) <u>Modification / Cancellation</u>.  Agency shall be entitled at any time to direct that any work previously requested or approved by Agency be modified or discontinued.  Upon receipt thereof, Subcontractor shall immediately modify or stop all such work as directed in such notice.  Agency shall reimburse Subcontractor for any proper and approved charges earned and incurred by Subcontractor in connection with such work up to the time of its modification or discontinuation, it being understood that Subcontractor shall use its best efforts to mitigate any damages or expenses arising from such modification or discontinuation.

    (e) <u>Deliverable Guidelines</u>.  Subcontractor will ensure that all Services and/or Deliverables provided hereunder conform with the terms set forth herein and in the applicable Work Order, and comply with Agency's and Client's guidelines or policies that are provided by Agency to Subcontractor.  In the event of any non-conformity to specifications, Agency shall inform Subcontractor of the deficiency and Subcontractor shall, at its sole expense, use best efforts to correct the non-conformity.  In the event that the non-conformity cannot be corrected, despite Subcontractor's use of best efforts, within a reasonable time (but in no event more than fifteen (15) days) after notification, Agency shall be entitled to any and all available remedies, at law or in equity, by statute or otherwise, including, but not limited to, termination of this Agreement, the cost of cover, and a refund of any fees already paid to Subcontractor for the affected Services.

2. **COMPENSATION**

(a) In consideration of the Services performed by Subcontractor pursuant to this Agreement, Agency shall pay Subcontractor those fees and expenses specifically set forth in the applicable Work Order. Subcontractor will give Agency the benefit of any cash discounts allowed by any third parties including, without limitation, any volume discounts attributable to amounts paid or spent on Agency or Client's behalf.

(b) Agency or Client will reimburse Subcontractor for all pre-approved actual, verified, reasonable, ordinary and necessary out of pocket expenses actually incurred by Subcontractor in the course of Services ("**OOP Expenses**"), provided that Subcontractor shall not mark-up any OOP Expenses or charge any fees or commission on any OOP Expenses.

(c) Subcontractor acknowledges that Agency is entering into this Agreement on behalf of its Client and Agency shall be liable for payments solely to the extent Agency has been paid by Client for such amounts. For amounts not paid to Agency, Client shall remain solely liable for such payments to Subcontractor.

3. **TERM; TERMINATION**

(a) The term of this Agreement shall commence on the Effective Date and will continue in effect until terminated in accordance with the terms of this Agreement (the "**Term**"). Agency shall have the right to terminate this Agreement or any Work Order for any reason, and at any time, upon thirty (30) days prior written notice to Subcontractor. Either Party may also terminate this Agreement if the other is in material breach of this Agreement, and such breach has not been cured by the breaching party within thirty (30) days of receiving notification of such breach.

(b) Termination for Insolvency. Either party may terminate this Agreement or applicable Work Order if any one of the following events occurs: (i) the other files a voluntary petition in bankruptcy or an involuntary petition is filed against it; (ii) the other is adjudged bankrupt; (iii) a court assumes jurisdiction of the assets of the other under a federal reorganization act, or other statute; (iv) a trustee or receiver is appointed by a court for all or a substantial portion of the assets of the other; (v) the other becomes insolvent, suspends business or ceases to conduct its business in the ordinary course; or (vi) the other makes an assignment of its assets for the benefit of its creditors. Each party will give prompt written notice of any such event relating to it.

(c) Upon any termination of this Agreement or any Work Order, Subcontractor shall promptly deliver all works-in-progress, Deliverables, and any other results of the Services conceived or produced for Agency or Client by Subcontractor under this Agreement and any Work Order, to Agency. Agency shall, within a reasonable time of such delivery, pay Subcontractor for all Services properly rendered prior to the date of such termination. Any reservations, contracts and other arrangements authorized by Agency, including without limitation arrangements for advertising space and time or other goods or facilities that still are in effect as of the effective date of termination, shall be assigned to Agency or Client, as directed by Agency. Neither Agency nor Client shall be liable for any consequential, punitive, incidental, or other damages, or for loss of profits or business, arising from any termination of this Agreement or any Work Order.

4. **INDEPENDENT CONTRACTOR**

Subcontractor agrees that it will perform its obligations under this Agreement as an independent contractor of Agency and shall not be entitled to any benefits offered to Agency's or Client's employees. Subcontractor acknowledges and agrees that, as an independent contractor, it will be responsible for the withholding and payment of all Federal, State and Local income taxes, Social Security taxes and the payment of all workers' compensation, state disability and unemployment contributions or premiums or other taxes or contributions under any benefit program mandated by applicable law, associated with the fees Subcontractor receives and the employees Subcontractor hires. Subcontractor agrees to indemnify Agency for any costs or liabilities, including reasonable attorney's fees, arising from Subcontractor's failure to withhold and pay such taxes, contributions or premiums.

