# EXHIBIT 41

**To:** BC Silver[bc.silver@joinroot.com]
**From:** Lauren Lanskie[lauren@collateraldamage.agency]
**Sent:** Wed 11/9/2022 7:02:36 PM (UTC)
**Subject:** Re: Root Q1 Planning

SOW Change Request Form 2022 shift to 2023.pdf
Root January Media Spend_CMA_10 08 22.pdf
Subcontractor Agreement CD | Root.pdf

Hi BC -
Here are the Collateral Damage contracts we have to date per your request. We look forward to continuing to work with Root for 2023!

Best,

On Wed, Nov 9, 2022 at 9:24 AM BC Silver <bc.silver@joinroot.com> wrote:

> Hello Lauren,
>
> Can you make sure you send me all the Collateral Damage contracts we have to date. I want to make sure Root has them all on file for subcontractor work in the future. We look forward to seeing great results at the beginning of 2023.
>
> Please make sure you send this morning.
>
> Regards,
> BC
> 415.919.9131

--



**Lauren Lanskie**  |  **Executive Assistant**  |  www.CollateralDamage.com

## SCOPE OF WORK AGREEMENT                    CHANGE REQUEST

**Project Name:**

H2 2022 Marketing Plan Shifting to January 2023

**Effective Date of Change:**

10/04/2022

**Client Requesting Change:**

| Name: | BC Silver |
|---|---|
| Title: | CMO |

**Requested Change:**

| Original SOW item(s) | Description of Change |
|---|---|
| H2 Marketing Spend Shift | We are shifting 2022 H2 Marketing plans to January 2023. All remaining budget will be leveraged next year. |

**Reason for Change:**

We are shift Marketing strategies from Brand building to Profit focus. We are slowing our growth expectations for the year based on that shift. We expect to drive growth beginning in Q1/Q2 of 2023.

**Budget Change:**

| Original Contracted Amount | $9.1M |
|---|---|
| Net Budget Change (+/-) | $0.00 |
| Revised Contracted Amount | $9.1M |

The parties agree that this Change Request is subject to the original Additional Terms and Services, unless otherwise outlined herein.

**Root Insurance**

By: _____

Name:        BC Silver

Title:          CMO

**Collateral Damage**

By: *Lauren Lanski*

Name: Lauren Lanski

Title: Principal

# Client Media Authorization (CMA)



**CMA#: 121**

**Date: Mon, Oct 10, 2022**

**Company:** Root Insurance

,

**Client Contact:** BC Silver |
bc.silver@joinroot.com

**Client Billing Contact:** invoices@joinroot.com

**Agency Media Contact:**

Lauren Lanski |

lauren@collateraldamage.agency

877-882-0578

**Agency Billing:**

CD Billing | invoices@collateraldamage.agency

Flight Dates: 1/1/23 - 1/31/23

Client Media Authorization must be signed prior to the agency placing any media insertion orders or signing any publisher contracts on your company's behalf.

## Estimated Budget by Partner

| Title | Imp. |
|---|---|
| ESPN: | 2,222,222 |
| Barstool Sports: | 4,370,629 |
| iHeart: | 2,507,149 |
| Adserving | Included |

| | |
|---|---|
| Services Sub-total | $0.00 |
| Materials Sub-total | $9,100,000.00 |
| **Total** | **$9,100,00.00** |

Advertiser Representative

10/10/22

BC Silver
CMO

Agency Representative

*Lauren Lanskie*

10/10/22

Lauren Lanskie
Principal/Owner

## Terms & Conditions

1. This CMA is governed by the Master Service Agreement. By signing this CMA, Advertiser/Agency is agreeing to all terms specified, unless otherwise noted.

2. This Client Media Authorization (CMA) represents a pre-optimized budget distribution. Optimizations and budgets shifts may occur after the signing of this CMA, but total amount of original CMA shall not be exceeded without explicit permission and documented change order to CMA.

3. In purchasing media, materials or services on Client's behalf, Collateral Damage shall act as Client's agent and all orders placed and contracts entered into by Collateral Damage for such purposes shall be billed to Client in accordance with the terms of this Agreement. Collateral Damage shall be authorized to proceed with such expenditures on behalf of Client upon receipt of Client's signed Client Media Authorization. Collateral Damage is not responsible for the failure of media providers to provide their services.

