**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **Root, Inc., *et al.*,** | : | Case No. 2:23-cv-512 |
|  | : |  |
| *Plaintiffs*, | : | Judge Sarah D. Morrison |
|  | : |  |
| v. | : | Magistrate Judge Chelsey M. Vascura |
|  | : |  |
| **Silver, *et al.*,** | : |  |
|  | : |  |
| *Defendants*. | : |  |

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiffs Root, Inc., Caret Holdings, Inc., and Root Insurance Agency, LLC (collectively, "Plaintiffs" or "Root") hereby move this Court for a Temporary Restraining Order and Preliminary Injunction, enjoining Defendants Brinson Caleb "BC" Silver ("Silver"), William Campbell ("Campbell"), Collateral Damage, LLC ("Collateral Damage"), Eclipse Home Design, LLC ("Eclipse"), Quantasy & Associates, LLC ("Quantasy"), and Paige McDaniel ("McDaniel") (collectively "Defendants") from using, converting, encumbering, transferring or disposing of any of their assets, except as normal day-to-day transactions as determined by the Court until this matter is resolved on the merits. As part of the injunction, Root requests the Court restrict the sale of the following properties except by leave of Court: 13105 Biscayne Island Terrace, Miami, Florida 33181; 9125 North Bayshore Drive, Miami, Florida 33138; and 2543 Walnut Avenue, Venice, California 90291. Root respectfully requests an expedited hearing on this Motion. Support for this Motion is set forth in the Verified Amended Complaint, filed February 14, 2023, and the attached Memorandum in Support.

Respectfully submitted,

/s/ William D. Kloss, Jr.
William D. Kloss, Jr. (0040854), Trial Attorney
Elizabeth S. Alexander (0096401)
Grace E. Saalman (0101603)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360  Fax: (614) 719-4807
wdklossjr@vorys.com
esalexander@vorys.com
gesaalman@vorys.com

Matthew L. Kutcher (IL Bar No. 6275320)
(*application for pro hac vice forthcoming*)
COOLEY LLP
110 N. Wacker Drive Suite 4200
Chicago, IL 60606
Phone: (312)-881-6500
Fax: (312)-881 6598
mkutcher@cooley.com

Kristine A. Forderer (CA Bar No. 278754)
(*application for pro hac vice forthcoming*)
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Phone: (415) 693-2128
kforderer@cooley.com

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................................... 2

    A.    Root Hires Silver as CMO ...................................................................... 2

    B.    Silver Strikes a Deal with Campbell and Quantasy to Funnel Root's
        Marketing Budget to Quantasy and Silver's Own Company, Collateral
        Damage .................................................................................................... 3

    C.    Root Makes Three Payments under SOW #1 to Quantasy at Silver's
        Direction and Quantasy Forwards a Portion of Those Payments to
        Collateral Damage .................................................................................. 3

    D.    Silver and Campbell Sign a Second Scope of Work Agreement (SOW #2)
        and Continue to Funnel Funds from Root to Quantasy to Collateral
        Damage .................................................................................................... 5

    E.    Defendants Take Steps to Hide Their Scheme from Root ...................... 5

    F.    Silver Uses Collateral Damage Funds Stolen from Root to Purchase
        Luxury Properties through Eclipse ......................................................... 6

    G.    During Root's Investigation, Defendants Fabricate Documents and Make
        Blatant Misrepresentations to Cover Their Fraud .................................. 6

    H.    Root Uncovers Defendants' Scheme ...................................................... 8

    J.    Several Defendants are Currently Evading Service and Attempting to Sell
        Luxury Homes to Transfer and Conceal the Stolen Assets ................... 9

III.    STANDARD OF REVIEW ................................................................................ 10

IV.    LAW AND ARGUMENT ................................................................................. 11

    A.    Root's Claims Are Likely to Succeed on the Merits ........................... 11

        1.    RICO (Count I) Against All Defendants ................................... 11

Root will likely succeed on its RICO claims because Defendants acted as an association-in-fact enterprise to conduct a pattern of wire fraud racketeering activity, and such activity affected interstate commerce. Here, each Defendant acted, directly or indirectly, to send fake invoices, contracts, and other documents to funnel over $9.9 million from Root to Quantasy, from Quantasy

to Collateral Damage, and from Collateral Damage to Silver, McDaniel, and Eclipse under false pretenses of providing marketing services to Root.

**Key Case**: *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006).

2.      Fraudulent Concealment (Count II) Against Silver, Campbell, and Quantasy ................................................................................................. 15

Root will likely succeed on the merits of its fraudulent concealment claims. Silver, Campbell, and Quantasy had a duty to disclose but failed to disclose that Quantasy was giving Silver's own company, Collateral Damage, kickbacks from Root's payments to Quantasy for marketing services. Defendants concealed these material facts with the intention of inducing Root to hire Quantasy and continue business with Quantasy. Root justifiably entered into business dealings with Quantasy because it lacked knowledge of Silver, Campbell, and Quantasy's secret, back-door deals with each other and fraudulent intentions towards Root. As a result of their concealment, Root was injured in an amount greater than $9.9 million.

**Key Case**: *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 539 (6th Cir. 2000).

3.      Fraudulent Misrepresentation (Count III) Against Silver, Campbell, and Quantasy ........................................................................... 16

Root will likely succeed on the merits of its fraudulent misrepresentation claims. Silver, Campbell, and Quantasy made material misrepresentations to Root, including that Quantasy would provide marketing services for Root and there were no improper personal interests in the matter. Silver also forged and fabricated emails, invoices, and contracts to the same end. Defendants knew these misrepresentations were false and made them with the intention of inducing Root to enter and continue its business relationship with Quantasy. Root justifiably relied on the misrepresentations and was injured in an amount greater than $9.9 million.

**Key Case**: *Burr v. Board of County Comm'rs*. (1986), 23 Ohio St.3d 69, 491 N.E.2d 1101.

4.      Conversion (Count IV) Against All Defendants...................................... 17

Root will likely succeed on the merits of its conversion claims because Defendants wrongfully exercised dominion over Root's funds by transferring $9.9 million from Root to Collateral Damage, McDaniel, Eclipse, and Silver without Root's knowledge or authority.

5.      Civil Action for Criminal Theft and Telecommunications Fraud (Counts (V and VI) ................................................................................... 18

        a.      Theft ............................................................................................. 18

Root will likely succeed on the merits of its theft claims because Defendants exerted control over Root's funds without Root's consent by transferring Root's funds to themselves. Defendants forged documents and blatantly lied to Root to conceal their scheme.

**Key Authority**: Ohio Revised Code § 2913.02(A).

b.     Telecommunications Fraud ........................................................... 19

Root will likely succeed on the merits of its telecommunications fraud claims because Defendants Silver, Campbell, Quantasy, and Collateral Damage knowingly disseminated messages, contracts, invoices, and other communications via email, WhatsApp, and text messaging to execute or further their scheme to defraud Root.

