**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Root, Inc.,** *et al.,* | : | |
| | : | Case No. 2:23-cv-512 |
| *Plaintiffs,* | : | |
| | : | Judge Sarah D. Morrison |
| v. | : | |
| | : | Magistrate Judge Elizabeth Preston Deavers |
| **Silver,** *et al.,* | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS FILED**
**BY DEFENDANTS QUANTASY & ASSOCIATES LLC AND WILLIAM CAMPBELL**

The motion to dismiss filed by Defendants Quantasy & Associates LLC and William Campbell ("Quantasy Defendants") should be denied. As a threshold matter, this Court has personal jurisdiction over the Quantasy Defendants pursuant to Ohio's long-arm statute, the Due Process Clause, and the nationwide service of process provision set forth in the Racketeer Influenced Corrupt Organizations Act. Further, the well-pled amended complaint ("Complaint") filed by Plaintiffs Root Inc., Caret Holdings, Inc., and Root Insurance Agency, LLC ("Plaintiffs" or "Root") contains over 40 pages of factual allegations – which, at this preliminary stage, must be taken as true with all reasonable inferences in Root's favor – that provide the Quantasy Defendants "fair notice" of Root's cognizable claims for violation of 18 U.S.C.S. § 1962(c), fraudulent concealment, fraudulent misrepresentation, conversion, violation of O.R.C. 2307.60, 2307.61, and 2913.05, breach of contract, and civil conspiracy and the grounds upon which those claims arise.

Respectfully submitted,

_/s/  William D. Kloss, Jr._
William D. Kloss, Jr. (0040854), Trial Attorney
Tiffany S. Cobb (0067516)
Elizabeth S. Alexander (0096401)
Grace E. Saalman (0101603)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360
Fax: (614) 719-4807
wdklossjr@vorys.com
tscobb@vorys.com
esalexander@vorys.com
gesaalman@vorys.com

Matthew L. Kutcher (IL Bar No. 6275320)
COOLEY LLP *Admitted Pro Hac Vice*
110 N. Wacker Drive Suite 4200
Chicago, IL 60606
Phone: (312)-881-6500  Fax: (312)-881 6598
mkutcher@cooley.com

Kristine A. Forderer (CA Bar No. 278754)
COOLEY LLP *Admitted Pro Hac Vice*
3 Embarcadero Center
San Francisco, CA 94111
Phone: (415) 693-2128
kforderer@cooley.com

*Counsel for Plaintiffs*

2

# TABLE OF CONTENTS

Page

I.     INTRODUCTORY STATEMENT ................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ...................................... 3

III.   ARGUMENT .................................................................................................. 15

    A.   As a Threshold Issue, the Quantasy Defendants Are Subject to
        Personal Jurisdiction in This Court. .................................................. 15

        1.   This Court's Exercise of Specific Jurisdiction Is Consistent
            with Ohio's Long-Arm Statute and the Due Process Clause. ............. 16

The Quantasy Defendants are subject to personal jurisdiction in Ohio because they purposefully availed themselves of the privilege of acting in Ohio by contracting with Root, an Ohio company, to do business in Ohio, communicating with Root's employees in Ohio, and accepting Root's money from a bank in Ohio.  The Court may also exercise specific personal jurisdiction because Quantasy Defendants "transacted business" in Ohio and, separately,  tortiously interfered with a company in Ohio.

*Chulsky v. Golden Corral Corp.*, 583 F. Supp. 3d 1059, 1075 (S.D. Ohio 2022); *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007); R.C. 2307.382(A)(1), (2), (4), (6), and (7).

        2.   The Court May Exercise Jurisdiction over All Defendants
            Pursuant to 18 U.S.C. § 1965(b) ........................................................... 23

18 U.S.C. § 1965(b) permits personal jurisdiction over defendants where a court has personal jurisdiction over one defendant and the ends of justice require jurisdiction over the other defendants.  It is undisputed that the Court has jurisdiction over Defendant Silver.  Furthermore, justice and efficiency weigh in favor of exercising jurisdiction over they Quantasy Defendants.

*Peters Broad. Eng'g, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 440 (6th Cir. 2022) (quoting 18 U.S.C. § 1965(b)).

    B.   Root Properly Pled Its RICO Claim Against the Quantasy Defendants
        (COUNT I). ................................................................................................ 26

        1.   The Complaint Sets Forth Sufficient Allegations of Predicate
            Acts. ......................................................................................................... 26

i

The Quantasy Defendants committed the predicate acts of wire fraud and money laundering in furtherance of their scheme to defraud Root. The Complaint adequately alleges numerous instances of sending false invoices and other communications to Root that caused Root harm.

*W. Hills Farms, LLC v. ClassicStar Farms, Inc. (In re ClassicStar Mare Lease, Litig.)*, 727 F.3d 473, 484 (6th Cir. 2013); *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 882 (E.D. Mich. 2019); *Dana Corp. v. Blue Cross & Blue Shield Mut. of No. Ohio*, 900 F.2d 882, 886 (6th Cir. 1990).

**2.** **The Quantasy Defendants Participated in the Operation and Management of an Association-in-Fact Enterprise**. ........................... 32

An association-in-fact enterprise is formed where two or more individuals and/or businesses that have a relationship with each other come together for a common purpose. The members of the enterprise need only have a general awareness of the other enterprise members, they need not know one another. The Quantasy Defendants actively participated and operated an association-in-fact enterprise by working with Silver to transfer Root's money from Root to Quantasy to Collateral Damage and then to the remaining defendants.

*Boyle v. United States*, 556 U.S. 938, 946 (2009); *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2016)

**3.** **Root Adequately Pled a Pattern of Racketeering**................................ 35

Defendants engaged in a pattern of related racketeering predicate acts that was open and continuous at the time of their activity. Open-ended continuity is adequately pled here, where the criminal activity could have continued if it was not interrupted by the discovery of the crime and subsequent filing of a RICO action.

*Kalitta Air, LLC v. GSBD & Assocs.*, 591 F. App'x 338, 347 (6th Cir. 2014); *Heinrich v. Waiting Angels Adoption Servs.*, 668 F.3d 393, 410 (6th Cir. 2012); *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991); *Blue Cross & Blue Shield of Michigan v. Kamin*, 876 F.2d 543, 545 (6th Cir. 1989).

**C.** **Root Sufficiently Alleges Fraudulent Concealment and Fraudulent Misrepresentation (Counts II and III)**. ............................................... 39

**1.** **Root States a Claim for Fraudulent Concealment (Count II)**. ........... 39

    **a.** **The Quantasy Defendants Had a Duty to Disclose Information to Root**. ................................................................. 40

The Quantasy Defendants had a duty to disclose to Root material facts of the business relationship with Collateral Damage because this was not a typical arms-length business transaction in which the two contracting persons were dealing with strangers and acting in the companies' best interests. Instead, the Quantasy Defendants knew that Silver was acting in his own best interest, rather than Root's, and Campbell and Silver created false contracts through private encrypted messaging platforms, rather than dealing at arms-length on the open market.

*Blon v. Bank One*, 35 Ohio St.3d 98 (1988); *Andersons, Inc. v. Consd, Inc.*, 185 F. Supp. 2d 835, 843-44 (N.D. Ohio 2002).

**b.** **The Quantasy Defendants Concealed Material Facts from Root**. ..................................................................... 42

The Quantasy Defendants concealed the nefarious nature of their contracts with Root, their secret relationship with Collateral Damage, Silver's conflict of interest with Collateral Damage, and the lack of work they were performing for Root. Had Root known, it would not have entered into an agreement with Quantasy or continued paying Quantasy.

*Javitch v. First Montauk Fin. Corp.*, 279 F. Supp. 2d 931, 940 (N.D. Ohio 2003); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001).

**c.** **The Quantasy Defendants Intentionally Withheld Material Information**. ................................................................. 44

The Complaint adequately alleges the Quantasy Defendants knew Root was unaware of the material facts and intentionally concealed them to further their scheme. This is evident because Quantasy Defendants sent invoices only to Silver, communicated exclusively via private messaging, lied during Root's investigation, and took other steps to evade detection of Root's audit systems.

*Mill's Pride, L.P. v. Miller Salvage, Inc.*, No. 2:07-cv-990, 2008 U.S. Dist. LEXIS 89288, at *11 (S.D. Ohio Apr. 23, 2008).

**2.** **Root Adequately States a Claim for Fraudulent Misrepresentation (Count III)**. ............................................................. 45

The Quantasy Defendants made material representations in their contracts and through communications to Root that they knew were false with the intent of misleading Root into continuing its business relationship with and payments to Quantasy.

*Burr v. Bd. of Cty. Comm'rs*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986).

      **3.**      **Root's Fraud Claims Are Not Duplicative of Its Breach of Contract Claim**.................................................................................... 47

**D.**      **Root's Conversion Claim Is Properly Pled (Count IV)**.................................. 49

The Quantasy Defendants converted Root's money by wrongfully exercising dominion over it in exclusion of Root's rights. Root sufficiently identifies the converted money in its Complaint by tracing the exact dates, senders and recipients, and account numbers of each transfer of money.

*Barestone, LLC v. Bair (In re Bair)*, Nos. 18-12585, 18-1062, 2020 Bankr. LEXIS 3649, at *25 (Bankr. S.D. Ohio Dec. 31, 2020); *City of Findlay v. Hotels.com, L.P.*, 441 F. Supp. 2d 855, 865 (N.D. Ohio 2006).

**E.**      **Root's Claim Under Ohio Rev. Code 2307.60 Is Permitted (Count V)**.......... 51

R.C. 2307.60(A)(1) creates a statutory cause of action for damages resulting from any criminal act. Root adequately pleads the Quantasy Defendants committed the criminal act of theft by acquiring funds through deceptive invoices.

*State v. Mahone*, 2014-Ohio-1251, ¶ 58 (Ohio Ct. App. 2014); *State v. Wells*, 2009-Ohio-908, ¶ 50 (Ohio Ct. App. 2009).

**F.**      **Root Has Stated a Claim for Breach of Contract (Count VIII)**..................... 54

As detailed in the Complaint, the Quantasy Defendants breached the two scope of work agreements by: (1) failing to perform the marketing services explicitly stated on the contracts; (2) assigning the contracts to Collateral Damage, in violation of the contracts' non-assignment provisions; and (3) breaching the implied covenant of good faith and fair dealing by entering the contracts with Root in bad faith and lying about their activities and intentions under the contract.

*Nichols v. State Farm Mut. Auto. Ins. Co.*, No. 2:22-cv-16, 2022 U.S. Dist. LEXIS 186623, at *6 (S.D. Ohio Oct. 11, 2022); *Blue Ash Auto Body, Inc. v. Grange Prop. & Cas. Ins. Co.*, 2022-Ohio-4599, ¶ 19 (Ohio Ct. App. 2022); *Accurate Elec. Constr. v. Ohio State Univ.*, 2019-Ohio-4992, ¶ 132 (Ohio Ct. App. 2019).

**G.**      **Root Sufficiently Pleads a Civil Conspiracy Claim (Count X)**. ...................... 60

The Quantasy Defendants are liable for civil conspiracy because they participated in a malicious combination between two or more persons that stems from at least one unlawful act – fraud, theft, conversion, money laundering – that caused harm to Root.

*DWS Int'l v. Meixia Arts & Handicrafts Co.*, No. 3:09-cv-458, 2010 U.S. Dist. LEXIS 140023, at \*14 (S.D. Ohio Dec. 10, 2010).

**H.** **Campbell Is Personally Liable for His Tortious Conduct and Vicariously Liable for Quantasy's Conduct**. .................................................... 61

Campbell is personally liable for his own actions and vicariously liable for Quantasy's conduct. To pursue the doctrine of piercing the corporate veil, Root need only plead allegations that put Campbell on notice that Root will attempt to pierce the veil and hold him personally liable. Root's Complaint puts Campbell on notice by alleging in detail his significant personal activities in the scheme and suing him in his personal capacity for fraud, conversion, theft, and civil conspiracy.

*Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, LTD.*, 476 F. Supp. 2d 809, 827 (S.D. Ohio 2007); *Dombroski v. Wellpoint, Inc.*, 7th Dist., 173 Ohio App.3d 508, 2007-Ohio-5054, 879 N.E.2d 225.

**IV.** **CONCLUSION** ........................................................................................... 63

<u>**MEMORANDUM IN OPPOSITION**</u>

**I.    INTRODUCTORY STATEMENT**

Operating hand-in-hand with Defendant BC Silver and his companies (the "Silver Defendants"), the Quantasy Defendants planned, orchestrated, and executed a kickback scheme to defraud Root of millions.  In response to the factual allegations in the Complaint, the Quantasy Defendants now claim that they were uninvolved in the scheme.  In order to believe their position, this Court would have to discredit the well-pled allegations in the Complaint, and accept as true the argument that the Quantasy Defendants had *no idea* that Collateral Damage, LLC ("Collateral Damage"), the company they hired and to which they funneled almost $10 million of Root's money, was a scam.  The Court would also have to believe that the Quantasy Defendants thought receiving no work product in exchange for $10 million was a reasonable business transaction.

Regardless, the Quantasy Defendants' arguments are also belied by the following:

(1)    Campbell, the CEO and sole owner of Quantasy, drafted the contracts between Root and Quantasy (Compl. ¶¶ 18, 27, 28, 57);

(2)    Days after signing the first contract, Campbell and Silver negotiated – and ultimately agreed upon – the division of Root's money between Quantasy and one of Silver's companies, Collateral Damage (*id.* ¶¶ 37, 38);

(3)    The Quantasy Defendants invoiced Root for marketing services that Quantasy did not, nor ever intended, to provide (*id.* ¶¶ 31, 40, 51, 58, 68);

(4)    The Quantasy Defendants intentionally split up invoices to evade Root's internal controls, which required invoices over $10 million be approved by the Board of Directors (*id.* ¶ 67);

(5)    The Quantasy Defendants funneled millions of dollars to Collateral Damage, despite Collateral Damage's failure to perform *any* work for Root (*id.* ¶¶ 39, 49, 55, 56, 66, 69, 73, 74, 79, 81, 84, 85);

(6)    In an attempt to cover his tracks, Campbell asked Silver to put in writing that Silver was no longer involved in Collateral Damage, but Campbell knew this was not true, and continued to conspire with Silver to transfer Root's money to Collateral Damage (*id.* ¶¶ 61-66);

1

(7)     In order to help Silver launder Root's money by purchasing a waterfront home using another one of Silver's companies, Eclipse Home Design, LLC ("Eclipse"), Campbell personally traveled to the bank to initiate a wire transfer of $1.5 million from Quantasy to Collateral Damage (*id.* ¶¶ 83, 86);

(8)     In order to hide the fact that Root's money had already been transferred to the Silver Defendants, the Quantasy Defendants created sham change orders stating that Root's "prepaid funds" were available for future spend (*id.* ¶ 93);

(9)     When interviewed by Root's audit department, the Quantasy Defendants "held the line" and falsely represented their dealings with the Silver Defendants and doubled down on representations that Root's prepaid funds were available for future spend (*id.* ¶¶ 97-99); and

(10)    Knowing that the Silver Defendants had already spent Root's money on luxury properties, and in another effort to evade responsibility, the Quantasy Defendants attempted to assign their agreement with Collateral Damage to Root (*id.* ¶ 100).

In an effort to avoid liability, the Quantasy Defendants argue that they are not subject to personal jurisdiction in this Court.[1] Yet, the Quantasy Defendants had far more than the required "minimum contacts" with Ohio. The Quantasy Defendants contracted with an Ohio company, corresponded with Root's Ohio employees, attended virtual meetings with Root's Ohio employees, accepted millions of dollars from Ohio, and defrauded an Ohio company, thus subjecting the Quantasy Defendants to the Court's jurisdiction.

Ignoring the well-pled allegations in the Complaint, the Quantasy Defendants also argue that Root failed to state any cognizable claim against them for racketeering, breach of contract, fraud, civil conspiracy, conversion, and violations of O.R.C. 2307.60, 2307.61, and 2913.05. In

---

[1] The Quantasy Defendants move to dismiss the Complaint with prejudice. (Defs.' Mot. at 1.) If the Court were to find that any of the Quantasy Defendants' arguments have merit, Root respectfully requests that any such dismissal occur without prejudice and with leave to amend. (*Cosmichrome, Inc. v. Spectra Chrome, LLC*, 504 F. App'x 468, 472 (6th Cir. 2012) (dismissals for lack of jurisdiction are without prejudice); *Newberry v. Silverman*, 789 F.3d 636, 646 (6th Cir. 2015) ("Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment.")).

doing so, the Quantasy Defendants narrowly construe the claims, ignore the well-pled allegations in the Complaint, and point the finger at the Silver Defendants. However, taking all of Root's allegations as true – as this Court is required to do at this stage – Root sufficiently pled each of its claims against the Quantasy Defendants and their motion should be denied.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Campbell and Silver Enter into a Marketing Services Contract to Funnel Root's Money to Quantasy and Then to Silver's Company, Collateral Damage.

