# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **ROOT, INC.,** *et al.*, | ) | CASE NO.: 2:23-CV-00512-SDM-EPD |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE SARAH D. MORRISON |
| | ) | MAGISTRATE JUDGE DEAVERS |
| **BRINSON CALEB SILVER,** *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# SPECIALLY APPEARING DEFENDANTS QUANTASY & ASSOCIATES LLC'S AND WILLIAM CAMPBELL'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT

Root's opposition takes significant liberties in describing the allegations in the Complaint. The Quantasy Defendants cannot detail each instance within this brief, but they encourage the Court to carefully review the assertions in the opposition and the paragraphs that supposedly support those assertions. At best, the opposition reads as a sort of wishful thinking, but more accurately, it is an opportunistic effort to line Root's own pockets with money from two victims of Root's own negligence. The inescapable fact is that Root employed, as its Chief Marketing Officer, a fraudster who used his position at Root to steal millions of dollars from not only Root, but also Quantasy. Silver, apparently without so much as a raised eyebrow, walked off with a truckload of stolen money, and he was able to do this because of *Root's* inadequate controls and *Root's* failure to supervise its employees. *Root* hired Silver without adequate investigation. *Root* appointed him CMO and held him out to the public as an officer of the company. *Root* gave him millions of dollars in spending authority without supervision. *Root* failed to institute accounting controls that would have detected the fraud. Indeed, Root *never* detected the fraud while Silver was employed; he was laid off as a part of a company-wide reduction in force.

The Complaint details a series of events where Root's CMO – an officer of the company with actual and apparent authority – gave instructions to the advertising company that he hired on behalf of Root. The Quantasy Defendants followed those instructions. That does not make them part of a conspiracy or a RICO enterprise. The claims against them must be dismissed with prejudice.[1]

---

[1] Plaintiffs' complaint is inherently incapable of being saved, but in a throwaway sentence, they request that any dismissal "occur without prejudice and with leave to amend." (Brief in Opposition to Motion to Dismiss, ECF 135 ("Opp."), PageID 1091, n. 1.) Rule 15's liberal amendment policy "does not apply to the plaintiffs' one-sentence request." *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014). Plaintiffs did not submit a copy of the proposed revisions to the complaint or describe revisions they would make to the complaint in order to state a claim.

I.     **Root's Complaint Fails to State a Claim for RICO**

*A. Plaintiffs Have Not Alleged a Pattern of Racketeering Activity.* The Complaint fails to plead a pattern[2] because it does not allege continuity. In the opposition, Root points to several wires and mailings supposedly in furtherance of the scheme, and it argues that these wires constitute the predicate acts that form a pattern. (ECF 135, PageID 1118). Root cites no case in support of this proposition, and it is not the law. Mailings (or wires) themselves can constitute mail fraud, but courts have consistently held that the number of mailings itself does not establish a pattern of racketeering activity; instead, an analysis of the underlying fraud is required. *Kehr Packages v. Fidelcor, Inc.*, 926 F.2d 1406, 1414 (3d Cir. 1991) ("Although the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis.").[3] Here, the underlying allegation of fraud for Campbell is one

---

[2] Root's opposition for the first time alleges an open-ended scheme. It claims that "the criminal activity could have continued if it were not interrupted by the discovery of the crime and subsequent filing of a RICO action." (*Id.*, PageID 1125). That is not what is in Root's Complaint. There, Silver was laid off by Root as part of a company-wide reduction in force on November 9. (ECF 20, ¶ 25). Root did not know of Silver's conduct at the time of his layoff, and when he was laid-off, that ended the possibility that any conduct involving Quantasy could continue into the future. Even leaving this aside, the Complaint is silent about future acts, and the opposition contains nothing but pure speculation as to the *Quantasy Defendants'* future conduct, as opposed to what *Silver* may have done with luxury real estate. *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995) (holding that open-ended conduct requires "far more than a hypothetical possibility of further predicate acts").

