UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **ROOT, INC.**, *et al.*, | ) | CASE NO.: 2:23-CV-00512-SDM-CM |
| | ) | |
| **Plaintiffs,** | ) | JUDGE SARAH D. MORRISON |
| | ) | |
| v. | ) | **REPLY TO PLAINTIFF'S RESPONSE** |
| | ) | **IN OPPOSITION TO QUANTASY** |
| **BRINSON CALEB SILVER**, *et al.*, | ) | **DEFENDANTS' MOTION TO QUASH** |
| | ) | **SUBPOENAS FOR FINANCIAL** |
| **Defendants.** | ) | **RECORDS AND MOTION TO STAY** |
| | ) | **DISCOVERY AS TO THE** |
| | ) | **QUANTASY DEFENDANTS** |

The fatal flaw on which the Plaintiff's arguments in opposition to the Motion to Quash are predicated is that Quantasy and its owner William Campbell (the "Quantasy Defendants") were involved in a "brazen kickback scheme to defraud Root of millions." Root Opp. p. 1. Nothing could be further from the truth. Plaintiff has offered *absolutely no* evidence that Quantasy was involved in a civil racketeering enterprise or that it conspired to defraud Root. Instead, it tries to make hay out of Mr. Campbell's 2022 purchase of his family's primary residence – a mid-century ranch on less than half an acre in Pasadena. While Root claims that it merely seeks to discover what happened to the money sent to Quantasy, its subpoenas reveal its real agenda: getting its hands on Mr. Campbell's personal financial information from January 1, 2020 – nearly two years before Silver was hired at Root or Root hired Quantasy – to the present. Root's subpoenas[1] are a fishing expedition, designed to embarrass Mr. Campbell and tar him with the same brush as B.C. Silver. The subpoenas should be quashed.

---

[1] The challenged actions are Root's issuance of subpoenas on November 2, 2023 to City National Bank, Mesh Payments, Inc., Morgan Stanley & Co., LLC, PayPal Holdings, Inc., Early Waning Services, LLC, and JP Morgan Chase Bank, N.A., as well as the subpoena issued on November 13, 2023 to Morgan Stanley Smith Barney LLC.

The only thing that the evidence demonstrates is that Root's negligent management and egregious lack of internal controls set up an explosive situation where its own top executive, Silver, was given unilateral control over a $15 million marketing budget only to hijack most of the money for a spending spree that would impress a Las Vegas high roller. This reckless conduct begs the question as to how Silver could presumably fool Root for so long. It is ironic that Root claims it did not know what Silver was doing (even though Silver reported to company executives, and his activities were monitored by Root's financial department) while simultaneously feigning outrage at the fact that a subcontractor retained by Root, working under the very same marketing executive (who interacted daily with Root employees and executives), was ignorant of the same activity Root is claiming it did not discover.

Root disingenuously attempts to impute Silver's opulent lifestyle to Quantasy and Will Campbell. Neither Quantasy nor Mr. Campbell bought luxury cars, yachts, jewelry, airplanes, multiple luxury waterfront mansions, or trips to Bali and Dubai. That was instead the conduct of *Root's* former senior executive. During virtually the entire pendency of this case, the Receiver has been tracing the funds that Silver stole from Root, but it has reported *nothing* that has implicated the Quantasy Defendants. That is because the Quantasy Defendants took nothing from Root other than fees and expenses for the performance of advertising work that the company legitimately contracted for with Root; that is, until Root breached its contract with Quantasy after discovering its employee's perfidy.

**1. Background**

Root's Opposition claims that it seeks to answer one question related to Quantasy: What happened to the millions retained by Quantasy, LLC? (Opp. Dkt. 201, at 1, PageID 1970). The answer is simple math; there is no mystery here, despite Root's characterizations: Root allocated

2

$15.9 million for advertising services in 2022 and assigned Silver to oversee that amount, apparently without any internal control mechanisms or cross-controls to ensure that Silver did not misappropriate funds. Root openly and transparently contracted with Quantasy for two statements of work: the first statement of work involved developing a "Celebrity Drivers" ad campaign, which Quantasy created and designed. This campaign was approved by Root executive management, and Quantasy charged $1,184,000.00 in fees for this service.[2]

