## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**ROOT, INC.,** *et al.,*

      **Plaintiffs,**      :

     v.                       **Case No. 2:23-cv-512**
                                     **Judge Sarah D. Morrison**
                                     **Magistrate Judge Elizabeth A. Preston Deavers**

**BRINSON CALEB SILVER,** *et al.,*    :

      **Defendants.**

## <u>OPINION AND ORDER</u>

Root, Inc., Caret Holdings, Inc., and Root Insurance Agency, LLC (together, "Root") filed this action asserting claims of racketeering, fraud, conversion, theft, breach of contract, breach of fiduciary duties, and civil conspiracy. (SAC, ECF No. 173.) Root asserts its claims against seven defendants, which can be grouped into three. First, Brinson Caleb "BC" Silver, Collateral Damage, LLC, and Eclipse Home Design, LLC are the "Silver Defendants." Next, William Campbell, Quantasy & Associates, LLC, and Quantasy, LLC are the "Quantasy Defendants." Finally, Paige McDaniel stands alone.

This matter is before the Court on the Quantasy Defendants' Motion to Dismiss (Mot. Dismiss, ECF No. 94), the Silver Defendants' Motion to Stay Proceedings (ECF No. 137), and the Quantasy Defendants' Motion to Quash (ECF No. 185). For the reasons below, the Motion to Dismiss is **GRANTED in part** and

**DENIED in part**; the Motion to Stay is **DENIED as moot**; and the Motion to Quash is **DENIED in part** and **REFERRED in part**.

# I.   MOTION TO DISMISS

## A.   Factual Background[1]

### 1.   SOW #1

Root is a publicly-traded insurance technology company based in Columbus, Ohio. (SAC, ¶¶ 1, 11–13.) In November 2021, Root hired BC Silver to act as its Chief Marketing Officer. (*Id.*, ¶ 2.) Mr. Silver was previously acquainted with William Campbell, CEO of Los Angeles-based advertising firm Quantasy. (*Id.*, ¶¶ 26, 17–18.) Two weeks after joining Root, Mr. Silver contacted Mr. Campbell about Root retaining Quantasy as a vendor. (*Id.*, ¶ 26.) The two negotiated a scope of work ("SOW") agreement directly. (*Id.*, ¶¶ 27–29.)

On February 3, 2022, Root and Quantasy executed SOW #1. (*Id.*, ¶ 30; *see also* SOW #1, ECF No. 20-3.) Jill Neely, VP Creative, signed for Root; Mr. Campbell signed for Quantasy. (SOW #1, PAGEID # 154.) Under SOW #1, Quantasy was to provide specific services under the banners of Client Partnerships, Brand Strategy, and Creative Services/Development Support. (*Id.*, PAGEID # 151–52.) The project was to be staffed by eighteen individuals from Quantasy's Account Management,

---

[1] All well-pled factual allegations in the Second Amended Complaint are considered as true for purposes of a Rule 12(b)(6) motion. *See Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016). This summary draws from the Second Amended Complaint and the documents integral to and incorporated in it. (Per Root's Motion for Leave to File Second Amended Complaint, the exhibits attached to the First Amended Complaint (ECF Nos. 20-1–20-42) apply identically to the Second. *See* ECF No. 165, PAGEID # 1379.) As to the portion of the motion made under Rule 12(b)(2), the Court also considers the sworn declaration submitted by Root.

Strategy, Creative, Social, and Program Management teams. (*Id.*, PAGEID # 153.) Root was to pay a total fee of $1,184,445, representing ten-thousand man-hours billed at blended rates of $100–$150 per hour. (*Id.*, PAGEID # 153.) The fee would be paid in three installments: $473,778 upon commencement; $414,555.75 on February 18, 2022; and $296,111.25 on March 1, 2022. (*Id.*, PAGEID # 154; *see also* SAC ¶ 30.) Quantasy sent Root an initial invoice requesting $473,778 for "Brand Services." (ECF No. 20-4.) Root paid Quantasy's invoice on February 9. (SAC, ¶ 33.)

Before the initial invoice was paid, Mr. Silver sent Mr. Campbell the following message on the private messaging platform, WhatsApp:



(SAC, ¶ 32; ECF No. 20-5.) Then, on February 11, Mr. Silver sent another WhatsApp message to Mr. Campbell. (*Id.*, ¶ 34.) This one contained a PDF labeled Quantasy Invoice – January. (ECF No. 20-7.) It sought $153,778, payable to Collateral Damage, for "2020 Promotion Plan" and "Campaign Design Support." (SAC, ¶ 34.) Mr. Silver and Mr. Campbell met that day at Quantasy's offices. (*Id.*, ¶ 36.)

3

Two days later, the men exchanged the following WhatsApp messages (with Mr. Silver on the left and Mr. Campbell on the right):

800,000 Q (20% of original invoice)
384,444 CD (balance)

CD Payments split in two payments within first two invoices
1. $192,000 beginning Feb
2. $192,000 mid feb

Quantasy will have 3 payments in two months totaling $800k

Vs original plan had the same total spread across 12 months.

> Nah. Let's just divide it equally across the 3. Keeps it simple

The three invoices are equal amounts

> My bad, I understand that part. I mean pro rata across the 3 per the percentages. 40/35/25

Sure if you prefer that

I didn't prefer to match one deal with another

> It's what I explained to my controller

That's why I did it 50/50. The first to pops are big enough to absorb the 5050, and Q final payment is all profit

You are want to split 67/37 across 3 payments

| 1,184,445 | | | |
|---|---|---|---|
| | Total | Q | CD |
| 100% | 1,184,445 | 800,000 | 384,445 |
| pmt 1) 40% | 473,778 | 320,000 | 153,778 |
| pmt 2) 35% | 414,555.75 | 280,000 | 134,555.75 |
| pmt 3) 25% | 296,111.25 | 200,000 | 96,111.25 |

Yes, you are saying you prefer to straight line as a percent across 3 payments

(*Id.*, ¶ 37 (reproduced as written).) Root alleges that, in these messages, Mr. Silver and Mr. Campbell decided how to divvy up the payments Root made under SOW #1 between Quantasy and Collateral Damage. (*Id.*, ¶¶ 37–38.) The next day, Quantasy wired $153,778 to Collateral Damage, using the wire instructions provided in Mr. Silver's February 7 WhatsApp message. (*Id.*, ¶ 39.)

On February 23, 2022, Mr. Campbell sent Root a Quantasy invoice for $414,555.75. (*Id.*, ¶ 40; *see also* ECF No. 20-8.) The following day, Mr. Campbell met via videoconference with members of Root's management team "to present Quantasy's ideas for Root's marketing campaigns." (SAC, ¶ 41.) Afterwards, Mr. Silver sent the following text messages to Mr. Campbell:



(ECF No. 20-9.)

Mr. Campbell sent Mr. Silver a WhatsApp message on March 2, asking him to have Lauren "send the invoice for phase 2[.]" (ECF No. 20-11.) "Lauren" refers to Lauren Lanskie, a then-former employee of Mr. Silver whose name and old email address were used by Mr. Silver without her knowledge or consent. (SAC, ¶¶ 44–45.)