5.  **CONFIDENTIAL INFORMATION**

Subcontractor agrees to keep confidential and not to disclose or use for Subcontractor's own benefit or for the benefit of any third party, any Agency or Client information, documents, trade secrets, or other materials (including the terms and existence of this Agreement, the Services, and all products and work product produced and/or provided by Subcontractor under this Agreement) which are provided, or otherwise made available, to Subcontractor, in any form whatsoever.  The confidentiality obligations in the preceding sentence, however, shall not extend to any information, documents, or materials that (a) become publicly available without breach of this provision, (b) are received from a third party without restriction, or (c) are independently developed without reference to information

6.  **OWNERSHIP**

    (a)  Except with respect to third-party rights of which Subcontractor has informed Agency in writing or as otherwise specifically provided herein, all of the results and proceeds of the Services including without limitation, tangible or intangible property developed or prepared for Agency during the Term of this Agreement, including, but not limited to, deliverables delivered by Subcontractor and/or required to be delivered by Subcontractor to Agency pursuant to one or more Work Orders ("**Deliverables**"), tables, codes, plans, sketches, layouts, copy, promotions, illustrations, transcriptions, and software; finished or unfinished, whether created by Subcontractor, Agency, or a third-party supplier, or any combination thereof; and all drafts and versions thereof, whether used or unused (together, "**Work Product**"), shall be and remain, as between the parties, the sole and exclusive property of Agency as a "work made for hire" as that term is defined in Section 101 of the United States Copyright Act, 17 U.S.C. Section 101 (or any successor section thereto).  If, for any reason, any of the Work Product is not deemed work made-for-hire, or as otherwise may be necessary, Subcontractor hereby assigns all its right, title, and interest in and to the Work Product to Agency. Subcontractor shall execute any instruments that, in the sole judgment and discretion of Agency, may be deemed necessary to further carry out such assignment or to protect Agency's and Client's rights in the Work Product ("**Assignment Documents**"). In the event Subcontractor fails to execute any Assignment Documents when requested by Agency or Client, Agency is hereby irrevocably granted a power of attorney to execute Assignment Documents on Subcontractor's behalf.

    (b) Subcontractor acknowledges and agrees that Agency and/or Client, their employees, subsidiaries, successors, agents, and assigns, and any others acting with their permission or under their authority, and without any limitations as to time or territory, and in all media now known or hereafter devised, shall have the right to copyright, use, publish, reproduce, alter, and prepare derivative works of the Work Product, for any lawful purpose whatsoever, in or through any media or combination of media, now existing or yet to be invented, without any obligation or liability to Subcontractor.  Neither Subcontractor nor any of its third-party suppliers shall permit any party (other than Agency and Client) to use any Work Product.

7.  **INDEMNIFICATION**

Subcontractor agrees to indemnify, defend and hold harmless Agency, Client, and their respective parent, subsidiary and affiliated companies, employees, officers, directors, shareholders, licensees and agents against all liabilities, losses, deficiencies, damages or expenses, including reasonable attorney's fees and costs, which such indemnified party may incur as the result of any claim, suit or proceeding brought or threatened against Agency, Client, or any other indemnified party: (i) caused by acts or omissions of Subcontractor, its employees, approved subcontractors or agents; (ii) pertaining to Subcontractor's breach or alleged breach of this Agreement or any Work Order; (iii) pertaining to the negligence or willful misconduct of Subcontractor, its employees, approved subcontractors or agents; (iv) relating to any employee, subcontractor, independent contractor, or freelancer of Subcontractor; and/or (v) arising out of any claim for infringement of the intellectual property or proprietary rights of any third party in connection with the Services.

8.  **SUBCONTRACTING**

Subcontractor may not delegate or subcontract any portion of Subcontractor's obligations set forth herein to a third party without the express written consent of Agency. Should Agency authorize, in writing, Subcontractor's delegation or subcontracting of any portion of Subcontractor's obligations to any third party, Subcontractor shall require such third party, as a condition to their engagement, to agree to be bound by provisions substantially the same as those contained in this Agreement and any Work Order0

9. **RETENTION OF RECORDS; AUDIT**

Subcontractor shall retain, and shall cause all Subcontractor affiliates and subcontractors performing services hereunder to retain, all records relating to Subcontractor Services ("**Subcontractor Records**") during the Term and for one (1) year thereafter. During the Term, and upon written notice, Subcontractor Records relating to this Agreement shall be open to inspection, copying, and audit by Agency or Client or a qualified representative of either party during Subcontractor's normal business hours at Subcontractor's place of business. If any records audit reveals that Subcontractor has overcharged Client and/or Agency, Subcontractor shall immediately refund such overcharge ("**Overcharge**") to Agency, and if the audit reveals an Overcharge greater than 2.5%, Subcontractor shall be responsible for Client and/or Agency's reasonable audit costs.