4. Media Billing. In the event Collateral Damage is paying for media on Client's behalf, all such media shall be billed monthly to Client at the initiation of media buy, upon receipt of CMA and shall be subsequently reconciled to actual cost within ninety (90) daysafter receipt of media/site invoice documentation. Client acknowledges that Collateral Damage is not responsible for financing Client'sadvertising or media purchases, that Collateral Damage shall make no commitments to purchase media until it has received payment therefore from Client, and that Collateral Damage is merely acting as Client's agent in placing such orders. In the event of late payment, Collateral Damage reserves the right in its sole discretion to place on hold media purchases on Client's behalf until all outstanding invoices have been paid by Client. In the event of Client's failure to pay, Client will be directly liable to media vendors for any outstanding amounts due.

5. Regardless of termination, at no time shall Collateral Damage be required to repay or return any monies that have been paid to Collateral Damage pursuant to this Agreement and/or the services that Collateral Damage has provided hereunder. All monies paid hereunder to Collateral Damage shall be non-refundable. All payments made by Client hereunder shall be nonrefundable and deemed fully earned upon receipt. At no time and for no reason, shall Client nor any third party have the right to claw back any monies received by Collateral Damage hereunder. All purchases made by Collateral Damage hereunder shall be non-refundable.

**6. First Month's Payment and pre-paid media due upon receipt of invoice.**

7. Asterisk notes media spend that is directly billed to client on platform or by partnering agency.

# Subcontractor Agreement

This Subcontractor Agreement (the "Agreement") is entered into as of _____10/04/22_____,
2022 (the "Effective Date") by and between Root Insurance Agency, LLC (hereinafter referred to as
"Contractor") and Collateral Damage, LLC (hereinafter "Subcontractor").

### 1. Engagement

Subcontractor engages Contractor to serve as a Subcontractor for the provision of strategy,
branding, media, and production services for Quantasy, LLC, pursuant to the Scope of Work
Agreement between Contractor and Quantasy, which is incorporated herein by referenced. The
aforementioned services shall be provided for a term ("Term") as hereinafter provided.

### 2. Scope of Services

Subcontractor will provide Contractor, for the benefit of Quantasy, with the services provided in
Schedule 1, attached hereto. Should Contractor request Subcontractor to perform additional
services beyond what is provided in Schedule 1, Contractor and Subcontractor will negotiate in
good faith with respect to the terms, conditions, and compensation for such additional services.
Any agreement for additional services will be in writing and considered an addendum to this
Agreement.

### 3. Term

The term of this Agreement shall commence on the date provided in Schedule 1 ("Commencement
Date") and shall continue until terminated by either party upon ninety (90) days' prior written
notice ("Notice Period"), provided that this Agreement may not be terminated effective prior to the
expiration of six (6) months from the Commencement Date. Notice shall be deemed given on the
day of certified mailing or. During the Notice Period, Subcontractor's rights, duties, and
responsibilities shall continue.

Regardless of termination, at no time shall Subcontractor be required to repay or return any monies
that have been paid to Subcontractor pursuant to this Agreement and/or the services that
Subcontractor has provided to Quantasy on behalf of Contractor. All monies paid hereunder to
Subcontractor shall be non-refundable.

### 4. Compensation and Billing Procedure

Subcontractor will be compensated and Contractor will be billed as provided in Schedule 1,
attached hereto. All payments made to Subcontractor hereunder shall be nonrefundable and
deemed fully earned upon receipt.

At no time and for no reason, shall Contractor nor any third party have the right to claw back any
monies received by Subcontractor hereunder.

### 5. Confidentiality and Safeguard of Property

Subcontractor and Contractor respectively agree to keep in confidence, and not to disclose or use
for its own respective benefit or for the benefit of any third party (except as may be required for the
performance of services under this Agreement or as may be required by law), any information,
documents, or materials that are reasonably considered confidential regarding each other's
products, business, customers, Subcontractors, suppliers, or methods of operation; provided,
however, that such obligation of confidentiality will not extend to anything in the public domain or
that was in the possession of either party prior to disclosure. Contractor and Subcontractor will take

reasonable precautions to safeguard property of the other entrusted to it, but in the absence of negligence or willful disregard, neither Contractor nor Subcontractor will be responsible for any loss or damage.