**Key Authority**: Ohio Revised Code § 2913.05(A).

B.     Root Has Been and Will Continue to Be Irreparably Harmed Absent an Injunction ........................................................................................................... 20

Root has been and will continue to be irreparably harmed absent an injunction on Defendants' assets because Defendants are likely to disperse and conceal their assets stolen from Root through fraudulent means. The Sixth Circuit has found that concealment and dissipation of assets likely obtained through fraud constitutes irreparable harm, particularly in cases such as this where the defendants are fugitives or where the defendants have already demonstrated an ability and willingness to lie, forge documents, or transfer funds to conceal them.

**Key Case**: *NCR Corp. v. Feltz*, 983 F.2d 1068 (6th Cir. 1993).

C.     The Issuance of an Injunction Will Cause No Harm to Others ........................... 22

This injunction will not harm Defendants because it permits day-to-day transactions so Quantasy can continue running its business and the other Defendants' lives are not substantially disrupted. The injunction also will not harm third parties.

D.     The Issuance of an Injunction Would Serve the Public Interest .......................... 23

This injunction will serve the public interest by discouraging future multi-state fraudulent schemes and protecting Plaintiffs' remedies.

**Key Case**: *NCR Corp. v. Feltz*, 983 F.2d 1068 (6th Cir. 1993).

IV.     CONCLUSION ............................................................................................................ 24

<u>**MEMORANDUM IN SUPPORT**</u>

## I.    <u>INTRODUCTION</u>

Root recently uncovered a brazen and sophisticated scheme—led by Root's former Chief Marketing Officer ("CMO"), BC Silver—to defraud Root of more than $9.4 million.  Silver misused his position as CMO to steal breathtaking sums from Root through a three-step plan:

- **Step 1:** Silver caused Root to pay William Campbell's company, Quantasy, for marketing services;

- **Step 2:** While Quantasy and Campbell retained some of Root's funds, Quantasy transferred the vast majority to Collateral Damage, a company owned and controlled by Silver and/or Silver's sister, Paige McDaniel; and

- **Step 3:** Collateral Damage then transferred some of Root's funds to other Defendants for their personal gain, including Eclipse, a company owned and controlled by Silver, which used the funds to purchase luxury real estate.

Defendants' scheme caused Root to pay Quantasy more than $13 million, Quantasy to transfer Collateral Damage more than $9.4 million, and Collateral Damage, upon information and belief, to distribute the funds to Defendants, including to Eclipse, which purchased grandiose coastal homes in Florida and California.

Root now moves for a temporary restraining order and preliminary injunction to prohibit Defendants from disposing of and concealing their ill-gotten assets prior to a decision on the merits.  Each factor weighs in favor of an injunction.  First, Root is substantially likely to succeed on the merits of its claims.  Even at this early stage of this case, Root has extensive evidence to support every claim for relief sought in its Verified Amended Complaint. Second, Root will be irreparably harmed through Defendants' concealment and dissipation of assets obtained through fraud.  Immediate injunctive relief is particularly appropriate here as a result of Defendants' established ability to funnel and conceal significant sums of money and assets through various entities.  Moreover, Eclipse recently listed one of its coastal properties for sale.  Third, neither

Defendants nor third parties will be harmed by the issuance of an injunction. And fourth, the public interest is served by stopping Defendants' multi-state fraudulent scheme and providing Root the opportunity for meaningful relief.

Temporary restraining orders and preliminary injunctions serve an important purpose—"to allow a victory by [the plaintiffs] to be meaningful." *See McGirr v. Rehme*, 891 F.3d 603, 614-15 (6th Cir. 2018). Until this case is fully and finally resolved on the merits, Root respectfully requests that the Court issue a temporary restraining order and injunction enjoining Defendants from using, converting, transferring or disposing of any of their assets, except as normal day-to-day transactions, including but not limited to the proceeds from any sale of their properties.[1] Without this relief, Defendants will transfer assets to preclude recovery and Root's victory in this litigation will be meaningless.

## II.  FACTUAL BACKGROUND

### A.  Root Hires Silver as CMO.

Root, Inc. is a publicly-traded insurance holding company based in Columbus, Ohio. (Am. Compl. ¶ 11.) Caret Holdings, Inc. and Root Insurance Agency, LLC are subsidiaries of Root, Inc. and are also based in Columbus, Ohio. (*Id.* ¶¶ 12, 13.) In the fall of 2021, Root hired Silver as its CMO. (*Id.* ¶ 21.) Silver served as Root's CMO from November 2021 to November 2022, at which point he was terminated as part of a company-wide reduction in force. (*Id.* ¶ 25.)

---

[1] As set forth in the Declaration of Elizabeth S. Alexander, attached hereto as Exhibit 1, Root has diligently attempted to give notice of the Amended Verified Complaint and this Motion to all Defendants. Given the multiple methods of attempted service described therein, there is good reason to believe that Silver has actual notice and is evading service.

**B.**     **Silver Strikes a Deal with Campbell and Quantasy to Funnel Root's Marketing Budget to Quantasy and Silver's Own Company, Collateral Damage.**

Within two weeks of starting his employment at Root, Silver contacted his acquaintance, Campbell, to put Silver's plan into motion. (*Id.* ¶ 26.) Silver and Campbell discussed Root retaining Campbell's company, Quantasy, as a marketing vendor for Root. (*Id.*) Under their scheme, after Root made payments to Quantasy, Quantasy would transfer the funds to Silver's own company, Collateral Damage. (*Id.* ¶ 32.) Essentially, Quantasy would hire Collateral Damage as a subcontractor for Root's marketing services, but Collateral Damage would not actually perform marketing services. Instead, Collateral Damage would simply pocket Root's funds.

Throughout Silver's first two months as CMO, he and Campbell exchanged text messages about forming a business relationship between Root and Quantasy. (*Id.* ¶¶ 27-29, Exs. 1, 2.) On February 3, 2022, at Silver's direction, Root signed a Scope of Work agreement with Quantasy ("SOW #1"). Under SOW #1, Quantasy agreed to provide marketing services for Root related to "Client Partnerships," "Brand Strategy," and "Creative Services/Development Support" in exchange for three payments totaling $1,184,445. (*Id.* ¶ 30, Ex. 3.) Silver sent Campbell a private message using the WhatsApp messaging application containing an account number and routing numbers for Collateral Damage's Bank of America bank account. (*Id.* ¶ 32, Ex. 5.) Silver and Campbell also negotiated via WhatsApp how to divide Root's payments between Quantasy and Collateral Damage. (*Id.* ¶¶ 37, 38, Fig. 1.) They ultimately decided that Collateral Damage would receive 40% of the first payment, 35% of the second payment, and 25% of the third payment. (*Id.* ¶ 38.)