Root is an automobile insurance carrier based in Columbus, Ohio. (First Amended Verified Complaint ¶ 1, ECF No. 20, hereinafter "Compl.".) Root hired Silver as its Chief Marketing Officer on November 8, 2021. (*Id.* ¶ 2.) Two weeks later, Silver and his coconspirator (and prior business acquaintance), Campbell, discussed Root retaining Campbell's company, Quantasy, as a marketing vendor. (*Id.* ¶ 26.) Campbell drafted a Scope of Work agreement ("SOW") between Root and Quantasy and sent it to Silver via text message on December 3, 2021. (*Id.* ¶ 27 and Exs. 1, 2.) Campbell and Silver exchanged several drafts of the SOW via text message on December 9, 2021 and January 30, 2022. (*Id.* ¶¶ 28-29.) On February 3, 2022, Silver caused Root to sign and Campbell signed the SOW on behalf of Quantasy ("SOW #1"). (*Id.* ¶ 30, Ex. 3.) Pursuant to SOW #1, Root was to pay Quantasy a fee of approximately $1,184,445 for "Client Partnerships"; "Brand Strategy"; and "Creative Services / Development Support." (*Id.* ¶ 30.)

Silver and Campbell, however, planned to keep this money for themselves while providing little if any actual marketing services. (*Id.* ¶ 56.) They agreed that Quantasy would transfer part of Root's payments to Silver's company, Collateral Damage, under the guise of hiring Collateral Damage as a "subcontractor." (*Id.* ¶ 32.) Silver and Campbell discussed in detail how and when to distribute Root's payments between Quantasy and Collateral Damage under the scheme. (*Id.* ¶ 37, Fig. 1.) Consistent with their agreed-upon division of profits, Quantasy invoiced Root and

paid a portion of Root's money to Collateral Damage in the following series of transactions:

- February 3, 2022 – Quantasy sends invoice to Root for $473,778;

- February 7, 2022 – Silver sends Campbell Collateral Damage's bank account information via WhatsApp message;

- February 9, 2022 – Silver directs Root to wire $473,778 to Quantasy;

- February 11, 2022 – Silver sends Collateral Damage invoice to Campbell for $153,778; and

- February 14, 2022 – Quantasy wires $153,778 to Collateral Damage.

(Compl. ¶¶ 31, 32, 33, 34, 39 and Exs. 4, 6, 7.) Silver sent Quantasy payment from Root even though Quantasy performed little to no work for Root. (*Id.* ¶ 96.) Similarly, Campbell sent Collateral Damage a portion of Root's money despite Collateral Damage not performing any work for Root. (*Id.* ¶ 56.)

No Root management other than Silver knew about Collateral Damage or knew that Campbell and Quantasy planned to funnel a portion of unearned payments to Collateral Damage. (*Id.* ¶ 35.) That was no accident. When discussing Collateral Damage, Silver and Campbell almost exclusively used WhatsApp, an encrypted text messaging application, as opposed to their corporate email accounts to avoid detection. (*Id.* ¶ 32.)

### B. Campbell Meets with Root Management, and, at Silver's Request, Campbell Agrees to Direct All Invoices to Silver to Avoid Detection of Their Scheme.

On February 24, 2022, Campbell met, via videoconference, with certain members of Root management, including Silver, to present Quantasy's ideas for Root's marketing campaigns. Following the meeting, Silver assured Campbell that their plan would proceed in a text message: "I had to explain some things to leaders, but they finally kinda started to see the light[.] That said, it doesn't really matter, I have autonomy to do what I need to do." (*Id.* ¶ 41, Ex. 9.) On March 16, 2022, Silver sent Campbell a text message instructing Campbell to direct invoices to Silver in the

future. Silver did this to ensure that other Root employees did not discover Silver and Campbell's plans. (*Id.* ¶ 50, Ex. 15.) Campbell complied. (*Id.* ¶ 51, Ex. 15.)

**C.  Silver and Campbell Funnel Additional Unearned Funds to Quantasy and Collateral Damage under SOW #1.**

After the first series of transfers in their scheme successfully escaped detection, Silver and Campbell funneled another flow of money from Root to Quantasy to Collateral Damage:

- February 23, 2022 – Campbell sends Quantasy invoice to Root for $414,555.75;

- March 7, 2022 – Silver directs Root to wire $414,555.75 to Quantasy;

- March 9, 2022 – Silver sends a Collateral Damage invoice to Campbell for $134,555.75; and

- March 9, 2022 – Quantasy wires $134,555.75 to Collateral Damage.

(Compl. ¶¶ 40, 47, 49 and Exs. 8, 14.)

During this second series of fraudulent transfers, Campbell directed Silver to send invoices and submit payments to Quantasy. For example, on February 25, 2022, Campbell sent Silver a text message notifying him that Root had yet to pay Quantasy's latest invoice. (*Id.* ¶ 42, Ex. 10.) On March 2, 2022, Campbell sent Silver a WhatsApp message, again stating that Root had yet to pay Quantasy. (*Id.* ¶ 43, Ex. 11.) Campbell wrote that Collateral Damage should send its "invoice for phase 2" so that Quantasy could "have [it] ready" once Quantasy received Root's next payment. (*Id.*) On March 4, 2022, Campbell sent Silver another text message that Quantasy had still not received Root's payment. (*Id.* ¶ 46, Ex. 12.) Silver finally directed Root to pay Quantasy on March 9, 2022. (*Id.* ¶ 48, Ex. 13.)

Following this familiar pattern, Campbell and Silver engaged in a third series of fraudulent transfers under SOW #1:

- March 17, 2022 – Quantasy sends invoice to Root for $296,111.25;

- March 24, 2022 – Silver directs Root to wire $296,111.25 to Quantasy;

- March 25, 2022 – Campbell directs Silver to send him Collateral Damage's invoice; Silver uses the email address of Collateral Damage's former employee, Lauren Lanskie, to send a Collateral Damage invoice to Campbell for $96,111.25; and

- March 28, 2022 – Quantasy wires $96,111.25 to Collateral Damage.

(Compl. ¶¶ 51-55 and Exs. 16-18.)

In total, pursuant to the February 13, 2022 WhatsApp arrangement between Silver and Campbell, Quantasy received $1,184,444 from Root and Campbell secretly transferred $384,444 of that amount to Collateral Damage. (*Id.* ¶ 56.) Throughout this period, Root management was unaware of Collateral Damage, or that it was Silver's company, and had no knowledge that Quantasy was paying Collateral Damage out of the money paid to Quantasy by Root. (*Id.*) Worse yet, the Quantasy Defendants transferred $384,444 of Root's money to Collateral Damage despite receiving no usable work product from Collateral Damage. (*Id.*)

### D. Emboldened by Their Successful Fraud, Silver and Quantasy Enter into a Second Marketing Services Contract to Steal $14.7 Million from Root.

At some point after April 1, 2022, Silver and Campbell signed a second Scope of Work ("SOW #2") on behalf of Quantasy and Root valued at $14.7 million. (*Id.* ¶ 57, Ex. 19.) Under SOW #2, Quantasy contracted to complete marketing programs including, but not limited to, an Athlete Driver Content Series, Best Driver in America National Program, Bleacher Report, Stream Team Activation, E-Sports Activation, Driver Appreciation Program, and In-Market Gas Station Takeover. (*Id.* Ex. 19 pp. 2-4.)

A fourth series of fraudulent transfers followed:

- April 1, 2022 – Quantasy sends two invoices to Root; one for $3.45 million and one for $3.9 million;

- April 4, 2022 – Silver directs Root to wire $7.35 million to Quantasy;

- April 11, 2022 – Quantasy wires $500,000 to Collateral Damage;

- April 13, 2022 – Quantasy wires $96,111.25 to Collateral Damage;

- April 14, 2022 – Campbell sends two invoices to Root for $3.45 million and $3.9 million;

- April 15, 2022 – Quantasy wires $500,000 to Collateral Damage;

- April 20, 2022 – Quantasy wires $1.3 million to Collateral Damage;

- April 25, 2022 – Silver directs Root to wire $7.35 million to Quantasy;

- April 27, 2022 – Collateral Damage sends Quantasy an invoice for $5.6 million; Quantasy wires $1.5 million to Collateral Damage;

- April 28, 2022 – Quantasy wires $1.3 million to Collateral Damage;

- May 11, 2022 – Collateral Damage sends Campbell an invoice for $3.5 million;

- May 12, 2022 – Quantasy wires $500,000 to the Collateral Damage;

- May 13, 2022 – Quantasy wires two payments of $500,000 to Collateral Damage;

- May 16, 2022 – Quantasy wires $500,000 to Collateral Damage; and

- May 17, 2022 – Quantasy wires $1.5 million to Collateral Damage.

(Compl. ¶¶ 57, 59, 66, 68, 69, 70, 72, 73, 74, 77, 79, 81, 82, 84 and Exs. 20, 21, 29, 32.)

On April 14, 2022, Silver sent Campbell a WhatsApp message telling Campbell to "make sure invoices are less than $10M . . . [s]o they don't need board approval." (*Id.* ¶ 67, Ex. 28.) Again, Campbell complied. (*Id.* ¶ 68.). In total, of the $14.7 million Quantasy received from Silver and Root related to SOW #2, Quantasy transferred $9.1 million of it to Collateral Damage. (*Id.* ¶ 85.)

Throughout this period, Root management (other than Silver) had no knowledge that Collateral Damage had been 'subcontracted' by Quantasy, and had no knowledge that Quantasy was transferring large sums of money to Collateral Damage. (*Id.*) Although the Collateral Damage invoices to Quantasy stated that it would "implement a sports marketing program integrating athletes and sports organizations . . . [i]n support of national awareness with an additional regional and national executions," Quantasy never provided Root with any documents or other materials to

substantiate the payments received. (*Id.* ¶¶ 56, 78, 85.) In fact, neither Quantasy nor Collateral Damage performed the services that Quantasy was paid to perform under SOW # 2. (*Id.* ¶¶ 56, 78, 85, 161.)

> **E.** **After Quantasy's Attorney Warns Campbell About the Perils of Sending Root's Money to Silver's Company, Campbell Suggests Creating a Formal Agreement Between Quantasy and Collateral Damage.**

On April 6, 2022, Campbell sent an email to Silver's private email account, "hello@bc-silver.com," informing Silver that Quantasy already "started putting together a subcontracting agreement between Quantasy and **your company**, Collateral Damage." (*Id.* ¶ 61 (emphasis added).) Campbell stated that Quantasy's attorney had "reminded" Campbell that "the advertising industry, especially the leading brands (both individually and through the ANA) have been very focused on the issues of subcontracting with interested parties and payments to agencies that include payments to third parties." (*Id.*) Campbell advised Silver that Quantasy's attorneys "recommend[] . . . that the relationship between Quantasy and Collateral Damage be approved by Root:"

> [t]his can be done by having simple approval language in the subcontracting agreement between Collateral Damage and Quantasy. It can also be done by way of a separate document between Root and Quantasy that authorizes the subcontracting relationship, services provided, etc. The approval can be signed by someone in Root's procurement, finance or legal.

(*Id.*, Ex. 23.)

This was an *ex post facto* attempt to "formalize" the scheme between Quantasy and Silver/Collateral Damage with Root's purported approval. (*Id.* ¶ 62.) Root never approved the agreement. (*Id.*) At no point during their scheme did Quantasy, Campbell, or Silver ever disclose to Root Silver's affiliation with Collateral Damage much less Collateral Damage's existence, nor any of the work Collateral Damage was "subcontracted" to do for Root or Quantasy.

**F.     Because Silver Still Owned Collateral Damage, Campbell and Quantasy Continued to Deal Exclusively with Silver on behalf of Collateral Damage.**

On or about April 7, 2022, Silver sent a WhatsApp message to Campbell stating Silver had been "completely removed from any previous ownership of C[ollateral] D[amage]." (*Id.* ¶ 63, Ex. 24.) This was not true. Rather, Campbell and Quantasy knew that Silver still controlled Collateral Damage because Silver remained heavily involved in dealings between Quantasy and Collateral Damage. Indeed, Silver was the first point of contact when it came to funneling Root's money to Collateral Damage. (*See id.* ¶¶ 66, 75 and Exs. 27, 31.)

For example, on April 11, 2022, Silver questioned Campbell about when Collateral Damage would be paid by Quantasy over a series of WhatsApp messages, first asking: "What is the latest on transfer? Did it go out Friday or this morning? They said it has not arrived yet. Maybe it's weekend processing, so it will hit tomorrow." (*Id.* ¶ 66, Ex. 27.) Then, again on April 27 and 28, Silver and Campbell messaged each other, again via WhatsApp, about the timing of payments from Quantasy to Collateral Damage. (*Id.* ¶ 75, Ex. 31.) Silver stated that "$500 came in this morning, but there is still $800 missing", and Campbell responded, "[i]t's all been sent." (*Id.* Ex. 31 p. 3.) And as a matter of public record, Silver registered Collateral Damage as a California LLC in his own name, on or around May 10, 2022. (*Id.* ¶ 65.)

**G.     Silver and Collateral Damage, Through Eclipse, Purchase Multi-Million Dollar Luxury Homes with Root's Money.**

Defendants used the money wired to Collateral Damage to make multiple luxury real estate purchases. (*Id.* ¶ 86.) Between April 2022 and August 2022, Silver purchased at least three high-end residential properties in Miami, Florida, and Venice, California, spending in excess of $10

million.[2]  Silver funded these real estate purchases, at least in part, with the money Quantasy wired to Collateral Damage for work that Collateral Damage never performed, nor intended to perform. (*Id.*)  Conscious of the gravity of the fraud, in order to conceal his ownership of the properties, Silver titled them under Eclipse, which is a Delaware limited liability company owned and controlled by Silver.  (*Id.*)

While all of the real estate purchases described in the Complaint closed around the time of Quantasy's fraudulent transfer of over $9.4 million to Collateral Damage, one of Eclipse's (Silver's) purchases corresponds precisely with the timing of a frantic text message by Silver to Campbell regarding a late wire payment.  (*Id.* ¶ 87.)  On May 13, 2022, a warranty deed conveyed to Eclipse a property located at 13105 Biscayne Island Terrace in Miami Shores, Florida.  (*Id.*)  Four days later, Silver messaged Campbell that he needs the money "in the next hour" because he was in the process of purchasing a property and if the sellers asked whether the money was in escrow, those involved in the transaction (presumably real estate agents or brokers) would not lie. (*Id.* Figs. 4-6.)  Campbell personally went to the bank to wire the money to Silver and Eclipse for purchase of the luxury home.  (*Id.* Fig. 6.)  Any argument that the Quantasy Defendants did not know that Silver was using Root's money to purchase luxury real estate is incredible.

### H.    Silver and Campbell Attempt to Further Cover Up Their Scheme by Creating After-the-Fact Contracts.

In the summer of 2022, Root's Finance Department began questioning the marketing department's excessive expenditures.  (*Id.* ¶ 92, Ex. 35.)  Silver notified Campbell of this fact, and they issued a series of backdated change orders to try to cover their tracks.  (*Id.* ¶ 92, Ex. 35.) Among other things, these change orders stated that the money Root paid Quantasy pursuant to

---

[2] The receiver recently discovered Silver purchased a fourth property in Ramona, California in June 2022.  (June 6, 2023 Order, ECF No. 120 (appointing receiver to control fourth property).)

SOW #2, and that Quantasy transferred to Collateral Damage (unbeknownst to Root), constituted Root's "prepaid funds" that were available for future spend. These change orders are *de facto* admissions that Collateral Damage provided no work product to Quantasy or Root whatsoever. With the exception of a February 24, 2022 presentation to Root management (which provided no actual marketing value to Root and for which Quantasy charged Root a staggering $1.2 million), Quantasy provided little to no services to Root. (*Id.* ¶ 93.) Quantasy never disclosed to anyone at Root that the majority of the $14.7 million was actually not held (or earned) by Quantasy, but had instead been transferred to Silver's company months earlier. (*Id.* ¶ 94.)

In addition to the change orders, Quantasy and Collateral Damage similarly created an after-the-fact 'subcontractor agreement' in an attempt to legitimize their relationship. (*Id.* ¶ 96, Ex. 36.) They entered the agreement on August 20, 2022, with an effective date of February 2, 2022. (*Id.*) "Paige Lynette" appears as signatory for Collateral Damage as "President," and Campbell signed on behalf of Quantasy.[3] (*Id.*) Paige Lynette, also called Paige McDaniel, is Silver's sister and was supposedly a member of Collateral Damage. (*Id.* ¶ 15.)

## I.      Campbell and Quantasy Blatantly Lie to Root During Root's Internal Investigation.

The Quantasy Defendants not only omitted crucial information about the existence of Collateral Damage during the course of Root's audit, but they also explicitly misrepresented that Root's spend with Quantasy was still available for Root in 2023. (*Id.* ¶ 97.) In August 2022, Root questioned Campbell directly about Quantasy's work for Root to determine the value obtained in

---

[3] The Quantasy Defendants claim they did not know Paige McDaniel existed. (Defs.' Mot. at 2.) Their argument ignores the Complaint's allegations and exhibits showing Campbell signed the subcontractor agreement on behalf of Quantasy and McDaniel signed the same agreement on behalf of Collateral Damage. (Compl. ¶ 96, Ex. 36.) Ms. McDaniel also signed the W-9 form that Silver sent to Campbell on behalf of Collateral Damage. (*Id.* ¶ 71, Ex. 30.)

exchange for the millions of dollars paid to Quantasy. (*Id*.) Campbell lied to Root and never disclosed that, in fact, the majority of Root's money had already been funneled to Collateral Damage (and spent on luxury real estate). (*Id*.)