[3] *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 781 (7th Cir. 1994) ("The Seventh Circuit . . . does not look favorably on relying on many instances of mail and wire fraud to form a pattern.") (quoting *Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir. 1990)) (holding that in mail and wire fraud RICO cases, continuity is based on the underlying alleged fraudulent activity); *see also Wisdom v. First Midwest Bank*, 167 F.4d 402, 407 (8th Cir. 1999) ("Though mail fraud can be a predicate act . . . [t]he court must look to the underlying scheme to defraud."). Root argues that the invoices are misrepresentations, but that is not alleged in the Complaint, and they are not. (*See* Section II(e), *infra*). But even if the Court were to consider every invoice as a separate predicate act for purposes of forming a pattern, the first invoice was sent on February 3 and the last alleged fraudulent statement was on November 16 – a period of 9½ months, which is an insufficient duration to form a pattern. *Third Millennium Materials, LLC v. Baker*, 2020 U.S. Dist. LEXIS 48480, at *18 (S.D. Ohio 2020).

omission. For Quantasy, it is two fraudulent statements one month apart, with one scheme and one victim.[4] That does not state a claim.[5]

Money laundering fares no better. The Complaint is bereft of allegations of money laundering. It never alleges that the Quantasy Defendants knew that the transferred funds were proceeds of a crime, and the assertion in the opposition that they knew the transactions were designed to conceal the location or control of the funds is unsupported. Root points to three paragraphs in the Complaint (ECF 20, ¶¶ 83, 86, 87), which purportedly show that the Quantasy Defendants knew that Silver was buying luxury properties with the funds. The paragraphs do not allege that; they show an exchange in which Silver tells Campbell that there is an acquisition pending and there is a delay in the title search. This indicates a real estate transaction, but there is no mention of homes. The Complaint alleges that *Silver* bought the homes using Eclipse, but it makes no allegations that Quantasy even knew of Eclipse, or that Silver was concealing the location or ownership of the funds. The allegations are simply insufficient.

*B. The Complaint Does Not Allege an Association-in-Fact Enterprise.* The Complaint alleges a rimless hub-and-spoke arrangement with Silver at the center; this does not suffice to establish a "relationship." Root counters that this is "flatly contradict[ed]" by the Complaint, which asserts that Quantasy and Campbell "were aware of Ms. McDaniel's existence and role in the scheme." (ECF 135, PageID 1122). This misrepresents the allegations. The paragraphs cited by Root refer to two documents signed by "Paige Lynette," not Paige McDaniel. There are no allegations in the

---

[4] The opposition claims that the other plaintiffs were also injured, but the Complaint does not allege they suffered an injury or that it was caused by Quantasy or Campbell. Root also (in its brief, but not the Complaint) claims injury by shareholders, employees, stakeholders, and partners, but even if allegations in the brief could be considered (they cannot), the losses claimed here belong to the corporation in any event. *E.g.*, *Infanti v. Scharpf*, 570 F. App'x 85, 88 (2d Cir. 2014).
[5] *Third Millennium*, 2020 U.S. Dist. LEXIS 48480, at *15-18; *Spool v. World Child Int'l Adopt. Agency*, 520 F.3d 178, 184 (2d Cir. 2008) (relevant time is when the predicate activity occurred).

Complaint that Quantasy or Campbell knew that Paige Lynette was the alter ego of McDaniel, that McDaniel (or Lynette) was Silver's sister, or that McDaniel was running Collateral Damage for the benefit of a RICO enterprise. At most, Root alleges that Quantasy received a W-9 form and a contract.[6] That is not enough. And there is nothing in the Complaint that ties Eclipse to Quantasy or Campbell, or that they knew, even in the vaguest sense, Eclipse's role. To plead a RICO enterprise, Root must allege that *all* the defendants functioned as a continuing unit. It cannot.[7]

*C. Root Has Not Alleged Causation.* The opposition asserts that but for Quantasy's invoices, Root would not have paid money to Quantasy. (*Id.*, PageID 1118). This is inconsistent with the Complaint, which alleges that *Silver* (not an independent person at Root) directed Quantasy to be paid (ECF 20, ¶¶ 59, 70), but this still looks at the wrong conduct. The injury must be caused by predicate acts sufficiently related *to cause a pattern*. *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985). In fraud cases, a pattern is determined by the underlying fraudulent scheme (*See* §I(A).). Here, those are statements made *after* the money had been transferred.