The second statement of work involved implementation of the agreed-upon campaign. The remaining $14.7 million (out of the $15.9 million) was intended as funds to implement the plan through a series of ad-buys and contracts with celebrities with the remainder designated as fees to Quantasy to ensure implementation. Silver ultimately was not happy with the profile of celebrities willing to participate and directed Quantasy to transfer $9.1 million to a company called Collateral Damage, which purportedly had relationships with athletes and sports teams and would solicit and hire higher-profile athletes/sponsors for Root's campaign. That left $5.6 million with Quantasy. During the summer of 2022, Root asked for partial refund because it wanted to reduce the scope of the advertising campaign, and Quantasy refunded $1.2 million to Root. (2d Am. Cmplt., ¶94, Dkt. 173, PageID 1499). That left $4.4 million with Quantasy, which had innocently been working on the ad campaign and had already contracted with Barstool Sports to provide some of the marketing Root had wanted. Thereafter, Root attempted to terminate SOW #2 in its entirety, but SOW #2 does not permit Root to terminate the agreement at will. (*See* Dkt. 20-19, at PageID 192, ¶2; PageID 197, ¶7). Notwithstanding this, Quantasy sought to unwind some of the payments it

---

[2] *See* Dkt. 173, Ex. 9. In a text message that Mr. Campbell sent to Silver after the presentation to the Root executive management team, he wrote "[h]ow was the feedback from this morning call? Hope it went over well." Silver responded, "It all went great. The team did an awesome job . . . I have autonomy to do what I need to."

had made to other service providers, including Barstool Sports. Through these efforts, Quantasy returned another $1,650,000 to Root, a fact only obliquely referenced in Root's complaint (Dkt. 173, at ¶138), leaving approximately $2.75 million in Quantasy's possession. Whether or not Root is entitled to a refund of some or all of this $2.75 million will depend on the outcome of Root's claims against Quantasy and those of Quantasy against Root. Indeed, prior to the filing of this litigation, Quantasy was cooperating with Root and had indicated that it would discuss with Root additional refunds of Root's fees, but that negotiation never occurred because Root suddenly and without warning filed this lawsuit bizarrely alleging a racketeering conspiracy between Quantasy and Silver.

Root claims that it needs information about so-called "suspicious transfers," which are nothing more than the owner of Quantasy, LLC taking distributions from the well-established, decade-old company.[3] Root offers no plausible explanation as to how the information it seeks is relevant to its claims. The fact that Mr. Campbell bought a house for his family is immaterial. There is no dispute that Quantasy has retained $2.75 million of the fees that Root paid to it. Quantasy's position is that Root has failed to state a claim, Root breached the agreement, and that Root is not entitled to the $2.75 million. Root's position is otherwise; this litigation will resolve that dispute. That does not mean that Root is permitted to rummage around the Campbell family bank accounts for the past four years on the hopes that it can dig up something with which to cast false aspersions on the personal expenditures of Will Campbell and his family. There is no basis for the Root subpoenas, and they should be quashed.

---

[3] Quantasy's clients include Lionsgate, Honda, Google, NBC, Facebook, and Acura. *See* https://quantasy.com.

2. **Argument**

   a. **The Subpoenas Should be Quashed**

Subpoenas should not be enforced if they seek "'documents [that] are privileged or the subpoenas are unreasonable, oppressive, annoying, or embarrassing.'" *Mid Am. Solutions v. Vantiv, Inc.*, 2016 U.S. Dist. LEXIS 53106 at \*14-15 (S.D. Ohio April 20, 2016). "[D]istrict courts have discretion to limit the scope of discovery [when] the information sought is overly broad…." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007). In determining the proper scope of discovery, a district court balances a party's "right to discovery with the need to prevent 'fishing expeditions.'" *Conti v. Am. Axle & Mfg.*, 326 Fed. Appx. 900, 907 (6th Cir. 2009).[4]

The information sought here through the subpoenas is astonishingly broad, seeking *all* of Mr. Campbell's personal financial records from multiple banks: "All Account records (including monthly statements) and documents evidencing all transactions within the Accounts from January 1, 2020 to present." *See* Dkt. 185-1, PageID 1633, 1645, and 1654. Root also seeks "all account records . . . from January 1, 2020 to present" relating to other financial accounts at Mesh Payments, Morgan Stanley, PayPal, and Early Warning Services. *See* Dkt. 185-1, PageID 1699, 1704, 1708, 1713, 1718, 1722, 1725, and 1729. Root makes no effort whatsoever to limit the scope of its subpoenas. Instead, it issued subpoenas that seek *all* of Mr. Campbell's financial transactions (along with those of his wife), beginning in January 2020 – 22 months *before* Mr. Silver was even hired at Root. (Sec. Am. Cmplt., Dkt. 173, Page ID 1477, at ¶ 22). Far from Root's claim that it