5

On March 4, 2022, Mr. Campbell texted Mr. Silver, advising that Quantasy had not been paid on the February 23 invoice. (*Id.*, ¶ 46.) Root paid $414,555.75 on March 7. (*Id.*, ¶ 47.) Mr. Campbell confirmed receipt of the payment via text message, before switching to WhatsApp to send the following:



(*Id.*, ¶ 48; *see also* ECF No. 20-13.) Mr. Silver responded with a PDF titled Quantasy Invoice – February, seeking $134,555.75 for "2021 Promotion Plan" and "Campaign Design Support." (SAC, ¶ 49; ECF No. 20-13; ECF No. 20-14.) Quantasy paid the invoice by bank wire that day. (SAC, ¶ 49.)

Mr. Silver subsequently instructed Mr. Campbell to send Quantasy's invoices to him directly, ostensibly because others at Root had not handled the prior invoice on a satisfactory timeline. (*Id.*, ¶ 50.) The next day, Quantasy sent the final invoice to Root (through Mr. Silver) for $296,111.25. (*Id.*, ¶ 51.) Root paid that invoice on March 24. (*Id.*, ¶ 52.)

On March 25, Mr. Silver and Mr. Campbell exchanged the following WhatsApp messages:



(*Id.*, ¶ 53; ECF No. 20-17.) Mr. Campbell then received an email from lauren@collateraldamage.agency with an invoice attached, requesting payment to Collateral Damage in the amount $96,111.25 for "Campaign Design Support." (SAC, ¶ 54; ECF Nos. 20-17, 20-18.) Quantasy wired the funds to Collateral Damage on March 28. (SAC, ¶ 55.)

### 2. SOW #2

Around April 1, Root and Quantasy executed a second scope of work agreement ("SOW #2"). (*Id.*, ¶ 57; SOW #2, ECF No. 20-19.) The Services to be provided under SOW #2 were identical to those in SOW #1. (*Compare* SOW #1, *and* SOW #2.) But SOW #2 differed from SOW #1 in many ways. Among them: instead

of Ms. Neely, Mr. Silver executed SOW #2 on behalf of Root; instead of a detailed agency staffing plan, SOW #2 included a provision allowing Quantasy to "subcontract third parties . . . to perform certain Services"; and instead of $1,184,445 paid over two months, SOW #2 provided for $14,900,000 paid over two weeks. (*Id.*)

Mr. Campbell emailed two invoices to Root (through Mr. Silver) on April 1, 2022, totaling $7,350,000. (SAC, ¶ 58.) Root paid the invoices on April 4. (*Id.*, ¶ 59.) The next day, Mr. Silver sent Mr. Campbell a WhatsApp message:



Let me know when you recieve, I will have Lauren forward the invoice this morning    9:45 AM

(*Id.*, ¶ 60; ECF No. 20-22.)

On April 6, 2022, Mr. Campbell sent an email to Mr. Silver's personal email account (*i.e.*, an account not affiliated with Root). (SAC, ¶ 61.) In the email, Mr. Campbell described excitement about working "with Root Insurance and you" and advised that his team "ha[d] already started putting together a subcontracting agreement between Quantasy and your company, Collateral Damage." (ECF No. 20-23.) Mr. Campbell then expressed "that the advertising industry . . . ha[d] been very focused on the issues of subcontracting with interested parties and payments to agencies that include payments to third parties." (*Id.*) He advised that Quantasy's attorney "recommend[ed] that the relationship between Quantasy and Collateral Damage be approved by Root." (*Id.*) Mr. Silver responded with a WhatsApp message representing that he had been "completely removed from any previous ownership"

8

of Collateral Damage. (SAC, ¶ 63; ECF No. 20-24.) Four days later, Paige McDaniel (Mr. Silver's sister) filed a certificate of organization with the Georgia Secretary of State for Collateral Damage LLC. (ECF No. 20-25.)

Meanwhile, Mr. Silver and Mr. Campbell continued to communicate via WhatsApp about the flow of funds between Root, Quantasy, and Collateral Damage. (SAC, ¶¶ 66–67.) The messages included direction from Mr. Silver to "make sure invoices are less than $10M . . . [s]o they don't need board approval." (*Id.*, ¶ 67; ECF No. 20-28.) It was the day that direction was given that Mr. Campbell sent Root the two invoices totaling $7,350,000. (SAC, ¶ 68; ECF No. 20-29.)

Quantasy then wired $2.8 million to Collateral Damage: $500,000 each on April 11, April 13, and April 15; and $1.3 million on April 20. (*Id.*, ¶¶ 66, 69.)

After Root paid Quantasy on April 25, Mr. Campbell received an email from lauren@collateraldamage.agency with a Form W-9 signed by "Paige Lynette" and an invoice for $5.6 million, due in installments on April 1 and April 15. (*Id.*, ¶¶ 70–72; ECF No. 20-30.) Quantasy wired $1.5 million to Collateral Damage that day, and $1.3 million the next. (SAC, ¶¶ 73–74.)

9

Over the next three weeks, Mr. Silver and Mr. Campbell continued in the same fashion. Mr. Silver's messages to Mr. Campbell expressed increasing urgency about the remaining payments to Collateral Damages, culminating on May 17, 2022, when Mr. Silver pressed Mr. Campbell: "This is major for me today, in the next hour[.]" (*Id.*, ¶ 83, fig. 4.) He continued:



(*Id.*, fig. 5.) Mr. Campbell responded with a photo of himself standing in front of a Chase Bank branch and wired $1.5 million to Collateral Damage. (*Id.*, fig. 6; *id.*, ¶ 84.)

In all, Root paid Quantasy $14.7 million under SOW #2. Quantasy passed $9.1 million of those funds along to Collateral Damage. Root alleges that it received nothing from Collateral Damage substantiating the fee paid and nothing of value in exchange. (*Id.*, ¶ 85.)

### 3.    Internal Inquiry

In the summer of 2022, Root's finance department begin investigating unplanned spending under Mr. Silver. (*Id.*, ¶ 92.) Root alleges that Mr. Silver and Mr. Campbell responded to "this heightened scrutiny" by executing "a series of change orders in an attempt to cover their tracks[.]" (*Id.*, ¶ 93.) Mr. Campbell also executed a Subcontractor Agreement, effective February 2, 2022, and signed August 20, 2022, by himself as CEO of Quantasy and "Paige Lynette" as President of Collateral Damage. (ECF No. 20-36.)

On August 22, 2022, Root's internal audit team questioned Mr. Campbell about Quantasy's work on Root matters "to determine whether there was justification for the millions of dollars Root had paid to Quantasy." (SAC, ¶ 97.) Mr. Campbell did not disclose the existence of Collateral Damage or that significant money had been passed along to it. (*Id.*) Over the next day, Mr. Silver sent Mr. Campbell screenshots of the internal audit team's preliminary findings over WhatsApp. (*Id.*, ¶ 99; ECF Nos. 20-28, 20-29.) He added:



One month later, Root questioned Quantasy employee David Rodriguez via email. (*Id.*, ¶ 98.) Mr. Rodriguez represented that $10.7 million was unallocated/uncommitted and "c[ould] be used for paid media in 2023." (ECF No. 20-37.)