10. **CONFLICTS OF INTEREST.**

Subcontractor represents and warrants that it has not taken, is currently taking or will take any action in furtherance of an offer, payment, gift or anything else of value, directly or indirectly, to any person or third party, while knowing that all or some portion of the money or value will be offered, given or promised to anyone to improperly obtain an improper advantage, or reward favorable treatment in its own operations or business relationships. Further, without limiting the foregoing, Subcontractor represents and warrants that it has not: (i) directly or indirectly made or authorized an offer, payment, promise to pay, or corrupt transfer of anything or value to any person, intending to induce such person to perform improperly a relevant function or activity or to reward a person for the improper performance of such function or activity; (ii) used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (iii) made any direct or indirect unlawful payment to any employee or agent of a private entity with which Subcontractor does or seeks to do business or (iv) otherwise made or received any bribe, rebate, payoff, influence payment, kickback, gift, or any other payment or thing of value in connection with this Agreement.

Subcontractor further represents and warrants that (i) it and each of its affiliates has instituted and has maintained, and will continue to maintain, policies and procedures reasonably designed to promote and achieve compliance with the US Foreign Corrupt Practices Act (FCPA) and all other applicable laws and regulations relating to anti-bribery and corrupt practices, including all local laws and all applicable anti-money laundering requirements, as well as with this representation and warranty; and (ii) none of Subcontractor nor any of its affiliates will directly or indirectly use the proceeds of convertible securities or lend, contribute or otherwise make available such proceeds to any subsidiary, affiliate, joint venture partner or other person or entity for the purpose of financing or facilitating any activity that would violate the laws and regulations referred to in this Section. Subcontractor shall implement adequate procedures for its personnel and subcontractors to comply with all applicable laws and this Section, and will keep accurate, full and complete records that support the transactions made under this Agreement.

11. **MISCELLANEOUS**

(a) This Agreement may not be assigned by Subcontractor without the prior written consent to Agency, and any such purported assignment shall be void. If any provision of this Agreement is held invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions shall in no way be affected or impaired thereby. A party's failure or delay in enforcing any provision of the Agreement will not be deemed a waiver of that party's rights with respect to that provision or any other provision of the Agreement. All provisions of this Agreement intended to survive termination shall survive the expiration or earlier termination of this Agreement.

(b) This Agreement represents Agency's and Subcontractor's entire agreement and supersedes all prior agreements between the parties. This Agreement will be governed and construed

under the laws of the State of New York without giving effect to conflict of laws principles, and the parties hereto consent to the exclusive jurisdiction by the state and federal courts sitting in the State of New York of any dispute arising out of or relating to this Agreement.

Please affirm acceptance of this Agreement by signing below.

| **QUANTASY, LLC** | **COLLATERAL DAMAGE, LLC** |
|---|---|
| *Will Campbell* | *Paige Lynette* |
| ECCDE668A1104CA... | 784365BF37C24E8... |
| Will Campbell | Paige Lynette |
| Printed Name: _____ | Printed Name: _____ |
| Title: CEO | Title: President |
| Date: 8/20/2022 | Date: 8/20/2022 |

5

# **WORK ORDER**

This Work Order is entered into as of April, 1, 2022 ("Work Order Effective Date") by and between Collateral Damage, LLC ("Subcontractor") and Quantasy, LLC ("Agency"), on behalf of Agency's client, Root Insurance, LLC ("Client") pursuant to the Subcontractor Agreement between Subcontractor and Agency, dated as of February 2, 2022.

| Description | Amount |
|---|---|
| A-List Pro Athlete Partnership: CD will negotiate, secure and integrate athlete marketing partnership with A-list pro athlete Russell Wilson or pro athlete of similar stature (i.e. NFL, NHL, MLB, Nascar) and regard. Athlete will participate in content, social media posting and appearances including promotion of in-market activations in Colorado during Q2/Q3 2022. | $1,500,000 |
| Sports Influencers: CD will negotiate, secure and integrate up to ten but no less than six (6-10) athlete/influencer endorsements for Root Sports Influencer Marketing program. Athletes will participate in core campaign activations including online and in-market appearances | $1,100,000 |
| Sports Teams and Venue Partnership Activations: CD will negotiate, secure and integrate sports partnerships (i.e. NFL, NHL, MLB, Nascar) with sports teams and venues to activate against Root Insurance campaign creative. | $3,000,000 |
| Strategy and Implementation Support: CD will provide strategy and execution to integrate sport marketing programs across campaign elements including Best Driver in America Challenge, In-Market activations and integrations. | Included |
| Total | $5,600,000 |

**Payment Terms**

| | |
|---|---|
| Payment #1 First 50% due 4/1 | $2,800,000 |
| Payment #2 Second 50% due 4/15 | $2,800,000 |

IN WITNESS WHEREOF, Subcontractor and Agency, on behalf of Client, have caused duly authorized representatives of the respective parties to execute this Work Order as of the Work Order Effective Date.

| QUANTASY, LLC | COLLATERAL DAMAGE, LLC |
|---|---|
| *Will Campbell* (DocuSigned, ECCDE668A1104CA...) | *Paige Lynette* (DocuSigned, 784365BF37C24F8) |
| Signature | Signature |
| Will Campbell    CEO | Paige Lynette    President |
| Printed Name and Title | Printed Name and Title |
| 8/20/2022 | 8/20/2022 |
| Date | Date |