## 6. Indemnities

Contractor agrees to indemnify and hold Subcontractor harmless with respect to any claims or actions by third parties against Subcontractor for any and all claims that may be brought against Subcontractor by virtue of this Agreement, including, but not limited to any claims that may be brought by Quantasy against Subcontractor.

Contractor shall be responsible for fully indemnifying and holding harmless Subcontractor from any and all such claims, including covering Subcontractor's legal fees, costs, and/or any settlement payments or judgments that may require money to be paid by Subcontractor.

## 7. Limitation of Liability

EXCEPT FOR LIABILITY ARISING FROM A PARTY'S INDEMNIFICATION OBLIGATIONS, UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY CHARACTER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF GOODWILL, LOST PROFITS, LOST SALES OR BUSINESS, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, LOST DATA, OR FOR ANY AND ALL OTHER DAMAGES OR LOSSES, EVEN IF A REPRESENTATIVE OF A PARTY HAS BEEN ADVISED, KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT FOR LIABILITY ARISING FROM A PARTY'S INDEMNIFICATION OBLIGATIONS, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY DIRECT DAMAGES, COSTS, OR LIABILITIES

## 8. Amendments

Any amendments to this Agreement must be in writing and signed by Contractor and Subcontractor.

## 9. Notices

Any notice shall be deemed given on the day of certified mailing or, if notice is by e-mail, on the next day following the day notice is e-mailed:

To:
**Root Insurance, LLC**

_____
_____
_____

To:
**Collateral Damage, LLC**

_____
_____
_____

## 10. Governing Law

This Agreement shall be interpreted in accordance with the laws of the State of California without regard to its principles of conflicts of laws. Jurisdiction and venue shall be solely within the State of California.

## 11. No Presumption Against Drafter

Each of the parties has jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by each of the parties and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement.

## 12. Advice of Counsel

In entering into this Agreement, each party has relied upon the advice of counsel, or has been advised, and has had reasonable time and opportunity, to consult counsel of its own choosing. Each party has completely read, fully understands, and voluntarily accepts the terms of this Agreement.

## 13. Cumulative Rights and Remedies

The rights and remedies provided for in this Agreement shall be cumulative; resort to one right or remedy shall not preclude resort to another or to any other right or remedy provided for by law or in equity.

## 14. Counterparts

This Agreement can be executed in counterparts, and each counterpart, when executed, shall have the effectiveness of a signed original. Photocopies of such signed counterparts may be used in lieu of the originals for any purpose.

## 15. Enforceability Representation

Each party to this Agreement represents that this Agreement constitutes the legally valid and binding obligation of that party, enforceable against that party in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally (including, without limitation, fraudulent conveyance laws) and by general principles of equity, including without limitation, concepts of materiality, reasonableness, good faith and fair dealing and the possible unavailability of specific performance or injunctive relief, regardless of whether considered in a proceeding in equity or at law.

IN WITNESS WHEREOF, Contractor and Subcontractor have executed this Agreement.

**CONTRACTOR,**

Root Insurance, LLC:

By: _____

Name:_____ BC Silver _____

Title:_____ CMO _____


**SUBCONTRACTOR,**

Collateral Damage, LLC:

By: _Lauren Lanski_____

Name:_____ Lauren Lanski _____

Title:_____ Officer _____

## Schedule 1: Scope of Work and Fees

**Description**

A-List Pro Athlete Partnership: CD will negotiate, secure and integrate athlete marketing partnership with A-list pro athlete Russell Wilson or pro athlete of similar stature (i.e. NFL, NHL, MLB, Nascar) and regard. Athlete will participate in content, social media posting and appearances including promotion of in-market activations in Colorado during Q2/Q3 2022.