**C.**     **Root Makes Three Payments under SOW #1 to Quantasy at Silver's Direction and Quantasy Forwards a Portion of Those Payments to Collateral Damage.**

Within days of Root's payment installments to Quantasy under SOW #1, Quantasy transferred a portion of those payments to Collateral Damage.

- **Installment One**: On February 9, 2022, at Silver's direction, Root paid Quantasy $473,778 for the first installment under SOW #1.  (*Id.* ¶ 33, Ex. 6.)  Five days later, Quantasy wired $153,778 to the Collateral Damage.  (*Id.* ¶ 34, Ex. 7.)

- **Installment Two**: On March 7, 2022, at Silver's direction, Root wired Quantasy $414,555.75 for the second installment of SOW #1.  (*Id.* ¶ 47.)  Two days later, Quantasy wired Collateral Damage $134,555.75.  (*Id.* ¶ 49.)

- **Installment Three:** On March 24, 2022, at Silver's direction, Root wired Quantasy $296,111.25 for the third SOW #1 installment.  (*Id.* ¶ 52.)  Four days later, Quantasy wired Collateral Damage $96,111.25.  (*Id.* ¶ 55.)

In total, Root paid Quantasy $1,184,444 under SOW #1 and Quantasy secretly transferred $384,444 of that money to Collateral Damage.  (*Id.* ¶ 56.)  Although Collateral Damage's invoices to Quantasy stated that Collateral Damage would provide "2021 Promotion Plan" and "Campaign Design Support" for Root, Root received little to no marketing services from Quantasy and no marketing services whatsoever from Collateral Damage.  (*Id.*)

In an effort to conceal Silver's involvement in Collateral Damage, Silver and Campbell hijacked the identity of a former Collateral Damage employee, Lauren Lanskie ("Lanskie").  (*Id.* ¶¶ 44, 45.)  Lanskie worked as an administrative assistant for Collateral Damage between November 2019 and February 2020 and had no involvement with Collateral Damage's dealings after her employment ended.  (*Id.*)  However, upon information and belief, Silver used Lanskie's former Collateral Damage email address to make it appear as if she was still an employee.  (*Id.*; Lanskie Decl. ¶¶ 15-18, attached hereto as Exhibit 2.)  Through Lanskie's email address, Silver sent invoices from Collateral Damage to Quantasy for the installments of SOW #1.  (Am. Compl. ¶¶ 43, 47-48, 53, 54, 72, 77, Exs. 7, 14, 18, 30, 32.)

Other than Silver, Root management had no knowledge of Collateral Damage's existence, that it was Silver's business, or any purported work it was "performing" with Quantasy for Root.  (*Id.* ¶ 35.)  More importantly, Root was unaware that Quantasy was giving portions of Root's payments to Collateral Damage.  (*Id.* ¶ 85.)  Instead, Silver used his position at Root to conceal

the scheme from Root management and make Quantasy's work appear legitimate. Following Quantasy's presentation to Root management on marketing strategies, Silver sent Campbell a text message stating, "I had to explain some things to leaders, but they finally kinda started to see the light[.] That said, it doesn't really matter, I have autonomy to do what I need to do." (*Id.* ¶ 41.)

**D.      Silver and Campbell Sign a Second Scope of Work Agreement (SOW #2) and Continue to Funnel Funds from Root to Quantasy to Collateral Damage.**

At some point after April 1, 2022, Silver caused Root to enter into a second Scope of Work agreement ("SOW #2") with Quantasy. (*Id.* ¶ 57, Ex. 19.) In total, Quantasy received $14.7 million from Root pursuant to SOW #2. Of that amount, Quantasy transferred $9.1 million to Collateral Damage. (*Id.* ¶ 85.)

Again, throughout this period, Root management (other than Silver) was unaware of Collateral Damage, or that Collateral Damage was Silver's company, and had no knowledge that Quantasy was paying Collateral Damage from the money Root paid to Quantasy. Root management (other than Silver) received no documents or other materials from Collateral Damage to substantiate the $9.1 million fee it received and Root received no value for the $9.1 million that was paid by Quantasy to Collateral Damage. (*Id.*)

**E.      Defendants Take Steps to Hide Their Scheme from Root.**

Throughout SOW #1 and SOW #2, Defendants took measures to conceal their misdeeds. For example, Silver recruited his sister, Paige McDaniel, to become sole owner or member of Collateral Damage to hide his relationship with Collateral Damage. (*Id.* ¶¶ 63-65.)

Silver and Campbell also worked to formalize Collateral Damage's position as Root's subcontractor in April 2022, six months *after* the purported subcontracting agreement started. On or about April 6, 2022, Campbell sent an email to Silver's private email account, "hello@bc-silver.com," suggesting they create two agreements to solidify Collateral Damage's involvement

in the marketing services: (1) a subcontracting agreement between Quantasy and Collateral Damage; and (2) an agreement between Root and Quantasy permitting Quantasy to hire subcontractors for work performed on behalf of Root. (*Id.* ¶¶ 61, 63, Ex. 23.)

On April 14, 2022, Silver instructed Campbell via private WhatsApp message that Quantasy should "make sure invoices are less than $10M so they don't need board approval." (*Id.* ¶ 67, Ex. 28.) Silver also sent Campbell a text message on March 16, 2022, instructing Campbell to only direct invoices to Silver—rather than other Root employees—presumably to prevent anyone at Root from catching onto the scheme. (*Id.* ¶ 50, Ex. 15.)

**F.    Silver Uses Collateral Damage Funds Stolen from Root to Purchase Luxury Properties through Eclipse.**

Upon information and belief, Silver used the funds wired to Collateral Damage to make various purchases. Between April 2022 and August 2022, Silver purchased at least three high-end residential properties in Miami, Florida, and Venice, California, totaling in excess of $10 million. In order to conceal his ownership of the properties, Silver purchased the properties using Eclipse, which, upon information and belief, is a limited liability company owned and controlled by Silver. (*Id.* ¶ 86.) The timing of Silver's communications to Campbell demanding Quantasy pay Collateral Damage lines up perfectly with the purchase date of one of the properties in Miami. (*Id.* ¶ 87.)

**G.    During Root's Investigation, Defendants Fabricate Documents and Make Blatant Misrepresentations to Cover Their Fraud.**

In June and July 2022, Root's Finance Department began investigating the high spending in Root's marketing department. (*Id.* ¶ 92.) With the exception of the February 24, 2022 presentation to Root management—which provided no actual marketing or advertising for Root and for which Quantasy charged Root a staggering $1.2 million dollars—Quantasy had provided little in the way of services to Root. (*Id.* ¶ 93.)