In September 2022, Quantasy employee David Rodriguez represented to Root's internal audit team that $10.7 million of the $14.7 million marketing spend was "currently unallocated/ uncommitted at this time." (*Id.* ¶ 98.) Rodriguez responded to an email from a member of the Root team working on the internal audit that "[y]es, the $10.7M can be used for paid media in 2023." (*Id.*) Of course, this was false; $9.1 million of the $10.7 million had already been transferred to Collateral Damage. (*Id.*, Ex. 37.)

**J.     Silver Assures Campbell That Their Fraud Has Escaped Detection and the Quantasy Defendants Attempt to Assign Their Contract with Collateral Damage to Root in Order to Evade Responsibility by Contract.**

In August 2022, Silver sent Campbell several WhatsApp messages attaching screenshots of Root's confidential communications and internal audit findings, which did not uncover Silver and Campbell's carefully concealed fraud. (*Id.* ¶ 99.) Silver wrote, "we literally are good. *I just need for you to trust me and hold the line.*" (*Id.*, Ex. 38, 39.) Again, Campbell complied. (*Id.* ¶ 100.) Thereafter, without Root's knowledge, Quantasy purported to "assign" the August 20, 2022, subcontractor agreement between Quantasy and Collateral Damage to Root itself. (*Id.*, Ex. 40.)

**K.     A Quantasy Employee Finally Tells Root About the Quantasy Defendants' Fraud Committed in Concert with Silver and Collateral Damage.**

In November 2022, following Silver's departure from the company, Root executives met virtually with David Rodriguez at Quantasy to discuss a return of the $10.7 million that Quantasy was purportedly holding for Root to spend on marketing initiatives in 2023. (*Id.* ¶ 103.) Not surprisingly, Campbell refused to attend the meeting. (*Id.*) During this meeting, Rodriguez disclosed to Root management, for the first time, the existence of Collateral Damage. (*Id.*)

Rodriguez also told Root management that payments were made to Collateral Damage using Root's funds. Rodriguez stated that he would be "overly transparent," and disclosed that Quantasy itself held approximately $1.6 million that could potentially be returned from the $10.7 million outstanding, but that the other $9.1 million had been transferred to Collateral Damage immediately upon receipt from Root. (*Id.*) This was the first time Root management (other than Silver) learned that Collateral Damage existed, and that the majority of the money Root paid to Quantasy was transferred to Collateral Damage. (*Id.*)

Following the conversation with Rodriguez, Root asked Silver about the newly-discovered 'subcontractor.' (*Id.* ¶ 104, Ex. 42.) Silver stated that Quantasy had full control over who they chose to work with, and that Collateral Damage was hired by Quantasy to perform sports and gaming marketing services. (*Id.*) Silver did not disclose that Collateral Damage never intended to perform any of the services for which it was 'subcontracted,' did not disclose his ownership of it, and did not disclose that he and other Defendants used Root's money to buy luxury real estate. (*Id.*)

Root also discovered during its investigation Silver ran a similar scheme with Ben-Her Marketing and stole an additional $502,999.86 from Root. (*Id.* ¶ 105.)

**L.      Root Is Forced to File a Civil Lawsuit, and the Quantasy Defendants File a Motion to Dismiss, Which Attempts to Rewrite the Complaint.**

On May 11, 2023, the Quantasy Defendants moved to dismiss all claims. (ECF No. 94, "Defs.' Mot.".) The motion to dismiss improperly makes numerous factual assertions and arguments well outside of the four corners of the Complaint or that altogether misstate the well-pled allegations in the Complaint. To wit:

- The Introduction sets forth a narrative contrived by the Quantasy Defendants hoping to engender sympathy and point the finger at Root, including statements that Mr. Campbell has "worked his entire adult life to build . . . a successful small business," "everything that he built is now in crisis," "Root failed to supervise Silver," and the

Quantasy Defendants were "defrauded by Root's C-suite executive."[4] (Defs.' Mot. at 1-3.) None of these allegations are in the Complaint.

- The Quantasy Defendants state: "**Chief Marketing Officer directed Quantasy to utilize . . . Collateral Damage**." (Defs.' Mot. at 4, citing Compl. ¶ 34) (emphasis added). However, paragraph 34 of the Complaint actually states, "Silver sent Campbell the first invoice for Collateral Damage via a WhatsApp Message." (Compl. ¶ 34.) It says nothing about Silver "directing" Quantasy.

- Quoting their co-conspirator's statements in furtherance of their fraud, the Quantasy Defendants state: The February 24, 2022 "meeting 'went great' and Quantasy did 'an awesome job' at the presentation" and that **"[b]ecause of Quantasy's 'awesome job' with SOW #1, Root elected to enter into a second statement of work with Quantasy** (SOW #2)." (Defs.' Mot. at 5, citing Compl. Exs. 9, 19 (emphasis added).) That is a clear misrepresentation of Exhibit 9, **Silver's** text messages to Campbell. (Compl. ¶ 57, Ex. 9 (emphasis added).) Rather, Root did not think the February 24, 2022 presentation "went great." (*Id.* ¶ 41.)

- The Quantasy Defendants state that **Silver deceived them and they did not know Silver had an interest in Collateral Damage**. (Defs.' Mot. at 6, citing Compl. ¶ 71, Ex. 23 (emphasis added).) This is directly contradicted by the allegations in the Complaint. (*See* Compl. ¶¶ 32, 34, 49.)

These are but a few examples of the misstatements that the Quantasy Defendants make while citing the Complaint. These, and other, misstatements are what the Quantasy Defendants rely upon to support their arguments, discussed below in turn.

---

[4] The Quantasy Defendants quote Root's SEC filings and draw speculative conclusions from it that are not in the Complaint. (Defs.' Mot. at 1.) While the Court may take judicial notice of SEC filings under certain circumstances, the Court may not accept the contents for the truth of the matter nor draw any inferences or conclusions from those filings for purposes of deciding the motion to dismiss. *Stein v. hhgregg, Inc.*, 873 F.3d 523, 528 (6th Cir. 2017) (a court may not consider materials outside the complaint unless they are referred to in the complaint and central to the claims therein). Further, courts may take judicial notice of some public records, but the majority of courts "have held that the use of such documents is proper only for the fact of the documents' existence, and not for the truth of the matters asserted therein." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005); *Platt v. Bd. of Comm'rs on Grievs. & Discipline of the Ohio Supreme Court*, 894 F.3d 235, 245 (6th Cir. 2018) ("Such notice, however, is limited: a court may take notice of the documents and what they say, but it cannot consider the statements contained in the document for the truth of the matter asserted.") (internal quotation omitted).

### III.     ARGUMENT

#### A.     As a Threshold Issue, the Quantasy Defendants Are Subject to Personal Jurisdiction in This Court.

A motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction raises a "threshold question" that a Court must resolve before turning to issues raised under Rule 12(b)(6).  *Bird v. Parsons*, 289 F.3d 865, 872 (6th Cir. 2002).  Perhaps in a tacit admission of the weakness of their jurisdictional argument, the Quantasy Defendants move to dismiss for lack of personal jurisdiction in a cursory fashion at the end of their motion.[5]  Regardless this Court has personal jurisdiction over the Quantasy Defendants for two reasons.  First, this Court has specific jurisdiction over the Quantasy Defendants consistent with the Due Process Clause and Ohio's long-arm statute.[6]  Second, even if this Court finds that the Quantasy Defendants do not have the requisite minimum contacts for specific jurisdiction, personal jurisdiction is nevertheless proper under the RICO nationwide service of process provision.  The grounds for jurisdiction are set forth in the Complaint (which is verified) and the Declaration of Megan Binkley, both of which must be construed in a light most favorable to the Root.  *Theunissen*, 935 F.2d at 1459.

---

[5]   The motion to dismiss states that Root does not "specifically allege that Quantasy or Campbell have minimum contacts with Ohio."  (Defs.' Mot. at 49.)  However, "under Fed. R. Civ. P. 8(a), 'a plaintiff has no obligation to specifically allege in the complaint the existence of personal jurisdiction over the defendant.'"  *United States v. Operation Rescue*, 112 F. Supp. 2d 696, 700 (S.D. Ohio 1999).

[6]   Because Root's claims arise from a common nucleus of operative fact – namely, the Defendants' conspiracy to defraud Root– this Court need only find personal jurisdiction over one of the claims asserted against a defendant.  *See J4 Promotions, Inc. v. Splash Dogs, LLC*, No. 08-cv-977, 2009 U.S. Dist. LEXIS 11023, at *62 (N.D. Ohio Feb. 13, 2009) ("Pendent personal jurisdiction is a common law doctrine that recognizes the inherent fairness of exercising personal jurisdiction over claims asserted against a Defendant over whom the Court already has personal jurisdiction with respect to another claim or claims arising out of the same nucleus of operative facts.").

1. **This Court's Exercise of Specific Jurisdiction Is Consistent with Ohio's Long-Arm Statute and the Due Process Clause.**

Specific jurisdiction is established pursuant to Ohio's long-arm statute and the federal Due Process Clause where, as here, a plaintiff's cause of action "arises from" the defendant's conduct in the forum state. *Premier Prop. Sales Ltd. v. Gospel Ministries Int'l*, 539 F. Supp. 3d 822, 828 (S.D. Ohio 2021). Courts "have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Rather, "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* As explained below, courts routinely find specific personal jurisdiction over defendants through remote contacts with the forum state, including contracting with a business in the forum state, communicating with individuals in the forum state, and causing an injury in the forum state.

a. **The Court May Exercise Personal Jurisdiction over the Quantasy Defendants Consistent with the Due Process Clause.**

In order to determine if there is specific jurisdiction over a defendant under the Due Process Clause, courts in the Sixth Circuit employ a three-part test: (1) "the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state"; (2) the claims "must arise from the defendant's activities" in the forum state; and (3) "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Chulsky v. Golden Corral Corp.*, 583 F. Supp. 3d 1059, 1075 (S.D. Ohio 2022) (quoting *S. Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). The three-part test is satisfied in this case.

16

i.  **The Quantasy Defendants Purposefully Availed Themselves of Ohio.**

There is no question that the Quantasy Defendants purposely availed themselves to Ohio by choosing to contract with Root, an Ohio company.  "[P]arties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanction for the consequences of their activities" and thus have purposely availed themselves for purposes of personal jurisdiction.  *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (quoting *Burger King*, 471 U.S. at 479).  For instance, there is purposeful availment where a defendant negotiates and executes a contract through phone calls and electronic messages to Ohio residents.  *See, e.g.*, *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998) ("If, as here, a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio."); *Kehoe Component Sales, Inc. v. Best Lighting Prods.*, No. 2:08-cv-752, 2009 U.S. Dist. LEXIS 74852, at *16-17 (S.D. Ohio Aug. 19, 2019) (finding the same).

Here, the Quantasy Defendants negotiated and executed a contract – the statements of work, each of which were signed by Campbell – through communications with Root, an Ohio company.  (Compl. ¶¶ 26-34; Declaration of Megan Binkley (attached hereto as Exhibit 1, ¶¶ 6-11).)  That alone establishes purposeful availment under Sixth Circuit law.  *Cole* at 436, *supra*; *Kehoe* at *16-17, *supra*.  The Quantasy Defendants also created a continuing relationship with, and obligation to, Root by submitting the SOWs (signed by Campbell) and numerous invoices over the span of many months.  (*See, e.g.*, Compl. ¶¶ 27-34, 40, 51, 56-58, 67-68, 85.)  They fostered the continuing relationship through phone calls and virtual meetings with Ohio residents – further availing themselves of the forum state.  (*See, e.g.*, *id.* at ¶¶ 26-38, 43, 48-50, 53-54, 57-

17

63, 66-77, 80-83, 97-99, 103-105; *see also* Ex. 1, ¶¶ 7-11.) These contacts are sufficient to establish this Court's exercise of specific jurisdiction.

The Quantasy Defendants purposefully availed themselves of Ohio by accepting money from – and sending money to – an Ohio bank. *See, e.g.*, *Commodigy OG Vegas Holdings, LLC v. ADM Labs*, 417 F. Supp.3d 912, 917-924 (N.D. Ohio 2019) (finding jurisdiction was proper where, among other factors, defendant received money from an Ohio bank); *Davis Aviation Specialties, Inc. v. Trace Engines, L.P.*, No. 2:09-cv-61, 2009 U.S. Dist. LEXIS 136203, *18 (E.D. Tenn. Dec. 29, 2009) (finding that depositing money into forum state's bank supported a finding of purposeful availment). Through five separate payments, the Quantasy Defendants accepted more than $15 million from a Root account held at Huntington National Bank, located in Columbus, Ohio. (Ex. 1, ¶ 12.) The Quantasy Defendants also sent $1.2 million to Huntington National Bank. (*Id.* ¶ 13.)

Additionally, the Quantasy Defendants purposefully availed themselves of Ohio by intentionally defrauding an Ohio company. A defendant's tortious act can establish purpose availment:

> [A] nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state, so long as the tort (1) was intentional; (2) was aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state.

*Advanced Dermatology v. Adv-Care Pharm., Inc.*, No. 1:17-cv-251, 2017 U.S. Dist. LEXIS 181364, at *12 (N.D. Ohio Oct. 31, 2017) (quoting *Louis Vuitton Malletier v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013)) (internal quotations omitted). Here, the Quantasy Defendants intentionally committed the tort of fraud by sending false invoices, statements of work, and other documents into Ohio to defraud an Ohio company, and they should have anticipated that it would

18

harm Root in Ohio. (Compl. ¶¶ 26-34, 40, 51, 56-58, 67-68, 85.)[7] The Sixth Circuit has found purposeful availment in similar electronic communication cases even when the defendant does not enter the state. *See Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) (finding purposeful availment where the content of the defendant's phone and fax communications into the forum state gave rise to the intentional tort action even though the defendant did not physically enter the state).

### ii. Root's Claims Arise Out of the Quantasy Defendants' Contacts with Ohio.

Second, Root's claims "arise out of" the Quantasy Defendants' significant contacts with Ohio. This is a "lenient standard." *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002). "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contact." *Mulch Mfg. v. Advanced Polymer Solutions*, LLC, 2012 U.S. Dist. LEXIS 24249, at *15 (S.D. Ohio Feb. 7, 2012) (quoting *S. Machine*, 401 F.2d at 384 n.29). This litigation arises from the Quantasy Defendants' contacts with Ohio: entering into multiple contracts with Root, an Ohio resident; frequently communicating with Root employees in Ohio; attending meetings and giving presentations to Root employees in Ohio; accepting money from Ohio; and intentionally defrauding Root, an Ohio resident. (Ex. 1, ¶¶ 7-11 (regarding communications and meetings with Ohio employees); *id*. at ¶¶ 12-13 (regarding wire transfers to and from an Ohio bank); *id*. at ¶ 3 (providing that Root is an Ohio resident with a principal place of business in Columbus, Ohio).)

---

[7] *See also Betco Corp. v. Peacock*, No. 3:12-cv-1045, 2014 U.S. Dist. LEXIS 25972, at *21 (N.D. Ohio Feb. 28, 2014) (finding purposeful availment where "misrepresentations were directed to the forum state by the Defendants"); *Fifth Third Bank v. Gentile*, No. 1:08-cv-52, 2008 U.S. Dist. LEXIS 45220, at *24 (N.D. Ohio June 9, 2008) (finding purposeful availment where defendant defrauded an Ohio bank and should have known that harm would be suffered in Ohio).

iii. **The Quantasy Defendants' Actions Have a Substantial Enough Connection to Ohio to Make Personal Jurisdiction Reasonable.**

Third, the Quantasy Defendants' actions and consequences have "a substantial enough connection" with Ohio to make the exercise of jurisdiction reasonable. *Chulsky*, 583 F. Supp. 3d at 1075. "[W]hen the first two elements are met, an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." *First Nat'l Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982); *Burger King*, 471 U.S. at 477 ("where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable").

In addition to meeting the first two elements of personal jurisdiction, there is ample evidence that the Quantasy Defendants' actions towards Root were connected to Ohio, and the consequences of their actions harmed Root, an Ohio company. As discussed, the Quantasy Defendants entered into multiple contracts with Root, an Ohio resident; frequently communicated with Root employees in Ohio; attended meetings and delivered presentations to Root employees in Ohio; accepted money from Ohio; and intentionally defrauded Root, an Ohio resident. (*See* Ex. 1, ¶¶ 7-11 (regarding communications and meetings with Ohio employees); *id.* at ¶¶ 12-13 (regarding wire transfers to and from Ohio bank); *id.* at ¶ 3 (providing that Root is an Ohio resident with a principal place of business in Columbus, Ohio).) Such substantial connections to Ohio render this Court's exercise of personal jurisdiction manifestly reasonable.

b. **The Court May Exercise Personal Jurisdiction over the Quantasy Defendants Pursuant to Ohio's Long-Arm Statute.**

This Court's analysis may end with the Due Process inquiry. "Ohio recently amended its long-arm statute . . . to mirror the constitutional limitations for personal jurisdiction." *NOCO*

*Co. v. Shenzhen Valuelink E-Com. Co*., 550 F. Supp. 3d 488, 493 (N.D. Ohio 2021). Under the amendment, R.C. 2307.382(C) provides that "a court may exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution." *C.T. v. Red Roof Inns*, No. 2:19-CV-5384, 2021 U.S. Dist. LEXIS 132392, *34 (S.D. Ohio July 1, 2021) (Ohio's long-arm statute and the Due Process standard "are now coextensive"). The foregoing Due Process analysis is therefore dispositive and provides that personal jurisdiction is also proper under Ohio's coextensive long-arm statute.