## II.   Root's Opposition Confirms That the Fraud Claims Fail on Their Face

*A. Root's fraud claims are duplicative of the breach of contract claim.* Root's only response to the fact that its fraud claims do not allege a duty separate from the contracts (a flat and

---

[6] Root also cites to paragraphs 61-62 and 93 and Exhibit 23, asserting that "Campbell and Quantasy suggested the Defendants create backdated contracts to cover up the scheme." (ECF 135, PageID 1123-24, and 1132). That was not alleged. "Because none of these allegations are in the Amended Complaint, the Court cannot consider them as informing the motion to dismiss." *Hill v. Ohio State Univ. T&L*, 2013 U.S. Dist. LEXIS 75379, *10 (S.D. Ohio May 29, 2013); *see also Eye Centers of Am. LLC v. Series Protected Cell 1*, 2022 U.S. App. LEXIS 29855, *11 (6th Cir. 2022).

[7] Root's claims about Quantasy and Campbell's operation or management of the enterprise are equally weak. It is a "very difficult test to satisfy," *Redtail Leasing, Inc. v. Bellezza*, 1999 U.S. Dist. LEXIS 486, at *11 (S.D.N.Y. 1999), and requesting that an invoice be sent, drafting contracts, or preparing a statement of work, is merely consistent with the operation of an advertising firm, not the management of a criminal enterprise. *See Dahlgren v. First Nat'l Bank of Holdrege*, 533 F.3d 681, 690 (8th Cir. 2008) (rejecting RICO claim where evidence cited of control all fell within the category of the defendant conducting its own affairs).

unsupported denial) does not merit a reply. Next, Root argues that its fraud and contract damages are different because without Quantasy's fraud, "Root would have been able to prevent Silver from running the same scheme with Ben-Her Marketing and stealing an additional $502,999.86 from Root." (ECF 135, PageID 1137). This is pure speculation and additionally fails under *Twombly*, as the Complaint does not identify whether Root paid Ben-Her before or after Quantasy's allegedly fraudulent acts. Finally, Root's assertion that its fraud claims can survive because they can be pled in the alternative is baseless. The cases it cites (*id.*) do not support this contention.[8]

    *B. Quantasy had no duty to disclose*. Root's argument that "the parties were not dealing at arm's length" is meritless. The Complaint does not allege Quantasy knew that Silver was concealing any of the "material information" from his colleagues. (ECF 94, PageID 786). The Complaint therefore makes it clear that, as far as Quantasy knew, the parties *were* dealing at arm's length. Root citations in "support" are unhelpful. (ECF 135, PageID 1129). Those paragraphs simply assume (but never allege) that Quantasy knew that Silver was hiding facts from Root. The Complaint itself actively contradicts Root's argument, repeatedly alleging that the "business relationship" and "business transaction[s]" at issue were "between Root and Quantasy" (ECF 20, ¶¶ 120-122, 126, 131, 159), and because SOW #1 (ECF 20-3), which was executed on Root's behalf by Root's "VP Creative" Jill Neely, not Silver.[9] Second, Root's claim that Quantasy had a duty to disclose in order to "correct" prior statements (ECF 135, PageID 1130) fails because none of the alleged misstatements and omissions satisfied Rules 9(b) and/or 12(b)(6) (*see* ECF 94, PageID 787-789). A non-actionable statement or omission cannot create a duty to disclose.

---

[8] *Lodestar* did not involve consideration of fraud/contract claims on a motion to dismiss; in *Lunkenheimer*, the plaintiff was admittedly uncertain regarding the existence of a valid contract.
[9] The only case cited by Root, *North Royalton City Sch. Dist. BOE v. Cuyahoga Cty. Bd. of Revision*, 129 Ohio St.3d 172 (2011), does not involve (or even address) a duty to disclose.

Finally, Root argues that disclosure was required because "Root did not have equal access to the undisclosed information." (ECF 135, PageID 1130.) But, unlike here, a party upon whom such a duty is imposed must know that the other party cannot access the facts at issue.[10]

*C. Root Does Not Plausibly Allege That Quantasy Concealed Material Facts.* Root claims that the "concealed" facts were material because it would not have engaged Quantasy with this knowledge. (ECF 20, ¶ 120). But the Complaint does not allege that Quantasy knew *anything* about Collateral Damage before the business relationship began on February 3, 2022. Trapped by the four corners of its own Complaint, Root insists that a grab bag of allegations (ECF 135, PageID 1131-32) somehow shows that Quantasy "in fact did know about Collateral Damage's impropriety from the very beginning." (*Id.*) Root is wrong, conceding as much when it argues that "[a]t a minimum, the Quantasy Defendants knew that Silver owned and spoke for Collateral Damage" (*id.*, PageID 1132), a contention notably absent from the Complaint.