---

[4] Because Mr. Campbell and his wife are California citizens, they also have a constitutionally protected privacy interest in their personal financial information. *SCC Acquisitions, Inc. v. Superior Court*, 243 Cal. App. 4th 741, 754 (Cal. Ct. App. 2015) ("Personal financial information comes within the zone of privacy protected by article I, section 1 of the California Constitution.").

"seeks to answer" what happened to the money retained by Quantasy, it really seeks a blanket grab of every scrap of financial data belonging to the Campbell family.

The cases cited by Root in its memorandum in opposition demonstrate that the subpoenas here are improper. In *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 2019 U.S. Dist. LEXIS 177798 (N.D. Ala. Feb. 12, 2019), the court specifically found that prior to the issuance of the subpoenas, plaintiffs amended their complaint to

> list[] specific allegations against each individual defendant regarding their alleged involvement in the underlying conspiracy and plead new facts that stemmed from previous discovery in this case. Plaintiffs base their requests regarding the individual Defendants' accounts in the non-party subpoenas on more than just pure speculation and conjecture.

*Id.* at *14-*15. Moreover, in that case, the Court noted that the subpoenas are "reasonably limited in scope to seek information concerning the transactions linked to the alleged fraud during the last 24 months." *Id.* at *6-*7.

Here, Root's subpoenas meet neither of the *Roche* criteria. The subpoenas are not reasonably limited in scope to the transactions linked to the alleged fraud – they seek *all* information in the accounts, regardless of relevancy – and are overbroad in time, seeking information from years before Silver even became an employee of Root. Even more critically, Root's RICO and fraud claims that purportedly justify these overbroad requests *are* just pure speculation and conjecture. Root has completely failed to produce any evidence of Mr. Campbell's or Quantasy's involvement in the fraud. Quantasy and Mr. Campbell have provided discovery responses to Root and have produced almost 10,000 pages of documents in discovery. In the motion to quash, Mr. Campbell and Quantasy all but double-dog dared Root to produce *any* evidence to support its claim that Campbell knew of Silver's fraud, and in the Opposition, we now have its answer: there is none. Root refers the Court to conclusory allegations in the complaint, and then points to the unremarkable fact that Quantasy and Mr. Campbell withdrew money from

a bank account, which Root claims demonstrates money laundering. Withdrawing money from a bank account is not money laundering. Root does not even assert that it has evidence to show that (1) the money transferred was actually proceeds of a specified unlawful activity; (2) that Mr. Campbell (or his wife) *knew* that the property transferred was proceeds of an unlawful activity; or (3) that Mr. Campbell or his wife specifically intended for the transaction to be for the purpose of the concealment the funds, all of which are elements of concealment money laundering. *See United States v. Chavez*, 951 F.3d 349, 356 (6th Cir. 2020). Alleging that Mr. Campbell has made withdrawals and deposits into a bank account, or that he bought a house, is not even close to hitting the mark, particularly where there is no evidence of actual concealment. Root likewise provides no evidence that Mr. Campbell engaged in a fraud. This is particularly noteworthy in light of Silver's recent guilty plea, in which there is no suggestion whatsoever that the Quantasy Defendants participated in or had any knowing involvement in Silver's fraud.[5] There is nothing to support Root's claims other than conjecture and speculation.

Root's arguments regarding the conversion claim are equally misguided. Quantasy's motion to dismiss does not argue that the funds cannot be converted because they are untraceable, as Root asserts. Instead, Quantasy's argument is that money is intangible property and thus it cannot be converted unless it is specially earmarked. Root does not allege that the money it paid Quantasy was earmarked, so it is not identifiable as a matter of law. The question posed by Root

---

[5] *See* Plea Agreement, *United States v. Silver*, Case No. 23-cr-201, Dkt. 41, attachment A ("After Mr. Silver entered into contracts on behalf of Root with the VENDORS, he directed the VENDORS to send a portion of what the VENDORS received from Root to bank accounts in the name of his business and in his control."). Although Quantasy was the largest of these vendors, there were three other vendor victims of Silver's scheme. As is customarily charged in a conspiracy scheme, there is no reference to unnamed co-conspirators. There is no hint in the indictment that any vendor was complicit in Silver's fraud, let alone anything that supports the Root's allegations that Campbell and Quantasy were actively involved in Silver's embezzlement.