Mr. Silver was terminated from Root on November 9, 2022. (SAC, ¶ 101.) On November 16, Mr. Rodriguez revealed the existence of Collateral Damage to Root for the first time. (*Id.*, ¶ 103.) Root investigated the relationship, and opened an inquiry to determine whether any of the marketing department's other vendors had dealings with Collateral Damage. (*Id.*, ¶ 104.) They uncovered evidence of a similar scheme, in which vendor Ben-Her Marketing transferred in excess of $500,000 to Collateral Damage. (*Id.*, ¶ 105.)

This lawsuit followed.

## B.    Procedural Background

Root filed its Verified Complaint for Damages and Injunctive Relief on February 2, 2023. (ECF No. 1.) The operative Second Amended Complaint for Damages and Injunctive Relief was filed more than eighteen months later. (SAC, ECF No. 173.) Substantial litigation took place in the interim, mostly involving the Silver Defendants. As to the Quantasy Defendants, the Second Amended Complaint alleges the following:

| | |
|---|---|
| Count I: | Civil RICO (Racketeer Influenced Corrupt Organizations), 18 U.S.C. § 1962(c) <br> All Defendants |
| Count II: | Fraudulent Concealment <br> Silver, Campbell, Quantasy |
| Count III: | Fraudulent Misrepresentation <br> Silver, Campbell, Quantasy |
| Count IV: | Conversion <br> All Defendants |
| Count V: | Civil Theft, Ohio Rev. Code §§ 2307.60, 2307.61 <br> All Defendants |

Count VI:    Civil Telecommunications Fraud, Ohio Rev. Code § 2913.05
             Silver, Campbell, Quantasy, Collateral Damage

Count VIII:  Breach of Contract
             Quantasy

Count X:     Civil Conspiracy
             All Defendants

They now move to dismiss all claims for lack of personal jurisdiction and failure to

state a claim upon which relief may be granted. (Mot. Dismiss.)

## C.    Personal Jurisdiction

### 1.    Legal Standard

Rule 12(b)(2) provides for dismissal of a lawsuit for lack of personal

jurisdiction. Fed. R. Civ. P. 12(b)(2). The plaintiff bears the burden of proving that

jurisdiction exists, *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991),

"over each defendant independently." *Beydoun v. Wataniya Rests. Holding, Q.S.C.*,

768 F.3d 499, 504 (6th Cir. 2014) (quoting *Days Inns Worldwide, Inc. v. Patel*, 445

F.3d 899, 904 (6th Cir. 2006)). "[I]n the face of a properly supported motion for

dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or

otherwise, set forth specific facts showing that the court has jurisdiction."

*Theunissen*, 935 F.2d at 1458. If a court rules on a Rule 12(b)(2) motion before trial,

"it has the discretion to adopt any of the following courses of action: (1) determine

the motions based on affidavits alone; (2) permit discovery, which would aid in

resolution of the motion; or (3) conduct an evidentiary hearing on the merits of the

motion." *Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005) (citation

omitted). "[T]he decision whether to grant discovery or an evidentiary hearing

before ruling on a 12(b)(2) motion is discretionary." *Burnshire Dev., LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 434 (6th Cir. 2006) (citation omitted). Here, no party has requested further discovery or an evidentiary hearing, and the Court concludes that neither is necessary to rule on the Quantasy Defendants' motion as it pertains to jurisdiction.

When a court resolves a Rule 12(b)(2) motion based on "written submissions and affidavits . . . , rather than resolving the motion after an evidentiary hearing or limited discovery, the burden on the plaintiff is 'relatively slight,' and 'the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal.'" *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988); *Theunissen*, 935 F.2d at 1458) (cleaned up). A plaintiff can meet the burden by "establishing with reasonable particularity sufficient contacts between [it] and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002) (internal quotation and citation omitted). In the absence of an evidentiary hearing, courts apply the *prima facie* standard weighing the evidence in the light most favorable to the plaintiff. *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998). Nonetheless, the court may consider a defendant's undisputed factual assertions. *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012). If "there does not appear to be any real dispute over the facts relating to jurisdiction, the *prima facie* proposition loses some of its significance." *Id.* (internal quotations and citation omitted).

14

In support of their Response, Root filed a sworn declaration of Megan Binkley, Root's Chief Financial Officer and Treasurer. (ECF No. 135-1.)

### 2.    Analysis

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). Where, as here, subject-matter jurisdiction is based on a federal question, a court may exercise personal jurisdiction over a defendant if it is "both authorized by the forum State's long-arm statute and in accordance with the Due Process Clause of the Fourteenth Amendment." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016) (citation omitted).

### a)    Ohio's Long-Arm Statute[2]

"Ohio's long-arm statute grants Ohio courts personal jurisdiction over a non-resident if his conduct falls within the nine bases for jurisdiction listed by the statute." *Conn*, 667 F.3d at 712. Root asserts that five such bases confer personal jurisdiction over the Quantasy Defendants. Because the Court finds that the

---

[2] Ohio's long-arm statute was amended effective April 7, 2021, to provide that "[in] addition to a court's exercise of personal jurisdiction under division (A) . . . , a court may exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution." Ohio Rev. Code § 2307.382(C). Neither the Ohio Supreme Court nor the Sixth Circuit has decided whether the long-arm statute, as amended, is co-extensive with the Due Process Clause. *But see LG Chem, Ltd. v. Goulding*, 194 N.E.3d 355, 358–59 (Ohio 2022) (analyzing personal jurisdiction under both the state long-arm statute and the Due Process Clause, even after the amendment went into effect). District courts have taken differing views. *See AmaTech Grp. Ltd. v. Fed. Card Servs., LLC*, No. 1:21-cv-406, 2022 WL 44674, at *4–5 (S.D. Ohio Jan. 5, 2022) (Cole, J.) (collecting cases). Without more clarity, the Court will analyze the two separately. *Accord A.B. Pratt & Co. v. Bridgeport Grp., LLC*, No. 1:22-CV-1579-PAB, 2023 WL 2865640, at *8 (N.D. Ohio Apr. 10, 2023).

Quantasy Defendants transacted business in the state of Ohio, it need not examine the other four bases.

Ohio's long-arm statute "permit[s] jurisdiction over nonresident defendants who are *transacting any* business in Ohio." *Ky. Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 559 N.E.2d 477, 480 (Ohio 1990) (citing Ohio Rev. Code § 2307.382(A)(1)) (emphasis in original). This "very broadly worded" provision has been interpreted to encompass activities including

> to *prosecute negotiations*; to carry on business; *to have dealings* * * *.
> The word embraces in *its meaning the carrying on or prosecution of business negotiations* but it is a *broader term than the word 'contract' and may involve business negotiations* which have been either wholly or partly brought to a conclusion * * *.

*Id*. (quoting BLACK'S LAW DICTIONARY (5th ed. 1979)) (emphasis in original). Mr. Campbell, on behalf of Quantasy, presented via videoconference to a group of management-level Root staff based in Ohio. He also signed a Statement of Work counter-signed by Root's VP of Creative, who was based in Ohio. And he sent invoices to Root employees based in Ohio. This is the transaction of business in Ohio, plain and simple.