Sports Influencers: CD will negotiate, secure and integrate up to ten but no less than six (6-10) athlete/influencer endorsements for Root Sports Influencer Marketing program. Athletes will participate in core campaign activations including online and in-market appearances

Sports Teams and Venue Partnership Activations: CD will negotiate, secure and integrate sports partnerships (i.e. NFL, NHL, MLB, Nascar) with sports teams and venues to activate against Root Insurance campaign creative.

Strategy and Implementation Support: CD will provide strategy and execution to integrate sport marketing programs across campaign elements including Best Driver in America Challenge, In-

Market activations and integrations.
**Total**                                    **$9,100,000.00**

## SCOPE OF WORK AGREEMENT

## CHANGE REQUEST

**Project Name:**

H2 2022 Marketing Plan Shifting to January 2023

**Effective Date of Change:**

10/04/2022

**Client Requesting Change:**

| Name: | BC Silver |
|-------|-----------|
| Title: | CMO |

**Requested Change:**

| Original SOW item(s) | Description of Change |
|----------------------|------------------------|
| H2 Marketing Spend Shift | We are shifting 2022 H2 Marketing plans to January 2023.  All remaining budget will be leveraged next year. |

**Reason for Change:**

We are shift Marketing strategies from Brand building to Profit focus. We are slowing our growth expectations for the year based on that shift. We expect to drive growth beginning in Q1/Q2 of 2023.

**Budget Change:**

| Original Contracted Amount | $9.1M |
|-----------------------------|-------|
| Net Budget Change (+/-) | $0.00 |
| Revised Contracted Amount | $9.1M |

The parties agree that this Change Request is subject to the original Additional Terms and Services, unless otherwise outlined herein.

**Root Insurance**

By: 

Name:  BC Silver

Title:  CMO

**Collateral Damage**

By:  Lauren Lanski

Name: Lauren Lanski

Title: Principal

# Client Media Authorization (CMA)



**CMA#: 121**

**Date: Mon, Oct 10, 2022**

**Company:** Root Insurance

,

**Client Contact:** BC Silver |
bc.silver@joinroot.com

**Client Billing Contact:** invoices@joinroot.com

**Agency Media Contact:**

Lauren Lanski |

lauren@collateraldamage.agency

877-882-0578

**Agency Billing:**

CD Billing | invoices@collateraldamage.agency

Flight Dates: 1/1/23 - 1/31/23

Client Media Authorization must be signed prior to the agency placing any media insertion orders or signing any publisher contracts on your company's behalf.

## Estimated Budget by Partner

| Title | Imp. |
| --- | --- |
| ESPN: | 2,222,222 |
| Barstool Sports: | 4,370,629 |
| iHeart: | 2,507,149 |
| Adserving | Included |

| | |
| --- | --- |
| Services Sub-total | $0.00 |
| Materials Sub-total | $9,100,000.00 |
| **Total** | **$9,100,00.00** |

Advertiser Representative

10/10/22

BC Silver
CMO

Agency Representative

*Lauren Lanskie*

10/10/22

Lauren Lanskie
Principal/Owner

## Terms & Conditions

1. This CMA is governed by the Master Service Agreement. By signing this CMA, Advertiser/Agency is agreeing to all terms specified, unless otherwise noted.

2. This Client Media Authorization (CMA) represents a pre-optimized budget distribution. Optimizations and budgets shifts may occur after the signing of this CMA, but total amount of original CMA shall not be exceeded without explicit permission and documented change order to CMA.

3. In purchasing media, materials or services on Client's behalf, Collateral Damage shall act as Client's agent and all orders placed and contracts entered into by Collateral Damage for such purposes shall be billed to Client in accordance with the terms of this Agreement. Collateral Damage shall be authorized to proceed with such expenditures on behalf of Client upon receipt of Client's signed Client Media Authorization. Collateral Damage is not responsible for the failure of media providers to provide their services.