Aware of this heightened scrutiny, Silver and Campbell issued a series of change orders stating that the money that Root had already paid Quantasy pursuant to SOW #2 constituted Root's "prepaid funds" that were available for future spend. (*Id.*, Ex. 35.) Quantasy and Collateral Damage also entered into an after-the-fact subcontractor agreement in August 2022, with an effective date of February 2, 2022. (*Id.* ¶ 96, Ex. 36.) "Paige Lynette" appears as signatory for Collateral Damage as "President," and Campbell signed on behalf of Quantasy. (*Id.*)

On August 22, 2022, Root's internal audit team questioned Campbell directly about Quantasy's work for Root to determine whether there was justification for the millions of dollars Root paid to Quantasy. Loyal to Silver and their scheme, Campbell never disclosed that the majority of Root's payments had been funneled to Collateral Damage. (*Id.* ¶ 97.)

On August 22 and August 23, 2022, Silver sent Campbell WhatsApp messages containing screenshots of Root's confidential communications and internal audit findings, which did not uncover Silver and Campbell's carefully concealed fraud. Silver wrote, "we literally are good. *I just need for you to trust me and hold the line.*" (*Id.* ¶ 99, Exs. 38, 39.)

On September 22, 2022, another Quantasy employee lied to Root's internal audit team representing that $10.7 million of the $14.7 million original spend was "currently unallocated/uncommitted at this time." Specifically, David Rodriguez from Quantasy responded to an email from a member of the Root team working on the internal audit that "[y]es, the $10.7M can be used for paid media in 2023." This was false as Quantasy had already paid $9.1 million of the $10.7 million to Collateral Damage. (*Id.* ¶ 98, Ex. 37.)

On September 29, 2022, Quantasy purported to "assign" the August 20, 2022 subcontractor agreement between Quantasy and Collateral Damage to Root. The only Root signatory on the

assignment was Silver. No other member of Root management had knowledge of the assignment. (*Id.* ¶ 100, Ex. 40.)

On November 9, 2022, Silver's last day at Root, Silver purported to email Lanskie at Collateral Damage, asking her to provide Silver with all the alleged agreements between Collateral Damage and Root. (*Id.* ¶ 101, Ex. 41.) Upon information and belief, Silver used Lanskie's former Collateral Damage email address to make it appear as if she was still an employee. (*Id.* ¶ 40; Lanskie Decl. ¶¶ 15-18.) Specifically, from Lanskie's old Collateral Damage email address, Silver sent three fabricated agreements to his Root email purportedly between Collateral Damage and Root: (i) an SOW between Root and Collateral Damage; (ii) a subcontractor agreement between Root and Collateral Damage; and (iii) a Client Media Authorization between Root and Collateral Damage. Silver is the only Root signatory on any of the agreements. Upon information and belief, Silver forged Lanskie's signature at the bottom of each fabricated agreement as signatory for Collateral Damage. (Am. Compl. ¶ 102, Lanskie Decl. ¶ 16.) The agreements were not in Root's possession before this November 9, 2022 email. (Am. Compl. ¶ 101.)

**H. Root Uncovers Defendants' Scheme.**

On November 16, 2022, following Silver's departure from the company, Root executives met with David Rodriguez at Quantasy to engage in further discussions about clawing back the $10.7 million that Quantasy was purportedly holding for Root to spend on marketing initiatives in 2023. Campbell refused to attend the meeting. During the meeting Rodriguez admitted that what he previously told Root (that $10.7 million of funds paid to Quantasy by Root was available to Root) was **false**. Instead, Rodriguez disclosed to Root management, for the first time that: (1) Collateral Damage existed; (2) payments had been made to Collateral Damage using Root's funds; and (3) Quantasy only had approximately $1.6 million that could potentially be returned from the

$10.7 million outstanding because $9.1 million had been transferred by Quantasy to Collateral Damage. (*Id.* ¶ 103.)

Root's investigation of Silver's misdeeds is ongoing. Upon information and belief, Root believes that other similar fraudulent schemes may exist between (at least) Silver and other vendors that Silver hired during his tenure at Root. Root has recently been made aware of at least one other vendor, called Ben-Her Marketing, that transferred $502,999.86 paid by Root at Silver's direction to Collateral Damage. Root is continuing to investigate these payments. (*Id.* ¶ 92.)

### I. Several Defendants Are Currently Evading Service and Attempting to Sell Luxury Homes to Transfer and Conceal the Stolen Assets.

There is little, if any, question that Silver and McDaniel are attempting to elude the Court and this litigation. Indeed, McDaniel is now a fugitive. On Friday, February 3, 2023, a woman answered the door and stated that Paige McDaniel was not home but confirmed that McDaniel lived at that residence. (A true and accurate copy of the process server's affidavit is attached hereto as Exhibit 3.) In front of the process server, the woman called "Auntie Paige" on the phone. (*Id.*) McDaniel said she would be back on Monday. (*Id.*) On Monday, February 6, 2023, the process server returned to the house. (*Id.*) McDaniel answered the door but pretended to be someone else and lied that McDaniel had left the country to check on her grandmother. (*Id.*) At the time, the process server did not recognize McDaniel because she was not able to find a picture of McDaniel. (*Id.*) Two days later, on February 8, 2023, after finding a picture of McDaniel and realizing she spoke to McDaniel, the process server returned to the residence. (*Id.*) A man in the yard confirmed that he and McDaniel lived there but again lied that McDaniel had left the country. (*Id.*) When the process server said that McDaniel was not allowed to leave the country while on probation, he represented that she actually had just left the state. (*Id.*) Because he confirmed that he and McDaniel lived together in that residence, the process server served him. (*Id.*) McDaniel is a

convicted felon **on probation** for mortgage fraud who obstructed service of process twice and is not allowed to leave the federal district in which she is sentenced under the conditions of her probation. (*Id.*)

Meanwhile, a process server in California has attempted multiple times to serve Silver at his various residences. (Alexander Decl.) Despite attempting to serve process four separate times on different days and times during the day, and staking out Silver's residence twice, Silver has evaded process. The process server reports no one answers the door even though there were lights on inside the house house, cars in the driveway, and a package outside the front door addressed to Silver.

Further, Silver is in the process of selling at least one of his luxury homes, likely in an effort to conceal the assets obtained from the scheme to defraud Root. In January 2022, Silver and Eclipse listed the waterfront property located at 13105 Biscayne Island Terrace, North Miami, Florida 33181. Silver is likely to put his other properties up for sale soon to liquidate and transfer any assets traceable to the scheme.

III.  **STANDARD OF REVIEW**

The granting of injunctive relief is within the sound discretion of the court. *Virginia Railway Co. v. System Federation, R.E.D.*, 300 U.S. 515, 551 (1937). The standard for obtaining a temporary restraining order and a preliminary injunction are the same. *Planned Parenthood of Greater Ohio*, 188 F.Supp.3d 684, 688-89 (S.D. Ohio 2016) (citing *Workman v. Bredesen*, 486 F.3d 896 (6th Cir. 2007)). In determining whether to grant or deny a temporary restraining order, the Court considers: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would

be served by issuance of the injunction." *Id.* at 689, *quoting City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014). The propriety of injunctive relief is determined by balancing these factors, not by requiring demonstration of each. *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 400 (6th Cir. 1994) ("The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met."). Moreover, there is no "rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief." *Tate v. Frey*, 735 F.2d 986, 990 (6th Cir. 1984).