But even if Ohio's long-arm statute is not coextensive with the Due Process Clause, this Court's exercise of personal jurisdiction is nevertheless consistent with R.C. 2307.382(A), which grants courts personal jurisdiction to hear "cause[s] of action arising from" an enumerated list of contacts with Ohio. R.C. 2307.382(A). This Court may properly exercise personal jurisdiction under any one of five separate provisions: R.C. 2307.382(A)(1), (2), (4), (6), or (7).

First, jurisdiction is proper under R.C. 2307.382(A)(1), which applies to defendants "[t]ransacting any business" in Ohio. "To 'transact' under R.C. 2307.382(A)(1) means 'to prosecute negotiations; to carry on business; to have dealings.'" *ATA Logistics, Inc. v. Empire Container Freight Station, Inc*., 2020-Ohio-4183, ¶ 16 (Ohio Ct. App. 2020) (quoting *Dahlhausen v. Aldred*, 932 N.E.2d 949, 954 (Ohio Ct. App. 2010)). As discussed above, the Quantasy Defendants transacted a continuing business relationship with Root, an Ohio company, over the span of many months. *See supra* Sec. IV.A.1. Those business dealings satisfy the "[t]ransacting any business" provision of Ohio's long-arm statute and independently warrant this Court's exercise of personal jurisdiction. Similarly, those business dealings satisfy R.C. 2307.382(A)(2), as Quantasy "contract[ed] to supply services . . . in this state" where the

21

statements of work provided that Quantasy would supply marketing services to Root, an Ohio company. (Ex. 1, ¶ 6 (attaching statements of work).)

Second, jurisdiction is proper under R.C. 2307.382(A)(6), which applies to defendants "[c]ausing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in this state." "[C]ourts have broadly construed this provision of Ohio's long-arm statute." *Chulsky*, 583 F. Supp. 3d at 1073. As discussed in the foregoing minimum contacts analysis, the Quantasy Defendants caused tortious injury to Root and should have expected that wrongfully depriving Root of millions of dollars would cause injury to Root, an Ohio resident. *Supra* Section IV.A.1. Their intentionally tortious conduct therefore satisfies R.C. 2307.382(A)(6) and independently warrants this Court's exercise of personal jurisdiction. Similarly, their tortious conduct satisfies R.C. 2307.382(A)(4), as the Quantasy Defendants "caus[ed] tortious injury in this state by an act or omission outside this state" and they further "derive[d] substantial revenue from . . . services rendered in this state" – namely, the approximately $15 million obtained for services purportedly provided to Root, an Ohio company. (Ex. 1, ¶ 12 (regarding invoices paid to Quantasy).)

Finally, jurisdiction is proper under R.C. 2307.382(A)(7), which applies to defendants "[c]ausing tortious injury to any person by a criminal act, any element of which takes place in this state, which the person commits or in the commission of which the person is guilty of complicity." As discussed in Section IV.E, *infra*, the Quantasy Defendants injured Root through the crime of theft, which involved the wrongful exercise of control over money obtained from an Ohio company. That criminal act satisfies R.C. 2307.382(A)(6) and also independently warrants this Court's exercise of personal jurisdiction.

### 2. The Court May Exercise Jurisdiction over All Defendants Pursuant to 18 U.S.C. § 1965(b).

Even if this Court finds it lacks specific personal jurisdiction over the Quantasy Defendants, personal jurisdiction is nevertheless proper under 18 U.S.C. § 1965(b). Under § 1965(b), this Court's jurisdiction extends to all defendants if: (1) the Court has personal jurisdiction over one defendant; and (2) the "ends of justice" require the Court to exercise jurisdiction over the remaining defendants. *Peters Broad. Eng'g, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 440 (6th Cir. 2022) (quoting 18 U.S.C. § 1965(b)). Here, both elements are satisfied.

### a. The Court Has Personal Jurisdiction over Silver.

It is undisputed that this Court has jurisdiction over Silver.[8] Personal jurisdiction over an individual is proper where the cause of action arises out of employment with a company in the forum state. *See, e.g.*, *Rexam Healthcare Packaging, Inc. v. Osiris Med., Inc.*, No. 3:09-cv-1584, 2010 U.S. Dist. LEXIS 21702, at *7 (N.D. Ohio Mar. 9, 2010) (finding personal jurisdiction to be proper where employee entered into an "employment relationship with a company he knew to be based in Ohio" and the "claims in this action arise directly from [the employee]'s abuse of the trust of his employer"); *Alloy Bellows & Precision Welding, Inc. v. Cole*, No. 1:15-cv-494, 2015 U.S. Dist. LEXIS 152318, at *14-15 (N.D. Ohio Nov. 10, 2015) (finding minimum contacts where defendant was, by virtue of his employment, "entering into ongoing obligations with an Ohio

---

[8] The Quantasy Defendants do not dispute that "this court has personal jurisdiction over at least one of the other defendants" in their motion to dismiss, thereby waiving any argument to the contrary. (Defs.' Mot. at 50); *see, e.g.*, *Magruder v. Grafton Corr. Inst.*, No. 1:19-cv-1980, 2020 U.S. Dist. LEXIS 93926, at *15 n.3 (N.D. Ohio Apr. 1, 2020) (where defendant's motion to dismiss argued it "does not concede" certain points, but failed to make any actual argument, the "Court will not make any arguments for the Defendant, and for purposes of this motion to dismiss determines any such arguments waived"); *Gant v. Elam*, No. 1:21-cv-117, 2022 U.S. Dist. LEXIS 59393, at *8 (S.D. Ohio Mar. 31, 2022) (same).

corporation, working with and communicating daily with Ohio employees, [and] traveling to Ohio on numerous occasions for meetings and training").

Here, Silver was employed by Root, an Ohio company. (Compl. ¶¶ 11, 14, 22-25.) During his employment, Silver devised and participated in a scheme to defraud Root by misrepresenting and concealing information from Root. (*Id.* ¶¶ 106-10, 118-21, 124-33.) To carry out this scheme, Silver executed an employment contract with Root, entered the forum state, and maintained contact with Root's Ohio employees. (*Id.* ¶¶ 22-23; Ex. 1, ¶¶ 4-5.) Silver's employment with, and scheme to defraud, a company he knew to be located in Ohio are more than sufficient contacts to warrant this Court's exercise of personal jurisdiction over him.

### b. The Ends of Justice Require Extending Jurisdiction to the Quantasy Defendants.

Under 18 U.S.C. § 1965(b), the "ends of justice" require that the Court's jurisdiction extend to the Quantasy Defendants. *Peters Broad*, 40 F.4th at 440. "[I]t would be inconsistent with RICO's purpose of 'eradicating organized crime' to force a RICO plaintiff to litigate in an inconvenient judicial district 'whenever organized criminals operate within the same locale and cause harm in a distant state.'" *Rexam*, 2010 U.S. Dist. LEXIS 21702, at *14 (quoting *Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1232 (10th Cir. 2006)). Courts have therefore adopted a "flexible" ends-of-justice inquiry that considers the desirability of having the whole action litigated in one court, the cost of the delay involved in transferring the case to another forum, and the general balance of hardships between plaintiff and defendant. *Id.* at *14-15 (collecting cases); *Suarez Corp. Indus. v. McGraw*, 71 F. Supp. 2d 769, 778 (N.D. Ohio 1999) ("It would not serve the ends of justice to require separate trials in different fora against parties who . . . have close involvement in the events underlying the plaintiff's case[.]").

Here, the ends of justice inquiry weighs in favor of the Court exercising jurisdiction over the Quantasy Defendants. First, this case should be tried in one court. Declining to exercise jurisdiction over the Quantasy Defendants would lead to Root litigating against them in a different court while also litigating against the remaining five defendants in this Court. Second, the delay and expense to transfer the case would be costly to the parties and both courts. Due to unique aspects of this case – including the temporary restraining order, an agreed preliminary injunction between all parties, expedited discovery, multiple hearings, and an appointed receiver – this case has proceeded well beyond the pleadings stage in this Court. Requiring Root to refile this case against the Quantasy Defendants in another jurisdiction would be an inefficient use of the parties' and both courts' resources. Finally, the Quantasy Defendants have already obtained local counsel and substantively participated in proceedings before this Court.

In their motion to dismiss, the Quantasy Defendants insist that there "is a more convenient forum available in California." (Defs.' Mot. at 52-53.) However, the ends of justice inquiry does not require that a plaintiff bring suit in the forum most convenient for all defendants, and any conceivable burden is minimal where, as here, the Defendants "already have competent Ohio counsel in place and appear quite capable of defending this action in" Ohio. *Rexam*, 2010 U.S. Dist. LEXIS 21702, at *16. Moreover, the Sixth Circuit has not adopted any requirement that courts find a lack of alternate forums. *See Peters Broad*, 40 F.4th 432. And prior to the Sixth Circuit's authoritative interpretation of § 1965(b), other district courts likewise rejected any such requirement. *See, e.g.*, *Rexam*, 2010 U.S. Dist. LEXIS 21702, at *14 (quoting *American Trade Partners, L.P. v. A-1 Int'l Importing Enterprises, Ltd.*, 755 F. Supp. 1292, 1305 n.20 (E.D. Pa. 1990) ("nowhere in section 1965(b) does it say that there must not be some other appropriate forum"). In any event, California courts may lack personal jurisdiction over

25

McDaniel, as Root does not know the extent of McDaniel's contacts with California.  (Complaint, ¶ 15 (providing that McDaniel is a Georgia resident).)  Thus, the Quantasy Defendants' alternative forum argument is both unsupported by law and facts of this case.

**B.    Root Properly Pled Its RICO Claim Against the Quantasy Defendants (COUNT I).**

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.S. §§ 1961–1968, creates a civil cause of action for any person or business injured by a violation of § 1962.  Section 1962(c) prohibits any person from engaging in: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006).  The Quantasy Defendants are liable under RICO for participating in and organizing an enterprise to defraud Root through wire communications and a series of false marketing contracts that resulted in stealing over $9 million from Root.  (Compl. Count I.)

**1.    The Complaint Sets Forth Sufficient Allegations of Predicate Acts.**

"Racketeering activity" includes any of the predicate acts listed in 18 U.S.C. § 1961(1).  Root's RICO claims are based on the predicate acts of wire fraud and money laundering.  18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1956 (money laundering).

**a.    Wire Fraud**

Wire fraud is defined as:  (1) a scheme based on an intent to defraud; and (2) the use of interstate wire communications, such as telephone calls or electronic communications, made in furtherance of the scheme.  18 U.S.C.S. § 1343; *United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990).

As to the first element of wire fraud, Root adequately alleges "a scheme based on an intent to defraud."  A scheme to defraud is "any plan or course of action by which someone intends to

deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises." *W. Hills Farms, LLC v. ClassicStar Farms, Inc. (In re ClassicStar Mare Lease, Litig.)*, 727 F.3d 473, 484 (6th Cir. 2013) (citations omitted). Here, Campbell and Silver signed marketing services contracts between Quantasy and Root designed solely to funnel Root's money to themselves and their companies for their own personal gain rather than actually providing the agreed upon services. (Compl. ¶¶ 3-5.) In addition, "the Sixth Circuit has . . . repeatedly confirmed that concealment of material facts can constitute a fraudulent scheme sufficient to establish RICO liability," whether or not there was a duty to disclose. *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 882 (E.D. Mich. 2019). Here, the Quantasy Defendants fraudulently concealed the existence of Collateral Damage, and Silver's ownership of it, from Root, intending to trick Root into entering fake contracts and paying money to Quantasy. (Compl. ¶¶ 56, 120, 121.)

With respect to the second element of wire fraud, Root's Complaint details wire communications made by the Quantasy Defendants to Root in furtherance of the scheme. Predicate wire communications need not be fraudulent in and of themselves. Innocuous or "innocent" mailings and wirings that do not contain misrepresentations are sufficient RICO predicates as long as they further a fraudulent scheme. *Schmuck v. United States*, 489 U.S. 705 (1989) (holding "innocent" mailings sufficient for purposes of mail fraud statute); *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 886 (6th Cir. 1990) (citing *Schmuck* for the same); *Gamboa*, 381 F. Supp. 3d at 880 (noting that predicate communications that are innocent or even legally necessary are sufficient). Furthermore, a plaintiff need not show that it relied on the defendant's alleged representations for the representations to be considered predicate acts. *Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639, 647-61 (2008) (rejecting RICO

defendants' arguments that Congress intended mail or wire fraud under RICO to incorporate the common law fraud requirement of first-party reliance).

The Quantasy Defendants' predicate wire communications to Root include, but are not limited to, the following:[9]

- Quantasy sent Root invoice number 2286 for $473,778 under SOW #1 via electronic mail on February 3, 2022, for "Brand Services." (Compl. ¶ 31, Ex. 4.) However, Quantasy did not, and had no intention of, rendering "Brand Services." (*Id.* ¶ 56.)

- On February 23, 2022, Campbell sent Root invoice number 2286 for $414,555.75 via electronic mail with an already expired due date of February 18, 2022, for "Brand Services." (Compl. ¶ 40, Ex. 8.) Again, Quantasy did not, and had no intention of, rendering "Brand Services." (*Id.* ¶ 56.)

- On April 1, 2022, Campbell sent Root's invoicing department Quantasy invoices 2307 and 2308 for a total of $7,350,000 via electronic mail. The invoices misrepresent that Quantasy will use the money for "Q2 Production Services and costs" and "Q2 Media Services and costs." (*Id.* ¶ 58 and Exs. 20, 21.) Root paid the invoice but Quantasy never provided production services or used the money for costs. (*Id.* ¶ 85.)

- On April 14, 2022, Campbell sent Root's invoicing department an email message attaching two Quantasy invoices: invoice number 2316 for $3,450,000, and invoice number 2317 for $3,900,000, for a total of $7,350,000. (*Id.* ¶ 68, Ex. 29.) The invoices misrepresent that Quantasy will use the money for "Q2 Production Services and costs" and "Q2 Media Services and costs." (*Id.* ¶ 58 and Exs. 20, 21.) Root paid the invoice but Quantasy never provided production services or used the money for costs. (*Id.* ¶ 85.)

- Quantasy misrepresented via email to Root on September 22, 2022 that $10.7 million of the $14.7 million Root paid was unallocated and could be used in 2023. (*Id.* at ¶ 98.) In fact, Quantasy had given $9.1 million of the $10.7 million to Collateral Damage. (*Id.* ¶ 85.)

- On September 29, 2022, Quantasy purported to "assign" the August 20, 2022 subcontractor agreement between Quantasy and Collateral Damage to Root. (*Id.* at ¶ 100, Ex. 40.)

---

[9] Root lists a few examples for the sake of brevity. There are numerous other examples of wire communications in the Complaint and in this response. (*E.g.* Compl. ¶¶ 30, 41, 57, 125.)

The Quantasy Defendants' representations to Root above constitute predicate acts of wire fraud because each was made in furtherance of the scheme to defraud Root.

Finally, the Quantasy Defendants' communications to Root were but-for and proximate causes of Root's injury. (Compl. ¶ 117.) Absent Quantasy's invoices and description of purported services listed therein, Root would not have paid Quantasy and suffered its losses of over $9 million. (*Id.*) And absent Quantasy's misrepresentation that it retained $10.7 million for Root's future use, Root would have immediately demanded more than the $1.2 million it clawed back from Quantasy, fired Silver before he created additional after-the-fact contracts on behalf of Root, filed suit against the Defendants, and would likely be able to recover more before Silver and Campbell squandered their proceeds. (*Id.* ¶¶ 94-104.) Instead, Quantasy's delay in disclosing Collateral Damage's existence and relationship to Silver delayed Root's investigation and limited Root's recovery of its funds. (*Id.*)

The Quantasy Defendants' arguments rest on an attempt to improperly narrow the frame of their misconduct. (Defs.' Mot. at 13-15.) They argue that their fraudulent scheme is limited to only two predicate acts: (1) David Rodriguez's misrepresentation to Root on September 22, 2022 that $10.7 million of the $14.7 million Root paid was unallocated and available for 2023 (Compl. ¶ 98); and (2) Quantasy's attempt to assign their subcontract with Collateral Damage to Root on September 29, 2022 (*id.* at ¶ 100, Ex. 40). (Defs.' Mot. at 13-15.) But, as detailed above, there are far more than those two predicate acts. The Quantasy Defendants sent countless wire communications directly to Root in furtherance of their scheme to defraud Root of millions of dollars. (*See, e.g.*, *id.* ¶¶ 31, 40, 58.) Any one of these communications is sufficient to establish the necessary predicate act to support Root's RICO claim.