*D. Root does not plausibly allege scienter.* Root's scienter argument boils down to two baseless contentions. First, it claims that the Complaint's use of the word "intentionally" satisfies its pleading burden on this issue (ECF 135, PageID 1133). Root does not cite a single case for this proposition. Second, Root insists that it is Quantasy's burden to show that the Complaint affirmatively alleges that "they believed Silver shared these material facts with Root," and because this "claim is found nowhere in the Complaint … [it] cannot be considered for this motion." (*Id.*).

---

[10] *Andersons, Inc. v. Consol, Inc.*, 185 F. Supp. 2d 833 (N.D. Ohio 2002), cited by Root (ECF 135, PageID 1129), makes it clear that unless Quantasy *knew* that Silver was not sharing material facts with Root (which the Complaint does not allege), it cannot be charged with a duty to ignore the actual and apparent authority exercised by Root's CMO, or communicate with others at Root. *Id.* at 843-44 ("duty to speak" dependent on whether "the non-disclosing party *knows* that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading") (emphasis supplied). The other case Root cites in support of this argument, *Mar Jul, LLC v. Hurst* (*Id.*, PageID 1129), does not address a party's duty to disclose, and it is inapposite.

Root cannot offload its pleading burden on Quantasy. The Complaint does not allege that Quantasy knew (or had reasonable cause to believe) that Silver was not sharing the "concealed" facts with his colleagues. Root has therefore failed to plead scienter for the reasons set forth in the Motion.

*E. Root's fraudulent misrepresentation claim fails.* Root now contends that Quantasy's invoices were "material misrepresentations," and their status as such saves Root's deficient fraudulent misrepresentation claim (ECF 135, PageID 1134-35). This argument fails for two reasons: (i) the Complaint does not allege that the invoices were "fraudulent misrepresentations;" and (ii) the invoices were, at most, representations concerning future events, which are not actionable unless Quantasy had an intention not to perform the tasks set forth in the invoices at the time they were rendered.[11] The Opposition argues that Quantasy "had no intention … to complete" the tasks identified in the invoices (*Id.*, PageID 1135), but its Complaint makes no such allegation.

### III. The Remaining State Law Claims All Fail

*A. Root Has Not Alleged Conversion.* A conversion action for money will only lie "if identification is possible and there is an obligation to deliver the specific money[12] in question." *Haul Transp. v. Morgan*, 1995 Ohio App. LEXIS 2240, at *9 (1995). Root claims that it "identified the *sums of money* converted..." (ECF 135, PageID 1139). Not good enough. A conversion "requires that the defendant have an obligation to deliver *specific money* as opposed to merely a *certain sum of money.*" *NPF IV v. Transitional Health Servs.*, 922 F. Supp. 77, 82 (S.D. Ohio 1996) (emphasis added). Root also argues that the "funds are sufficiently identifiable" because it "identified . . . the accounts the money was transferred between." (ECF 135, PageID 1138-39).

---

[11] *E.g.*, *Adams v. Margarum*, 2017-Ohio-2741, ¶ 16-19 (Ct. App. 2017); *Exal Corp. v. Roselein & Assocs.*, 2015 U.S. Dist. LEXIS 107951, at *33 (N.D. Ohio Aug. 17, 2015).

[12] Specific money means "money in a bag . . . or notes that have been entrusted to the defendant's care . . . where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum." *Id.*

"While this evidence might show that [Root] has a right to possess some of the funds in the … account[s], it does not show that the funds were specifically identifiable at the time of the alleged conversion, a separate requirement that [Root] must meet to satisfy [its] prima facie case." *Taglieri v. Monasky*, 2017 U.S. Dist. LEXIS 223789, *25-26 (N.D. Ohio 2017).[13]

B. *Claims Under Section 2307.60 Must be Dismissed.* Root's claim under Ohio Rev. Code 2307.60 fails as a matter of law. Pursuant to Ohio Rev. Code 2307(b)(1)(a), Root's civil theft claim fails as a tort because its essence is derived from contracts - Quantasy's alleged failure to perform on the Contracts. "Consequently, [Root] [is] not entitled to R.C. 2307.61 damages for claims based on a breach of contract." *STE Invs., LLC v. Macprep, Ltd.,* 2022-Ohio-2614, ¶ 42.