7

in its brief, "how else would Root be able to trace the money?" goes precisely to the heart of why its conversion claim fails. Root *cannot* trace the money. It is impossible because it is intangible. *E.g.*, *RAE Assocs. v. Nexus Comm'ns, Inc.,* 2015-Ohio-2166, ¶ 31, 36 N.E.3d 757, 765 (10th Dist.). Root's conversion claim fails as a matter of law, and Mr. Campbell's bank accounts, from 2020, no less, have no relevance to these claims whatsoever.

Nor does Root cite any case to this Court as to why it should be entitled to discovery of all of Mr. Campbell's personal financial bank accounts, PayPal accounts, and investment accounts for purposes of litigating a breach of contract claim.[6] Quantasy either performed or it did not. Root either breached the agreement or it did not. What Mr. Campbell buys with his PayPal account does not bear on these claims. Here again, Root does not even attempt to defend the temporal scope of the subpoena or the fact that the money admittedly retained by Quantasy was an agreed-upon fee for services. Root's attempt to chase "ill-gotten assets" is directed to the wrong party – with respect to Quantasy and Campbell, there are no ill-gotten assets to trace.

Regarding Root's discussion in the brief regarding veil piercing, as noted in Quantasy's motion to dismiss, Root's complaint does not allege any facts to support veil piercing, and which in any event is not a cause of action but a remedy. *Fast Tract Title Servs. v. Barry*, 2022-Ohio-1943, ¶ 17 (8th Dist.). The remedy is only relevant where there is a valid claim and, as discussed above, there is no valid claim that Root is advancing here. Moreover, Root's suggestion that co-mingling of funds is sufficient to pierce the corporate veil is simply incorrect. There must be control of the corporation so complete that the corporation as no separate mind, will, or existence of its own; the control was exercised in a manner as to commit fraud or an unlawful act against

---

[6] Quantasy is a for-profit company, and it does not work for free. Root's attempted characterization of the issue as whether Quantasy used the entire sum for Root's benefit is a red herring.

Root, and Root suffered injury from such control or wrong. *Id.* (quoting *Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos.*, 67 Ohio St. 3d 274 (1993)). That is not proven here.

### 3. Discovery Should be Stayed

While Quantasy does not dispute that there is a high bar for a stay of discovery, a stay is clearly appropriate here. Even after discovery, Root is unable to muster any evidence to put before this Court in support of its claims. Mr. Silver has pleaded guilty, and there is no suggestion in the record or the criminal plea that Quantasy or Mr. Campbell was involved in his scheme. As detailed in Root's motion and above, these claims completely lack merit, and a stay should be entered.

Root's Opposition notes that Quantasy did not identify any cases where discovery was stayed in RICO cases, but such authority is legion. *See, e.g.*, *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 240389, at *43 (C.D. Cal. Sept. 6, 2022) (staying RICO discovery and noting that the defendant's arguments target the allegations in the complaint, so no discovery is needed); *Lawson v. Rubin*, 2018 U.S. Dist. LEXIS 238295, at *7 (E.D.N.Y. March 7, 2018) (staying discovery where plaintiffs "raise[d] credible arguments that plaintiffs . . . fail to state a RICO claim"); *Blevins v. Aksut,* 2015 U.S. Dist. LEXIS 636, at *41 (S.D. Ala. Apr. 17, 2015) (staying discovery in RICO class action "[b]ecause there is a strong possibility that a ruling on these motions may narrow the scope of this action considerably," which is "in the best interests of all involved"); *Guajardo v. Martinez*, No. 2:14-CV-450, 2015 WL 12831683, at *2 (S.D. Tex. Dec. 22, 2015) (finding that stay warranted "[b]ecause Plaintiffs allege complex claims under civil RICO, Defendants' concerns about the cost and inconvenience of discovery are reasonable"); *see also Bell Atl. v. Twombly*, 550 U.S. 544, 557 (2007) (discussing the problem of allowing a largely groundless claim to proceed that "takes up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.").