### b)    Due Process Clause

Having found that Ohio's long-arm statute is satisfied, the Court moves on to determine whether personal jurisdiction comports with the Due Process Clause. To satisfy due process, a court's exercise of its power over an out-of-state defendant must "not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). "[T]he defendant's conduct and connection with the forum State [must be] such that he should

16

reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The Fourteenth Amendment's Due Process Clause recognizes two types of personal jurisdiction—general and specific—either one of which is adequate to confer jurisdiction over a defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

"If a court has general jurisdiction over a defendant, it can adjudicate any claims involving that defendant, regardless of where the cause of action arose." *Maclin v. Reliable Reports of Tex., Inc.*, 314 F. Supp. 3d 845, 849 (N.D. Ohio 2018). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home[,]" such as the corporation's place of incorporation and its principal place of business. *Goodyear*, 564 U.S. at 924. General jurisdiction may also exist over an out-of-state corporation when its contacts with the forum state "are so continuous and systematic as to render [it] essentially at home in the forum state." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (internal quotations and citations omitted). Root does not argue that this Court has general jurisdiction over the Quantasy Defendants.

"Specific jurisdiction refers to jurisdiction over claims arising from or related to a defendant's contacts with the forum state." *Maclin*, 314 F. Supp. 3d at 849. The Sixth Circuit uses a three-prong test to "guide[] the determination of whether specific jurisdiction exists" while protecting a defendant's due process rights. *Intera Corp.*, 428 F.3d at 615.

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). "Failure to meet any one of the three prongs means that personal jurisdiction may not be invoked." *Maclin*, 314 F. Supp. 3d at 849.

### (1) Purposeful Availment

Under *Southern Machine*, the Court first looks to whether the Quantasy Defendants purposefully availed themselves of the privilege of conducting business in Ohio. The Court determines that they have. "In the Sixth Circuit, the emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt actions connecting the defendant with the forum state." *Beydoun*, 768 F.3d at 506 (internal quotation and citation omitted). "[T]he issue is not the quantity, but the quality of a defendant's contacts with the forum state." *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 901 (6th Cir. 2017) (citations omitted). Although "physical presence in the forum state is not required," it "is certainly a relevant contact." *Id*. at 900 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). The Sixth Circuit has found purposeful availment when a business relationship was "intended to be ongoing in nature," despite a "paucity" of evidence that the nonresident defendant was physically or tangibly present in the state. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1264–65 (6th Cir. 1996). A defendant's creation of business "obligations . . .

18

[that] have a realistic impact on the commerce of" the forum state may give rise to specific jurisdiction when it is reasonably foreseeable that those obligations "would have consequences" in the forum state. *Id.* (quoting *Mohasco Indus.*, 401 F.2d at 382–83). Similarly, courts have also held that directing correspondence to the forum state is a relevant contact and can itself establish personal jurisdiction when the correspondence gives rise to the action. *See, e.g., Schmückle*, 854 F.3d at 902.

Here, the Quantasy Defendants corresponded with, and attended virtual meetings with, Root employees based in Ohio. And Quantasy, through Mr. Campbell, entered into two contracts to provide marketing services to Root, an Ohio-based company. This activity would be indicative of an active business relationship—instead, Root alleges that it comprised (or concealed) a tortious scheme to siphon funds away from Root for others' private benefit. These contacts are sufficient to establish that the Quantasy Defendants purposefully availed themselves of the privilege of conducting business in Ohio.

### (2) Arising From

The Court next examines whether Root's claims arise out of the Quantasy Defendants' activities in Ohio. The Sixth Circuit has explained,

> [t]o satisfy the "arising from" prong of the *Southern Machine* test, the plaintiff must demonstrate a causal nexus between the defendant's contacts with the forum state and the plaintiff's alleged cause of action. *See Burger King Corp.*, 471 U.S. at 474, 105 S.Ct. 2174 ("[I]t may well be unfair to allow [out-of-state parties] to escape having to account in other States for consequences that arise proximately from such activities."). As our circuit has explained, "the cause of action must . . . have a substantial connection with the defendant's in-state activities." [*Dean*, 134 F.3d at 1275] (quotation marks omitted). Put another way, "[t]he 'arising from' requirement under the second prong [of the *Southern Machine* test] is satisfied when the operative facts of

19

> the controversy arise from the defendant's contacts with the state. 'Only when the operative facts of the controversy are not related to the defendants contact with the state can it be said that the cause of action does not arise from that contract.'" *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723–24 (6th Cir. 2000) (quoting *S. Mach. Co.*, 401 F.2d at 384 n. 29); *see also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 451 (6th Cir. 2012) ("Even a single act by a defendant directed toward the relevant forum *that gives rise to a cause of action* can support" a finding of personal jurisdiction. (emphasis added, citation, quotation marks, and alterations omitted)).

*Beydoun*, 768 F.3d at 506–07. Mr. Campbell's and Quantasy's dealings with Root are part and parcel of the conduct giving rise to Root's claims against them.[3] They form a part of the operative facts of the Second Amended Complaint, which therefore arises out of the Quantasy Defendants' contacts with Ohio.

### (3)    Reasonableness

Finally, the Court must determine whether its exercise of jurisdiction over the Quantasy Defendants is reasonable. "When the first two prongs of our personal jurisdiction test are met, there is an inference of reasonableness and 'only the unusual case will not meet this third criteria.'" *Schmückle*, 854 F.3d at 903–04 (quoting *Air Prods. & Controls, Inc.*, 503 F.3d at 554). The reasonableness determination is made upon review of the following three factors: "(1) the burden on the defendant; (2) the forum state's interest; and (3) the plaintiffs' interest in obtaining relief." *Id.* (citation omitted).

There is nothing unusual about this case that would rebut the inference of reasonableness. The Quantasy Defendants do not argue otherwise. Further, Ohio

---

[3] There is overlap between the first and second prongs of the *Southern Machine* analysis. *Beydoun*, 768 F.3d at 507 (citations omitted).

20

has an interest in ensuring that its citizens are able to conduct their business free from tortious harm, such as that alleged here.

### c) RICO's Nationwide Service Provision

The Quantasy Defendants argue only that RICO's nationwide service of process clause does not grant this Court jurisdiction because the "ends of justice" do not require it. (Mot. Dismiss, PAGEID # 802.) But the Court has found jurisdiction over the Quantasy Defendants without needing to consult RICO.

The Quantasy Defendants' Motion to Dismiss for lack of personal jurisdiction is **DENIED**.

### D. Failure to State a Claim

### 1. Legal Standard

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal alteration and quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Supreme Court has explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555.) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In reviewing a motion to dismiss, the Court "construe[s] the complaint in the light most favorable to the plaintiff[.]" *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

Plaintiffs face a heightened pleading standard with respect to claims sounding in fraud. *See* Fed. R. Civ. P. 9(b) (requiring that the circumstances constituting fraud must be pled "with particularity"). To satisfy Rule 9(b)'s heightened standard, a complaint must "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993) (internal quotation and citation omitted). Rule 9(b) "should not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by the Federal Rules." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503–04 (6th Cir. 2008) (internal quotation and citation omitted). Instead, Rule 9(b) is intended to "provide a defendant with 'at least the minimum degree of detail necessary to begin a competent defense'" and "discourage fishing expeditions . . . which appear more likely to consume a defendant's resources than to reveal evidence of wrongdoing." *Scotts Co. LLC v.*

*Liberty Mut. Ins. Co.*, 606 F. Supp. 2d 722, 736 (S.D. Ohio 2009) (Graham, J.)