4. Media Billing. In the event Collateral Damage is paying for media on Client's behalf, all such media shall be billed monthly to Client at the initiation of media buy, upon receipt of CMA and shall be subsequently reconciled to actual cost within ninety (90) daysafter receipt of media/site invoice documentation. Client acknowledges that Collateral Damage is not responsible for financing Client'sadvertising or media purchases, that Collateral Damage shall make no commitments to purchase media until it has received payment therefore from Client, and that Collateral Damage is merely acting as Client's agent in placing such orders. In the event of late payment, Collateral Damage reserves the right in its sole discretion to place on hold media purchases on Client's behalf until all outstanding invoices have been paid by Client. In the event of Client's failure to pay, Client will be directly liable to media vendors for any outstanding amounts due.

5. Regardless of termination, at no time shall Collateral Damage be required to repay or return any monies that have been paid to Collateral Damage pursuant to this Agreement and/or the services that Collateral Damage has provided hereunder. All monies paid hereunder to Collateral Damage shall be non-refundable. All payments made by Client hereunder shall be nonrefundable and deemed fully earned upon receipt. At no time and for no reason, shall Client nor any third party have the right to claw back any
monies received by Collateral Damage hereunder. All purchases made by Collateral Damage hereunder shall be non-refundable.

**6. First Month's Payment and pre-paid media due upon receipt of invoice.**

7. Asterisk notes media spend that is directly billed to client on platform or by partnering agency.

# Subcontractor Agreement

This Subcontractor Agreement (the "Agreement") is entered into as of _____10/04/22_____,
2022 (the "Effective Date") by and between Root Insurance Agency, LLC (hereinafter referred to as
"Contractor") and Collateral Damage, LLC (hereinafter "Subcontractor").

1. **Engagement**

    Subcontractor engages Contractor to serve as a Subcontractor for the provision of strategy,
    branding, media, and production services for Quantasy, LLC, pursuant to the Scope of Work
    Agreement between Contractor and Quantasy, which is incorporated herein by referenced. The
    aforementioned services shall be provided for a term ("Term") as hereinafter provided.

2. **Scope of Services**

    Subcontractor will provide Contractor, for the benefit of Quantasy, with the services provided in
    Schedule 1, attached hereto. Should Contractor request Subcontractor to perform additional
    services beyond what is provided in Schedule 1, Contractor and Subcontractor will negotiate in
    good faith with respect to the terms, conditions, and compensation for such additional services.
    Any agreement for additional services will be in writing and considered an addendum to this
    Agreement.

3. **Term**

    The term of this Agreement shall commence on the date provided in Schedule 1 ("Commencement
    Date") and shall continue until terminated by either party upon ninety (90) days' prior written
    notice ("Notice Period"), provided that this Agreement may not be terminated effective prior to the
    expiration of six (6) months from the Commencement Date. Notice shall be deemed given on the
    day of certified mailing or. During the Notice Period, Subcontractor's rights, duties, and
    responsibilities shall continue.

    Regardless of termination, at no time shall Subcontractor be required to repay or return any monies
    that have been paid to Subcontractor pursuant to this Agreement and/or the services that
    Subcontractor has provided to Quantasy on behalf of Contractor. All monies paid hereunder to
    Subcontractor shall be non-refundable.

4. **Compensation and Billing Procedure**

    Subcontractor will be compensated and Contractor will be billed as provided in Schedule 1,
    attached hereto. All payments made to Subcontractor hereunder shall be nonrefundable and
    deemed fully earned upon receipt.

    At no time and for no reason, shall Contractor nor any third party have the right to claw back any
    monies received by Subcontractor hereunder.

5. **Confidentiality and Safeguard of Property**

    Subcontractor and Contractor respectively agree to keep in confidence, and not to disclose or use
    for its own respective benefit or for the benefit of any third party (except as may be required for the
    performance of services under this Agreement or as may be required by law), any information,
    documents, or materials that are reasonably considered confidential regarding each other's
    products, business, customers, Subcontractors, suppliers, or methods of operation; provided,
    however, that such obligation of confidentiality will not extend to anything in the public domain or
    that was in the possession of either party prior to disclosure. Contractor and Subcontractor will take

reasonable precautions to safeguard property of the other entrusted to it, but in the absence of negligence or willful disregard, neither Contractor nor Subcontractor will be responsible for any loss or damage.

### 6. Indemnities

Contractor agrees to indemnify and hold Subcontractor harmless with respect to any claims or actions by third parties against Subcontractor for any and all claims that may be brought against Subcontractor by virtue of this Agreement, including, but not limited to any claims that may be brought by Quantasy against Subcontractor.