## IV.   LAW AND ARGUMENT

Root is entitled to a temporary restraining order and preliminary injunction enjoining Defendants from dispersing, transferring, or using assets except as normal day-to-day transactions. Each factor weighs in favor of granting injunctive relief.

### A.   Root's Claims Are Likely to Succeed on the Merits.

Root is likely to succeed on the merits of its RICO, conspiracy, fraudulent concealment, fraudulent misrepresentation, conversion, and civil action for criminal theft and telecommunications fraud claims.[2]

### 1.   RICO (Count I) Against All Defendants

Defendants engaged in a pattern of racketeering in violation of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

---

[2] In addition, Root asserts claims for breach of contract against Silver and Quantasy and breach of fiduciary duty against Silver. Root is also likely to succeed on the merits of these claims. For the sake of brevity, however, Root does not set forth the merits of each of these claims herein. In the event briefing on Root's breach of contract and breach of fiduciary duty claims are necessary to award Root injunctive relief, Root will supplement this Motion.

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Here, all four required elements clearly exist: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (internal quotation omitted)).

First, the following conduct summarizes Defendants' scheme: Silver, in his new position as Root CMO, contracted with Campbell and Quantasy to provide marketing services for Root in exchange for $13 million. (Am. Compl. ¶ 2.) Unbeknownst to Root management, Silver and Campbell, with McDaniel's help, secretly transferred $9.4 million of those payments to Collateral Damage under the guise of subcontractor work. (*Id.*) Root never received marketing services from Collateral Damage. (*Id.* at ¶ 85.) Instead, Defendants used the money for personal expenditures including the purchase of luxury coastal properties in California and Florida. (*See id.* ¶¶ 86-91.) Silver also used a second marketing vendor, Ben-Her, to funnel $502,999.86 of Root's money to Collateral Damages under the guise of subcontractor work. (*Id.* ¶ 105.)

Second, Defendants constituted an association-in-fact enterprise because they collaborated over the course of a year for the united purpose of wiring payments from Root to themselves under false pretenses of providing marketing services.[3] *See Boyle v. United States*, 556 U.S. 938, 946-47 (2009) (finding an association-in-fact should be interpreted broadly and is shown where there is: (1) "a purpose"; (2) "relationships among those associated with the enterprise"; and (3) "longevity sufficient to permit those associates to pursue the enterprise's purpose.").

Third, Defendants' conduct of wiring money from Root to Quantasy and Ben-Her and then from Quantasy and Ben-Her to Collateral Damage multiple times throughout 2022 constitutes a

---

[3] In addition, Collateral Damage and Eclipse constitute an "enterprise" under 18 U.S.C. § 1961(4).

pattern of racketeering activity because it consisted of two or more acts within one year. *Moon*, 465 F.3d at 723 (citing 18 U.S.C. § 1961(5) (noting a "pattern of racketeering activity" means "at least two predicate acts of racketeering activity occurring within a ten-year period.").

Fourth, each Defendant individually committed wire fraud, a racketeering activity, in violation of 18 U.S.C. § 1343. Wire fraud involves: (1) a scheme based on an intent to defraud; and (2) the use of mail or wires to further that scheme. *United States v. Coffman*, 574 Fed. Appx. 541, 549 (6th Cir. 2014). Innocuous or "innocent" mailings and wirings are sufficient RICO predicates as long as they further a fraudulent scheme. *Schmuck v. United States*, 489 U.S. 705 (1989) (holding "innocent" mailings sufficient for purposes of mail fraud statute); *Dana Corp. v. Blue Cross & Blue Shield Mut. of No. Ohio*, 900 F.2d 882, 886 (6th Cir. 1990) (finding defendant's mailed invoices and bills were sufficient evidence of mail fraud even though the mailings "were required by the contract and would have been sent whether or not an alleged scheme existed"). The following are examples of each Defendant committing wire fraud in furtherance of the scheme to defraud Root:

- On or about November 22, 2021, Silver and Campbell concocted a plan via text messaging for Silver to retain Quantasy for Root's marketing services in exchange for Quantasy passing along part of Root's payments to Silver's company, Collateral Damage.

- Between December 3, 2021 and February 7, 2022, Silver and Campbell, through WhatsApp, text messaging and personal email, drafted the SOW between Root and Quantasy.

- On February 7, 2022, Silver sent Campbell a private message, using the WhatsApp messaging application, containing Collateral Damage's bank account number and routing numbers for Campbell and Quantasy to send the fraudulent funds.

- On February 9, 2022, at Silver's direction, Root wired $473,778 to Quantasy and texted Campbell to inform him of the payment. This was the first payment in Defendants' scheme to defraud Root of money without providing the promised marketing services.

13

- On February 11, 2022, Silver sent Campbell an invoice for Collateral Damage via WhatsApp. This was the first invoice from Collateral Damages that Quantasy paid with Root's payments, without Root's knowledge or permission.

- On February 13, 2022, via WhatsApp, Silver and Campbell discussed how the payments would be divided between Collateral Damage and Quantasy in the scheme to defraud Root.

- The next day, on February 14, 2022, Quantasy wired $153,778 to the Collateral Damage pursuant to the secret payment schedule. This was the first payment Quantasy and Campbell made to Collateral Damage and Silver as part of the scheme to defraud Root.

- On March 16, 2022, Silver texted Campbell to only send Quantasy's invoices to Root directly to him and not to anyone else at Root. Upon information and belief, this was to ensure no one else at Root would discover the scheme.

- On March 25, 2022, upon information and belief, Silver used Lanskie's former Collateral Damage email address to email Campbell an invoice on behalf of Collateral Damage to Quantasy in an amount of $96,111.25 under the guise of subcontracting services performed for Root, despite no services rendered.

- Upon information and belief, McDaniel communicated with Silver via text messaging, email, WhatsApp, and/or other channels to file a certificate of organizing with the Georgia Secretary of State on April 11, 2022. This was an attempt to hide Collateral Damage's affiliation with Silver from Root by attaching McDaniel's name to the company instead of Silver's.

- Upon information and belief, Eclipse, through Silver, communicated via text messaging, email, WhatsApp, and/or other channels with Silver via Lanskie's former email address, McDaniel, and Collateral Damage to obtain the funds stolen from Root and purchase luxury properties with the funds.

The above list is a few of many instances Defendants committed wire fraud by communicating via email, text messaging, phone, WhatsApp, and other forms of airwave or cable communication to further their scheme to defraud Root of millions of dollars under the false pretenses of contracting and subcontracting marketing services.