Next, the Quantasy Defendants argue that the predicate acts set forth in the Complaint are insufficient to support a RICO claim because Root did not rely upon the Quantasy Defendants' misrepresentations. (Defs.' Mot. at 13-15.) But as a matter of law, reliance is not a required element in RICO wire fraud cases. *Grange Mut. Cas. Co. v. Mack*, 290 F. App'x 832, 835 (6th Cir. 2008) (reliance is no longer required to show proximate cause in a RICO claim) (citing *Bridge*, 553 U.S. at 647-61). In any event, Root certainly relied upon the Quantasy Defendants' fraudulent contracts, emails, and invoices when Root paid Quantasy nearly $15 million. (Compl. ¶¶ 56, 85.)

### b. Money Laundering

Money laundering occurs when a person takes steps to make funds appear legitimate by channeling illegally obtained money through legitimate people or accounts. *Regalado Cuellar v. United States*, 553 U.S. 550, 558 (2008). To plead money laundering, a plaintiff must allege facts that support the following elements: (1) use of funds in financial transactions; (2) knowledge that the funds are proceeds of unlawful activity; and (3) "knowledge that the financial transactions were designed to disguise the nature, location, source, ownership or control of the proceeds." 18 U.S.C. 1956(a)(1)(B)(i); *United States v. Moss*, 9 F.3d 543, 551 (6th Cir. 1993); *Roden v. Schlichter*, 6th Cir. No. 20-3466, 2021 U.S. App. LEXIS 4562, at *7 (Feb. 17, 2021).

Root pleads all three elements. First, the Quantasy Defendants used Root's money in financial transactions by transferring vast sums of it to Collateral Damage for alleged marketing services. (Compl. ¶¶ 39, 41, 49, 55, 69, 73, 74, 79, 82, 84.)

Second, Quantasy Defendants knew that the funds were the proceeds of unlawful activity, namely fraud, theft, money laundering, and conversion. The Quantasy Defendants:

- concocted this scheme together with Silver and others via encrypted private messaging rather than using their professional emails (*id.* ¶¶ 32, 35, 37);

- claim that they thought Root was on board with this arrangement, but never divulged to a single person at Root (other than Silver) their "subcontract" with or transfers to Collateral Damage (*id.* ¶ 49, 55, 56, 69, 72, 78, 81, 82);

- never raised Silver's conflict of interest with anyone at Root (*id.*); abided by, and never questioned or brought to Root's attention, Silver's suggestions to only send invoices to him to avoid detection (*id.* ¶ 50), and to only send invoices below $10 million "so they don't need board approval" (*id.* ¶ 67);

- attempted to blanket the issue with backdoor contracts when attorneys advised the Quantasy Defendants that their deal with Collateral Damage was potentially illegitimate (*id.* ¶¶ 61, 62);

- fabricated backdated change orders with Collateral Damage and Root to justify the lack of work product delivered to Root (*id.* ¶¶ 93, 96); and

- lied when Quantasy employees and Campbell were asked about the whereabouts of Root's money and the purported services (*id.* ¶¶ 96, 97).

Third, the Quantasy Defendants knew their transfers to Collateral Damage from Root were designed to disguise the nature, location, source, ownership or control of the proceeds. Otherwise, they would not have lied to Root about the whereabouts of Root's funds, used private encrypted messaging to avoid detection, nor created backdated contracts to cover up the lack of work product and shift blame for their failure. The Complaint also alleges that the Quantasy Defendants knew Silver was buying luxury real estate through Eclipse with the money from Root (*id.* ¶¶ 83, 86, 87), and they knew Root was unaware of the transactions (*id.* ¶¶ 49, 55, 56, 69, 72, 78, 81, 82, 85). Therefore, the Quantasy Defendants knew about and participated in the group's efforts to funnel money away from Root and disguise the nature, location, source, ownership or control of the proceeds.

When taking the allegations of the Complaint as true and drawing all reasonable inferences in Root's favor, Root sufficiently alleges the predicate act of money laundering.

### 2. The Quantasy Defendants Participated in the Operation and Management of an Association-in-Fact Enterprise.

Under RICO, an "enterprise" can include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise does not have to be a formal business; it can be composed of an "association-in-fact": where two or more individuals and/or businesses that have a relationship with each other come together for a common purpose for a sufficient length of time "to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). By contrast, there is no association-in-fact enterprise where individuals act "independently and without coordination." *Id.* at 947 n.4. Conspirators must only have some general "aware[ness]" that the scheme involves other participants, *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977), but they need not "know one another." *United States v. Jones*, 275 F.3d 648, 652 (2001); *United States v. Donagher*, 520 F. Supp. 3d 1034, 1056 (N.D. Ill. 2021); *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2016) (finding defendants did not need to know about each other or each other's roles in the enterprise, but only the nature of the enterprise).

Here, the Defendants formed an association-in-fact enterprise for the common purpose of defrauding Root through false marketing contracts for approximately 12 months. (Compl. ¶¶ 109-16.) Silver and Campbell led the enterprise together at the top of the chain. (*See, e.g.*, *id.* ¶¶ 26, 32, 56, 61, 85.) They used their companies – Collateral Damage, Quantasy, and Eclipse – to enter Root and Quantasy into false marketing contracts under which they would receive millions of dollars in exchange for little to no marketing services. (*Id.*)

The Quantasy Defendants argue that they were not an association-in-fact enterprise because they were not aware of McDaniel or Eclipse. (Defs.' Mot. at 16.) However, that flatly

32

contradicts the allegations and documentary evidence in the Complaint, which details that they dealt with Ms. McDaniel in her role as "President" of Collateral Damage. (Compl. ¶ 96, Ex. 36 (McDaniel and Campbell sign a subcontractor agreement on behalf of Collateral Damage and Quantasy); *id.* ¶ 71, Ex. 30 (McDaniel signs the W-9 form that Silver sent to Campbell on behalf of Collateral Damage).) As evidenced by the multiple agreements they signed with Ms. McDaniel, the Quantasy Defendants were aware of her existence and role in the scheme. (*See id.* ¶¶ 71, 96.) Moreover, the encrypted WhatsApp text messages between Silver and Campbell indicate that Campbell knew Silver was using Root's money to purchase luxury real estate through Eclipse. The Quantasy Defendants' general, if not actual, awareness of their co-conspirators is sufficient. *Donagher*, 520 F. Supp. 3d at 1056.

The Quantasy Defendants next argue there are insufficient allegations of an association-in-fact enterprise because Defendants operated in a "hub-and-spoke" structure with Silver directing all the activities of Defendants without coordination. (Defs.' Mot. At 16-17.) While the Sixth Circuit has not accepted or rejected this hub-and-spoke theory, other circuits describe such structures as those where one actor "engage[s] in a series of separate frauds involving different sets of individuals" without coordination. *D'Addario v. D'Addario*, 901 F.3d 80, 101 (2d Cir. 2018). That is not the case here. But even if it was (which it is not), this Court need not, and should not, adopt a judicial overlay of RICO liability which the Sixth Circuit has not adopted.

Assuming without deciding that the so-called "hub-and-spoke" defense has any applicability as a matter of law in this Court, it is again plainly contradicted by the allegations in the Complaint. Silver did not have an isolated or disconnected relationship with Campbell and Quantasy in which he directed their fraudulent activities separate and apart from the other

Defendants. Instead, the Quantasy Defendants worked together with Silver, Collateral Damage, McDaniel, and Eclipse, to perpetrate the fraud:

- Campbell and Silver brainstormed the scheme's details together in November and December 2021 (Compl. ¶¶ 27, 28, 29);

- Campbell created the percentage structure to funnel Root's funds from Root to Quantasy to Collateral Damage (*id*. ¶¶ 37, 38);

- Campbell and Quantasy suggested that the group attempt to hide its misdeeds by creating after-the-fact, backdated, 'subcontracts' and change orders between Root, Quantasy, and Collateral Damage (*id*. ¶¶ 61, 93);

- Campbell sent messages to Silver asking for Root to pay or for Collateral Damage and Lauren Lanskie to send the fake invoices to Collateral Damage (*id*. ¶¶ 43, 48); and

- McDaniel and Campbell signed an after-the-fact subcontractor agreement on behalf of Collateral Damage and Quantasy (*id*. ¶ 96, Ex. 36).

Their argument for a hub-and-spoke structure is plainly contradicted by the Complaint.

Alternatively, the Quantasy Defendants argue they cannot be held liable even if they were part of the enterprise because they did not participate in the management and operation of the enterprise. (Defs.' Mot. at 17-18); *see Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (requiring that RICO defendants must have "some part in directing the enterprise's affairs"). This, predictably, ignores the specific allegations in the Complaint that Campbell directed Silver and Collateral Damage at times, and that Campbell and Quantasy participated in management and operation of the scheme:

- Campbell initiated the creation of SOW #1 and took charge of revising it, while Silver merely "provid[ed] additional information for Campbell to include in the SOW" (Compl. ¶¶ 27, 28, 29 and Exs. 1, 2);

- During Silver and Campbell's encrypted discussions via WhatsApp as to how Root's payments would be divided between Quantasy and Collateral Damage on February 13, 2022, Campbell participated in creating the payment structure of the enterprise by stating that there should be three payments to Collateral Damage and that they should be divided up "pro rata" (*id*. ¶¶ 37, 38, Fig. 1);

- Campbell directed Silver to send Collateral Damage's invoices to him (*id.* ¶¶ 43, 48 and Exs. 11, 13, 17); and

- Campbell and Quantasy suggested the Defendants create backdated contracts between Collateral Damage and Quantasy, and Collateral Damage and Root to cover up the scheme (*id.* ¶ 61, Ex. 23).

In addition, Campbell and Quantasy worked with the other Defendants to initiate, direct, facilitate, and cover up the scheme. (*Id.* ¶ 97 (Campbell fails to disclose Collateral Damage's existence even when Root directly asked where its money was); *id.* ¶ 99 (Silver sends Campbell screenshots of Root's internal investigation and telling him "we are literally good," "hold the line").) These allegations are sufficient at the motion-to-dismiss stage to establish the Quantasy Defendants' participation in the management and operation of an association-in-fact enterprise.

### 3. Root Adequately Pled a Pattern of Racketeering.

The RICO statute defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5); *Busacca*, 936 F.2d at 238; *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). To establish a pattern, a plaintiff must show two prongs: (1) the predicate acts are related, and (2) that they pose (or once posed) a threat of continued criminal activity.[10] *H. J. Inc.*, 492 U.S. at 239. The Quantasy Defendants challenge only the second prong, which is referred to as "continuity."

Continuity can be closed-ended, meaning "a closed period of repeated conduct," or opened-ended, meaning "past conduct that by its nature projects into the future with a threat of repetition" or once posed a threat of repetition if the criminal activity had not stopped. *H. J. Inc.*, 492 U.S.

---

[10] The first prong – that the predicate acts are related – is satisfied if the predicate acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H. J. Inc.*, 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)); *Grubbs v. Sheakley Grp.*, 807 F.3d 785, 804 (6th Cir. 2015). It is undisputed that Root meets the first prong. (*See generally* Defs.' Mot. at 8-19.)

at 241. Whether the continuity requirement is satisfied depends on the specific facts of each case. *See id.* at 242; *Moon*, 465 F.3d at 724. As set forth below, the scheme satisfies open-ended continuity.

Open-ended continuity is established where the predicate acts involved implicit or explicit threats of repetition, that they formed the operations of an association that exists for criminal purposes, or that they were the defendants' regular way of conducting a legitimate enterprise. *See H. J. Inc.*, 492 U.S. at 242–43. Open-ended continuity also exists in cases, such as this one, where the criminal activity could have continued if it was not interrupted by the discovery of the crime and subsequent filing of a RICO action. *Heinrich v. Waiting Angels Adoption Servs.*, 668 F.3d 393, 410 (6th Cir. 2012); *Kalitta Air, LLC v. GSBD & Assocs.*, 591 F. App'x 338, 347 (6th Cir. 2014) (finding open continuity where there were allegations sufficient to suggest the defendants *could have* continued their criminal activity or may continue their criminal activity with other businesses); *Busacca*, 936 F.2d at 238 ("in the context of an open-ended period of racketeering activity, the threat of continuity must be viewed at the time the racketeering activity occurred," not necessarily whether the activity is still occurring at the time of litigation).

Once again, the Quantasy Defendants narrowly construe their own fraud, arguing that there is no open-ended continuity because there were only two predicate acts alleged in the Complaint. (Defs.' Mot. at 13.) However, as explained above, the Quantasy Defendants committed more than two predicate acts. *Supra* Sec. IV.B.1 (detailing the numerous wire communications from Quantasy Defendants to Root that constitute predicate acts).

Moreover, the Complaint sufficiently alleges that the Defendants' scheme would have continued if Root had not fired Silver and filed this action. *See Blue Cross & Blue Shield of Michigan v. Kamin*, 876 F.2d 543, 545 (6th Cir. 1989) (finding that continuity was established

because, if the defendant had not been caught, there was no reason to believe he would not still be submitting fraudulent insurance claims). Silver and Campbell signed successive marketing contracts between Root and Quantasy to steal money from Root and would have continued to do so until Root stopped them. (Compl. ¶¶ 56, 85, 93.) Indeed, and apart from future 'marketing' agreements, the original fraud had yet to conclude: the luxury real estate purchased with Root's stolen money had yet to be sold at the time the fraud was discovered, which appeared to be the intended vehicle to launder the money. (*Id*. ¶¶ 86-91.) As held in other Sixth Circuit cases, at the time the racketeering activity occurred, "there was no indication that their pattern of behavior would not continue indefinitely into the future." *Heinrich*, 668 F.3d at 411; *Busacca*, 936 F.2d at 238 (because "[a]ll racketeering conduct must necessarily come to an end at sometime . . . [t]he lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity.").

Finally, the Quantasy Defendants contend that their scheme cannot constitute a pattern of racketeering because there was only one victim and one scheme. (Defs.' Mot. at 13.) In so arguing, the Quantasy Defendants overstate the requirements to allege a RICO claim. The plain language of the RICO statute explicitly defines a "pattern" as "***at least two acts of racketeering activity*** . . . the last of which occurred within ten years after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (emphasis added)[11]; *H. J. Inc.*, 492 U.S. at 256 (Scalia concurrence)

---

[11] RICO was enacted to eliminate "the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91-617, at 76 (1969). Infiltration of even one legitimate organization operating in interstate commerce – in this case, Root – can still give way to a pattern consisting of two or more predicate acts. *See generally United States v. Turkette*, 452 U.S. 576, 591 (1981) (noting that RICO targets bad actors who misuse or wrongfully acquire or invest in *one* legitimate enterprise); *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997) (describing the prototypical RICO case as one in which a person "bent on criminal activity" uses control of *a* legitimate firm to perpetrate criminal activities).

("nothing in the statute supports the proposition that predicate acts constituting part of a single scheme (or single episode) can never support a cause of action under RICO.").  Here, the plain language of the statute is satisfied – there are more than two predicate acts occurring within ten years of each other that posed a continued threat of criminal activity before it was stopped.

Moreover, the number of victims and schemes are but two of the many considerations in determining what constitutes a pattern of racketeering activity.  Courts should also consider the number of predicate acts (the more the better), the variety of predicate acts (the more the better), and the number of perpetrators (the less the better).  *Columbia Nat. Res. v. Tatum*, 58 F.3d 1101, 1110 (6th Cir. 1995); *see also H. J. Inc.*, 492 U.S. at 242 (noting that whether there is a pattern depends on the specific facts of each case, courts should not apply blanket rules).  Here, there were numerous acts of wire fraud and money laundering, *see supra* Sec. IV.B.1, and only a handful of perpetrators – Silver, Campbell, Quantasy, Collateral Damage, Eclipse, and McDaniel.  There was more than one victim in this case: each of the three Plaintiffs were injured by Defendants' conduct (Compl. at 1, defining "Root" as Root, Inc., Caret Holdings, Inc., and Root Insurance Agency, LLC); Plaintiffs' shareholders, employees, stakeholders, and partners were injured by Defendants' conduct; and Defendants stole Lauren Lanskie's identity while perpetrating their scheme (*id.* ¶¶ 44, 45, 48, 53, 54, 71).

The Quantasy Defendants' assertion that the fraud was not ongoing because it related only to Root's current marketing spend is incorrect.  (*See* Defs.' Mot. at 13.)  As shown by the change orders and after-the-fact, back dated contracts created in the fall of 2022, they had every intention of continuing to defraud and transfer funds from Root into the following year.  (Compl. ¶¶ 100-102 (in November 2022, discussing Collateral Damage's work for Root in 2023).)

There was a pattern of racketeering because there were numerous related predicate acts perpetrated by a few people that was ongoing at the time it was discovered and stopped. *See*, *e.g.*, *Tatum*, 58 F.3d at 1110.

In conclusion, when taking the allegations of the Complaint as true and drawing all reasonable inferences in Root's favor, the Quantasy Defendants are liable under RICO for forming an associate-in-fact enterprise that engaged in a pattern of wire fraud and money laundering.