C. *The Complaint Fails to State a Claim for Breach.* The exhibits to the Complaint make clear that Quantasy was allowed to subcontract its work to third parties and that it performed its obligations under the Contracts.[14] First, there is no provision in SOW #1 that prohibits Quantasy from subcontracting its work to third parties. Root cites a Federal Court of Claims case (ECF 135, PageID 1146), but that case involved the interpretation of a federal statute on whether

---

[13] *Barestone, LLC v. Bair (In re Bair),* 2020 Bankr. LEXIS 3649, *24 (2020), is inapplicable. Specifically, Root argues that in *Barestone*, "the plaintiff's conversion claim survived motion for judgment on the pleadings because the money was identifiable from account records and other evidence and whether 'the funds in question in these claims are identifiable is an evidentiary issue to be determined at trial.'" (ECF 135, PageID 1140). The Bankruptcy Court held that "money does not have to be rare coins to be identifiable if it is clear from account records or other evidence that *specific money* rightfully owned or in possession of a plaintiff was taken by the defendant *without authority* and used by the defendant in a manner inconsistent with the plaintiff's ownership or possession." *Id.* (emphasis added). Root's complaint does not identify specific money – there was no money in a bag or "kept intact." Root demands a *sum* of money, not specific money, and it was paid pursuant to an SOW, for which Silver apparently had authority. This is not conversion.
[14] Root also claims in its opposition that "[b]y failing to make any argument that Quantasy did not breach the covenant of good faith and fair dealing, Quantasy has waived those argument." (*Id.*, PageID 1148). Quantasy did, in fact, argue that it did not breach the covenant of good faith and fair dealing. (ECF 94, PageID 800). Specifically, in its motion, Quantasy argued that it "could not have breached the agreement by doing what it was expressly permitted to do under the terms of that agreement," and that a breach of the covenant does not create a standalone claim. (*Id.*)

subcontractors or assignees are in privity with the U.S. and thus have the right to sue. That is light-years from whether an assignment clause prevents sub-contracting. SOW #1's Terms and Conditions state that Quantasy "will bill for any third party services . . . needed." (ECF 20-3, PageID 155). Likewise for SOW#2. (ECF. 20-19, §4(b)). "Under Ohio law, specific contractual provisions control conflicting general provisions." *Lexington Ins. Co. v. F.W. Woolworth Co.*, 230 F.3d 835, 839 (6th Cir. 2000).[15] Second, the Complaint does not adequately allege that Quantasy did not perform – quite the opposite. For SOW#1, the Complaint alleges that Quantasy met with Root's leadership team to present "its ideas for Root's marketing campaigns." (ECF 20, ¶ 41). Developing ideas and strategy *was* the scope of work for SOW#1. (ECF 20-3, ¶ 4) (E.g., "Create GTM strategic plan"). That leadership meeting "went great. The team did an awesome job." (ECF 20-9). In response, Root and Quantasy executed SOW #2. If SOW #1 was breached, there never would have been an SOW #2. For SOW #2, work was in progress when Root contacted Quantasy to "claw back" the entire $10.7 million held by Quantasy for the work performed. (ECF 20, ¶ 103). It was *Root* that sought to unwind SOW#2, not Quantasy. The claim must be dismissed.

    *D. No Civil Conspiracy Claim Has Been Pled.* Root argues that it "explicitly incorporated all 'foregoing paragraphs as if fully rewritten' in the civil conspiracy section." (ECF. 135, PageID 1149). Root's conclusory recitations are insufficient to state a civil conspiracy claim; as such, Count X must be dismissed. *Williams v. U.S. Bank Shaker Square*, 2008-Ohio-1414, ¶ 1.

    *E. Root Fails to Allege that Campbell is Personally Liable.* The Complaint contains no allegations that would allow veil piercing, but Root argues it is enough for the "complaint [to] contain[] some indication that evidence on the issue would be introduced at trial." (ECF 135,

---

[15] In any event, Root signed the subcontractor agreement with Collateral Damage. Even if the anti-assignment clause applied, Root waived. (ECF 20, ¶ 102).