### 4. Conclusion

Root knows where the money sent to Quantasy ended up. It is proper to discover and trace the funds Silver absconded with, by his own actions and through Collateral Damage, as well as to try to recover those funds by seizing and selling all the luxury items that Silver bought. Silver has admitted guilt and pled to multiple criminal charges. It is not proper, however, to employ a similarly aggressive approach against Quantasy and Will Campbell's family. The Court recognized this when it declined to issue a restraining order against Quantasy because the Plaintiff could not show misconduct warranting such an order. The circumstances have not changed. Root is not entitled to ransack Campbell's personal records based on what at most, is a business dispute, because it is panicked by the unpleasant and unwelcome implications of its own employee's fraud and seeks to place blame elsewhere. The first two questions on the first page of Plaintiffs' response demand a third: Why does Root refuse to accept responsibility for its blatantly deficient controls environment that allowed Silver to do what he did?[7]

Root's audacious attempts to attribute Silver's misconduct to Quantasy, which is the source of a fishing expedition based on the fact that it will clearly not be made whole by selling Silver's depreciating assets, is simply to harass the Quantasy Defendants – and Mr. Campbell's family members – by the issuance of subpoenas seeking highly personal financial information, including banking records, PayPal records, and Venmo transfers. The subpoenas should be quashed, and this Court should stay all discovery relating to the Quantasy Defendants until such time as it has ruled on the motion to dismiss.

---

[7] From a criminal or regulatory perspective, *respondeat superior* liability "permits the criminal prosecution of a corporation for the crimes of its employees absent proof of corporate ratification or the involvement of corporate officers." Luskin, Robert, *Caring About Corporate Due Care: Why Criminal Respondeat Superior Liability Outreaches Its Justification*, American Criminal Law Review Vol 57, Issue 2 (2020).

Respectfully submitted,

*/s/ Matthew D. Ridings*
Matthew D. Ridings, Trial Attorney (0079402)
THOMPSON HINE LLP
127 Public Square
3900 Key Center
Cleveland, Ohio 44114
Telephone:  216.566.5561
Facsimile:  216.566.5800
Matt.Ridings@ThompsonHine.com

Joan E. Meyer
(Admitted *Pro Hac Vice*)
THOMPSON HINE LLP
1919 M Street, N.W.
Suite 700
Washington, D.C.  20036-3537
Telephone:  202.263.4115
Facsimile:  202.331.8330
Joan.Meyer@ThompsonHine.com

Jamar T. King (0091093)
THOMPSON HINE LLP
10050 Innovation Drive, Suite 400
Miamisburg, OH 45342
Telephone:  937.443.6852
Facsimile:  937.443.6635
Jamar.King@ThompsonHine.com

Karim Sabbidine
(Admitted *Pro Hac Vice*)
THOMPSON HINE LLP
335 Madison Avenue
12th Floor
New York, NY  10017
Telephone:  212.908.3944
Facsimile:  212.344.6101
Karim.Sabbidine@ThompsonHine.com

Joshua H. Epstein
(Admitted *Pro Hac Vice*)
Eva M. Jimenez
(Admitted *Pro Hac Vice*)
DAVIS+GILBERT LLP

11

1675 Broadway
New York, NY 10019
Telephone: 212.468.4869
jepstein@dglaw.com
ejimenez@dglaw.com

*Attorneys for Specially Appearing Defendants
William Campbell, Quantasy, LLC, and
Quantasy & Associates LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2023, a true and accurate copy of the foregoing was filed electronically. Notice of this filing has been sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

A copy was also sent by ordinary U.S. Mail, postage prepaid, on December 20, 2023 to the following non-represented parties:

Paige McDaniel
5576 Alexanders Lake Road
Stockbridge, GA 30281

Brinson Caleb Silver
Butler County Jail
Attn: Brinson Caleb Silver, Inmate No. 303850
705 Hanover Street
Hamilton, Ohio 45011

Collateral Damage, LLC
101 N. Brand Blvd.
11th Floor
Glendale, California 31203

Eclipse Home Design, LLC
651 N. Broad Street
Suite 201
Middletown, Delaware 19709

                                              */s/ Matthew D. Ridings*
                                              Matthew D. Ridings

4885-1114-6135