(quoting *U.S. ex rel. SNAPP*, 532 F.3d at 504) (cleaned up).

### 2.    Count I: Civil RICO

Count I of the Second Amended Complaint asserts a civil RICO claim against

all Defendants. (*See* SAC, ¶¶ 106–17.) Under RICO, it is

> unlawful for any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct
> of such enterprise's affairs through a pattern of racketeering activity or
> collection of unlawful debt.

18 U.S.C. § 1962(c). To state a RICO claim, a plaintiff must plead the following

elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 791 (6th Cir.

2012) (internal quotation and citation omitted). The Quantasy Defendants argue

that Root fails to allege facts supporting each element.

#### a)    Conduct

As to element one, the Quantasy Defendants argue that Root fails to allege

the degree of 'conduct' necessary—specifically, that they cannot be held liable under

RICO even if they participated in the scheme because Root fails to allege that the

Quantasy Defendants "operat[ed] or manage[d]" the enterprise. (Mot. Dismiss,

PAGEID # 773 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). The

Supreme Court has indeed held that defendants must have "conducted or

participated in the conduct of the '*enterprise's* affairs'" to be liable—"not just their

*own* affairs." *Reves*, 507 U.S. at 185 (citing 18 U.S.C. § 1962(c)). To satisfy this

standard, the Sixth Circuit requires a showing that the defendant "ma[de] decisions

on behalf of the enterprise or [] knowingly carr[ied] them out." *Ouwinga*, 694 F.3d at 792 (internal quotation, citation, and emphasis omitted). The Second Amended Complaint alleges exactly that. Among other things, Root alleges that Mr. Campbell devised and agreed to a payment distribution framework with Mr. Silver before any invoices were generated; that Quantasy issued invoices to Root, and subsequently issued wires to Collateral Damage, in accordance with that framework; that Mr. Campbell expedited wiring more than $1 million to Collateral Damage so that Mr. Silver could complete a real estate transaction (far beyond the scope of marketing services); that Mr. Campbell and other Quantasy employees misrepresented the availability of Root's funds for future marketing spend; and that Mr. Campbell took and apparently heeded Mr. Silver's advice to "hold the line." That is enough at this stage.

### b) Enterprise

As to element two, the Quantasy Defendants argue that the Second Amended Complaint fails to allege an "association in fact" enterprise. The argument is unavailing. RICO punishes "any person employed by or associated with any enterprise[.]" 18 U.S.C. § 1962(c). Though not an exhaustive definition, the statute provides that "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4); *Boyle v. United States*, 556 U.S. 938, 944 n.2 (2009). This latter "concept of an association in fact is expansive." *Boyle*, 556 U.S. at 944. It means "simply a continuing unit that functions with a common purpose." *Id.* at 948. Though the Supreme Court has emphasized that an

24

association-in-fact need not have a formal structure, it does require "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

The Quantasy Defendants challenge the sufficiency of allegations showing relationships among those in the enterprise. In particular, they argue that the Second Amended Complaint fails to allege that the Quantasy Defendants had any awareness of or connection to Ms. McDaniel or Eclipse Home Design. Instead, they believe the allegations describe a "rimless hub-and-spoke arrangement," with Mr. Silver at the center, and all other Defendants as spokes. Notably, courts outside the Sixth Circuit have held that "a group of individuals related by a structure that mimics so-called 'rimless hub-and-spoke' conspiracies cannot be considered a RICO association-in-fact." *D'Addario v. D'Addario*, 901 F.3d 80, 101 (2d Cir. 2018) (collecting cases). But this Court disagrees with the Quantasy Defendants' reading of the Second Amended Complaint. Instead of a rimless hub-and-spoke (which might be, for example, Mr. Silver running a series of parallel frauds against Root), the Complaint describes a group of individuals and corporate entities *working together* to *jointly* execute a scheme of fraud and embezzlement. Mr. Campbell executed an agreement co-signed by Ms. McDaniel (albeit, using her alias) and wired funds to Collateral Damage after receiving a Form W-9 signed by Ms. McDaniel. The funds wired out to Collateral Damage were a pre-determined percentage of the funds Root paid to Quantasy two days prior. That is enough to adequately allege an association-in-fact.

25

c)    **Pattern**

As to element three, the Quantasy Defendants argue that Root has not alleged continuous racketeering activity sufficient to establish a pattern. Root argues that it has alleged open-ended continuity and the Court agrees. A pattern of racketeering activity requires, at a minimum, two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5). The Supreme Court has held, however, that the minimum two acts are not necessarily sufficient and that a plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original). This is known as the "relationship plus continuity" test. *Ouwinga*, 694 F.3d at 795. There is no argument here that the alleged predicate acts are not related.

Continuity "is both a closed- and open-ended concept[.]" *H.J. Inc.*, 492 U.S. at 241. A 'closed-ended' pattern is "a series of related predicate acts extending over a substantial period of time," where an 'open-ended' pattern is "a set of predicate acts that poses a threat of continuing criminal conduct extending beyond the period within which the predicate acts were performed." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 409–10 (6th Cir. 2012) (cleaned up). As the Sixth Circuit has explained,

> [o]ften a RICO action will be brought before continuity can be established by showing predicate acts spanning a substantial period of time. In such cases, liability depends on whether the threat of continuity is demonstrated. So the plaintiffs must plausibly allege that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed. Determining whether the predicate acts establish open-ended continuity requires a court to examine the

26

> specific facts of the case. The threat of continuing racketeering activity need not be established, however, exclusively by reference to the predicate acts alone; rather, a court should consider the totality of the circumstances surrounding the commission of those acts.

*Id.* at 410 (internal quotations, citations, and alterations omitted). "Subsequent events are irrelevant to the continuity determination[.]" *Id.* Instead, "the threat of continuity must be viewed at the time the racketeering activity occurred." *Id.* (quoting *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991)).

Here, Root alleges that the Quantasy Defendants sent fraudulent multi-million-dollar invoices to Root, which were approved by Mr. Silver. The resulting payments were divided between the Quantasy Defendants and the Silver Defendants according to the percentage scheme worked out in advance between Mr. Campbell and Mr. Silver on WhatsApp, a private messaging service. Those funds were retained for Defendants' personal benefit. This was not an "inherently terminable scheme" with a "built-in ending point" but rather one that likely would have continued into the future had Root not terminated Mr. Silver and investigated the irregular spending in his department. *Heinrich*, 668 F.3d at 410; *see also Blue Cross and Blue Shield of Mich. v. Kamin*, 876 F.2d 543, 545 (6th Cir. 1989) (finding that continuity was established because, if the defendant had not been caught, there was no reason to believe he would have stopped submitting fraudulent insurance claims).

The Quantasy Defendants argue that the scheme was not interminable, because Mr. Silver left Root for reasons unrelated to the fraud. "[F]acts external to the predicate acts may, and indeed should, be considered." *Busacca*, 936 F.2d at

238. But Root also alleges that the Silver Defendants engaged in a similar kickback scheme with Ben-Her Marketing, another "sham" vendor. Had Root not investigated and brought this suit, the Quantasy Defendants could have sent the same type of overstated invoiced to any future employer of Mr. Silver. *See H.J. Inc.*, 492 U.S. at 242 ("[T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.").