Contractor shall be responsible for fully indemnifying and holding harmless Subcontractor from any and all such claims, including covering Subcontractor's legal fees, costs, and/or any settlement payments or judgments that may require money to be paid by Subcontractor.

### 7. Limitation of Liability

EXCEPT FOR LIABILITY ARISING FROM A PARTY'S INDEMNIFICATION OBLIGATIONS, UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY CHARACTER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF GOODWILL, LOST PROFITS, LOST SALES OR BUSINESS, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, LOST DATA, OR FOR ANY AND ALL OTHER DAMAGES OR LOSSES, EVEN IF A REPRESENTATIVE OF A PARTY HAS BEEN ADVISED, KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT FOR LIABILITY ARISING FROM A PARTY'S INDEMNIFICATION OBLIGATIONS, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY DIRECT DAMAGES, COSTS, OR LIABILITIES

### 8. Amendments

Any amendments to this Agreement must be in writing and signed by Contractor and Subcontractor.

### 9. Notices

Any notice shall be deemed given on the day of certified mailing or, if notice is by e-mail, on the next day following the day notice is e-mailed:

To:
**Root Insurance, LLC**

_____
_____
_____

To:
**Collateral Damage, LLC**

_____
_____
_____

### 10. Governing Law

This Agreement shall be interpreted in accordance with the laws of the State of California without regard to its principles of conflicts of laws. Jurisdiction and venue shall be solely within the State of California.

## 11. No Presumption Against Drafter

Each of the parties has jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by each of the parties and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement.

## 12. Advice of Counsel

In entering into this Agreement, each party has relied upon the advice of counsel, or has been advised, and has had reasonable time and opportunity, to consult counsel of its own choosing. Each party has completely read, fully understands, and voluntarily accepts the terms of this Agreement.

## 13. Cumulative Rights and Remedies

The rights and remedies provided for in this Agreement shall be cumulative; resort to one right or remedy shall not preclude resort to another or to any other right or remedy provided for by law or in equity.

## 14. Counterparts

This Agreement can be executed in counterparts, and each counterpart, when executed, shall have the effectiveness of a signed original. Photocopies of such signed counterparts may be used in lieu of the originals for any purpose.

## 15. Enforceability Representation

Each party to this Agreement represents that this Agreement constitutes the legally valid and binding obligation of that party, enforceable against that party in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally (including, without limitation, fraudulent conveyance laws) and by general principles of equity, including without limitation, concepts of materiality, reasonableness, good faith and fair dealing and the possible unavailability of specific performance or injunctive relief, regardless of whether considered in a proceeding in equity or at law.

IN WITNESS WHEREOF, Contractor and Subcontractor have executed this Agreement.

**CONTRACTOR,**

Root Insurance, LLC:

By:

Name: BC Silver

Title: CMO

**SUBCONTRACTOR,**

Collateral Damage, LLC:

By: Lauren Lanski

Name: Lauren Lanski

Title: Officer

## Schedule 1: Scope of Work and Fees

**Description**

A-List Pro Athlete Partnership: CD will negotiate, secure and integrate athlete marketing partnership with A-list pro athlete Russell Wilson or pro athlete of similar stature (i.e. NFL, NHL, MLB, Nascar) and regard. Athlete will participate in content, social media posting and appearances including promotion of in-market activations in Colorado during Q2/Q3 2022.

Sports Influencers: CD will negotiate, secure and integrate up to ten but no less than six (6-10) athlete/influencer endorsements for Root Sports Influencer Marketing program. Athletes will participate in core campaign activations including online and in-market appearances

Sports Teams and Venue Partnership Activations: CD will negotiate, secure and integrate sports partnerships (i.e. NFL, NHL, MLB, Nascar) with sports teams and venues to activate against Root Insurance campaign creative.

Strategy and Implementation Support: CD will provide strategy and execution to integrate sport marketing programs across campaign elements including Best Driver in America Challenge, In-

Market activations and integrations.
**Total**                                          **$9,100,000.00**