Root will succeed on the merits of its RICO claim because, in addition to the above elements, Defendants intended to cause Root to lose money. Furthermore, their scheme affected interstate commerce because they wired money between Root in Ohio to Defendants located in

California, Georgia, and Florida.[4]  As a result of Defendants' racketeering activities, Root suffered injuries in an amount greater than $9.9 million.

### 2. Fraudulent Concealment (Count II) Against Silver, Campbell, and Quantasy

In Ohio, a plaintiff must prove six elements to prevail on a fraudulent concealment claim: (1) a concealment of fact where there is a duty to disclose; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the concealment; and (6) a resulting injury proximate caused by the reliance.  *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 539 (6th Cir. 2000).  All six elements are established here.

First, Silver had a duty to Root, as its CMO, to disclose that he had made a private deal with Quantasy and Campbell to funnel a substantial portion of Root's marketing budget through Quantasy to his own companies, Collateral Damage and Eclipse, for his own personal gain.  (Am. Compl. ¶ 119.)  Silver also had a duty to disclose that Ben-Her, another marketing vendor, was giving a portion of Root's payments to Collateral Damage.  (*Id.*)  Campbell and Quantasy, as parties to a business contract with Root, had a duty to disclose that they were paying Collateral Damage over $9.4 million of Root's $13 million payments under the guise of subcontracting work, and that Silver had a personal conflict of interest in Quantasy's deal with Collateral Damage.  (*Id.* ¶ 120.)  Second, these concealed facts were material to Root's business transaction with Quantasy.  Third, Silver knew Root would falsely believe he had no personal conflicts related to his duties as CMO.  (*Id.* ¶ 121.)  Fourth, Silver, Campbell and Quantasy knew that Root was unaware of these

---

[4]  The same facts establish that Root will succeed on its conspiracy claim against Silver, Campbell, Quantasy, Collateral Damage, and McDaniel.

material facts and concealed them with the intent of misleading Root into entering the contract with Quantasy and paying more than $13 million for marketing services. (*Id.*) Fifth, Root justifiably relied on Silver, Campbell and Quantasy because it did not know of the Defendants' scheme. (*Id.* ¶ 122.) And sixth, as a result of the concealment, Root suffered over $9.9 million in damages. (*Id.* ¶ 123.)

### 3. Fraudulent Misrepresentation (Count III) Against Silver, Campbell, and Quantasy

A plaintiff seeking to prove fraudulent misrepresentation or inducement in Ohio must show: (1) a representation made; (2) material to the transaction; (3) which is false, with knowledge or with utter disregard and recklessness as its falsity; (4) with intent to mislead; (5) justifiably relied upon; and (6) a resulting injury. *Countrymark Coop. v. Smith*, 124 Ohio App. 3d 159, 171-72 (3rd Dist. 1997) (citing *Burr v. Board of County Comm'rs*. (1986), 23 Ohio St.3d 69, 491 N.E.2d 1101)). Again, each element is satisfied.

First, Silver, Campbell, and Quantasy made numerous misrepresentations to Root. For example:

- On February 24, 2022, Silver, Campbell and Quantasy advocated for Quantasy to perform marketing services for Root during a presentation to Root management. Silver, Campbell, and Quantasy represented to Root that it would provide professional marketing services with the intent to induce Root into continuing payments to Root for services never rendered.

- On September 22, 2022, Silver, Campbell, and Quantasy claimed that $10.7 million of the $14.7 million already paid Quantasy constituted "prepaid funds" that were available for future spend in 2023. In reality, at least $9.1 million of these funds were already transferred to Collateral Damage.

- On November 9, 2022, despite Lanskie ending her employment with Collateral Damage two years prior, Silver used Lanskie's Collateral Damage email address to send Root three fabricated and backdated agreements purportedly between Root and Collateral Damage with the intention of covering up his and the other co-conspirators' scheme and inducing Root to continue making payments to them. Silver forged Lanskie's signature at the bottom of each agreement as signatory for Collateral Damage.

16

- On November 22, 2022, Silver represented to Root's general counsel that Quantasy had complete control over hiring subcontractors and that Quantasy had hired Collateral Damage to assist with sports marketing and gaming support.

Second, each of these representations were material because Root would have immediately terminated its relationship with Silver, Quantasy, and Collateral Damage if it had known the truth. (Am. Compl. ¶¶ 125-29.)  Third, Defendants knew their statements were false.  (*Id.* ¶ 130.)  Fourth, Defendants made these statements to cover up their scheme, mislead Root, and induce Root to continue its business relationships with Quantasy.  (*Id.* ¶ 131.)  Fifth, Root justifiably relied upon Silver, Campbell, and Quantasy's representations as they did "not appear unreasonable on [their] face" and "under the circumstances, there [was] not apparent reason to doubt the veracity of the represention[s]."  *Ownerland Realty, Inc. v. Zhang*, 12th Dist. Warren Nos. CA2013-09-77 and CA2013-10-97, 2014-Ohio-2585, ¶ 19 (citation omitted); (*Id.* ¶ 132.)  And sixth, as a result of these misrepresentations, Root suffered damages in an amount greater than $9.4 million.  (*Id.* ¶ 133).

### 4.  Conversion (Count IV) Against All Defendants

Conversion is defined as "the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights."  *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990).  The elements of conversion are: "(1) the plaintiff's ownership and right to possess the property at the time of the conversion; (2) the defendant's conversion by wrongful act of plaintiff's property rights; and (3) damages."  *Martin v. MAHR Machine Rebuilding, Inc.*, 11th Dist. Lake No. 2015-L-101, 2017-Ohio-1101, ¶ 13.  Where a conversion claim is premised on the unlawful retention of property, the plaintiff must also establish that he or she demanded that the defendant return the property and that the defendant refused to do so.  *Sonis v. Rasner*, 39 N.E.3d 871, 891 (Ohio Ct. App. 2015).

17

Here, Defendants converted more than $9.4 million from Root. There can be no dispute that Root owned and the right to possess its funds. (Am. Compl. ¶ 135.) Defendants converted Root's property by wrongfully transferring $15.9 million of Root's funds from Root to Quantasy. (*Id.* ¶ 138.) Quantasy originally retained $6.5 million and Defendants transferred more than $9.4 million from Quantasy to Collateral Damage, and, upon information and belief, from Collateral Damage to Eclipse. (*Id.* ¶ 136.) Defendants ultimately used the funds to purchase multiple multi-million dollar coastal properties. (*Id.*) When Root's finance department became aware of the excessive and unauthorized spend from its marketing department, Root demanded the return of funds from Quantasy. (*Id.* ¶ 137.) While Quantasy returned a portion of the funds to Root, Quantasy wrongfully retained $3.6 million of Root's funds itself – the vast majority of which Quantasy did not earn – and Defendants altogether refused to return the remaining $9.4 million. For these reasons, Root is substantially likely to prevail on its conversion claim.