### C. Root Sufficiently Alleges Fraudulent Concealment and Fraudulent Misrepresentation (Counts II and III).

The Quantasy Defendants move to dismiss Root's fraud claims on three erroneous grounds: (1) Root fails to properly plead the elements of a fraudulent concealment claim; (2) Root fails to adequately plead the elements of a fraudulent misrepresentation claim; and (3) the fraud claims against the Quantasy Defendants are allegedly duplicative of Root's breach of contract claim against Quantasy. (Defs.' Mot. at 19-33.) All three arguments fail.

### 1. Root States a Claim for Fraudulent Concealment (Count II).

The Complaint asserts a viable fraudulent concealment claim against the Quantasy Defendants. In Ohio, a plaintiff properly pleads a fraudulent concealment claim where they allege:

> [1] a representation, or, where there is a duty to disclose, a concealment of a fact, [2] which is material to the transaction at hand, [3] made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, [4] with the intent of misleading another into relying upon it, [5] justifiable reliance upon the representation or concealment, and [6] a resulting injury proximately caused by the reliance.

*Burr v. Bd. of Ctny. Comm'rs*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986) (quoting *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 462 N.E.2d 407 (1984)). The Quantasy Defendants challenge only the first, second, and fourth elements. As set forth below, the Quantasy Defendants' arguments are without merit.

### a. The Quantasy Defendants Had a Duty to Disclose Information to Root.

The Quantasy Defendants had a duty to disclose material information to Root. (Compl. ¶ 120.) It is true that parties to a business transaction normally do not have a duty to disclose information. *Blon v. Bank One*, 35 Ohio St.3d 98 (1988). However, there is a duty to disclose where: (1) the transaction is not made at arm's length; (2) "the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading," **or** (3) the non-disclosing party does not have "equal access" to the undisclosed information. *Id.*; *Andersons, Inc. v. Consol, Inc.*, 185 F. Supp. 2d 835, 843-44 (N.D. Ohio 2002); *Mar Jul, LLC v. Hurst*, No. 12CA6, 2013-Ohio-479, 52 (4th Dist. February 6, 2013).

First, the parties were not dealing at arm's length. An arm's-length transaction is a transaction taking place on the open market between two unrelated and unaffiliated parties acting in good faith and conducted "as if the parties were strangers, so that no conflict of interest arises." *Black's Law Dictionary* (9th ed. 2009); *North Royalton City Sch. Dist. BOE. v. Cuyahoga Cty. Bd. of Revision*, 129 Ohio St.3d 172, 2011-Ohio-3092, 950 N.E.2d 955.[12]

Here, Silver acted in his own interest, not Root's interests, when he signed contracts and agreements on behalf of Root with Quantasy and Collateral Damage. (Compl. ¶¶ 3, 37, 56, 57, 62, 86.) And Campbell and Silver were not two strangers negotiating a deal on the open market – they were prior business acquaintances, working together to perpetuate a fraudulent scheme and communicating via encrypted messaging to avoid detection. (*Id.* ¶ 32.) Therefore, the Quantasy Defendants had a duty to disclose because this was not an arm's length transaction. They knew

---

[12] The case the Quantasy Defendants rely upon, *Demcyzk v. Lesh, Casner & Miller (In re Kirkpatrick)*, 254 B.R. 378, 387 (N.D. Ohio 2000), discusses the duty to disclose in a case where the plaintiff claims the defendant failed to disclose his decision to not prosecute someone. It does not concern a transaction between two parties and is as such inapplicable to this case.

40

that Silver was not acting in Root's interests, and Silver and Campbell were not strangers on the open market, and there was a clear conflict of interest.

Second, there is a duty to disclose where "the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading." *Andersons, Inc.*, 185 F. Supp. 2d at 843. Here, the Quantasy Defendants made the following representations and failed to correct them: Quantasy's invoices represented that Quantasy (rather than Collateral Damage) would perform certain marketing services (Compl. ¶¶ 31, 40, 51, 58 and Exs. 4, 8, 16, 20, 21); Quantasy and Campbell misrepresented during the February 24, 2022 meeting that Quantasy (rather than Collateral Damage) was executing the ideas on behalf of Root (*id.* ¶ 41); on August 22, 2022, Campbell failed to correct earlier representations that Quantasy was performing the work for Root and had Root's money in its possession (*id.* ¶ 97); on September 22, 2022, Quantasy's David Rodriguez (copying Campbell on the email) misrepresented to Root's internal audit team that $10.7 million of the $14.7 million original spend was "currently unallocated/uncommitted at this time" (*id.* 98, Ex. 37). The Quantasy Defendants knew these statements were or became untrue or misleading, yet they failed to disclose the truth to Root.

Third, the Quantasy Defendants had a duty to disclose their dealings with Silver because Root did not have equal access to the undisclosed information. Root did not know and could not have known that the Quantasy Defendants sent part of Root's payments to Collateral Damage. Root also did not know Silver was sending money to his own company and working out private deals. (Compl. ¶¶ 56, 85.) Root did not have access to any of this information because Silver and Campbell communicated exclusively through private email accounts, encrypted WhatsApp messages, and text messaging. (*Id.* ¶ 32.) Silver and Campbell hatched methods specifically

41

designed to evade Root's financial controls such as sending all invoices directly to Silver, and circumventing board approval of the contracts required for expenditures in excess of $10 million by only submitting invoices for lesser amounts. (*Id.* ¶¶ 50, 67.)

### b. The Quantasy Defendants Concealed Material Facts from Root.

A fact is deemed material where it "affects the conduct of a reasonable person with reference to the transaction in question." *Javitch v. First Montauk Fin. Corp.*, 279 F. Supp. 2d 931, 940 (N.D. Ohio 2003) (citing *Leal v. Holtvogt*, 123 Ohio App.3d 51, 76, 702 N.E.2d 1246 (1998). Whether a fact is material is a mixed question of law and fact that is normally decided by the trier of fact. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001).

The following facts are material: (1) the Quantasy Defendants accepted millions of dollars but failed to perform the contracted services; (2) the Quantasy Defendants gave the majority of Root's payments to Collateral Damage but Collateral Damage performed little or no work for Root; and (3) Silver had a serious conflict of interest due to his ownership of and involvement in Collateral Damage. (Compl. ¶ 120.) Root would not reasonably enter into contracts with, pay, or continue business with the Quantasy Defendants if it had known those material facts.

The Quantasy Defendants first argue that they had no knowledge of Silver's improper connection to Collateral Damage and therefore could not have concealed information about it. (Defs.' Mot. at 26-27.) In so arguing, the Quantasy Defendants ignore the following allegations, which taken as true, show they in fact did know about Collateral Damage's impropriety from the very beginning:

- Silver and Campbell had conducted business together before Root (Compl. ¶ 26);

- Silver and Campbell set up a scheme via encrypted WhatsApp messaging on February 7, 2022 for Quantasy to transfer part of Root's funds to Collateral Damage (*id.* ¶ 32);

- Silver and Campbell discussed how the payments would be divided between them and their companies on February 13, 2022, via WhatsApp (*id.* ¶ 37);

- Despite paying Collateral Damage, the Quantasy Defendants knew that Collateral Damage used the money to purchase luxury real estate rather than performing services for Root (*id.* ¶¶ 56, 83, 85);

- Even though Silver claimed he was no longer involved in Collateral Damage, he still spoke for Collateral Damage and Quantasy and Campbell communicated with him regularly regarding Collateral Damage (*id.* ¶¶ 63, 66, Fig. 3 (Silver signing an email from Collateral Damage to Quantasy));

- Silver sends Campbell screenshots of Root's internal investigation, telling him "we are literally good," "hold the line" (*id.* ¶ 99); and

- Campbell and Quantasy suggested they create backdated agreements to "paper up" the scheme (*id.* ¶¶ 61, 62).

The Quantasy Defendants did not need to know *all of* the facts about Collateral Damage or Lauren Lanskie to know that funneling Root's money to Silver's company was improper.  At a minimum, the Quantasy Defendants knew that Silver owned and spoke for Collateral Damage, Silver was Root's new Chief Marketing Officer, and Silver's positions in Root and Collateral Damage was an obvious conflict of interest.  (*Id.* ¶ 120.)  Indeed, the Quantasy Defendants' own lawyer raised this very issue and counseled their client to obtain Root's written approval of Quantasy's relationship with Collateral Damage.  (Compl. Ex. 23.)  These are sufficiently pled material facts that should have been disclosed to Root.

The Quantasy Defendants erroneously argue that – as a matter of law – the fact that Quantasy hired a subcontractor is not material.  (Defs.' Mot. at 27.)  However, materiality is not a proper inquiry at this stage of the case because it is a mixed question of law and fact.  *Helwig*, 251 F.3d at 563.  In any event, while subcontracting work to a legitimate marketing agency in a regular business transaction may not be a material fact depending on the facts of the case, Quantasy's "subcontracting" $9.1 million worth of the $15 million in total work it received from Root to Root's Chief Marketing Officer's shell company is certainly material to the transaction between

Quantasy and Root. Especially because Quantasy knew (or should have known) it was not going to receive any deliverables from Collateral Damage to produce to Root. (Compl. ¶¶ 56, 85.)

### c. The Quantasy Defendants Intentionally Withheld Material Information.

At the pleadings stage, a plaintiff need only *allege* the defendant's intent. *See Neal v. Second Sole of Youngstown, Inc.*, No. 1:17-cv-1625, 2018 U.S. Dist. LEXIS 4031, at *8 (N.D. Ohio Jan. 9, 2018) (although "conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), the plaintiff still must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation "plausible on its face."). A defendant is not expected to have voluminous evidence of the defendant's intent before the discovery process. *See Mill's Pride, L.P. v. Miller Salvage, Inc.*, No. 2:07-cv-990, 2008 U.S. Dist. LEXIS 89288, at *11 (S.D. Ohio Apr. 23, 2008) (intent need not be explicitly alleged in the claim as long as it states sufficient facts upon which the Court can "reasonably infer and find that the allegation of the defendant's 'intent to defraud' has been established.") Here, the Complaint sufficiently alleges that "Silver, Campbell, and Quantasy **intentionally** concealed the above material information from Root in order to induce Root into entering a business relationship with Quantasy and paying Quantasy at least $9.4 million for services that were never rendered." (Compl. ¶ 121 (emphasis added).)

Without any citation to the Complaint, the Quantasy Defendants argue that they believed Silver shared these material facts with Root and therefore did not have the requisite intent to conceal information. (Defs.' Mot. at 30.) The Quantasy Defendants' claim is found nowhere in the Complaint and cannot be considered for this motion. Moreover, it is false: Campbell did not *once* mention Collateral Damage during Root's entire investigation. (Compl. ¶ 97.) This suggests that Campbell was hiding it and knew Root was not aware of Collateral Damage. Further, Silver directed Campbell and Quantasy to send invoices only to him to cut out Root employees. (*Id.*

¶ 50). In addition, Silver and Campbell used personal email, text messages, and WhatsApp for all their communications rather than Silver's official Root email to avoid detection. (*Id.* ¶ 32.) Silver even messaged Campbell that they "are literally good" and to "hold the line" during Root's investigation and after Silver had shared Root's confidential documents with Campbell (*id.* ¶ 99).[13]

### 2. Root Adequately States a Claim for Fraudulent Misrepresentation (Count III).

Root sufficiently pleads that Campbell and Quantasy made false representations to Root about material facts with knowledge of their falsity or utter disregard as to the truth of those statements. A fraudulent misrepresentation claim requires: (1) a representation, (2) that is material to the transaction, (3) made with knowledge of its falsity or "with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred," (4) intent of misleading another, (5) justifiable reliance upon the representation, and (6) "a resulting injury proximately caused by the reliance." *Burr v. Bd. of Cmty. Comm'rs*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986) (citation omitted). The Quantasy Defendants challenge only the first and sixth elements of the claim. (Defs.' Mot. at 31.)

The Complaint sets forth the Quantasy Defendants' misrepresentations – and Root's injury proximately caused by reliance on these misrepresentations – with the requisite particularity. On each invoice, the Quantasy Defendants represented certain tasks they would complete for Root in

---

[13] The cases cited by the Quantasy Defendants in the motion to dismiss are inapplicable. *Carter v. Natl. City Bank*, No. 1:17-cv-508, 2018 U.S. Dist. LEXIS 122683, at *3, 22 (S.D. Ohio July 23, 2018) (dismissing fraud claim where the plaintiff fails to allege intent and the "who, what, where, when" of fraudulent representations at all); *Kelly v. United States Bank Natl. Assn.*, No. 1:15-CV-01019, 2015 U.S. Dist. LEXIS 132734, at *4 (N.D. Ohio Sept. 30, 2015) (dismissing fraudulent misrepresentation claim for failing to identify the misrepresentation, unrelated to a fraudulent concealment claim for failing to allege intent); *In re Royal Appliance Mfg. Co. Secs. Litig.*, 2010 U.S. Dist. LEXIS 101367 (N.D. Ohio Sept. 27, 2010) (determining claims in a securities fraud case, which holds a different and higher standard for scienter than common law fraud claims).

exchange for the payment. However, they had no intention to nor the ability to complete such tasks and, importantly, never did:

- Quantasy sent Root invoice number 2286 for $473,778 under SOW #1 via electronic mail on February 3, 2022, for "Brand Services." (Compl. ¶ 31, Ex. 4.) However, Quantasy did not, and had no intention of, rendering "Brand Services." (*Id.* ¶ 56.)

- On February 23, 2022, Campbell sent Root invoice number 2286 for $414,555.75 via electronic mail with an already expired due date of February 18, 2022, for "Brand Services." (*Id.* ¶ 40, Ex. 8.) However, Quantasy did not, and had no intention of, rendering "Brand Services. (*Id.* ¶ 56.)

- On April 1, 2022, Campbell sent Root's invoicing department Quantasy invoices 2307 and 2308 for a total of $7,350,000 via electronic mail. The invoices misrepresent that Quantasy will use the money for "Q2 Production Services and costs" and "Q2 Media Services and costs." (*Id.* ¶ 58 and Exs. 20, 21.) Root paid the invoice but Quantasy never provided production services or used the money for costs. (*Id.* ¶ 85.)

- On April 14, 2022, Campbell sent Root's invoicing department an email message attaching two Quantasy invoices: invoice number 2316 for $3,450,000, and invoice number 2317 for $3,900,000, for a total of $7,350,000. (*Id.* ¶ 68, Ex. 29.) Despite representing in the invoices that the payment was for "Q2 Production Services and Costs," Quantasy had not and was not going to provide such services to Root. (*Id.* ¶ 85.)

Root justifiably relied on the descriptions of services, and the descriptions proximately caused Root to pay Quantasy over $15 million over the course of three or four months, $9.4 million of which was transferred to Collateral Damage without any services received in return. (*Id.* ¶¶ 56, 85.)

In addition to the invoices, the Quantasy Defendants misrepresented their ideas and intentions for marketing services during the February 24, 2022 presentation. *(Id*. ¶ 41.) The Quantasy Defendants stated their ideas for Root's marketing campaigns, which were false, because the Quantasy Defendants could not – and had no intention of – executing any of those marketing "ideas." (*Id*.) The Quantasy Defendants' representations proximately caused Root's injury

because Root continued its business relationship with Quantasy and, soon after, Root paid Quantasy again.[14]  (*Id.* ¶ 47.)

In addition, on August 22, 2022, "Campbell lied to Root" that Quantasy still retained all of Root's money.  (*Id.* ¶ 97.)  And again, on September 22, 2022, when Quantasy employee David Rodriguez (copying Campbell) stated via electronic mail to Root's internal audit team that $10.7 million of the $14.7 million original spend was "currently unallocated/ uncommitted at this time" and "could be used for paid media in 2023."  (*Id.* ¶ 98, Ex. 37.)  Campbell's and Rodriguez's statements were false, as Quantasy had already funneled away $9.1 million of that money.  (*Id.*)  If Root had discovered the fraud at that point, it could have stopped Silver from signing the backdated "assignment" between Root and Quantasy on September 9, 2022.  (*Id.* ¶ 100.)  It also would have stopped Silver from creating and executing backdated contracts between Root and Collateral Damage on November 9, 2022.  (*Id.* ¶¶ 101, 102.)  Unquestionably, Root was harmed by Quantasy's and Campbell's misstatements.

### 3. Root's Fraud Claims Are Not Duplicative of Its Breach of Contract Claim.

As a threshold matter, Root does not allege a breach of contract claim against Campbell; therefore, he cannot move to dismiss Root's fraud claims as duplicative of its breach of contract claim.  A plaintiff must allege both fraud and breach of contract claims against a specific defendant for that defendant to argue the claims are duplicative.  *MedChoice Fin., LLC v. ADS All. Data Sys.*, 857 F. Supp. 2d 665, 677 (S.D. Ohio 2012) (denying motion to dismiss fraud claims as duplicative of breach of contract claim because party did not allege both breach of contract and fraud claims).

---

[14]  To the extent the Court determines the statements in the referenced PowerPoint presentation itself are necessary to evaluate Root's fraud claim, Root respectfully requests leave to amend its complaint to identify the statements and attach the PowerPoint presentation to the Complaint.