PageID 1151). The Complaint does not even meet this standard. It is devoid of allegations relating to "corporate formalities," "corporate records," the "commingl[ing] [of] corporate and personal funds" and the "use [of] corporate property for personal purposes." *Ramjet Aviation, Inc. v. My Parts Locator, Inc,* 2023 U.S. Dist. LEXIS 6178, *17 (N.D. Ohio 2023).

### IV. The Exercise of Personal Jurisdiction Violates Due Process.

Root essentially claims that because Silver is an employee of an Ohio company and Quantasy signed a contract with Root, this court has personal jurisdiction over both Quantasy and Campbell.[16] But it is the defendants' conduct, not Root's or Silver's, that must be the focus of this analysis, and neither Quantasy nor Campbell sought to solicit or expand its nonexistent business in Ohio.[17] In addition, Root does not even address two relevant factors in this analysis – the three California choice of law provisions or the exclusive jurisdiction provision (New York) in three of the agreements that are central to its claims. Finally, Section 1965(b) cannot abrogate the constitutional limits of due process, and it is unconstitutional to base personal jurisdiction of one defendant based on the minimum contacts of another defendant.

For the foregoing reasons, and those in Quantasy's Motion, the Complaint should be dismissed with prejudice.

---

[16] There is no connection between Root's causes of action and "defendant's in-state activities." The facts that form the basis for Root's claims against *these* defendants occurred in California. (ECF 94, PageID 803-4); *Baker v. Bensalz Prods.*, 480 F. Supp. 3d 792 (S.D. Ohio 2020).

[17] *See IDS Publ'g Corp. v. Reiss Profile Eur., B.V.*, 2017 U.S. Dist. LEXIS 152114 (S.D. Ohio 2017) (holding that contracts and communications between the parties in the proposed forum state and financial injury in Ohio are not dispositive where defendant did not have employees or offices in Ohio, conducted no business in Ohio, was never physically present in Ohio and the negotiation and performance of the agreement occurred elsewhere); *Auto Place LLC v. Cargill*, 2020 U.S. Dist. LEXIS 60921 (S.D. Ohio 2020) (noting that the defendant must have done something to create contacts with the forum and the "unilateral activity" of the plaintiff or a third-party cannot be the basis for exercising personal jurisdiction over a defendant).

Respectfully submitted,

*/s/ Matthew D. Ridings*
Matthew D. Ridings, Trial Attorney (0079402)
THOMPSON HINE LLP
127 Public Square
3900 Key Center
Cleveland, Ohio 44114
Telephone: 216.566.5561
Facsimile: 216.566.5800
Matt.Ridings@ThompsonHine.com

Joan E. Meyer
(Admitted *Pro Hac Vice*)
THOMPSON HINE LLP
1919 M Street, N.W.
Suite 700
Washington, D.C. 20036-3537
Telephone: 202.263.4115
Facsimile: 202.331.8330
Joan.Meyer@ThompsonHine.com

Jamar T. King (0091093)
THOMPSON HINE LLP
10050 Innovation Drive, Suite 400
Miamisburg, OH 45342
Telephone: 937.443.6852
Facsimile: 937.443.6635
Jamar.King@ThompsonHine.com

Karim Sabbidine
(Admitted *Pro Hac Vice*)
THOMPSON HINE LLP
335 Madison Avenue
12th Floor
New York, NY 10017
Telephone: 212.908.3944
Facsimile: 212.344.6101
Karim.Sabbidine@ThompsonHine.com

-12-

        Joshua H. Epstein
        (Admitted *Pro Hac Vice*)
        Eva M. Jimenez
        (Admitted *Pro Hac Vice*)
        DAVIS+GILBERT LLP
        1675 Broadway
        New York, NY 10019
        Telephone: 212.468.4869
        jepstein@dglaw.com
        ejimenez@dglaw.com

        *Attorneys for Specially Appearing Defendants*
        *William Campbell and Quantasy &*
        *Associates, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2023, a true and accurate copy of the foregoing was filed electronically. Notice of this filing has been sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

A copy was also sent by ordinary U.S. Mail, postage prepaid, to the following:

Paige McDaniel
5576 Alexanders Lake Road
Stockbridge, GA 30281

*/s/ Matthew D. Ridings*
Matthew D. Ridings

4863-2709-5383.7