Given the full scope of the allegations against the Quantasy Defendants—including: that Mr. Campbell devised a payment distribution schedule with Mr. Silver before any invoices were sent to Root; that Mr. Campbell expedited wiring of more than $1 million so that Mr. Silver could complete a real estate transaction; and that Quantasy misrepresented to Root the availability and location of Root-paid funds when asked—the Court cannot conclude that the parties intended this scheme to last for only a finite period of time. There is no indication that, at the time of the predicate acts alleged, the Quantasy Defendants' pattern of behavior would not have continued indefinitely into the future. *Cf. Busacca*, 936 F.2d at 237–38 (finding that there was an "implicit threat of continuity" where the defendant "demonstrated his complete ability to control the dispensation of monies . . . while . . . pursuing and establishing his scheme" even where there were only six predicate acts committed in a span of two and one-half months). Based on the totality of the facts alleged in the Second Amended Complaint, Root states a pattern of racketeering activity under the open-ended continuity theory.

### d)    Racketeering Activity

Finally, as to element four, the Quantasy Defendants argue that Root fails to adequately plead the necessary predicate acts of racketeering activity. Root responds that it has alleged numerous instances of wire fraud, which constitute predicate acts under RICO. The Court agrees. RICO lists those acts that constitute predicate offenses. 18 U.S.C. § 1961(1). The list includes, among other crimes, wire fraud. *See id.* (citing 18 U.S.C. § 1343). Wire fraud consists of (1) a scheme to defraud, and (2) use of interstate wire communications in furtherance of the scheme. 18 U.S.C. § 1343. "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Heinrich*, 668 F.3d at 404 (internal quotation and citation omitted). A plaintiff alleging a scheme to defraud must satisfy the heightened pleading standard under Fed. R. Civ. P. 9(b) and show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 405 (internal quotation and citation omitted).

Root alleges that the Quantasy Defendants sent four invoices for false marketing services to Root. Those invoices were approved by Mr. Silver, triggering payments from Root's bank accounts to Quantasy. Quantasy then wired a pre-determined portion of those payments to Collateral Damage—an entity Mr. Campbell himself described as an "interested party." Later, when asked whether those funds were still available to Root for future marketing spend, a Quantasy employee falsely represented that they were. The Second Amended Complaint states the dates that the fraudulent invoices and misrepresentations were received

by Root, the amount of the invoices, the dates the associated payments were wired to Quantasy and then on to Collateral Damages, and the amount of the wire transfers. That is enough. *Bird v. Delacruz*, No. 04-CV-661, 2005 WL 1625303, at *6 (S.D. Ohio July 6, 2005) (holding that, to state a valid wire fraud claim as a predicate act under RICO, "the plaintiff must, within reason, describe the time, place, and content of the wire communications, and it must identify the parties to these communications" (internal quotations omitted)); *FFL Holdings, LLC v. Moeller*, No. 3:14CV693V, 2014 WL 4322804, at *6 (N.D. Ohio Aug. 29, 2014) (explaining that sufficiently pled predicate acts include the "who, what, when, where" of the specific false statements or misrepresentations that drove the scheme). Root sufficiently alleged multiple acts of wire fraud, satisfying the racketeering element of its RICO claims against Defendants.

The Quantasy Defendants argue for the opposite conclusion by re-casting the facts alleged in the Second Amended Complaint. In their telling, Mr. Campbell and Quantasy are also victims of Mr. Silver's fraud, having been led to believe that they were legitimately and simply sub-contracting work to Collateral Damage. But Root does not allege that Collateral Damage was Quantasy's *sub-contractor*; it alleges that Collateral Damage was Quantasy's *co-conspirator* in a scheme to defraud Root. At this stage, the Court must accept all well-pled factual allegations as true and view them in the light most favorable to Root. With the benefit of discovery, the Quantasy Defendants' theory (which is possible) may prove to be true. But, at this point, the Court is bound to accept Root's (which is plausible).

30

The Quantasy Defendants' Motion to Dismiss is **DENIED** as to Count I (Civil RICO).

### 3.     Counts II and III: Fraudulent Concealment, Fraudulent Misrepresentation

The Second Amended Complaint next asserts claims against Mr. Silver and the Quantasy Defendants for fraudulent concealment (Count II) and fraudulent misrepresentation (Count III). (*See* SAC, ¶¶ 118–33.) The claims' elements are similar, but not identical. As an Ohio[4] appeals court recently explained:

> To prevail on a claim of fraudulent misrepresentation, the plaintiff must establish "(1) a representation or, when there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that such knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) with justifiable reliance on the misrepresentation or concealment, and (6) an injury proximately caused by that reliance." *Doctor v. Marucci*, [No. 2013-L-056, 2013 WL 6880935, at *2 (Ohio Ct. App. Dec. 13, 2013)]. Similar elements are necessary for fraudulent concealment, which also requires the actual concealment of a material fact and knowledge of the fact concealed. *Thaler v. Zovko*, [No. 2008-L-091, 2008 WL 5389607, at *6 (Dec. 26, 2008)].

*Cianfaglione v. Lake Nat'l Bank*, 134 N.E.3d 661, 666 (Ohio Ct. App. 2019).

### a)     Fraudulent Concealment

Root alleges that the Quantasy Defendants fraudulently concealed the following information from Root:

---

[4] "A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999) Where the parties apply Ohio law without dispute, the Court will do the same.

1) Quantasy's intent to subcontract marketing work for Root to Collateral Damage;

2) Quantasy's intent to work out a private payment structure with Silver that was not disclosed to anyone else at Root; [and]

3) that instead of performing marketing work for Root, Quantasy and Campbell were channeling funds to Collateral Damage even though Collateral Damage was not performing marketing services.

(SAC, ¶ 120 (formatting added).) To survive a motion to dismiss, Root must "specify the who, what, when, where, and how of the alleged omission[s]." *Smith v. Gen. Motors LLC*, 988 F.3d 873, 884 (6th Cir. 2021). The Court finds that it has.

The Second Amended Complaint alleges that Mr. Silver brought Quantasy on as a vendor at Root, after negotiating SOW #1 with Mr. Campbell directly. SOW #1 was signed on February 3, 2022, by Root's VP of Creative, Jill Neely. (SOW #1.) SOW #1 includes, among other things, a thorough description of services to be performed, a staffing plan listing eighteen individuals, a fee and payment schedule, and terms and conditions. (*Id.*) The terms and conditions contemplate that Quantasy may procure third party services and materials, but states that "billing for any such third-party materials will be based on estimates to be approved[.]" (*Id.*, PAGEID # 155.)

That day, Mr. Campbell sent a nearly half-million-dollar invoice to Ms. Neely. Before Root paid the invoice, Mr. Campbell received (via private message from Mr. Silver) Collateral Damage's address and bank account and routing numbers. Just two days after Root paid the invoice, on February 11, Mr. Campbell received (again via private message from Mr. Silver) a Collateral Damage invoice, purportedly for "Campaign Design Support." On February 13, Mr. Silver and Mr. Campbell (via

private message) devised a schedule dividing future payments from Root between Quantasy and Collateral Damage. Root paid Quantasy $1,184,444 under SOW #1, and Quantasy sent $384,444 of that sum to Collateral Damage. But Root "received no documents or other materials from Collateral Damage to substantiate" that fee, and "received no value" for it either.