### 5. Civil Action for Criminal Theft and Telecommunications Fraud (Counts (V and VI)

A party injured by a criminal act may file a civil action to recover compensatory and punitive or exemplary damages under Ohio Revised Code § 2307.60. Punitive and exemplary damages are appropriate if the actions or omissions of the defendant demonstrated "malice or aggravated or egregious fraud." R.C. § 2315.21(C)(1). Here, Defendants committed at least two crimes under Ohio law: (1) theft; and (2) telecommunications fraud.

#### a. Theft Against All Defendants

Ohio Revised Code § 2913.02(A) defines the crime of theft under Ohio law. Section 2913.02(A) provides in part:

> [n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: (1) Without the consent of the owner or person authorized to give

consent; (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent; (3) By deception . . . .

R.C. § 2913.02(A).

Here, Defendants have committed theft under Ohio law.  (Am. Compl. ¶ 141.)  In an intentional effort to deprive Root of its funds, Defendants worked together to transfer funds to Quantasy and Ben-Her without Root's consent and by deception.  (*Id.* ¶ 142.)  Silver did not have Root's permission to transfer funds to Quantasy and Ben-Her under these circumstances, nor did Quantasy or Ben-Her have permission to transfer Root's funds to Collateral Damage and then to Eclipse.  (*Id.* ¶ 143.)  Campbell, Quantasy, Collateral Damage, Eclipse, and McDaniel all exerted control of Root's funds without Root's consent because they assisted with the unauthorized transfers of Root's funds and took steps to conceal the scheme from Root.  (*Id.* ¶¶ 144-45.) Therefore, Root is substantially likely to succeed on its civil claim for criminal theft against all Defendants.

### b.    Telecommunications Fraud Against Silver, Campbell, and Collateral Damage

Ohio Revised Code § 2913.05(A) defines the crime of telecommunications fraud under Ohio law.  Section 2913.05(A) provides in part:

> No person, having devised a scheme to defraud, shall knowingly disseminate, transmit, or cause to be disseminated or transmitted by means of a wire, radio, satellite, telecommunication, telecommunications device, telecommunications service, or voice over internet protocol service any writing, data, sign, signal, picture, sound, or image with purpose to execute or otherwise further the scheme to defraud.

R.C. § 2913.05(A).

Here, Silver, Campbell, Quantasy, and Collateral Damage violated R.C. 2913.05.  Silver and Campbell communicated via text message, WhatsApp, and email—at times on behalf of Collateral Damage and Quantasy—as part of their scheme to defraud Root.  (Am. Compl. ¶ 149.)

By way of example only, they used those platforms to communicate about: Root's hiring Quantasy; the SOW, including how to split up Root's payments between Quantasy and Collateral Damage; Silver's alleged "autonomy" to hire Quantasy; the Collateral Damage invoices; the fraudulent payments from Root to Quantasy; the fraudulent payments from Quantasy to Collateral Damage; the creation of backdated and otherwise fraudulent documents to conceal the scheme. (*Id.* ¶ 150.) For these reasons, Root is substantially likely to succeed on its civil claim for the crime of telecommunications fraud against Defendants.

## B. Root Has Been and Will Continue to Be Irreparably Harmed Absent an Injunction.

Root is and will continue to be irreparably harmed absent an order enjoining Defendants from transferring or disposing of their assets outside of normal day-to-day transactions. The Sixth Circuit and this Court regularly find that "'concealment and dissipation of assets' likely obtained through fraud constitutes irreparable harm." *Huntington Nat'l Bank v. Guishard, Wilburn & Shorts, LLC*, No. 2:12-CV-1035, 2012 U.S. Dist. LEXIS 167214 (S.D. Ohio Nov. 26, 2012) (quoting *NCR Corp. v. Feltz*, 983 F.2d 1068 (6th Cir. 1993) (per curiam) (unpublished table case); *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 628 (6th Cir. 2013) (granting injunction because the case involved fraudulent conveyances and one of the defendants was a wanted fugitive); *HBA Motors, LLC v. Brigante*, No. 1:21-cv-624, 2021 U.S. Dist. LEXIS 193641, at *12-13 (S.D. Ohio Oct. 7, 2021) (granting an injunction on "the use, conversion, and disposition of Defendants' assets" where the defendant tricked the plaintiff into wiring him money for fake cars online).

Based on Defendants' history of fraud and ability to conceal stolen funds, there is a strong likelihood that they will attempt to conceal, encumber and/or dissipate assets to prevent Plaintiffs from collecting at final judgment in this litigation. Defendants' ability and willingness to do so is evidenced most strongly by the following:

- Silver and Campbell fabricated and forged numerous invoices, change orders, subcontractor agreements and other documents as part of their scheme to defraud Root. They also forged Lanskie's signature, created fake email accounts and, upon information and belief, created shell companies to channel funds from Root to their personal accounts.  There is a significant risk Silver and Campbell will use similar methods to disperse and conceal their assets related to this lawsuit.

- According to Lanskie, Silver never paid her or other employees at Collateral Damage.  Even though she filed a claim with the California Department of Industrial Relations and was awarded her wages, she has not been able to collect. Silver continues to evade the agency's judgment.  (Lanskie Decl. ¶¶ 9, 14.)

- Upon information and belief, Collateral Damage and Eclipse are business fronts created by Silver to move money and purchase assets.  Neither entity has legitimate business ventures.

- Silver recently placed his luxury homes bought with Root's stolen funds on the market for sale.  Upon information and belief, this may be an attempt to disperse or conceal the funds stolen from Root in response to Root's internal investigation and this litigation.

- McDaniel is a convicted felon currently sentenced to three years of probation for a large-scale bank fraud scheme in Georgia. For her part in the scheme, McDaniel fabricated bank statements and employment verification forms to obtain significant mortgage loans.  McDaniel was indicted in September 2020 and sentenced in August 2021.  A few months later, in 2022, she began helping her brother, Silver, in his scheme to defraud Root.  McDaniel's demonstrated propensity to fabricate documents and engage in multiple fraudulent schemes while on probation makes it very likely she will engage in illegal activity to disperse the assets she obtained from Root absent an injunction.  *See* McDaniel Sentencing Memorandum and Judgment Order (attached as Exhibit A).

This case is on all fours with *NCR Corp. v. Feltz*, 1993 U.S. App. LEXIS 1402 (6th Cir. 1993).  In *NCR*, the plaintiff brought RICO and fraud claims, alleging that the defendants fraudulently induced the plaintiff to pay hundreds of thousands of dollars for market studies and products the plaintiff never received.  *Id.* at *6-7.  The defendants attempted to cover up their scheme through deceptive and complex transfers of assets, and began to dissipate assets.  *Id.*  This Court enjoined the defendants from transferring or disposing of any of their assets, except as to 'normal day-to-day' transactions $500 or less.  *Id.*  The Sixth Circuit affirmed the decision.  *Id.*  Plaintiffs now ask this Court for the same remedy.