With respect to Root's claims against Quantasy, Root alleges a separate duty and damages, such that Root's fraud and breach of contract claims are not duplicative. *Moore v. Caliber Home Loans, Inc.*, No. 1:14-cv-852, 2015 U.S. Dist. LEXIS 117737, at *33 (S.D. Ohio Sept. 3, 2015) (a plaintiff's fraud claim in Ohio is not duplicative of a breach of contract claim if the fraud claim concerns separate duties or damages). Quantasy had a duty to disclose material information to Root, which is independent from the duties Quantasy owed Root pursuant to the contracts. (Compl. ¶¶ 30, 57, 120, 131, 161–62 and Exs. 3, 19.)

In addition, Root incurred damages because of Quantasy's fraudulent concealment and misrepresentations apart from the damages stemming from Root's contracts with Quantasy. That is, if Quantasy had not concealed and lied about the scheme and Silver's conflict of interest, Root would have been able to prevent Silver from running the same scheme with Ben-Her Marketing and stealing an additional $502,999.86 from Root. (*Id.* ¶ 105.)

Regardless, even if the Court finds that these claims are duplicative as to Quantasy, Root is nonetheless permitted to plead breach of contract and fraud claims simultaneously and in the alternative.[15] *Lodestar v. Zeigler*, Nos. CA-2630, CA-2645, 1989 Ohio App. LEXIS 4151, at *10-11 (Ct. App. Oct. 18, 1989) ("[C]laims for a breach of contract and fraud arising out of the same transaction can stand together: the intermingling of allegations of fraud and breach of contract concerning the same transactions does not necessarily commit the pleader to a single theory of his

---

[15] The cases the Quantasy Defendants cite in their motion do not involve plaintiffs alleging breach of contract *and* fraud claims in the alternative. *WMS Monroe LLC v. Gulfport Energy Corp.*, No. 2:19-cv-2908, 2020 U.S. Dist. LEXIS 265937 (S.D. Ohio Jan. 6, 2020) (contract claim and tort claims not pled in the alternative); *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 706 (6th Cir. 1981) (discussing whether an insured could recover in excess of policy limits against his insurer in contract when that action was traditionally in tort); *Gregoire v. Rice Drilling D. LLC*, No. 2:21-cv-4631, 2021 U.S. Dist. LEXIS 263733 (S.D. Ohio Nov. 17, 2021) (contract claim and tort claim not pled in the alternative).

right to recover.") (internal citation omitted); *Lunkenheimer Co. v. Pentair Flow Control Pacific Pty*, No. 1:11-cv-824, 2014 U.S. Dist. LEXIS 126395, at *38-39 (S.D. Ohio Sept. 10, 2014) ("The law similarly permits a plaintiff to plead fraud as an alternative theory to a breach of contract count."); *see also* Fed. R. Civ. P. 8(d)(2). Here, Root can and has pled breach of contract and fraud simultaneously and in the alternative. (Compl. ¶¶ 118–33, 158–63.)

    **D.    Root's Conversion Claim Is Properly Pled (Count IV).**

As set forth in the Complaint, the Quantasy Defendants converted Root's property. (Compl. Count IV.) The Quantasy Defendants argue that Root's conversion claim should fail because Root's funds were not "earmarked."[16] (Defs.' Mot. at 37-9.) Their argument fails because: (1) Root's funds are sufficiently identifiable; and (2) in any event, whether the funds are "earmarked" is properly decided at a later stage of the litigation.

Conversion is the wrongful exercise of dominion over property in exclusion of the right of the owner. *Zacchini v. Scripps-Howard Broadcasting Co.*, 47 Ohio St.2d 224, 351 N.E.2d 454 (1976), *rev'd on other grounds*, 433 U.S. 562, 97 S. Ct. 2849 (1977). A plaintiff may assert a claim for the conversion of money where the plaintiff alleges that the sums of money at issue are specifically "identifiable." *City of Findlay v. Hotels.com, L.P.*, 441 F. Supp. 2d 855, 865 (N.D. Ohio 2006) (denying defendants' motion to dismiss because plaintiff sufficiently alleged that

---

[16] The Quantasy Defendants cite to one unpublished opinion ruling on summary judgment motions to support their claim that Root's conversion claim against Campbell fails. In *Wheat v. Chase Bank*, No. 3:11-cv-309, 2014 U.S. Dist. LEXIS 14003 (S.D. Ohio Feb. 3, 2014), the court found that two of the defendants did not "exercise dominion or control over the funds in question." *Id.* at 81. In contrast, Root has sufficiently alleged in the Complaint that Campbell exercised dominion or control over Root's funds. (Compl. ¶¶ 3, 32, 34, 37–40, 42–43, 46, 48–49, 53–55, 60, 66–67, 75–77, 82–83, 136 and Figs. 1–6 and Exs. 5, 7–8, 10–14, 17–18, 22, 27–28, 31–32, 34.)

defendants converted its tax funds).  Here, the Quantasy Defendants wrongfully stole and converted Root's money and Root suffered damages as a result.

In fact, Root identified the sums of money converted, including the amounts Defendants converted on the precise dates and the accounts the money was transferred between.  (Compl. ¶¶ 31-34, 39-40, 47, 49, 52, 55, 59, 66, 69-70, 73-74, 79, 81-84 and Exs. 4-5, 7-8, 13-14, 16, 18, 20-21, 29, 30, 32.)  And, according to Quantasy employee David Rodriguez, $9.1 million of Root's funds "had been transferred, immediately upon Quantasy's receipt from Root, to Collateral Damage."  (*Id.* ¶ 103.)  Silver and Campbell then coordinated with each other so that when Root paid Quantasy, Quantasy could quickly send part of that payment to Collateral Damage.  (*Id.* ¶¶ 33, 37-38, 42-43, 46-55, 59-60, 66-70, 72-77, 79, 82-83, 110-12, 120, 127, 136, 149, 173 and Figs. 1-2, 4-6 and Exs. 6, 10-18, 22, 27-29, 31-32, 34.)

In at least one instance, Root's money flowed from Root to Quantasy to Collateral Damage to Eclipse for the purchase of a luxury home in Miami, Florida within a matter of days. Specifically, on April 25, Root paid Quantasy $7.35 million.  (*Id.* ¶ 70.)  Then, on May 17, 2022, Silver frantically texted Campbell about wiring him $2 million, demanding that the transfer be sent immediately because "they are a bit under the gun on an acquisition," and "Maria is stalling as much as she can, but if seller asks if she has the money in escrow, she cannot lie."  (*Id.* ¶¶ 82-83.) Later that *same day*, Campbell sent a portion of money Quantasy had received from Root to Collateral Damage.  (*Id.* ¶¶ 70, 76, 83, 103.)  The next day, on May 18, 2022, Silver and Eclipse used that $2 million to purchase a luxury waterfront home in Miami, Florida.  (*Id.* ¶¶ 87–88.) Therefore, Root has sufficiently identified the funds that Defendants converted.

Furthermore, the Quantasy Defendants' argument is premature.  Whether the funds are identifiable from an evidentiary perspective is a question that should be resolved at a later stage of

the litigation.  *See Barestone, LLC v. Bair (In re Bair)*, Nos. 18-12585, 18-1062, 2020 Bankr. LEXIS 3649, at *25 (Bankr. S.D. Ohio Dec. 31, 2020).  For example, in *Barestone*, the plaintiff's conversion claim survived motion for judgment on the pleadings because the money was identifiable from account records and other evidence and whether "the funds in question in these claims are identifiable is an evidentiary issue to be determined at trial."  *Id.*  Like in *Barestone*, Root is entitled to discovery on the transfers of its funds between Defendants' accounts and Root will present evidence of its sufficiently identifiable property at summary judgment and at trial.

For these reasons, Root properly pleads its conversion claim.  The Quantasy Defendants' motion to dismiss Count IV should be denied.

### E.  Root's Claim Under Ohio Rev. Code 2307.60 Is Permitted (Count V).

The Complaint properly states a claim under R.C. 2307.60(A), which provides a cause of action for any person injured by a criminal act.  (Compl. Count V.)  Contrary to the Quantasy Defendants' argument, which cites a separate, inapplicable portion of the statute, R.C. 2307.60(A) is not limited to tort claims.  (Defs.' Mot. at 40-43.)

### 1.  The Complaint Properly States a Claim Under R.C. 2307.60.

"R.C. 2307.60(A)(1), by its plain and unambiguous terms, creates a statutory cause of action for damages resulting from any criminal act."  *Jacobson v. Kaforey*, 149 Ohio St.3d 398, 400 (2016).  That general statute is supplemented by R.C. 2307.61, which confirms that such actions may be brought against any person "who commits a theft offense, as defined in section 2913.01 of the Revised Code."  R.C. 2307.61.  Under the pertinent statutory sections defining criminal theft, a defendant commits theft if they, "with purpose to deprive the owner of property or services . . . knowingly obtain or exert control over either the property or services" without the owner's consent or through deception.  R.C. 2913.01(A)(1)-(3).

In their motion to dismiss, the Quantasy Defendants focus solely on the issue of consent, ignoring that theft can also be committed through deception. But, under either theory of theft – lack of consent *or* deception – Root has properly stated its claim.

First, the Quantasy Defendants insist that Root consented to the theft because Root willingly relinquished the funds pursuant to the parties' contracts. (*See* Defs.' Mot. at 41-42.) However, under Ohio's theft statute, a defendant's control of funds may be beyond the scope of consent even in instances where the money was disbursed to defendant pursuant to a contract or where the defendant is given access to funds. *See, e.g.*, *State v. Wells*, 2009-Ohio-908, ¶ 50 (Ohio Ct. App. 2009) (affirming conviction of theft beyond the scope of consent, under R.C. 2913.02(A)(2), where defendant received a $4,000 check after falsely representing he had not yet purchased the bricks and other exterior supplies as part of a home renovation contract); *State v. Woodburn*, 140 N.E.3d 66, 74 (Ohio Ct. App. 2019) (affirming conviction of theft beyond the scope of consent where defendant was given access to funds in joint and survivorship bank account, but defendant was not authorized to spend those funds on herself). Here, Root never provided consent – either explicitly or implicitly – for the Quantasy Defendants to take custody of Root's money without actually receiving the marketing services in exchange. Nor did Root consent to Quantasy's funneling of those funds to Collateral Damage in exchange for nothing. As Root pled, the Quantasy Defendants accepted more than $15 million from Root and provided little in the way of marketing services. (Compl., ¶¶ 56-57 (alleging that Root paid Quantasy almost $1.2 million under SOW #1 and that SOW #2 was valued at $14.7 million); *id.* ¶ 112 (alleging that Quantasy accepted funds for services not provided).)

Second, Root adequately alleged that the Quantasy Defendants obtained funds through deception. "'Deception' occurs when one knowingly deceives another or causes another to be

deceived 'by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another.'" *State v. Jones*, 2019-Ohio-4216, ¶ 6 (Ohio Ct. App. 2019) (quoting R.C. 2913.01(A)). Courts have affirmed theft convictions where the defendant submitted false or deceptive invoices. *See, e.g.*, *State v. Mahone*, 2014-Ohio-1251, ¶ 58 (Ohio Ct. App. 2014) (defendant "knowingly obtained control of money by deception by submitting false billing statements to [government agency] for services she did not provide"); *State v. Moore*, 2010-Ohio-4322, ¶ 19 (Ohio Ct. App. 2010) (defendant deceived government agency by submitting false timesheets and invoices).

Here, Root alleges that Quantasy submitted false invoices for services that were never rendered or intended to be rendered. The element of deception is alleged both in the falsity of those invoices – *see, e.g.*, *Mahone* at ¶ 58; *Moore* at ¶ 19, *supra* – and in numerous other acts, including Quantasy's role in covering up the fraud during Root's internal audit. (*See* Compl. ¶¶ 95-98, 112.) Thus, whether by reference to consent (under R.C. 2913.01(A)(1)-(2)) or deception (under R.C. 2913.01(A)(3)), Root has adequately alleged a cause of action under R.C. 2307.60(A) for injury resulting from the criminal act of theft.

### 2. R.C. 2307.60(A) Is Not Limited to Tort Claims.

The Quantasy Defendants next argue that R.C. 2307.60 is limited to tort actions. (Defs.' Mot. at 39-40.) In support of their argument, however, the Quantasy Defendants improperly cite to R.C. 2307.60(***B***), a provision that does not create a cause of action. (*Id*. at 39.) Root's cause of action arises under, and is pled pursuant to, R.C. 2307.60(***A***). (Compl. ¶¶ 140-46.) Contrary to the Quantasy Defendants' assertion, nowhere in the statute does Section A limit recovery to "tort claims." Further, the Ohio Supreme Court has settled any possible ambiguity in this respect, and interpreted the statute as creating "a statutory cause of action for damages resulting from ***any***

53

criminal act." *Jacobson*, 149 Ohio St.3d at 400 (emphasis added).[17]  For these reasons, the

Quantasy Defendants' motion to dismiss Count V fails.

### F.    Root Has Stated a Claim for Breach of Contract (Count VIII).

"To establish a claim for breach of contract, a plaintiff must allege: (1) a valid contract

existed between the parties; (2) non-performance by the defendant; and (3) that damages resulted

from the defendant's non-performance." *Nichols v. State Farm Mut. Auto. Ins. Co*., No. 2:22-cv-

16, 2022 U.S. Dist. LEXIS 186623, at *6 (S.D. Ohio Oct. 11, 2022) (citing *Lucarell v. Nationwide*

*Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018)).[18]  Quantasy challenges only the second element

– Quantasy's non-performance, or breach, of the contract.[19]  However, the Complaint alleges three

separate breaches by Quantasy:  (1) Quantasy's failure to provide the required marketing services;

(2) Quantasy's  purported  assignment  of  contractual  duties  to  Collateral  Damage;  and

---

[17]    The Quantasy Defendants' reliance on *Wildcat Drilling, LLC v. Discovery Oil & Gas, LLC*, 2018-Ohio-4015 (Ohio Ct. App. 2018), is misplaced; *Wildcat Drilling* is inapplicable to Count V.  *Id.* at ¶ 43 (dismissing the plaintiff's R.C. 2307.60 claim because it was premised only on a breach of contract and the plaintiff did not allege harm to person or property).  Unlike in *Wildcat*, here, Root alleges harm to property through theft of Root's money.  *See Reiter v. Sonotone Corp*., 442 U.S. 330, 338 (1979) ("money, of course, is a form of property.").

[18]    Even if New York law applies to the contracts at issue, it does not change the applicable analysis as New York law provides the same elements in a breach of contract action and similarly implies a covenant of good faith and fair dealing in all contracts.  *LexisNexis v. Murrell*, 2019-Ohio-3293, ¶ 14 (Ohio Ct. App. 2019) (declining to consider whether choice-of-law provision applied because "[t]he elements of a breach-of-contract action are the same in Ohio and New York"); *511 W. 232nd Owners Corp. v. Jennifer Realty Co*., 98 N.Y.2d 144, 153 (N.Y. 2002 ("In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance"); *see also Ochal v. Television Tech. Corp*., 26 A.D.3d 575, 576 (N.Y. Ct. App. 2006) (New York's covenant of good faith and fair dealing "encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included").

[19]    By failing to make any argument regarding the other elements of breach of contract, Quantasy has waived those arguments.  *See, e.g., Gant v. Elam*, No. 1:21-cv-117, 2022 U.S. Dist. LEXIS 59393, at *8 (S.D. Ohio Mar. 31, 2022) (finding that defendant waived argument which it failed to raise in motion to dismiss).

(3) Quantasy's breach of the implied covenant of good faith and fair dealing. (Compl. ¶¶ 161-62.) Any one of which is sufficient to sustain Root's claim for breach of contract.

### 1. Quantasy Failed to Perform Marketing Services.

Root plainly – and repeatedly – alleges that Quantasy never provided the marketing services Quantasy promised. Quantasy agreed to create a "GTM Strategic plan to roll out the brand story across 360 channels, with key market roll out plan and within key interest categories" and "a comprehensive web content strategy including audience," and "an all-new web experience based on the content strategy and new brand strategy." (Compl. Ex. 3, listing a "Description of Services" under the SOW; Ex. 19.) However, "Quantasy provided little in the way of services to Root. Rather the 'value' enjoyed was by windfall to Quantasy for services not provided." (*See, e.g.*, *id.* ¶ 93.) Further, Quantasy "accept[ed] the payment of funds from Root for services not rendered" and "submit[ed] false invoices to Root for services not rendered, nor ever rendered, by Quantasy for Root's benefit." (*Id.* ¶ 112.)

Quantasy looks far beyond the four corners of the Complaint, arguing that it sufficiently performed a portion of the contracts' required services. (*See* Defs.' Mot. at 43-44.) Such factual disputes, however, cannot be resolved on a motion to dismiss, where the court "must accept all of the plaintiff's factual allegations as true." *Bunn v. Navistar, Inc.*, 797 F. App'x 247, 251 (6th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Issuer Advisory Group LLC v. Tech. Consumer Prods.*, No. 5:14CV1705, 2015 U.S. Dist. LEXIS 12719, at *14 (N.D. Ohio Feb. 3, 2015) (finding that defendant's attempt to resolve "an obvious factual dispute, on a completely undeveloped record, underscores the premature nature of [defendant]'s motion to dismiss").