SOW #2 was executed on April 1, 2022, by Mr. Silver (as CMO of Root) and Mr. Campbell (as CEO of Quantasy). (SOW #2.) SOW #2 covered the same services as SOW #1, for substantially more money. Instead of an agency staffing plan, SOW #2 stated that Quantasy "may subcontract third parties . . . to perform certain Services (including without limitation physical production services, talent procurement, consulting and media services)[.]" (*Id.*, PAGEID # 193.) After SOW #2 was executed, the pattern continued—Root paying Quantasy's invoices, and Quantasy paying Collateral Damage's invoices in rapid succession. Although the Collateral Damage invoices purported to be for services covered by SOW #2, Root alleges that, on May 17, 2022, Mr. Campbell personally went to a Chase Bank branch to wire $1.5 million to Collateral Damage for a transaction that Mr. Silver said was "major" for *him* and involved a "lien/permit (title) search." Yet, none of the services identified in SOW #2 or the Collateral Damage invoices pertain to real estate.

Three months later, Root's internal audit team questioned Mr. Campbell "directly about Quantasy's work for Root to determine whether there was justification for the millions of dollars Root had paid to Quantasy." Mr. Campbell

33

responded without revealing the existence of Collateral Damage or their relationship.

While parties to an arm's length business transaction generally do not have a duty to disclose material information to each other, *see Blon v. Bank One, Akron, N.A.*, 519 N.E.2d 363, 367 (Ohio 1988), Ohio courts have long recognized "a duty to make full disclosure in those circumstances where such disclosure is necessary to dispel misleading impressions that are or might have been created by a partial revelation of the facts." *Connelly v. Balkwill*, 174 F. Supp. 49, 58 (N.D. Ohio 1959). Further, "Ohio courts have held that fraudulent inducement claims, based on a party's intent not to perform their terms at the time of contracting, are viable." *Redhawk Global, LLC v. World Projects Int'l, Inc.*, 2:11-cv-666, 2017 WL 4862485, at *7 (S.D. Ohio Sept. 26, 2017) (Sargus, J.) (internal quotation and citation omitted). The facts alleged in the Second Amended Complaint and recounted above support an inference that the Quantasy Defendants knew, when executing SOW #1, that they intended to engage in a course of conduct that made the representations inside of SOW #1 misleading, and knew when executing SOW #1 that they did not intend to perform the promised services. The Second Amended Complaint sufficiently pleads a claim for Fraudulent Concealment.

### b)     Fraudulent Misrepresentation

The Quantasy Defendants next argue that Root fails to state a claim in Count

III (Fraudulent Misrepresentation). As to the following statements, the Court

agrees:

> 1)  Mr. Campbell's statements during the February 24, 2022 presentation
>     to Root management;
>
> 2)  Mr. Campbell's statements to the internal audit team on August 22,
>     2022, about the work Quantasy had performed for Root; and
>
> 3)  A Quantasy employee's statement on September 22, 2022, that $10.7
>     million was available for Root's future marketing spend.

(SAC, ¶¶ 125–27.)

Rule 9(b)'s heightened pleading standard requires a plaintiff to allege "the

time, place, and _**content**_ of the alleged misrepresentation." *Smith*, 988 F.3d at 883

(internal quotations and citations omitted) (emphasis added). The pleadings do not

allege with particularity the contents of the first statement. Although the second

and third statements' content is more particularly alleged, they are alleged to have

been made *after* Root transferred funds to Quantasy and *after* Quantasy transferred

funds to Collateral Damage. The allegations thus do not support an inference that

Root relied on these statements, or that such reliance proximately caused Root's

injury. Root cannot pursue its fraudulent misrepresentation claim against the

Quantasy Defendants based on the three statements identified above.

In its response, Root argues that Quantasy's invoices can support its

fraudulent misrepresentation claim. The Court agrees. Root alleges that the

Quantasy Defendants, in furtherance of an established fraudulent kickback scheme,

sent invoices to Root charging amounts they did not intend to keep for services they

did not intend to perform. The Complaint recites the dates on which the invoices were sent, to whom and from whom they were sent, and their contents. In short, the Second Amended Complaint provides the Quantasy Defendants with the detail necessary to begin a competent defense to a claim on those grounds.

### c) Counts II and III are not duplicative of Count VIII.

Finally, the Quantasy Defendants argue that Root's fraud claims are duplicative of its breach of contract claim. As an initial matter, and as Root points out, the Second Amended Complaint does not assert a breach of contract claim against Mr. Campbell. The argument thus fails as against him. Additional analysis is required for Quantasy.

Ohio law "generally prohibits tort actions arising out of contract claims." *Popovich v. Sony Music Ent.*, No. 1:02 CV 359, 2005 WL 8171846, at *12 (N.D. Ohio Feb. 10, 2005) (citation omitted). An exception exists, however, where:

> (1) [] the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed; and (2) the fraud action includes actual damages attributable to the wrongful acts of the alleged tortfeasor which are in addition to those attributable to the breach.

*Id.* (internal quotation marks and citations omitted). That exception applies here.

Quantasy had a duty to disclose the allegedly concealed and misrepresented facts, as already discussed. And Root alleges that the damages resulting from the Ben-Her Marketing scheme stemmed from Quantasy's fraud. Although, with the benefit of discovery, those damages may prove too far attenuated from Quantasy's conduct to be viable, the allegation is sufficient to survive at this stage. *See*

*Stratesphere LLC v. Kognetics Inc.*, No. 2:20-cv-2972, 2021 WL 11457420, at *2 (S.D. Ohio May 4, 2021) (Watson, J.).

The Quantasy Defendants' Motion to Dismiss is **DENIED** as to Count II (Fraudulent Concealment) and **GRANTED in part** and **DENIED in part** as to Count III (Fraudulent Misrepresentation).

### 4.     Count IV: Conversion

In Count IV, Root alleges that the defendants converted Root's funds "by transferring the funds to Quantasy and then to Collateral Damage[,]" and further "to Eclipse to purchase multiple multi-million dollar coastal properties." (SAC, ¶ 136.) Root further alleges that the Quantasy Defendants "refused to return all of the stolen funds" when asked. (*Id.*, ¶¶ 137–38.) The elements of conversion under Ohio law are:

> (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.

*NPF IV, Inc. v. Transitional Health Servs.*, 922 F. Supp. 77, 81 (S.D. Ohio 1996) (Graham, J.). A claim for conversion of money additionally requires that the money "is 'earmarked' or is specific money capable of identification, such as money in a bag[.]" *Id*; *see also RAE Assocs., Inc. v. Nexus Commc'ns, Inc.*, 36 N.E.3d 757, 765–66 (Ohio Ct. App. 2015). The funds alleged to have been converted here were not earmarked, or otherwise specifically identifiable. Root simply asserts a right to a certain sum of money. That cannot form the basis of a conversion claim. *RAE Assocs.*, 36 N.E.3d at 765–66; *Fed. Ins. Co. v. Benchmark Bank*, No. 2:17-cv-135, 2018 WL 527285, at *10 (S.D. Ohio Jan. 24, 2018) (Smith, J.).

The Quantasy Defendants' Motion to Dismiss is **GRANTED** as to Count IV (Conversion).