Like *NCR*, here Defendants fraudulently induced Root to pay for marketing services that were never rendered. Like *NCR*, Defendants attempted to disperse and hide Root's payments through complex transfers of assets. Silver channeled funds through Quantasy and Campbell, then through Collateral Damage, McDaniel, and finally to Eclipse, which purchased luxury coastal properties with the funds in an attempt to conceal them. The only contrast between this matter and NCR is that the *NCR* defendants only stole hundreds of thousands of dollars while here Defendants stole more than $9.4 million. Regardless, the irreparable harm to Root "from defendants' concealment and dissipation of assets outweigh[s] defendants' desire to continue unrestricted [ ] transfers."

In sum, if Defendants' funds and properties, which were procured through fraudulent activity, are not frozen except for day-to-day transactions, Plaintiffs will likely suffer irreparable harm in that they will not be able to recover for their injuries. *See McGirr v. Rehme*, 891 F.3d 603, 613 (6th Cir. 2018) (granting injunction because "there is a significant risk that [defendants'] assets will be liquidated without recognition of Plaintiffs' claims and before a decision as to their status can be made" such that Plaintiffs will be left without any recourse); *Concheck v. Barcroft*, No. 2:10-cv-656, 2010 U.S. Dist. LEXIS 110325, 2010 WL 4117480, at *3, *2 (S.D. Ohio Oct. 18, 2010) ("Plaintiff is likely to suffer irreparable harm if [Defendants] are not required to submit funds . . . they still retain to the safekeeping of the Court" where evidence "indicat[es] that [Defendants] are willing to dispose of or conceal remaining funds" for personal expenditures rather than return them" and the funds at issue are "likely contracted by fraud").

### C. The Issuance of an Injunction Will Cause No Harm to Others.

Third, the Court's issuance of an injunction will cause no harm to others. Root is seeking to enjoin Defendants from disposing of their assets with the exception of normal day-to-day

transactions. The exception for day-to-day transactions will allow Defendants—such as Quantasy—to continue to conduct its routine business operations with third parties. However, it prevents potentially fraudulent transactions, such as moving funds or other property, in an effort to further Defendants' fraudulent scheme and prevent Root from obtaining meaningful relief.

> **D.** **The Issuance of an Injunction Would Serve the Public Interest.**

Finally, the issuance of the requested injunction serves the public interest. In cases involving fraud, courts routinely hold that the public interest is served by an injunction freezing the defendant's assets to prevent the perpetuation of fraudulent acts. *NCR*, 1993 U.S. App. LEXIS 1402, at *6-7; *Clayton v. Heartland Res.*, Inc., No. 1:08CV-94-M, 2009 U.S. Dist. LEXIS 20969, at *20 (W.D. Ky. Jan. 8, 2009).

For example, in *NCR*, the plaintiff brought a RICO claim against the defendants, alleging that the defendants defrauded plaintiffs of hundreds of thousands of dollars, engaged in deceptive and complex transfers of assets, and began to dissipate assets. 1993 U.S. App. LEXIS 1402, at *6-7. Therefore, the plaintiff sought a preliminary injunction, enjoining Defendants from transferring or disposing of any of their assets, except as to 'normal day-to-day' transactions. *Id.* The district court entered the injunction and the Sixth Circuit affirmed its decision. As the Sixth Circuit held, "**the public interest would be served by issuing the injunction**, **as the injunction is necessary to prevent multi-state fraudulent schemes and to prevent the deprivation of remedies to [the plaintiffs].**" *Id.* (emphasis added). Like in *NCR*, here, the public interest is served by issuing the injunction to prevent the perpetuation of Defendants' fraudulent scheme. Further, given the likelihood that Defendants will try to dissipate their assets, the injunction prevents further deprivation of Root's remedies.

**IV.**    **CONCLUSION**

For the foregoing reasons, Root requests the Court issue a temporary restraining order and injunction that will immediately preclude Defendants from using, converting, encumbering, transferring or disposing of any of their assets, except as normal day-to-day transactions, including but not limited to restricting the sale of the following properties: 13105 Biscayne Island Terrace, Miami, Florida 33181; 9125 North Bayshore Drive, Miami, Florida 33138; and 2543 Walnut Avenue, Venice, California 90291, except by leave of Court or until this matter is resolved on the merits.

Respectfully submitted,

*/s/ William D. Kloss, Jr.*
William D. Kloss, Jr. (0040854), Trial Attorney
Elizabeth S. Alexander (0096401)
Grace E. Saalman (0101603)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360  Fax: (614) 719-4807
wdklossjr@vorys.com
esalexander@vorys.com
gesaalman@vorys.com


Matthew L. Kutcher (IL Bar No. 6275320*)*
(*application for pro hac vice forthcoming*)
COOLEY LLP
110 N. Wacker Drive Suite 4200
Chicago, IL 60606
Phone (312)-881-6500
Fax (312)-881 6598
mkutcher@cooley.com

Kristine A. Forderer (CA Bar No. 278754)
(*application for pro hac vice forthcoming*)
COOLEY LLP
3 Embarcadero Center
San Francisco, CA 94111
Phone (415) 693-2128
kforderer@cooley.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served on this 14th day of February 2023, via email upon counsel for Quantasy & Associates, LLC and William Campbell, via email and certified mail upon Brinson Caleb Silver, and via certified mail upon Paige McDaniel, Collateral Damage, LLC, and Eclipse Home Design, LLC.

**Collateral Damage, LLC**
Registered Agent: LEGALZOOM.COM, Inc.
101 N Brand Blvd., 11th Floor
Glendale, CA 91203

**Eclipse Home Design, LLC**
Registered Agent: United States
Corporation Agents, Inc.
651 N. Broad St., Suite 201
Middletown, DE 19709

**Paige McDaniel**
5576 Alexanders Lake Rd.
Stockbridge, GA 30281

**Brinson Caleb Silver**
1550 Michigan Avenue, Apt. 3
Miami Beach, FL 33139
brinsonsilver@gmail.com
hello@bc-silver.com

**Matthew D. Ridings** (0079402)
THOMPSON HINE LLP
127 Public Square, 3900 Key Center
Cleveland, Ohio 44114
Telephone: 216.566.5561
Facsimile: 216.566.5800
Matt.Ridings@ThompsonHine.com

*and*

**Jamar T. King** (0091093)
THOMPSON HINE LLP
10050 Innovation Drive, Suite 400
Miamisburg, OH 45342
Telephone: 937.443.6852
Facsimile: 937.443.6635
Jamar.King@ThompsonHine.com

*Counsel for Quantasy & Associates, LLC and William Campbell*

*/s/ William D. Kloss, Jr.*
William D. Kloss, Jr. (0040854)

*Counsel for Plaintiffs*