Moreover, Quantasy's contentions fail to negate the existence of a breach, as it sets forth only a few contractual obligations that Quantasy believes it satisfied. (*See* Defs.' Mot. at 43-44.)

For example, Quantasy does not claim that it ever created a "GTM Strategic plan to roll out the brand story across 360 channels, with key market roll out plan and within key interest categories" and "a comprehensive web content strategy including audience," or that it designed "an all-new web experience based on the content strategy and new brand strategy." (Compl. Ex. 3.)

In any event, setting aside such potential factual disputes as this Court must at the pleading stage, Root has plainly alleged that Quantasy breached the contracts by failing to render the required services.

> ### 2. Quantasy Breached the SOWs by Entering into a Purported Subcontract without Root's Knowledge or Permission and Paying Collateral Damage for Work Not Performed.

The Quantasy Defendants breached the SOWs by entering into a sham subcontract with Collateral Damage that violates the anti-assignment clause in the SOWs. "Ohio enforces anti-assignment clauses where there is clear contractual language prohibiting an assignment." *Csizmadia v. Gilkey*, 2021-Ohio-2760, ¶ 38 (Ohio Ct. App. 2021) (citing *J.G. Wentworth, LLC v. Otisha Christian, et al.*, 2008-Ohio-3089, ¶ 40 (Ohio Ct. App. 2008)); *see also Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St. 3d 482, 488 (2006) ("if there is clear contractual language prohibiting assignment, an assignment will not be enforced"); *Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc.*, No. 2:07-cv-116, 2013 U.S. Dist. LEXIS 34943, at *57-58 (S.D. Ohio Mar. 13, 2013) (anti-assignment provisions are generally permissible under Ohio law"). Courts find breach of contract claims to be proper where the defendant attempted to assign its contractual duties in violation of a contract's non-assignment provision. *See, e.g.*, *Blue Ash Auto Body, Inc. v. Grange Prop. & Cas. Ins. Co.*, 2022-Ohio-4599, ¶ 19 (Ohio Ct. App. 2022) ("Because we hold that the assignment was invalid, the trial court properly granted summary judgment in favor of [plaintiff] on the breach-of-contract claim."); *Ohio Envtl. Dev. Ltd. P'ship v. Envirotest Sys. Corp.*, 478 F. Supp. 2d 963, 981 (N.D. Ohio 2007) (finding triable issue on breach of contract

claim where the contract "contains language prohibiting assignment of both contractual rights and duties").

Here, each SOW contained the same non-assignment provision: "This Agreement shall not be assignable by either party hereto without the written consent of the other." (Compl. Ex. 3, SOW #1, Terms and Conditions, ¶ 13; Compl. Ex. 19, SOW #2, Terms and Conditions, ¶ 12.) Yet, Quantasy argues that the contracts contain no provision prohibiting Quantasy from subcontracting its work to third parties. (Defs.' Mot. at 43.) Worse yet, Quantasy uses that to argue that it is relived from any responsibility for the "subcontractor" actually doing the work, or not, as the case may be. The plain terms of the contracts speak for themselves; the non-assignment provision is mutual and therefore prohibits the assignment of both contractual rights and duties such that Quantasy was prohibited from assigning its duties to a "subcontractor." *See, e.g.*, *Blue Ash* at ¶ 19; *Ohio Envtl.* at 981, *supra*. By prohibiting the assignment of Quantasy's contractual duties, the non-assignment provision necessarily prohibited subcontracting. *See Oakland Steel Corp. v. United States*, 33 Fed. Cl. 611, 613 (1995) ("the distinction between subcontractors and assignees is without a significant difference."). Root's allegation that Quantasy purported to assign its duties to Collateral Damage, in contravention of the non-assignment provision, sufficiently alleges a breach of the contracts. (*See* Compl. ¶¶ 61, 96, 100-101.)

Quantasy argues that certain provisions of SOW #1 and SOW #2 permit Quantasy's reliance on Collateral Damage. (Defs.' Mot. at 43-45.) That is incorrect. Quantasy first points to the statement in SOW # 1 that Quantasy "will bill for any third party services and materials that are part of or needed for our provision of services and materials outlined herein." (*Id.*) Under the contract, the term "third party services" contemplated that Quantasy would procure resources necessary to create marketing materials; also, the contract expressly listed "music, photography,

art, and design" as such services.  (Compl. Ex. 3 at 6.)  Collateral Damage was not contracted to provide any such services, and therefore is not a defined 'third party' service provider.  Instead, as Root alleged, Collateral Damage did not actually provide any services or materials for Root. (Compl. ¶ 56 (alleging that Root "received no value" for the money paid from Quantasy to Collateral Damage under SOW #1.))  Thus, the Quantasy Defendants' reliance on this contractual provision is misplaced.

> Quantasy next directs the Court to the following statement in SOW # 2:
>
> Client acknowledges that Agency may subcontract third parties in Agency's discretion to perform certain Services (including without limitation physical production services, talent procurement, consulting and media service) to be provided pursuant to this Agreement.  Agency shall be responsible for overseeing and delivering the complete performance of all Services provided by its subcontractors and agents in accordance with the terms and conditions hereof.

(Compl. Ex. 19.)  Like the foregoing provision in SOW #1, this provision is similarly inapplicable because Collateral Damage provided no actual services or materials for Root.  (*Id.* ¶ 85 (alleging that Root "received no value" for the money paid from Quantasy to Collateral Damage under SOW #2).)  Even if it is applicable it has been breached.  The services "subcontracted" to Collateral Damage were never provided, and Quantasy "was responsible for overseeing and delivering complete performance of all Services provided by its subcontractors."  (*Id.* Ex. 19.)

In the end, the purported subcontract argument fails either way: (1) Quantasy could not assign the fundamental obligation of the contract; and (2) even if it could subcontract to an extent, Quantasy still remained liable to Root to ensure performance of the contractual obligations.

### 3. Quantasy Breached the Implied Covenant of Good Faith and Fair Dealing.

Finally, Quantasy breached the implied covenant of good faith and fair dealing.  In Ohio, "there is an implied duty of good faith and fair dealing in every contract."  *CosmetiCredit, LLC v. World Fin. Network Nat'l Bank*, 24 N.E.3d 762, 773 (Ohio Ct. App. 2014).  "'Good faith' is a

compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 444 (1996).

Here, Quantasy's bad faith is established by allegations that Quantasy took "opportunistic advantage" of Root by submitting false invoices for services which were never rendered. *Supra*, Sec. IV.C. Quantasy also paid $9.1 million to Collateral Damage without receiving ***any*** work product from Collateral Damage to provide to Root, undermining any argument that Quantasy merely subcontracted its work in good faith. (*See* Compl. ¶ 103). Quantasy argues only that its breach of the covenant of good faith and fair dealing does not create a standalone action for breach of contract.[20] (Defs.' Mot. at 44.) But Root has not pled a standalone claim for breach of the covenant. (*See* Compl. ¶¶ 152-57.)

Under Ohio law, a breach of contract claim can be based on a breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Accurate Elec. Constr. v. Ohio State Univ.*, 2019-Ohio-4992, ¶ 132 (Ohio Ct. App. 2019) (holding that trial court erred in dismissing claim premised on breach of good faith and fair dealing, where plaintiff properly stated claim for breach of contract); *see also Shepard & Assocs. v. Lokring Tech., LLC*, No. 1:20-cv-02488, 2022 U.S. Dist. LEXIS 116253, at *18 (N.D. Ohio June 30, 2022) ("To the extent [p]laintiffs allege that [defendant] breached the implied covenant of good faith and fair dealing, that claim must be argued under [p]laintiffs' remaining breach of contract claim.").

---

[20] By failing to make any argument that Quantasy did not breach the covenant of good faith and fair dealing, Quantasy has waived those arguments. *See, e.g.*, *Gant v. Elam*, No. 1:21-cv-117, 2022 U.S. Dist. LEXIS 59393, at *8 (S.D. Ohio Mar. 31, 2022) (finding that defendant waived argument which it failed to raise in motion to dismiss).

Because Root's claim for breach of contract properly incorporates the allegation that Quantasy breached the implied covenant of good faith and fair dealing, Quantasy's argument should be rejected.

> **G.     Root Sufficiently Pleads a Civil Conspiracy Claim (Count X).**

In Ohio, the elements of civil conspiracy are: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *DWS Int'l v. Meixia Arts & Handicrafts Co.*, No. 3:09-cv-458, 2010 U.S. Dist. LEXIS 140023, at *14 (S.D. Ohio Dec. 10, 2010). Each element is satisfied here.

Root has sufficiently alleged a malicious combination between two or more persons that stems from an unlawful act and caused harm to Root. The Quantasy Defendants combined with the other Defendants – Silver, Collateral Damage, Eclipse, and McDaniel – to perpetrate a scheme to defraud Root through false contracts for marketing services. *Gosden v. Louis*, 116 Ohio App. 3d 195, 219, 687 N.E.2d 481 (9th Dist. 1996) (noting that a "combination" requires a common understanding to commit an unlawful act, no express agreement is necessary). The conspiracy was "malicious" and caused Root injury because the Defendants purposely acted to cause injury to Root in excess of $9.9 million. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998) (malice in the context of civil conspiracy may be implied and is the "state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.") (citation omitted). Finally, the Quantasy Defendants committed acts of fraud, theft, conversion, and money laundering in furtherance of the conspiracy. *See Supra* Secs. IV.B–E.

Contrary to the Quantasy Defendants' assertion, Root's allegations supporting its civil conspiracy claim are not limited to paragraphs 172 and 174. (Defs.' Mot. at 45.) Root explicitly incorporated all "foregoing paragraphs as if fully rewritten" in the civil conspiracy section. The

Court should also reject the Quantasy Defendants' argument that there are insufficient allegations against Campbell.  (*Id.*)  As detailed below in Section IV.H, Campbell actively participated in the fraudulent scheme.  *Supra* Sec. IV.H.

### H.    Campbell Is Personally Liable for His Tortious Conduct and Vicariously Liable for Quantasy's Conduct.

In a last ditch effort to avoid liability for his actions, the Quantasy Defendants claim that Campbell cannot be held personally liable for any of Root's claims in this litigation.  (Defs.' Mot. at 33–39.)  Contrary to the Quantasy Defendants' assertions, however, Campbell is personally liable for his own tortious conduct and vicariously liable for Quantasy's conduct.

### 1.    Campbell Is Personally Liable for His Own Tortious Conduct.

It is well established that an individual is personally liable for his or her own tortious actions.  *Kehoe Component Sales v. Best Lighting Prods.*, No. 2:08-cv-0752, 2008 U.S. Dist. LEXIS 136526, at *3 (S.D. Ohio Oct. 29, 2008) ("if the officer personally engages in tortious conduct, his status as a corporate officer or employee will not shield him from responsibility.") (citation omitted).[21]

Here, Root asserts seven claims against Campbell in his personal capacity: (1) RICO; (2) fraudulent concealment; (3) fraudulent misrepresentation; (4) conversion; (5) civil action for

---

[21]  The Quantasy Defendants cite to *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274 (1993) and *Tenable Protective Srvs. v. Bit E-Technologies, L.L.C.*, No. 89958, 2008-Ohio-4233, (8th Dist. August 21, 2008) for the proposition that Campbell is not personally liable.  In *Belvedere*, the court found that the plaintiff did not introduce evidence demonstrating that the corporate officer used his control over the company to defraud the plaintiff.  In contrast, Root has sufficiently alleged that Campbell used his control over Quantasy to defraud Root, as argued herein.  In *Tenable*, a non-binding and unpublished case, the court focuses on Section B of R.C. 1705.48 and omits the following relevant section, which states "Nothing in this chapter affects any personal liability of a member of a limited liability company or any manager of a limited liability company for the member's or manager's own actions or omission." R.C. 1705.48(C).

criminal theft; (6) civil action for telecommunications fraud; and (7) civil conspiracy. Each claim

against Campbell is premised upon Campbell's own tortious conduct. *Supra* Secs. IV.B–E, G.

### 2. Campbell Is Vicariously Liable for Quantasy's Actions.

In addition to his own conduct, Campbell is also liable for Quantasy's wrongful conduct

under the doctrine of piercing the corporate veil. Under this theory,

> the corporate form may be disregarded, and shareholders, officers and directors of
> the corporation may be held liable for corporate misdeeds when: (1) control over
> the corporation by those to be held liable was so complete that the corporation has
> no separate mind, will, or existence of its own; (2) control over the corporation by
> those to be held liable was exercised in such a manner as to commit fraud or an
> illegal act against the person seeking to disregard the corporate entity; and (3) injury
> or unjust loss resulted to the plaintiff from such control or wrong.

*Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, LTD.*, 476 F. Supp. 2d 809, 827

(S.D. Ohio 2007).

The Quantasy Defendants claim that Campbell cannot be held vicariously liable because

the Complaint does not expressly state that Root is seeking to pierce the corporate veil. (Defs.'

Mot. at 34.) However, under Ohio and federal law, "even if a complaint contains no allegations

specifying an intent to proceed under the doctrine, it is sufficient if the complaint contained some

indication that evidence on the issue would be introduced at trial." *Ohio Bureau of Workers'*

*Comp. v. MDL Active Duration Fund, LTD.*, 476 F. Supp. 2d 809, 827 (S.D. Ohio 2007) ("A

complaint need only give the defendant fair notice of a desired claim and an opportunity to

respond.") (internal citation omitted); *Dombroski v. Wellpoint, Inc.*, 7th Dist., 173 Ohio App.3d

508, 2007-Ohio-5054, at ¶¶ 21, 36-37, 70, 879 N.E.2d 225, *rev'd on other grounds*, 119 Ohio St.3d

506, 895 N.E.2d 538 (Ohio 2008) (finding a complaint need not expressly or specifically plead the

piercing-the-corporate-veil doctrine as long as it pleads sufficient facts to give the defendant fair

notice of such intention).

The Complaint contains sufficient allegations about Campbell's primary and personal role in acting on behalf of Quantasy in all aspects of the scheme to put Campbell on notice that Root intends to pierce the veil. Such allegations include the following: Campbell was the CEO of Quantasy at all relevant times (Compl. ¶ 18); Campbell drafted SOW #1 between Quantasy and Collateral Damage (*id.* ¶¶ 26-29); Campbell dictated the payment structure, timing, and amount of payments to Quantasy (*id.* ¶¶ 32, 37–38, 43, 48, 50, 53, 60, 66, 67, 76, 82); Campbell asked Silver to make Root pay Quantasy (*id.* ¶¶ 42-43, 46); Campbell facilitated the transfers of Root's money through Quantasy to Collateral Damage, even personally going to the bank to transfer $1.5 million (*id.* ¶¶ 39, 66, 68, 82, 83-84); Campbell worked with Silver to "formalize" an agreement between Quantasy and Collateral Damage (*id.* ¶ 62); and Campbell created an after-the-fact and fraudulent assignment of the Collateral Damage subcontracting agreement in an attempt to avoid liability to Root (*id.* ¶¶ 61–62.) In sum, Campbell was personally responsible for, or at least involved in, almost all of Quantasy's conduct.

The Complaint further adequately alleges Campbell controls Quantasy and that as a result of Campbell's control, Root was injured in an amount greater than $9.9 million. (*Id.* ¶¶ 117, 123, 133, 139, 146, 151, 174.) Therefore, the Complaint's allegations put Campbell squarely on notice that Root will pierce the corporate veil. These allegations are sufficient at the pleadings stage.

## IV.    CONCLUSION

For the foregoing reasons, the Quantasy Defendants' Motion to Dismiss should be denied. In the event the Court determines that any of the Quantasy Defendants' arguments have merit, Root respectfully requests leave to amend the Complaint.

Respectfully submitted,

*/s/ William D. Kloss, Jr.*
William D. Kloss, Jr. (0040854), Trial Attorney
Tiffany S. Cobb (0067516)
Elizabeth S. Alexander (0096401)
Grace E. Saalman (0101603)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6360  Fax: (614) 719-4807
wdklossjr@vorys.com
tscobb@vorys.com
esalexander@vorys.com
gesaalman@vorys.com

Matthew L. Kutcher (IL Bar No. 6275320*)*
COOLEY LLP *Admitted Pro Hac Vice*
110 N. Wacker Drive Suite 4200
Chicago, IL 60606
Phone: (312)-881-6500  Fax: (312)-881 6598
mkutcher@cooley.com

Kristine A. Forderer (CA Bar No. 278754)
COOLEY LLP *Admitted Pro Hac Vice*
3 Embarcadero Center
San Francisco, CA 94111
Phone: (415) 693-2128
kforderer@cooley.com

*Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and accurate copy of the foregoing was filed electronically on this 22nd day of June 2023 with the Clerk of Court using the CM/ECF system. Service will be made through the Court's CM/ECF system on all parties and attorneys so registered, and all parties may access this filing through the Court's system.

A copy was also sent by regular U.S.P.S. mail and email to the following:

**Paige McDaniel**
5576 Alexanders Lake Road
Stockbridge, GA  30281
paigemcase25@gmail.com

*/s/ Elizabeth S. Alexander*
Elizabeth S. Alexander (0096401)

*Counsel for Plaintiffs*