### 5.     Counts V and VI: Civil Theft, Telecommunications Fraud

Ohio Revised Code § 2307.60(A)(1) provides that "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law." *See Jacobson v. Kaforey*, 75 N.E.3d 203, 205 (Ohio 2016). A related statute allows a property owner to bring a § 2307.60(A) claim to recover damages resulting from "a theft offense." Ohio Rev. Code § 2307.61(A). Root asserts two such claims: Count V for Theft; and Count VI for Telecommunications Fraud. The Quantasy Defendants argue that these claims fail first, because the statute does not authorize claims for damages based on breach of contract; second, because Root fails to allege an intent to defraud; and third, because Root gave express or implied consent to the conduct. Each argument fails.

To begin, nothing in Ohio Rev. Code § 2307.60 or § 2307.61 limits the available claims to tort actions. Section 2307.60(B) identifies certain conditions for recovery when the claim *is* a tort action—but those conditions do not limit the universe of viable claims to tort actions. *Cf. Jacobsen*, 75 N.E.3d at 207 (holding that § 2307.60 creates a civil cause of action for damages resulting from any criminal act").

Moving on, the Quantasy Defendants argue that the Second Amended Complaint "makes no factual allegations whatsoever that would be sufficient to support a conclusion that either Quantasy or Campbell intended to defraud Root[.]"

(Mot. Dismiss, PAGEID # 796.) For the reasons already described (*see* § I.C.3,

*supra*), Root has alleged facts sufficient to support an inference that the Quantasy

Defendants intended to defraud Root. The pleadings are sufficient to survive a

motion to dismiss.

Finally, the Quantasy Defendants argue that Root fails to state a claim for

theft because the conduct was carried out through a Root executive and thus done

with Root's express or implied consent. *See* Ohio Rev. Code § 2913.02(A)(1)–(2). But,

as Root points out, the statute also applies to deprivation of property procured by

deception. Ohio Rev. Code § 2913.02(A)(3). "Deception" is defined as

> knowingly deceiving another or causing another to be deceived by any
> false or misleading representation, by withholding information, by
> preventing another from acquiring information, or by any other conduct,
> act, or omission that creates, confirms, or perpetuates a false impression
> in another, including a false impression as to law, value, state of mind,
> or other objective or subjective fact.

Ohio Rev. Code § 2913.01(A). The Second Amendment Complaint alleges facts

sufficient to support the inference that Mr. Campbell prepared and submitted,

through Quantasy, invoices for services that Quantasy did not intend to perform. In

other words, it adequately alleges that the Quantasy Defendants obtained or

exerted control over Root's funds by means of deception.

The Quantasy Defendants' Motion to Dismiss is **DENIED** as to Count V

(Civil Theft) and VI (Telecommunications Fraud).

### 6.    Count VIII: Breach of Contract

Under Ohio law, a breach-of-contract claim requires the plaintiff to prove

that (i) a contract existed, (ii) the defendant failed without legal excuse to perform

when performance was due, and (iii) the plaintiff was damaged by that failure. *Lucarell v. Nationwide Mut. Ins. Co*., 97 N.E.3d 458, 469 (Ohio 2018). Only the second element is in dispute.

Root alleges that Quantasy breached SOW #1 and SOW #2 by failing to provide "the agreed-upon marketing services," "entering into a purported subcontract with Collateral Damage," and breaching the implied covenant of good faith and fair dealing. (SAC, ¶ 161.) Quantasy argues that Root fails to adequately allege a breach because Quantasy provided services, SOW #1 and SOW #2 allow subcontracting, and breaching the implied covenant of good faith and fair dealing "does not create a standalone cause of action." (Mot. Dismiss, PAGEID # 800.)

On this issue, Quantasy not only fails to persuade, it approaches the outermost boundaries of good-faith argument. At this stage of the litigation, the Court is bound of accept all well-pled factual allegations as true and view them in the light most favorable to the plaintiff. (*Id.*, PAGEID # 763 (citing *Twombly* and *Iqbal*).) Root alleges that, save for the February 24, 2022 presentation, Quantasy "provided little in the way of services to Root"—despite having been contracted to provide a litany of specific deliverables. (SAC, ¶ 93; *see also* SOW #1, SOW #2.) Root further alleges that Quantasy violated SOW #1 and SOW #2 by purporting to engage Collateral Damages to provide certain of those deliverables. SOW #1 contemplates that Quantasy may procure third-party services—but does not authorize billing for such services without providing estimates to Root (which, according to the Second Amended Complaint, Quantasy did not do). Similarly, SOW

40

#2 expressly allows Quantasy to engage subcontractors—but only to the extent the subcontractor provides "Services" (which, according to the Second Amended Complaint, Collateral Damage did not do). Because Root has adequately alleged a claim based on those independent breaches, the good-faith-and-fair-dealing component does not "stand alone."

Quantasy's Motion to Dismiss is **DENIED** as to Count VIII (Breach of Contract).

### 7. Count X: Civil Conspiracy

To state a claim for civil conspiracy, a plaintiff must allege (1) a malicious combination; (2) of two or more persons; (3) resulting injury to person or property; and (4) the existence of an unlawful act independent from the actual conspiracy. *Rosy Blue, NV v. Lane*, 767 F. Supp. 2d 860, 868 (S.D. Ohio 2011) (*citing Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000)). The Quantasy Defendants argue that Root fails to allege an underlying unlawful act. Having concluded that Root can proceed on several of its claims, the Court disagrees.

The Quantasy Defendants' Motion to Dismiss is **DENIED** as to Count X (Civil Conspiracy).

### 8. Personal Liability

Finally, the Quantasy Defendants argue that the Second Amended Complaint fails to allege that Mr. Campbell is personally liable to Root. In their view, "[t]he basis of [Mr.] Campbell's claimed liability is not precisely clear from the" Second Amended Complaint. (Mot. Dismiss, PAGEID # 789.) The Court

disagrees. The Second Amended Complaint alleges that Mr. Campbell personally engaged in tortious conduct, and thus seeks personal liability. The Quantasy Defendants' Motion to Dismiss is **DENIED** to the extent it seeks to prevent Root from pursuing its claims against Mr. Campbell personally.

## II.    MOTION TO STAY

The Silver Defendants moved to stay these proceedings until the related criminal case against Mr. Silver has been resolved. (ECF No. 137.) Mr. Silver recently pled guilty to a bill of information charging him with offenses arising out of the conduct underlying the Second Amended Complaint. *See United States v. Silver*, No. 2:23-cr-201 (S.D. Ohio, docket no. 41). The motion is thus **DENIED as moot**.

## III.    MOTION TO QUASH

Finally, the Quantasy Defendants filed a Motion to Quash Subpoenas for Financial Records and to Stay Discovery as to the Quantasy Defendants. (ECF No. 185.) As to the requested stay, that motion is **DENIED as moot**. The balance of the motion is **REFERRED** to the Magistrate Judge for consideration.

## IV.    CONCLUSION

For the reasons above, the Motion to Dismiss (ECF No. 94) is **GRANTED in part** and **DENIED in part**; the Motion to Stay (ECF No. 137) is **DENIED as moot**; and the Motion to Quash (ECF No. 185) is **DENIED in part** and **REFERRED in part**.

IT IS SO ORDERED.

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

42