**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROOT, INC.**, *et al.* | ) | |
| Plaintiffs, | ) ) ) | CASE NO.: 2:23-CV-00512-SDM-EPD |
| v. | ) ) | JUDGE SARAH D. MORRISON |
| **BRINSON CALEB SILVER**, *et al.*, | ) ) ) | MAGISTRATE JUDGE ELIZABETH A. PRESTON DEAVERS |
| Defendants. | ) ) | |

<u>**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND CROSS-CLAIMS**</u>
<u>**OF DEFENDANTS QUANTASY & ASSOCIATES, LLC, QUANTASY, LLC, AND**</u>
<u>**WILLIAM CAMPBELL**</u>

Defendants Quantasy & Associates, LLC, Quantasy, LLC, and William Campbell (collectively, the "Quantasy Defendants") as and for their Answer to the Second Amended Complaint (the "Complaint," Doc. 173) of Plaintiffs Root, Inc., Caret Holdings, Inc., and Root Insurance Agency, LLC (collectively, the "Plaintiffs"), Counterclaims, and Cross-Claims, hereby allege and state as follows:

1.      The Quantasy Defendants admit that Root is a publicly-traded company based in downtown Columbus, and lack knowledge and information sufficient to form a belief as to the truth of the remainder of the allegations contained in paragraph number "1" of the Complaint and therefore denies them.

2.      The Quantasy Defendants deny the allegations of paragraph number "2" of the Complaint to the extent they allege the Quantasy Defendants engaged in a scheme to defraud Root of at least $9.9 million; the Quantasy Defendants admit the allegations of paragraph "2" to the extent they allege B.C. Silver ("CMO Silver") was Root's Chief Marketing Officer between

November 2021 and November 2022; to the extent that paragraph "2" alleges any additional facts, they are denied.

3. The Quantasy Defendants admit the allegations contained in paragraph number "3" of the Complaint to the extent they allege that CMO Silver contacted Campbell to engage Quantasy, LLC, that Root contracted with Quantasy, LLC to perform marketing services for Root, and that Root paid Quantasy, LLC certain funds for Quantasy, LLC's services; to the extent that paragraph "3" alleges any additional facts, they are denied.

4. The Quantasy Defendants deny the allegations of paragraph number "4" of the Complaint to the extent they allege Campbell executed a scheme to defraud Root; to the extent that paragraph "4" alleges any additional facts, they are denied.

5. The Quantasy Defendants admit that CMO Silver purchased luxury real estate in Florida and California using funds from Collateral Damage and lack knowledge and information sufficient to form a belief as to the truth of any remaining allegations contained in paragraph number "5" of the Complaint and therefore denies them.

6. The allegations of paragraph number "6" of the Complaint do not state any facts to which a response is required from the Quantasy Defendants; however, to the extent the allegations were intended to elicit a response, the Quantasy Defendants deny the allegations.

7. The Quantasy Defendants neither admit nor deny the allegations contained in paragraph number "7" of the Complaint, which are legal as opposed to factual assertions, and refer all questions of law to the Court.

8. The Quantasy Defendants neither admit nor deny the allegations contained in paragraph number "8" of the Complaint, which are legal as opposed to factual assertions, and refer all questions of law to the Court.

9.      The Quantasy Defendants neither admit nor deny the allegations contained in paragraph number "9" of the Complaint, which are legal as opposed to factual assertions, and refer all questions of law to the Court.

10.     The Quantasy Defendants neither admit nor deny the allegations contained in paragraph number "10" of the Complaint, which are legal as opposed to factual assertions, and refer all questions of law to the Court.

11.     The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "11" of the Complaint and therefore denies them.

12.     The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "12" of the Complaint and therefore denies them.

13.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "13" of the Complaint and therefore denies them.

14.     The Quantasy Defendants admit that CMO Silver is Root's former Chief Marketing Officer and admit he is a resident and citizen of California, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "14" of the Complaint and therefore denies them.

15.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "15" of the Complaint and therefore denies them.

16.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "16" of the Complaint and therefore denies them.

17.     The Quantasy Defendants admit the allegations contained in paragraph number "17" of the Complaint to the extent they allege that Quantasy & Associates, LLC is a limited liability company formed under the laws of Delaware with headquarters in California, that Quantasy & Associates, LLC is an advertising agency, that Quantasy, LLC is a limited liability company formed under the laws of California with headquarters in California, and that Quantasy, LLC is an advertising agency; to the extent that paragraph "17" alleges any additional facts, they are denied.

18.     The Quantasy Defendants admit the allegations contained in paragraph number "18" of the Complaint.

19.     The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "19" of the Complaint and therefore denies them.

20.     The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "20" of the Complaint and therefore denies them.

21.     The Quantasy Defendants admit that Root hired CMO Silver and they lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "21" of the Complaint and therefore denies them.

22.     The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "22" of the Complaint and therefore denies them.

23.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "23" of the Complaint and therefore denies them.

24.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "24" of the Complaint and therefore denies them.

25.     The Quantasy Defendants admit that CMO Silver was employed by Root as its CMO and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "25" of the Complaint and therefore denies them.

26.     The Quantasy Defendants admit the allegations contained in paragraph number "26" of the Complaint to the extent that "Silver and Campbell were previous acquaintances who had worked together prior to Silver joining Root", "[o]n or about November 22, 2021 … Silver sent Campbell a series of text messages", and "[i]n these initial test message exchanges, CMO Silver and Campbell discussed Root's retaining Quantasy as a marketing vendor"; to the extent that paragraph "26" alleges any additional facts, they are denied.

27.     The Quantasy Defendants admit the allegations contained in paragraph number "27" of the Complaint to the extent that Campbell sent a text message on December 3, 2021, a copy of which appears to be attached to the Complaint as Exhibit 1, and that the document speaks for itself; to the extent that paragraph "27" alleges any additional facts, they are denied.

28. The Quantasy Defendants admit the allegations contained in paragraph number "28" of the Complaint to the extent that Campbell received a text message on December 9, 2021, a copy of which appears to be attached to the Complaint as Exhibit 1, and that the document speaks for itself; to the extent that paragraph "28" alleges any additional facts, they are denied.

29. The Quantasy Defendants admit the allegations contained in paragraph number "29" of the Complaint to the extent that Campbell received a text message on January 30, 2022, a copy of which appears to be attached to the Complaint as Exhibit 2, and that the document speaks for itself; to the extent that paragraph "29" alleges any additional facts, they are denied.

30. The Quantasy Defendants admit the allegations contained in paragraph number "30" of the Complaint to the extent that Root Insurance Agency, LLC signed SOW #1, a copy of which appears to be attached to the Complaint as Exhibit 3, and that the document speaks for itself; to the extent that paragraph "30" alleges any additional facts, they are denied.

31. The Quantasy Defendants admit the allegations contained in paragraph number "31" of the Complaint to the extent that Quantasy, LLC issued Invoice No. 2277 in the amount of $473,778 to Root, a copy of which appears to be attached to the Complaint as Exhibit 4, and that the document speaks for itself; to the extent that paragraph "31" alleges any additional facts, they are denied.

32. The Quantasy Defendants admit the allegations contained in paragraph number "32" of the Complaint to the extent that Campbell received a WhatsApp message on February 7, 2022, a copy which is attached to the Complaint as Exhibit 5, and that the document speaks for itself; the Quantasy Defendants deny the allegations remaining allegations of paragraph "32."

33. The Quantasy Defendants admit the allegations contained in paragraph number "33" of the Complaint to the extent that Quantasy, LLC received a payment from Root in the

amount of $473,778 on or around February 9, 2022; the Quantasy Defendants admit the allegations contained in paragraph number "33" to the extent that CMO Silver received a text message on February 9, 2022, a copy of which appears to be attached to the Complaint as Exhibit 6, and the referenced document speaks for itself; to the extent that paragraph "33" alleges any additional facts, they are denied.

34.     The Quantasy Defendants admit the allegations contained in paragraph number "34" of the Complaint to the extent Campbell received a WhatsApp message on February 11, 2022, a copy of which appears to be attached to the Complaint as Exhibit 7, and that the document, as well as any embedded documents, speak for themselves; to the extent that paragraph "34" alleges any additional facts, they are denied.

35.     The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "35" of the Complaint and therefore denies them.

36.     The Quantasy Defendants admit the allegations contained in paragraph number "36" of the Complaint.

37.     The Quantasy Defendants admit the allegations contained in paragraph number "37" of the Complaint to the extent Campbell sent and received WhatsApp messages on February 13, 2022, copies of which appear to be inserted into the Complaint as Figure 1, and that the referenced documents speak for themselves; to the extent that paragraph "37" alleges any additional facts, they are denied.

38.     The Quantasy Defendants admit the allegations contained in paragraph number "38" of the Complaint to the extent Campbell sent and received WhatsApp messages on February 13, 2022, copies of which appear to be inserted into the Complaint as Figure 1, and that the

referenced documents speak for themselves; to the extent that paragraph "38" alleges any additional facts, they are denied.

39. The Quantasy Defendants admit the allegations contained in paragraph "39" of the Complaint to the extent that on February 14, 2022, Quantasy, LLC wired $153,778 to the Collateral Damage account that CMO Silver had provided; to the extent that paragraph "39" alleges any additional facts, they are denied.

40. The Quantasy Defendants admit the allegations contained in paragraph number "40" of the Complaint to the extent that Quantasy, LLC issued Invoice No. 2286 in the amount of $414,555.75 to Root, a copy of which appears to be attached to the Complaint as Exhibit 8, and that the document speaks for itself; to the extent that paragraph "40" alleges any additional facts, they are denied.

41. The Quantasy Defendants admit the allegations contained in paragraph number "41" of the Complaint to the extent that on February 24, 20222, Campbell met, via video conference with certain members of Root's management, including CMO Silver, to present Quantasy's ideas for Root's marketing campaigns; the Quantasy Defendants admit the allegations of paragraph "41" to the extent Campbell received text messages after meeting, copies of which appear to be attached to the Complaint as Exhibit 9, and that the documents speak for themselves; to the extent that paragraph "41" alleges any additional facts, they are denied.

42. The Quantasy Defendants admit the allegations contained in paragraph number "42" of the Complaint to the extent that Campbell sent a text message on February 25, 2022, a copy of which appears to be attached to the Complaint as Exhibit 10, and that the document speaks for itself; to the extent that paragraph "42" alleges any additional facts, they are denied.

43.     The Quantasy Defendants admit the allegations contained in paragraph number "43" of the Complaint to the extent that Campbell sent a WhatsApp message on March 2, 2022, a copy of which appears to be attached to the Complaint as Exhibit 11, and that the document speaks for itself; to the extent that paragraph "43" alleges any additional facts, they are denied.

44.     The Quantasy Defendants admit the Ms. Lanskie quit her employment at Collateral Damage in February 2020 and deny for lack of knowledge the remainder of paragraph "44."

45.     The Quantasy Defendants admit that CMO Silver used Lanskie's Collateral Damage email address and impersonated her as part of his fraudulent scheme, and deny for lack of knowledge whether Lanskie had any contact with CMO Silver in 2022.

46.     The Quantasy Defendants admit the allegations contained in paragraph number "46" of the Complaint to the extent that Campbell sent a text message on March 4, 2022, a copy of which appears to be attached to the Complaint as Exhibit 12, and that the document speaks for itself; to the extent that paragraph "46" alleges any additional facts, they are denied.

47.     The Quantasy Defendants admit the allegations contained in paragraph number "47" of the Complaint to the extent that Quantasy, LLC received a payment in the amount of $415,555.75 from Root on or around March 7, 2022; to the extent that paragraph "47" alleges any additional facts, they are denied.

48.     The Quantasy Defendants admit the allegations contained in paragraph number "48" of the Complaint to the extent that Campbell sent a text and WhatsApp messages on March 9, 2022, copies of which appears to be attached to the Complaint as Exhibit 13, and that the documents speak for themselves; admit that Lanskie was not employed by Collateral Damage in 2022, and to the extent that paragraph "48" alleges any additional facts, they are denied.

49.     The Quantasy Defendants admit the allegations contained in paragraph "49" of the Complaint to the extent that on March 9, 2022, Quantasy, LLC wired $134,555.75 to the Collateral Damage account that CMO Silver had provided; the Quantasy Defendants admit the allegations to the extent that they received Invoice No. 12022021 in the amount of $134,555.75, a copy of which appears to be attached as Exhibit 14, and that the document speaks for itself; to the extent that paragraph "49" alleges any additional facts, they are denied.

50.     The Quantasy Defendants admit the allegations contained in paragraph number "50" of the Complaint to the extent that Campbell sent and received text message on March 16, 2022, copies of which appear to be attached to the Complaint as Exhibit 15, and that the documents speak for themselves. The Quantasy Defendants deny that Campbell was involved in any scheme, and deny that Campbell had any involvement in any decision-making process relating to Individual A. To the extent that paragraph "50" alleges any additional facts, they are denied.

51.     The Quantasy Defendants admit the allegations contained in paragraph number "51" of the Complaint to the extent that Quantasy, LLC issued Invoice No. 2303 in the amount of $473,778 to Root, a copy of which appears to be attached to the Complaint as Exhibit 16, and that the document speaks for itself; to the extent that paragraph "51" alleges any additional facts, they are denied.

52.     The Quantasy Defendants admit the allegations contained in paragraph number "52" of the Complaint to the extent that Quantasy, LLC received a payment in the amount of $296,111.25 from Root on or around March 24, 2022; to the extent that paragraph "52" alleges any additional facts, they are denied.

53.     The Quantasy Defendants admit the allegations contained in paragraph number "53" of the Complaint to the extent that Campbell sent and received WhatsApp message on March

25, 2022, copies of which appear to be attached to the Complaint as Exhibit 17, and that the documents speak for themselves, admit that CMO Silver made false statements to Campbell, and admit that CMO Silver sent a fraudulent message to Quantasy, LLC that he signed with Lanskie's name. To the extent that paragraph "53" alleges any additional facts, they are denied.

54. The Quantasy Defendants admit the allegations contained in paragraph number "54" of the Complaint to the extent that Campbell received an email containing an attachment on March 25, 2022, a copy of which appears to be attached to the Complaint as Exhibit 18, and that the document speaks for itself, and admit that CMO Silver sent false and fraudulent emails and invoices to Quantasy, LLC. To the extent that paragraph "54" alleges any additional facts, they are denied.

55. The Quantasy Defendants admit the allegations contained in paragraph "55" of the Complaint to the extent that on March 28, 2022, Quantasy, LLC wired $96,111.25 to the Collateral Damage account that CMO Silver had provided; to the extent that paragraph "55" alleges any additional facts, they are denied.

56. The Quantasy Defendants admit the allegations contained in paragraph "56" of the Complaint to the extent that it received a total of $1,184.444 from Root in connection with SOW #1, and that, at the direction of Root's Chief Marketing Officer, it transferred $384,444 of that amount to the Collateral Damage bank account that CMO Silver provided; to the extent that paragraph "55" alleges any additional facts as to the Quantasy Defendants, they are denied.

57. The Quantasy Defendants admit the allegations contained in paragraph number "57" of the Complaint to the extent that Root Insurance Agency, LLC entered SOW #2 with Quantasy, a copy of which appears to be attached to the Complaint as Exhibit 19, and that the

document speaks for itself; to the extent that paragraph "57" alleges any additional facts, they are denied.

58. The Quantasy Defendants admit the allegation contained in paragraph number "58" of the Complaint to the extent that, on April 1, 2022, Campbell emailed Invoice Nos. 2307 and 2308 on April 1, 2022, copies of which appear to be attached to the Complaint as Exhibits 20 and 21, that the documents speak for themselves; to the extent that paragraph "58" alleges any additional facts, they are denied.

59. The Quantasy Defendants admit the allegations contained in paragraph number "59" of the Complaint to the extent that Quantasy, LLC received a payment in the amount of $7,350,000 from Root on or around April 4, 2022; to the extent that paragraph "59" alleges any additional facts, they are denied.

60. The Quantasy Defendants admit the allegations contained in paragraph number "60" of the Complaint to the extent that Campbell received a WhatsApp message on April 5, 2022, a copy of which appears to be attached to the Complaint as Exhibit 22; admit that the document speaks for itself, admit that Lanskie was not employed by Collateral Damage at this time, and admit that CMO Silver made false statements to Quantasy, LLC; to the extent that paragraph "60" alleges any additional facts, they are denied.

61. The Quantasy Defendants admit the allegations contained in paragraph number "61" of the Complaint to the extent that Campbell sent an email on or about April 6, 2022, a copy of which appears to be attached to the Complaint as Exhibit 23, and that the document speaks for itself; to the extent that paragraph "61" alleges any additional facts, they are denied.

62. The Quantasy Defendants deny the allegations contained in paragraph number "62."

63. The Quantasy Defendants admit the allegations contained in paragraph number "63" of the Complaint to the extent that Campbell received a WhatsApp message on or about April 7, 2022, a copy of which appears to be attached to the Complaint as Exhibit 24, and that the document speaks for itself; to the extent that paragraph "63" alleges any additional facts, they are denied.

64. The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "64" of the Complaint and therefore denies them.

65. The Quantasy Defendants admit that CMO Silver made false statements to Quantasy, LLC regarding Collateral Damage, and lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "65" of the Complaint and therefore denies them.

66. The Quantasy Defendants admit the allegations contained in paragraph "66" of the Complaint to the extent that Quantasy, LLC wired payments of $500,000 to the Collateral Damage account that CMO Silver had provided on each of April 11 and 13, 2022; the Quantasy Defendants admit the allegations of paragraph "66" to the extent they allege Campbell received WhatsApp messages on April 11, 2022, a copy of which appears to be attached to the Complaint as Exhibit 27, and that the document speaks for itself; to the extent that paragraph "66" alleges any additional facts, they are denied.

67. The Quantasy Defendants admit the allegations contained in paragraph number "67" of the Complaint to the extent that Campbell received a WhatsApp message on or about April 14, 2022, a copy of which appears to be attached to the Complaint as Exhibit 28, and that the

document speaks for itself; to the extent that paragraph "67" alleges any additional facts, they are denied.

68.     The Quantasy Defendants admit the allegations contained in paragraph number "68" of the Complaint to the extent that Campbell sent an email with Invoice Nos. 2316 and 2317 attached on or about April 14, 2022, copies of which appear to be attached to the Complaint as Exhibit 29, and that the documents speak for themselves; to the extent that paragraph "68" alleges any additional facts, they are denied.

69.     The Quantasy Defendants admit the allegations contained in paragraph "69" of the Complaint to the extent that Quantasy, LLC wired payments of $500,000 and $1,300,000 to the Collateral Damage account that CMO Silver had provided on April 15 and 20, respectively; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the final sentence of paragraph "69" and it is therefore denied.  To the extent that paragraph "69" alleges any additional facts, they are denied.

70.     The Quantasy Defendants admit the allegations contained in paragraph number "70" of the Complaint to the extent that Quantasy, LLC received a payment in the amount of $7,350,000 from Root on or around April 25, 2022; to the extent that paragraph "70" alleges any additional facts, they are denied.

71.     The Quantasy Defendants admit the allegations contained in paragraph number "71" of the Complaint to the extent that Campbell received an email with attachments on or around April 27, 2022, copies of which appear to be attached to the Complaint as Exhibit 30, and that the documents speak for themselves, and admit that CMO Silver sent false and fraudulent documents and emails to Quantasy, LLC.  To the extent that paragraph "71" alleges any additional facts, they are denied.

72.     The Quantasy Defendants admit the documents referenced in paragraph "72" of the Complaint speak for themselves, and they admit that CMO Silver sent false and fraudulent invoices to Quantasy, LLC.  To the extent that paragraph "72" alleges any additional facts, they are denied.

73.     The Quantasy Defendants admit the allegations contained in paragraph number "73" of the Complaint to the extent that on or around April 27, 2022, Quantasy, LLC wired $1.5 million to the Collateral Damage account that CMO Silver had provided; to the extent that paragraph "73" alleges any additional facts, they are denied.

74.     The Quantasy Defendants admit the allegations contained in paragraph number "74" of the Complaint to the extent that on or around April 27, 2022, Quantasy, LLC wired $1.3 million to the Collateral Damage account that CMO Silver had provided.  The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the final sentence of paragraph "74" and it is therefore denied.   To the extent that paragraph "74" alleges any additional facts, they are denied.

75.     The Quantasy Defendants admit the allegations contained in paragraph number "75" of the Complaint to the extent that Campbell received WhatsApp messages between April 27, 2022 and May 17, 2022, copies of which appear to be attached to the Complaint as Exhibit 31, and that the documents speak for themselves; to the extent that paragraph "75" alleges any additional facts, they are denied.

76.     The Quantasy Defendants admit the allegations contained in paragraph number "76" of the Complaint to the extent that Campbell received a WhatsApp message on or about May 11, 2022, a copy of which appears to be inserted in the Complaint as Figure 2, and that the document speaks for itself; to the extent that paragraph "76" alleges any additional facts, they are denied.

77.     The Quantasy Defendants admit the allegations contained in paragraph number "77" of the Complaint to the extent that Campbell received an email containing an attachment on May 11, 2022, a copy of which appears to be attached to the Complaint as Exhibit 32 and inserted to the Complaint as Figure 3, and that the document speaks for itself.  The Quantasy Defendants admit that CMO Silver made false statements and sent false and fraudulent documents to Quantasy, LLC; the Quantasy Defendants deny for lack of knowledge whether Lanskie worked in accounts payable or whether Collateral Damage had an accounts payable function.  To the extent that paragraph "77" alleges any additional facts, they are denied.

78.     The Quantasy Defendants admits the first two sentences of paragraph "78," and they lack knowledge and information sufficient to form a belief as to the truth of the last sentence of paragraph number "78" and therefore denies them.

79.     The Quantasy Defendants admit the allegations contained in paragraph number "79" of the Complaint to the extent that on or around May 11, 2022, Quantasy, LLC wired $500,000 to the Collateral Damage account that CMO Silver had provided.  The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the final sentence of paragraph "79" and it is therefore denied.  To the extent that paragraph "79" alleges any additional facts, they are denied.

80.     The Quantasy Defendants admit the allegations contained in paragraph number "80" of the Complaint to the extent that Campbell received a WhatsApp message on or about May 12, 2022, a copy of which appears to be attached to the Complaint as Exhibit 33, and that the document speaks for itself; to the extent that paragraph "80" alleges any additional facts, they are denied.

81.     The Quantasy Defendants admit the allegations contained in paragraph number "81" of the Complaint to the extent that on or around May 13, 2022, Quantasy, LLC wired $500,000 to the Collateral Damage account that CMO Silver had provided; to the extent that paragraph "81" alleges any additional facts, they are denied.

82.     The Quantasy Defendants admit the allegations contained in paragraph number "82" of the Complaint to the extent that Campbell sent and received WhatsApp messages on or about May 16, 2022, copies of which appear to be attached to the Complaint as Exhibit 34, and that the documents speak for themselves; the Quantasy Defendants admit the allegations of paragraph "82" to the extent that on or around May 16, 2022, Quantasy, LLC wired $500,000 to the Collateral Damage account that CMO Silver had provided.  The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the final sentence of paragraph "82" and it is therefore denied.  To the extent that paragraph "82" alleges any additional facts, they are denied.

83.     The Quantasy Defendants admit the allegations contained in paragraph number "83" of the Complaint to the extent that Campbell sent and received WhatsApp and text messages on or about May 17, 2022, copies of which appear to be attached inserted into the Complaint as Figures 4-6, and that the documents speak for themselves.  The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the final sentence of paragraph "83" and it is therefore denied.  To the extent that paragraph "83" alleges any additional facts, they are denied.

84.     The Quantasy Defendants admit the allegations contained in paragraph number "84" of the Complaint to the extent that on or around May 17, 2022, Quantasy, LLC wired $1.5

million to the Collateral Damage account that CMO Silver had provided; to the extent that paragraph "84" alleges any additional facts, they are denied.

85.     The Quantasy Defendants admit the allegations contained in paragraph "85" of the Complaint to the extent that Quantasy, LLC received $14,700,000 from Root related to SOW #2; the Quantasy Defendants admit the allegations of paragraph "85" to the extent that Quantasy, LLC transferred $9,100,000 to the Collateral Damage account that CMO Silver had provided; the Quantasy Defendants deny the allegations of paragraph "85" to the extent they allege that Root received no value from Quantasy, LLC and Campbell; to the extent that paragraph "85" alleges any additional facts, they are denied.

86.     The Quantasy Defendants admit that Silver purchase properties in Florida and California using money from Collateral Damage, and they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "86" of the Complaint and therefore denies them.

87.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "87" of the Complaint and therefore denies them.

88.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "88" of the Complaint and therefore denies them.

89.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "89" of the Complaint and therefore denies them.

90.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "90" of the Complaint and therefore denies them.

91.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "91" of the Complaint and therefore denies them.

92.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "92" of the Complaint and therefore denies them.

93.     The Quantasy Defendants admit that Quantasy, LLC and Root executed a series of change orders; otherwise, denied.

94.     The Quantasy Defendants admit the allegations contained in paragraph 94 of the Complaint to the extent that Quantasy, LLC wired $1.2 million to Root on or around August 26, 2022; to the extent that paragraph "94" alleges any additional facts, they are denied.

95.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "95" of the Complaint and therefore denies them.

96.     The Quantasy Defendants admit the allegations contained in paragraph number "96" of the Complaint to the extent that Quantasy, LLC signed a certain document titled Subcontract Agreement on or around August 20, 2022, a copy of which appears to be attached to the Complaint as Exhibit 36, and that the document speaks for itself; to the extent that paragraph "96" alleges any additional facts, they are denied.

97.     The Quantasy Defendants admit the allegations contained in paragraph "97" of the Complaint to the extent that Campbell spoke with members of Root's internal audit team on around August 22, 2022; to the extent that paragraph "97" alleges any additional facts, they are denied.

98.     The Quantasy Defendants deny that they omitted crucial information about Collateral Damage and deny that they misrepresented what was available to be reallocated in 2023. The Quantasy Defendants admit that Mr. Rodriguez told Root that the $10.7 million could be used for paid media in 2023, but Mr. Rodriguez was relaying what he believed to be truthful information based on his prior discussions with CMO Silver, who was responsible for the relationship with Root's separate agency, Collateral Damage. To the extent that paragraph 98 alleges any additional facts, they are denied.

99.     The Quantasy Defendants admit the allegations contained in paragraph number "99" of the Complaint to the extent that Campbell received WhatsApp messages on August 22 and 23, 2022, copies of which appear to be attached to the Complaint as Exhibits 38 and 39, and that the documents speak for themselves; the Quantasy Defendants deny that the messages contained internal audit findings and deny that Campbell committed or concealed any fraud; to the extent that paragraph "99" alleges any additional facts, they are denied.

100.    The Quantasy Defendants admit that the subcontractor agreement was assigned to Root and that Quantasy, LLC signed a certain document titled Assignment, a copy of which appears to be attached to the Complaint as Exhibit 40, and that the document speaks for itself. The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the final sentence of paragraph "100" and it is therefore denied. To the extent that paragraph "100" alleges any additional facts, they are denied.

101.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "101" of the Complaint and therefore denies them.

102.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "102" of the Complaint and therefore denies them.

103.     The Quantasy Defendants admit the allegations contained in paragraph 103 to the extent that on November 16, 2022 David Rodriguez of Quantasy, LLC met with Root executives; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph "103" to the extent they allege that this November 16, 2022 meeting was the first time Root management (other than CMO Silver) learned of Collateral Damage or that the money Root provided to Quantasy, LLC had been transferred to the Collateral Damage account that CMO Silver had provided; to the extent that paragraph "103" alleges any additional facts, they are denied.

104.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "104" of the Complaint and therefore denies them.

105.     The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "105" of the Complaint and therefore denies them.

## COUNT I: 18 U.S.C. § 1962(c) Civil RICO
## (Racketeer Influenced Corrupt Organizations) Against All Defendants

106.    The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "106" of the Complaint with the same force and effect as if fully set forth herein.

107.    The Quantasy Defendants neither admit nor deny the allegations contained in paragraph number "107" of the Complaint, which are legal as opposed to factual assertions, and refer all questions of law to the Court.

108.    The Quantasy Defendants neither admit nor deny the allegations contained in paragraph number "108" of the Complaint, which are legal as opposed to factual assertions, and refer all questions of law to the Court.

109.    The Quantasy Defendants deny the allegations contained in paragraph number "109" of the Complaint.

110.    The Quantasy Defendants deny the allegations contained in paragraph number "110" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "110" of the Complaint and therefore denies them.

111.    The Quantasy Defendants deny the allegations contained in paragraph number "111" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "111" of the Complaint and therefore denies them.

112.    The Quantasy Defendants deny the allegations contained in paragraph number "112" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "112" of the Complaint and therefore denies them.

113.    The Quantasy Defendants deny the allegations contained in paragraph number "113" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "113" of the Complaint and therefore denies them.

114.    The Quantasy Defendants deny the allegations contained in paragraph number "114" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "114" of the Complaint and therefore denies them.

115.    The Quantasy Defendants deny the allegations contained in paragraph number "115" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "115" of the Complaint and therefore denies them.

116.    The Quantasy Defendants deny the allegations contained in paragraph number "116" of the Complaint.

117.    The Quantasy Defendants deny the allegations contained in paragraph number "117" of the Complaint.

## COUNT II: Fraudulent Concealment
## Against CMO Silver, Campbell, and Quantasy

118.    The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "118" of the Complaint with the same force and effect as if fully set forth herein.

119. The Quantasy Defendants deny the allegations contained in paragraph number "119" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "119" of the Complaint and therefore denies them.

120. The Quantasy Defendants deny the allegations contained in paragraph number "120" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "120" of the Complaint and therefore denies them.

121. The Quantasy Defendants deny the allegations contained in paragraph number "121" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "121" of the Complaint and therefore denies them.

122. The Quantasy Defendants deny the allegations contained in paragraph number "122" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "122" of the Complaint and therefore denies them.

123. The Quantasy Defendants deny the allegations contained in paragraph number "123" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "123" of the Complaint and therefore denies them.

<u>**COUNT III: Fraudulent Misrepresentation**</u>
<u>**Against CMO Silver, Campbell, and Quantasy**</u>

124. The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "124" of the Complaint with the same force and effect as if fully set forth herein.

125. The allegations contained in paragraph number "125" of the Complaint directed at the Quantasy Defendants have been partially dismissed pursuant to the Opinion and Order, dated January 8, 2024; to the extent that any allegations contained in paragraph number "125" as to the Quantasy Defendants survived said Opinion and Order, they are denied; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "125" of the Complaint and therefore denies them.

126. The allegations contained in paragraph number "126" of the Complaint directed at the Quantasy Defendants have been partially dismissed pursuant to the Opinion and Order, dated January 8, 2024; to the extent that any allegations contained in paragraph number "126" as to the Quantasy Defendants survived said Opinion and Order, they are denied; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "126" of the Complaint and therefore denies them.

127. The allegations contained in paragraph number "127" of the Complaint directed at the Quantasy Defendants have been partially dismissed pursuant to the Opinion and Order, dated January 8, 2024; to the extent that any allegations contained in paragraph number "127" as to the Quantasy Defendants survived said Opinion and Order, they are denied.

128. The allegations contained in paragraph number "128" of the Complaint directed at the Quantasy Defendants have been partially dismissed pursuant to the Opinion and Order, dated January 8, 2024; to the extent that any allegations contained in paragraph number "128" as to the

Quantasy Defendants survived said Opinion and Order, they are denied; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "128" of the Complaint and therefore denies them.

129. The allegations contained in paragraph number "129" of the Complaint directed at the Quantasy Defendants have been partially dismissed pursuant to the Opinion and Order, dated January 8, 2024; to the extent that any allegations contained in paragraph number "129" as to the Quantasy Defendants survived said Opinion and Order, they are denied; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "129" of the Complaint and therefore denies them.

130. The allegations contained in paragraph number "130" of the Complaint directed at the Quantasy Defendants have been partially dismissed pursuant to the Opinion and Order, dated January 8, 2024; to the extent that any allegations contained in paragraph number "130" as to the Quantasy Defendants survived said Opinion and Order, they are denied; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "130" of the Complaint and therefore denies them.

131. The allegations contained in paragraph number "131" of the Complaint directed at the Quantasy Defendants have been partially dismissed pursuant to the Opinion and Order, dated January 8, 2024; to the extent that any allegations contained in paragraph number "131" as to the Quantasy Defendants survived said Opinion and Order, they are denied; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "131" of the Complaint and therefore denies them.

132. The allegations contained in paragraph number "132" of the Complaint directed at the Quantasy Defendants have been partially dismissed pursuant to the Opinion and Order, dated

January 8, 2024; to the extent that any allegations contained in paragraph number "132" as to the Quantasy Defendants survived said Opinion and Order, they are denied; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "132" of the Complaint and therefore denies them.

133. The allegations contained in paragraph number "133" of the Complaint directed at the Quantasy Defendants have been partially dismissed pursuant to the Opinion and Order, dated January 8, 2024; to the extent that any allegations contained in paragraph number "133" as to the Quantasy Defendants survived said Opinion and Order, they are denied; the Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "133" of the Complaint and therefore denies them.

## COUNT IV: Conversion
## Against All Defendants

134. The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "134" of the Complaint with the same force and effect as if fully set forth herein.

135. The allegations contained in paragraph number "135" of the Complaint directed at the Quantasy Defendants have been dismissed pursuant to the Opinion and Order, dated January 8, 2024, and therefore no response is required.

136. The allegations contained in paragraph number "136" of the Complaint directed at the Quantasy Defendants have been dismissed pursuant to the Opinion and Order, dated January 8, 2024, and therefore no response is required.

137. The allegations contained in paragraph number "137" of the Complaint directed at the Quantasy Defendants have been dismissed pursuant to the Opinion and Order, dated January 8, 2024, and therefore no response is required.

138.    The allegations contained in paragraph number "138" of the Complaint directed at the Quantasy Defendants have been dismissed pursuant to the Opinion and Order, dated January 8, 2024, and therefore no response is required.

139.    The allegations contained in paragraph number "139" of the Complaint directed at the Quantasy Defendants have been dismissed pursuant to the Opinion and Order, dated January 8, 2024, and therefore no response is required.

## COUNT V: O.R.C. 2307.60, 2307.61 Civil Action for Criminal Theft Against All Defendants

140.    The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "140" of the Complaint with the same force and effect as if fully set forth herein.

141.    The Quantasy Defendants deny the allegations contained in paragraph number "141" of the Complaint.

142.    The Quantasy Defendants deny the allegations contained in paragraph number "142" of the Complaint.

143.    The Quantasy Defendants deny the allegations contained in paragraph number "143" of the Complaint.

144.    The Quantasy Defendants deny the allegations contained in paragraph number "144" of the Complaint.

145.    The Quantasy Defendants deny the allegations contained in paragraph number "145" of the Complaint.

146.    The Quantasy Defendants deny the allegations contained in paragraph number "146" of the Complaint.

## COUNT VI: O.R.C. 2913.05 Civil Action for Criminal Act of Telecommunications Fraud
## Against CMO Silver, Campbell, Quantasy, and Collateral Damage

147. The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "147" of the Complaint with the same force and effect as if fully set forth herein.

148. The Quantasy Defendants deny the allegations contained in paragraph number "148" of the Complaint.

149. The Quantasy Defendants deny the allegations contained in paragraph number "149" of the Complaint.

150. The Quantasy Defendants deny the allegations contained in paragraph number "150" of the Complaint.

151. The Quantasy Defendants deny the allegations contained in paragraph number "151" of the Complaint.

## COUNT VII: Breach of Contract Against CMO Silver

152. The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "152" of the Complaint with the same force and effect as if fully set forth herein.

153. The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "153" of the Complaint and therefore denies them.

154. The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "154" of the Complaint and therefore denies them.

155. The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "155" of the Complaint and therefore denies them.

156. The Quantasy Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph number "156" of the Complaint.

157. The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "157" of the Complaint and therefore denies them.

## COUNT VIII: Breach of Contract Against Quantasy

158. The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "158" of the Complaint with the same force and effect as if fully set forth herein.

159. Quantasy & Associates, LLC and Quantasy, LLC admit the allegations contained in paragraph number "159" of the Complaint.

160. Quantasy & Associates, LLC and Quantasy, LLC deny the allegations contained in paragraph number "160" of the Complaint.

161. Quantasy & Associates, LLC and Quantasy, LLC deny the allegations contained in paragraph number "161" of the Complaint.

162. Quantasy & Associates, LLC and Quantasy, LLC deny the allegations contained in paragraph number "162" of the Complaint.

163. Quantasy & Associates, LLC and Quantasy, LLC deny the allegations contained in paragraph number "163" of the Complaint.

## COUNT IX: Breach of Fiduciary Duty Against CMO Silver

164.    The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "164" of the Complaint with the same force and effect as if fully set forth herein.

165.    The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "165" of the Complaint and therefore denies them.

166.    The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "166" of the Complaint and therefore denies them.

167.    The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "167" of the Complaint and therefore denies them.

168.    The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "168" of the Complaint and therefore denies them.

169.    The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "169" of the Complaint and therefore denies them.

170.    The Quantasy Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph number "170" of the Complaint and therefore denies them.

## COUNT X: Civil Conspiracy
## Against All Defendants

171. The Quantasy Defendants repeat and reallege each and every response to the paragraphs referred to in paragraph number "171" of the Complaint with the same force and effect as if fully set forth herein.

172. The Quantasy Defendants deny the allegations contained in paragraph number "172" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "172" of the Complaint and therefore denies them.

173. The Quantasy Defendants deny the allegations contained in paragraph number "173" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "173" of the Complaint and therefore denies them.

174. The Quantasy Defendants deny the allegations contained in paragraph number "174" of the Complaint as alleged against the Quantasy Defendants, and lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph number "174" of the Complaint and therefore denies them.

175. The Quantasy Defendants deny any and all allegations not expressly admitted.

## FIRST DEFENSE

176. The Complaint fails to state a claim on which relief can be granted.

## SECOND DEFENSE

177. The Court lacks personal jurisdiction over Defendants William Campbell and Quantasy & Associates, LLC.

### THIRD DEFENSE

178.    At all relevant times, the Quantasy Defendants acted in good faith in justifiable reliance on the actual and/or apparent authority of Root's Chief Marketing Officer.

### FOURTH DEFENSE

179.    Plaintiffs' alleged damages were caused in whole or in part by their own actions.

### FIFTH DEFENSE

180.    The failures of the Quantasy Defendants, if any, are excused by the intervening and superseding conduct of others.

### SIXTH DEFENSE

181.    The damages described in the Complaint were proximately caused by Root's Chief Marketing Officer, for whom the Quantasy Defendants are not responsible.

### SEVENTH DEFENSE

182.    Any claim for breach of contract is barred by Plaintiffs' material breach of the contracts.

### EIGHTH DEFENSE

183.    Any claim for fraud is barred by the failure to pleading with the particularity required under Fed. R. Civ. P. 9(b).

### NINTH DEFENSE

184.    Root's claims are barred by the doctrines of unclean hands and/or in pari delicto.

### TENTH DEFENSE

185.    Root's claim for breach of contract is barred by fraudulent inducement.

## ELEVENTH DEFENSE

186.    Root has released the Quantasy Defendants from any claims relating to the litigation.

**WHEREFORE**, the Quantasy Defendants respectfully request that: (1) the Complaint be dismissed at the cost of Plaintiffs; and (2) the Court grant such other and further relief to which the Quantasy Defendants may be entitled.

## COUNTERCLAIMS AND CROSS-CLAIMS

Defendant/Counterclaim-Plaintiff Quantasy, LLC[1] ("Quantasy, LLC" or "Counterclaim-Plaintiff"), by and through its undersigned counsel, aver and allege as follows for its Counterclaims and Cross-Claims against Counterclaim-Defendants Root, Inc. ("Root"), Caret Holdings, Inc. ("Caret Holdings"), and Root Insurance Agency, LLC ("RIA", collectively "Root") and Cross-claim-Defendant Brinson Caleb "BC" Silver ("CMO Silver" and together with Root, the "Counterclaim-Defendants"):

## THE PARTIES

1.    Counterclaim-Plaintiff Quantasy, LLC is a limited liability company formed under the laws of California with its headquarters in California.  Quantasy, LLC is an advertising agency in the Los Angeles area that was formed in 2011.

2.    Upon information and belief, Counterclaim-Defendant Root, Inc. is an insurance holding company incorporated under the laws of Delaware with a principal place of business in Columbus, Ohio.

---

[1] Quantasy & Associates, LLC was not a party to any contract with Root and had no involvement in the claims and issues detailed throughout this action.

3. Upon information and belief, Counterclaim-Defendant Caret Holdings, Inc. is a subsidiary of Root, Inc. and incorporated under the laws of Delaware, with its principal place of business in Columbus, Ohio.

4. Upon information and belief, Counterclaim-Defendant Root Insurance Agency, LLC (collectively, Root, Inc., Caret Holdings, Inc. and Root Insurance Agency, LLC will be referred to as "Root") is an Ohio limited liability company with its principal place of business in Columbus, Ohio.

5. Cross-claim-Defendant Brinson Caleb "B.C." Silver (formerly Brinson Bernard McDaniel) is an individual that, upon information and belief, is a citizen of the state of California. Silver is Root's former Chief Marketing Officer ("CMO").

6. Non-party William Campbell was, during all relevant times, the Chief Executive Officer ("CEO") of Quantasy, LLC. Campbell resides in California and is a citizen of California. William Campbell is not asserting any of the counterclaims and cross-claims stated herein.

## NATURE OF THE ACTION

7. This is a civil action for fraud, negligent supervision, fraudulent concealment, and contractual indemnity.

## SUMMARY OF THE FRAUDULENT SCHEME

8. Quantasy, LLC asserts counterclaims against Root for fraud, negligent supervision, fraudulent concealment, and express contractual indemnity. These counterclaims arise from the fact that Quantasy, LLC is a victim of CMO Silver's fraudulent scheme to steal millions of dollars from Root. By hiring, authorizing, empowering, and failing to supervise CMO Silver, Root bears legal responsibility for CMO Silver's fraud.

9. Root hired Silver as its CMO in November 2021. A CMO occupies the highest-level marketing position in a company, determines that company's brand direction and marketing

strategy, and leads the company's marketing team.[2]  CMO Silver went on to steal $9.9 million from Root in less than a year.

10.    Root admitted in its securities filings that it: (i) hired CMO Silver without adequate investigation of his background; (ii) gave him sweeping authority over all aspects of Root's marketing and advertising activities, including millions of dollars in discretionary spending authority; (iii) failed to supervise CMO Silver in any effective manner; and (iv) never instituted accounting controls that would have detected Silver's fraud.

11.    Without these failures and his CMO position at Root, CMO Silver could not have engaged in the fraudulent scheme that led to his incarceration.  Unwilling to accept responsibility for its failures, Root looked for the easy way out by blaming Quantasy, an unwitting victim of the fraud.

12.    CMO Silver, upon whom Root publicly conferred virtually unlimited marketing and advertising authority, defrauded Quantasy, LLC by falsely representing:

- Root had authorized a budget of $14.7 million to develop and implement entirely new and re-imagined brand refresh for Root that incorporated a comprehensive and breakout advertising, marketing, and promotional campaigns ("Root's Budget"), with a critical and substantial focus on sports marketing due to Root's target audience of young male drivers.

- CMO Silver had full authority on behalf of Root to decide and direct (i) what agencies and third-parties Root would retain, (ii) how Root would work with such

---

[2] According to the American Marketing Association, a CMO's principal duties are to: (i) create and implement marketing campaigns, (ii) oversee market research and analyze metrics, (iii) oversee all public relations and public-facing communication, and (iv) work closely with other senior executives in the company's "C-Suite". *See* https://www.ama.org/marketing-news/the-role-of-the-cmo/

agencies and third parties, (iii) how much funds Root would allocate to its marketing and advertising efforts, and (iv) when and how Root would pay for such work.

- Quantasy, LLC would be responsible for virtually every aspect of developing and implementing Root's brand refresh that would include but not be limited to new marketing, advertising and promotional campaigns, but with one critical exception - sports marketing and sponsorships would be handled by an independent and separate specialist agency to be selected by Root called Collateral Damage.

- Prior to Quantasy, LLC being retained, Root already had existing sports marketing relationships, including a sponsorship deal with Bubba Wallace, the first African American driver in NASCAR Grand National racing.

- Root selected Collateral Damage and instructed Quantasy, LLC to work with Collateral Damage in a form and process as CMO Silver determined. Root presented Collateral Damage as an experienced, reputable, and effective sports marketing agency, in which CMO Silver had no ownership stake. Quantasy, LLC was required to transmit millions of dollars in funds received from Root as "pass through funds" (funds paid to an agency to be used for the purpose of passing them through to third parties providing services or materials to an advertiser company) to Collateral Damage, which would then, under CMO Silver's sole and exclusive supervision and direction, use those funds to implement sports marketing campaigns and initiatives on Root's behalf.

13. Quantasy, LLC had every reason to rely on CMO Silver's representations and direction, because as Root's CMO, he had full authority to direct Root's marketing and advertising

activities. In the advertising world, a CMO is the person who has authority to make any and all decisions on an advertiser's behalf, including, but not limited, to hiring agencies, setting budgets, determining creative and strategic direction, and making all of the advertising and marketing decisions for the company relating to its brand and the products and/or services it sells. Quantasy, LLC reasonably relied on Silver's representation and direction <u>because</u> he was Root's CMO. For an advertising agency like Quantasy, LLC, CMO Silver was Root's "voice" – he spoke, with full corporate authority, on Root's behalf.

14. Pursuant to CMO Silver's instructions, Quantasy, LLC sent $9.4 million of Root's money to Collateral Damage as funds for Collateral Damage to provide sports marketing and sponsorships directly to Root. Unbeknownst to Quantasy, LLC, CMO Silver stole those funds and spent them on a dizzying array of multimillion dollar mansions, luxury vehicles, exotic travel, and plastic surgery.

15. Meanwhile Quantasy, LLC did its job. Root, a new entrant in the car insurance market, desperately needed to increase consumer awareness of its brand. Unaware that CMO Silver was perpetrating a fraud on the side, Quantasy, LLC performed a "deep dive" analysis of Root's brand and the highly competitive market in which it operates; developed an overarching plan for Root's new marketing, advertising and promotional strategies; created innovative marketing, advertising and promotional campaigns for Root involving digital, broadcast, and print media; and began to plan and purchase that media to ensure that Root's marketing, advertising and promotional campaigns would reach Root's target audience.

16. Quantasy, LLC is a successful, award-winning leader in the marketing and advertising industry. There is no reason that it would jeopardize its good name to participate in a brazen theft.

17.     Like Root, Quantasy, LLC has been damaged by CMO Silver's misconduct. Unlike Root, however, Quantasy, LLC did not cause it. It was Root that placed CMO Silver in a top executive spot. It was Root that gave CMO Silver authority over a multi-million-dollar budget with no cross-controls. It was Root that put CMO Silver in a position where he could steal millions of dollars and remain undetected for months. It should be Root that bears liability for CMO Silver's fraud.

18.     The fraud at issue in this case arose in connection with an engagement between Quantasy, LLC and Root for the provision of a broad array of advertising, marketing and promotional services. CMO Silver directed Quantasy, LLC to subcontract the sports marketing and sponsorships portion of these services to Collateral Damage. Unbeknownst to Quantasy, LLC, CMO Silver, upon information and belief, controlled Collateral Damage. In his position as CMO, Silver used Quantasy, LLC as a conduit to improperly divert funds from Root to Collateral Damage. CMO Silver then took the funds for his own personal use.

19.     Chief Marketing Officer is the most senior marketing executive in an organization. Upon information and belief, Root's Chief Marketing Officer reports directly to its Chief Executive Officer and: (i) is responsible for brand management, marketing communications (including advertising and promotions), market research and product marketing; and (ii) has authority to hire and fire advertising agencies, approve advertising and marketing budgets, and authorize payments to marketing vendors. CMO Silver was in a position to create and execute his fraudulent scheme by virtue of his employment as the Chief Marketing Officer at Root, which, through Root's own conduct, including giving CMO Silver unilateral control of the distribution of marketing funds, placed CMO Silver in a position to carry out his fraud.

20.     Quantasy, LLC is a black-owned, Los Angeles-based, multi-cultural, full-service advertising agency that was founded in 2011 by Campbell.  By any measure, Quantasy, LLC has been a small-business success story.  Since its founding in 2011, Quantasy, LLC has grown to 85 employees, and it now counts blue-chip, publicly-traded companies amongst its clients.  Quantasy, LLC has also won recognition in the industry for its success and its work, winning Ad Age's 2021 Small Agency of the Year Award, MediaPost OMMA Awards for its outstanding contributions to the cultural and digital marketing landscape, an Effie award for marketing effectiveness, and a Webby award for excellence on the Internet.  It has also been ranked on the Inc. 5000, which tracks the fastest growing privately-held companies in America.

21.     As a full-service agency, Quantasy, LLC provides a range of advertising and marketing services and materials for its clients, including but not limited to, strategic direction, competitive analysis, advertising and marketing creative materials and campaigns development and production for all media (traditional, broadcast, print, radio, digital, POS (point of sale) and social), promotion marketing, web/app   development, entertainment content creation, and select media planning and buying.  Frequently, Quantasy, LLC acts as the "agency of record" (an "AOR") for its clients and as such provides a comprehensive set of advertising creative development and production, marketing, promotion, competitive analysis and strategic services and materials that fulfills the vast majority of the advertiser's (*i.e.*, the agency's client's) needs. AORs use other third-use other third-party agencies who are experts in their fields to provide specialized advertising and marketing services in particular areas. Examples include media buying and planning and sports marketing and sponsorships.  Further it is not uncommon for the selection of such specialist agencies to be designated and selected by the advertiser, not by the advertising agency – even if the advertising agency is an AOR.  These specialist agencies may have a direct

contractual relationship with the advertiser who controls that relationship. Advertisers will designate the specialist agency to coordinate with the AOR to ensure a level of consistency in the advertising and marketing materials. Advertisers may also direct the AOR agency to retain the designated specialist agency to contract with the AOR even though the advertiser controls that relationship.

22. Upon information and belief, prior to joining Root as its CMO, CMO Silver held several other marketing positions, including with Green Dot Corporation ("Green Dot"), which is a financial and banking company based in Austin, Texas, and the world's largest prepaid debit card company. Quantasy, LLC occasionally performed project-based advertising work for Green Dot. In or around 2018, another Green Dot employee told Quantasy, LLC that it had hired Silver as a Vice President and manager for one of its brands. Silver met with Quantasy, LLC, and during their discussions, Silver represented to Quantasy, LLC that he previously worked at Procter & Gamble Company.

23. In their initial meetings, Campbell discussed Quantasy, LLC's capabilities and credentials and, ultimately, Silver hired Quantasy, LLC to work on a project for RushCard, the brand that he was managing under the Green Dot umbrella. Silver told Quantasy, LLC that he liked that Quantasy, LLC worked with celebrities, and he thought Quantasy, LLC could help Silver achieve his goal of making the Green Dot brand "cool."

24. While employed at Green Dot, Silver involved Quantasy, LLC and/or Campbell in various proposals or potential projects. As an example, on one occasion in 2018, Silver told Campbell that Green Dot was considering a sponsorship of the Los Angeles Rams football team. Silver asked Campbell to attend a sponsorship pitch at a football game at the Los Angeles Coliseum so that Quantasy, LLC could be involved in any advertising and brand work based on Green Dot's

sponsorship of the Los Angeles Rams. Silver requested that Quantasy, LLC provide ideas and mockups relating to a stadium sponsorship deal by Green Dot.

25. Upon information and belief, Silver resigned his position at Green Dot and was hired by the Change Company, a financial services company, as the President of Digital Banking and Chief Executive Officer of Change Finance. While employed by the Change Company, Silver again contacted Quantasy, LLC for the purpose of requesting that Quantasy, LLC submit a proposal to the Change Company for advertising work. At Silver's request, Quantasy, LLC prepared a proposal and submitted it to the Change Company, but Quantasy, LLC was not awarded any work by the Change Company.

26. During Silver's employment at Green Dot and the Change Company, CMO Silver would frequently communicate with Quantasy, LLC about business matters by text message and/or telephone calls, although he also occasionally communicated by email, particularly when Silver was employed at Green Dot.

27. In addition to CMO Silver's employment with Green Dot and the Change Company, CMO Silver, upon information and belief, previously worked for Mars Company, the Clorox Company, and he was elected as an independent director on the Board of Directors of Rent-A-Center, the Texas-based rent-to-own company. CMO Silver was a successful African-American executive who appeared to have contacts in corporate circles who Campbell, also an African-American executive, believed would be helpful to his business.

*CMO Silver Contacts Quantasy, LLC On Behalf of Root.*

28. Upon information and belief, on or around November 8, 2021, CMO Silver and Caret Holdings executed an employment agreement under which CMO Silver assumed position of CMO for Root. At all relevant times herein, Root held CMO Silver out to be its CMO. In its

February 24, 2022, earnings call, Daniel Rosenthal, Root's then-Chief Financial Officer, announced that Root had hired CMO Silver as its CMO, representing that CMO Silver had a strong marketing background. Specifically, Mr. Rosenthal stated that "[Root has] a very strong new Chief Marketing Officer, B.C. Silver, who is bringing differentiated strategies to our direct marketing. We were thrilled to hire him from Green Dot and a lot of other prior experience at Procter & Gamble and Clorox brands and otherwise. He has been a great addition as a leader to the team."

29. In connection with his employment as Root's CMO, CMO Silver had apparent and/or actual authority to develop and direct Root's marketing, advertising, and brand strategy, direct Root's marketing employees in connection with their day-to-day duties, hire third-party vendors to execute that strategy, and to authorize and approve expenditures relating to Root's marketing and advertising programs. Upon information and belief, CMO Silver was entrusted by Root to take action to reposition Root in the marketplace with an aggressive advertising, marketing and promotional strategy, campaigns and new creative efforts. CMO Silver regularly and repeatedly appeared in public representing Root in his capacity as Chief Marketing Officer, and he regularly and repeatedly gave statements to the public and media relating to Root's advertising and marketing efforts. At no time during CMO Silver's employment as Chief Marketing Officer did any employee of Root ever inform Quantasy, LLC that CMO Silver was not authorized to act on behalf of Root.

30. On or around November 22, 2021, CMO Silver contacted Campbell via text message in order to tell Campbell that he was now the CMO at Root and for the purpose of seeking to hire Quantasy, LLC to provide advertising. marketing and promotional services and materials for Root. At or around the same time, CMO Silver contacted Campbell by telephone and asked for Quantasy, LLC's assistance with Root's social media presence, and CMO Silver requested a

written proposal relating to social media from Quantasy, LLC. During the course of Quantasy, LLC's prior interactions with CMO Silver, CMO Silver had always been very demanding regarding the services and materials provided, insisting upon the highest quality work reflecting "breakthrough creative" performed and completed on a very aggressive timeline. CMO Silver continued this pattern at Root. On December 1, 2021, CMO Silver sent an iMessage, a text-message service provided by Apple, to Campbell to inquire as to the status of Quantasy, LLC's proposal; Campbell replied that it would be sent the following afternoon.

31.     On December 3, 2021, at 7:16 a.m., Campbell sent a PDF of Quantasy, LLC's advertising proposal to CMO Silver via iMessage. A few hours later, CMO Silver requested a call with Campbell and requested some revisions to the proposal, which Quantasy, LLC provided (again by iMessage) on December 9, 2021.

32.     On or around January 13, 2022, CMO Silver sent an iMessage to Quantasy, LLC that attached a marketing gap analysis that Root had prepared. The gap analysis was designed to identify the additional work that Root wanted to perform to meet its marketing and business goals. In response to Quantasy, LLC's proposal related to Root's social media presence, CMO Silver told Quantasy, LLC that he wanted to hire Quantasy, LLC as Root's agency of record, and that Root would use Quantasy, LLC to execute CMO Silver's advertising and marketing vision for the company.

33.     In a January 19, 2022 iMessage, CMO Silver explained his advertising and marketing vision and priorities for the brand and Root to Quantasy, LLC and Campbell which included:

- Brand story
- Create the cool factor
- Go big on a two state strategy (Colorado and Oklahoma)
- Create national influencer, social, sports mgmt and spokesperson

44

- Highlight technology (telematics) key differentiator
- Get prepared to scale
- Target audience (white males 20-39, mid to high credit, single)
- Prove holistic/multi-channel marketing works

34.     At or around this time, CMO Silver informed Campbell, CEO of Quantasy, LLC, that CMO Silver had a "sports idea" for Root that involved another group with which he was working, Collateral Damage, but that CMO Silver wanted Quantasy, LLC to be the lead team for Root's overall advertising and marketing project. Root had already sponsored NASCAR driver Bubba Wallace, and CMO Silver's statements about a sports marketing idea and Root's pre-existing relationship with another sports marketing agency was consistent with the Bubba Wallace sponsorship. However, upon information and belief, CMO Silver's statements to Campbell were false. CMO Silver did not disclose that he intended to, and did, in fact, use Collateral Damage to convert Root's funds for his own personal benefit. Upon information and belief, CMO Silver made the statements to Mr. Campbell in order to persuade him to send a portion of Root's Budget to Collateral Damage. Quantasy, LLC would not have done so, and it would not have entertained CMO Silver's proposal to do so, but for his position as Root's CMO.

35.     On Sunday, January 30, 2022, CMO Silver sent Campbell an iMessage that attached a document entitled "Gap Analysis – Quantasy Support" that was dated January 28, 2022. CMO Silver and Campbell then scheduled a kickoff meeting by Zoom for Tuesday, February 1, 2022.

36.     After the kickoff meeting, CMO Silver sent Campbell additional documents by iMessage, including a PowerPoint document relating to Root. CMO Silver regularly communicated with Campbell about official Root business using his phone and text messaging services. At no time did CMO Silver or anyone else at Root indicate that communication by text

message was prohibited by Root policy or that it was an improper means of communication regarding Root business.

37.     On February 3, 2022, CMO Silver sent Campbell a text message in which he invited Campbell to a NASCAR race.  At that time, Root was a primary sponsor of the Bubba Wallace NASCAR race team, and CMO Silver said that he would be at the race track with the Bubba Wallace race team.  On the same day, Campbell reviewed a proposed statement of work for Root. CMO Silver instructed Quantasy, LLC to sign the agreement and send to Jill Neely ("Neely"), Root's Executive Creative Director, for counter-signature.  After Campbell signed and sent the statement of work to Ms. Neely, CMO Silver texted Campbell that he was "so geeked.  I can't wait to see the creative [stuff] we are going to cook up. . . . We got a week to have a plan locked if I am going to share in time for board."  CMO Silver followed up that text message with another text message that attached a document entitled: "Marketing Reboot:  Two State Strategy – Colorado + Oklahoma."

38.     The statement of work referenced in the February 3, 2022 conversation between Campbell and CMO Silver was the Statement of Work Agreement ("SOW #1") dated February 3, 2022 and effective February 1, 2022 between Quantasy, LLC and RIA, a true and accurate copy of which is attached hereto as **Exhibit 1**.  Campbell executed SOW #1 on behalf of Quantasy, LLC and Neely executed SOW #1 on behalf of RIA.

39.     Pursuant to SOW #1, Root was to pay Quantasy, LLC a fee of approximately $1,184,445 for "Client Partnerships"; "Brand Strategy"; and "Creative Services / Development Support."

40.     SOW #1 provided that Root would pay approximately 40% of the outstanding amount, or $473,778.00, "upon commencement"; 35%, or $414,555.75, by February 18, 2022; and

25%, or $296,111.25, by March 1, 2022. The fees were compensation to Quantasy, LLC for the services, strategies, materials, insights, intellectual property and value all to be delivered on an accelerated timetable.

41.     Section 13 of SOW #1 stated, in pertinent part, that "[t]his Agreement shall be governed and construed in accordance with the laws of the State of California for contracts made and to be performed entirely therein, without reference to conflict of law principles."

42.     Under the terms of the Statement of Work, RIA agreed to indemnify, defend, and hold Quantasy, LLC harmless from losses or costs arising from certain events. Specifically, Section 4(b) of the SOW #1 stated, in pertinent part, that:

> [RIA] agree[s] to indemnify, defend and hold harmless, [Quantasy, LLC's] and [its] parent and affiliated companies, and [Quantasy, LLC's] and their employees, officers, directors, shareholders, licensees, assigns, and agents against any loss, cost, liability and expense (including reasonable attorneys' fees and costs) [Quantasy, LLC] or such other party may incur as the result of any claim, suit or proceeding made or brought against [Quantasy, LLC] or any of the indemnified parties … (iii) based upon any material or information supplied by [RIA] to [Quantasy, LLC]…

43.     After the execution of SOW # 1, also on February 3, 2021, CMO Silver sent an iMessage to Campbell stating: "Man I'm excited. Can't wait to see what we do together to blow the brand up!!!" CMO Silver was referring to the Root brand.

44.     On February 3, 2022, Quantasy, LLC invoiced Root for $473,778.00 (Invoice No. 2277).

45.     On February 6, 2022, Campbell attended a NASCAR event at the invitation of CMO Silver. Root sponsored NASCAR race car driver Bubba Wallace, and CMO Silver attended the event as the top representative of Root. During the course of the event, CMO Silver introduced Campbell to members of the Bubba Wallace race team. Upon information and belief, CMO Silver was showing off Root's relationship with Bubba Wallace and CMO Silver's management of that

relationship, as well as engaging Quantasy, LLC, as Root's newly appointed AOR, to help maximize the value of Root's sponsorship of a professional race car driver.

46. Among the ideas that Quantasy, LLC and CMO Silver discussed as part of Root's overarching marketing campaign and rebrand was the "Best Driver in America" marketing promotion and program to be supported by a comprehensive advertising campaign. Some of the key elements of the marketing promotion and program included retaining a major celebrity talent—Jack Black was CMO Silver's first choice—and offering to consumers a promotional contest where the winner would win a prize of $1 million plus a Root Best Driver in America Championship trophy—all to be presented by NASCAR race car driver Bubba Wallace at a winner's ceremony.

47. On February 7, 2022, CMO Silver sent Campbell a message using the WhatsApp messaging application, containing account and routing numbers for Collateral Damage's Bank of America bank account. Unbeknownst to Quantasy, LLC and Campbell, the Collateral Damage account that CMO Silver provided was, upon information and belief, an account controlled by CMO Silver which he used to funnel funds from Quantasy, LLC to himself for his own personal benefit.

48. As part of his February 7, 2022 message, CMO Silver also identified "45 South Arroyo Pkwy Pasadena, Ca 91105" as the address for Collateral Damage.

49. On February 9, 2022, Root paid Invoice No. 2277, via wire to Quantasy, LLC, in the amount of $473,778. On the same day, CMO Silver sent Campbell a text message saying, "Payment went out. Excited to have you all on the team."

50. On February 11, 2022, CMO Silver sent Quantasy, LLC the first invoice for Collateral Damage. The invoice, numbered 12012021 and dated January 29, 2020, was for

$153,778 and identified Collateral Damage's services as "2020 Promotion Plan" and "Campaign Design Support." The invoice sent to Campbell was false and fraudulent. CMO Silver also did not disclose that he intended to, and did, in fact, use Collateral Damage to convert Root's funds for his own personal benefit. Upon information and belief, CMO Silver made the statements to Mr. Campbell in order to persuade him to send a portion of Root's Budget to Collateral Damage. Quantasy, LLC would not have done so, and it would not have entertained CMO Silver's proposal but for his position as Root's CMO.

51. Also on February 11, 2022, CMO Silver and the Quantasy, LLC team, including Campbell, David Rodriguez, and several other members of the Quantasy, LLC staff met in-person at Quantasy, LLC's Los Angeles offices. Upon information and belief, CMO Silver, on behalf of Root, was very happy with the presentation Quantasy, LLC provided during the meeting.

52. Over the next few weeks, Quantasy, LLC worked closely with Root on developing the ideas and concepts for a new advertising and marketing campaign. During that time, Quantasy, LLC and CMO Silver worked on developing three separate, but related, ideas and concepts that would be key elements of the Root advertising and marketing brand proposal: "Impossible," "Do Better," and "Best Driver in America." On February 12, 2022, Campbell sent CMO Silver a text message enthusiastically stating, "If you pull this off Root will be the most entertaining brand in the insurance industry. Get ready for a fun awards season."

53. CMO Silver was eager to begin work on producing the advertising concepts. On February 12, 2022, he wrote to Campbell, via text message, "what's the quickest we should execute impossible and do better," referring to two campaign ideas. Campbell responded that it could be done in 60 days, including talent negotiations and production. This was important to CMO Silver because, as he wrote to Campbell, "I have video time with [B]ubba [Wallace, a NASCAR driver

sponsored by Root] in 2 weeks." CMO Silver stated that he needed a "quick 60 day campaign" to set the stage for the Impossible and Do Better advertising concepts that he and Quantasy, LLC had discussed. He said that he was primarily looking for the concepts to be executed in print and billboard media, and that Root had an in-house production team if needed.

54. After their meeting and the first Collateral Damage invoice, CMO Silver and Quantasy, LLC continued discussing payment arrangements for Collateral Damage. Specifically, on February 13, 2022, via WhatsApp, CMO Silver and Quantasy, LLC discussed how the payments would be divided between the companies.

55. CMO Silver stated Root would pay to Quantasy, LLC the entire amount due under SOW #1, $1,184,445. CMO Silver then instructed Quantasy, LLC to pay $384,445 of that amount to Collateral Damage for sports marketing, advertising, and sponsorship services purportedly performed by Collateral Damage pursuant to the subcontractor relationship that CMO Silver was managing. CMO Silver's statement that Collateral Damage would perform work for Root pursuant to the subcontractor relationship was false, and his instruction to Quantasy, LLC to wire money to Collateral Damage was fraudulent. CMO Silver's statement to Campbell was false. At the time of the statement, CMO Silver knew that Collateral Damage was serving as a conduit for CMO Silver's conversion of money from Root. Upon information and belief, CMO Silver made the statements to Mr. Campbell in order to persuade him to send a portion of Root's advertising and marketing budget to Collateral Damage. Quantasy, LLC would not have done so, and it would not have done business with Collateral Damage but for CMO Silver's instruction and his position as Root's CMO.

56. On about February 14, 2022, in justifiable reliance on the fraudulent representations of CMO Silver, Quantasy, LLC wired $153,778.00 to the Collateral Damage account that Root

provided to Quantasy, LLC. Quantasy, LLC would not have made this payment but for the instruction to do so from Root's CMO.

57. On February 23, 2022, Quantasy, LLC issued Invoice No. 2286 in the amount of $414,555.75, and sent it to Jill Neely, Root's VP Creative and CMO Silver's direct subordinate.

58. On or about February 23, 2022, Campbell met, via videoconference, with certain members of Root's marketing team, including CMO Silver, Geoff Klapisch, Neely, Kevin Rapp, and Nadine Izaguirre, to present Quantasy, LLC's ideas for Root's advertising and marketing.

59. On February 24, 2022, following Quantasy, LLC's successful presentation to Root's marketing team, Quantasy, LLC presented to, among others, Alex Timm, Root's Chief Executive Officer, Daniel Rosenthal, Root's Chief Operating Officer, and CMO Silver.

60. During both the February 23 and 24, 2022 meetings, pursuant to SOW #1, Quantasy, LLC performed a comprehensive analysis of the relevant market and created an advertising and marketing plan for Root that included strategic and creative recommendations, creative ideas and concepts for advertising materials, promotional programs, related to the new branding and strategic positioning of Root in the marketplace. This included, without limitation, brand insights, comparative market analyses from an industry perspective, multiple advertising campaign ideas and concepts, the sequencing of brand and supporting advertising launches, and promotion programs, content and product tie-in's, analyses and recommendations of social media and digital platforms to utilize, the creation of intellectual property that would be the property of Root, as well as other proposed advertising materials and concepts. Quantasy, LLC's employees dedicated significant manhours in the development of these recommendations, ideas, and concepts. In addition to other mediums, Quantasy, LLC summarized, relayed, and demonstrated these plans,

recommendations, and ideas through an extensive slideshow presentation at the February 23 and 24 meetings.

61.     As examples of the services performed and materials to be provided in Paragraph 59, Quantasy, LLC recommended and developed pre-production boards for a thirty second video commercial featuring NASCAR race car driver Bubba Wallace and celebrity actor Jack Black, a detailed summary of Quantasy, LLC's advertising program for Root, a proposal for a marketing and promotional campaign titled "Best Driver in America," which involved a consumer promotion and the scoring of ordinary drivers who would win prizes for their safe driving capabilities. This would be advertised on numerous media platforms, and a full schedule for implementation was part of Quantasy, LLC's recommendations and ideas. Root's executive team was impressed with Quantasy, LLC's work on the advertising and marketing brand project. Following the meetings, CMO Silver sent Campbell a text message stating, "It all went great. The team did an awesome job[.] I had to explain some things to leaders, but they finally kinda started to see the light[.] That said, it doesn't really matter, I have autonomy to do what I need to do."

62.     On February 25, 2022, Campbell sent CMO Silver a text message notifying him that Root had yet to pay Quantasy, LLC for Invoice No. 2286 (*i.e.*, $414,555.75). That same day, Neely, presumably at the direction of her boss, CMO Silver, sent an email to Root's accounts payment department forwarding Quantasy, LLC Invoice No. 2286 and stating "[s]ee the attached invoice to be paid immediately. Please send a note that you have received this email and date when the payment will be processed."

63.     On February 28, Blake Mealer, upon information and belief, Root's Financial Operations Manager, sent Neely an email stating "Jill, we'll get this paid tomorrow via ACH. They should have the funds by Wednesday" (*i.e.*, March 2, 2022).

64.     On March 2, 2022, Quantasy, LLC sent CMO Silver a WhatsApp message, again stating that Root had yet to pay Quantasy, LLC for Invoice No. 2286 (*i.e.*, $414,555.75). Moreover, Quantasy, LLC wrote that Collateral Damage should send its "invoice for phase 2" so that Quantasy, LLC could "have [it] ready" once Quantasy, LLC received Root's next payment. Quantasy, LLC wrote that Lauren Lanskie, who Quantasy, LLC believed to be an employee of Collateral Damage, should send the next one.

65.     On March 4, 2022, Quantasy, LLC informed CMO Silver and Neely, that Quantasy, LLC had still not received payment from Root for Invoice No. 2286 (*i.e.*, $414,555.75).

66.     On March 7, 2022, Root wired Quantasy, LLC $414,555.75 as payment of Invoice No. 2286.

67.     After receiving Root's payment on March 8, 2022, Quantasy, LLC sent a text message to CMO Silver on March 9, 2022, notifying him that Root's payment had been received.

68.     Thereafter, Campbell, who was waiting on another invoice from Collateral Damage, asked CMO Silver why Lanskie had not sent the invoice. CMO Silver responded by forwarding a screenshot of an email purportedly sent by Lanskie to Campbell that Campbell never received. After Campbell told CMO Silver that Quantasy, LLC had not received a copy of the invoice, CMO Silver sent a PDF of the Collateral Damage invoice dated March 1 to Campbell by text. Upon information and belief, this invoice was not prepared by Lanskie, but it was actually prepared and sent by CMO Silver. This invoice, numbered 12022021, was for $134,555.75 and included as services "2021 Promotion Plan" and "Campaign Design Support." The invoice was fraudulent. CMO Silver did not disclose that he intended to, and did, in fact, use Collateral Damage to convert Root's funds for his own personal benefit. CMO Silver misrepresented the invoice's origins to Mr. Campbell in order to persuade him to send a portion of Root's advertising

budget to Collateral Damage. Quantasy, LLC would not have done so, and it would not have conducted business with Collateral Damage but for CMO Silver's instruction and his position as Root's CMO.

69. On March 9, 2022, in justifiable reliance on the fraudulent invoice sent from CMO Silver, Quantasy, LLC wired Collateral Damage $134,555.75 to the bank account that Root had provided to Quantasy, LLC. Quantasy, LLC would not have made this payment but for the instruction to do so from CMO Silver.

70. On March 16, 2022, Quantasy, LLC informed CMO Silver that it was going to "send the final invoice." In response, CMO Silver sent Quantasy, LLC a message stating "Send to just invoices and me[.] No longer Jill. She no longer approves invoices." Quantasy, LLC responded, "Uh oh. Did she get in trouble? You were not playing." CMO Silver wrote back: "Yes. I can't have our vendors not being paid on time." By using such language, CMO Silver represented to Quantasy, LLC that he had relieved Neely of the responsibility for remitting invoice payments because she was failing to correctly perform her job functions.

71. On March 17, 2022, Quantasy, LLC sent Root invoice number 2303 for $296,111.25.

72. On March 24, 2022, Root wired Quantasy, LLC $296,111.25 in payment of invoice 2303.

73. The next day, on March 25, 2022, CMO Silver sent Quantasy, LLC a WhatsApp message alerting it that Quantasy, LLC "should have received the payment today." Quantasy, LLC responded, "[c]onfirmed" and "[p]lease have Lauren send an invoice." CMO Silver responded to Quantasy, LLC that Lauren Lanskie "sent the invoice." CMO Silver never told

Quantasy, LLC that Lauren Lanskie was no longer an employee of Collateral Damage, or that he was misappropriating her name to further his fraud.

74.     That same day, CMO Silver, apparently impersonating Lauren Lanskie, sent another Collateral Damage invoice to Quantasy, LLC. The invoice, numbered 03012021 and dated March 1, 2022, was for $96,111.25. The invoice was fraudulent. CMO Silver did not disclose that he intended to, and did, in fact, use Collateral Damage to convert Root's funds for his own personal benefit. CMO Silver misrepresented the invoice's origins to Mr. Campbell in order to persuade him to send a portion of Root's advertising budget to Collateral Damage. Quantasy, LLC would not have done so, and it would not have conducted business with Collateral Damage but for CMO Silver's instruction and his position as Root's CMO.

75.     On March 28, 2022, in justifiable reliance on the representation made by CMO Silver, Quantasy, LLC wired Collateral Damage $96,111.25 to the bank account that Root had provided Quantasy, LLC. Quantasy, LLC would not have made this payment but for the instruction to do so from CMO Silver.

76.     On March 31, 2022, Quantasy, LLC discovered that Root's media agency had contacted Bleacher Report, a sports media and news website. Quantasy, LLC was perplexed by this discovery as CMO Silver had told Quantasy, LLC that it would be responsible for handling the media buy at Bleacher Report. Bleacher Report being contacted directly by Root's media agency reflected poorly on Quantasy, LLC, because it would have the appearance to Bleacher Report that Quantasy, LLC may not have the authority that CMO Silver had given to it. After contacting CMO Silver, he explained that Root used media buying agencies other than Quantasy, LLC and that Ben Her Marketing, and not Root, had reached out to Bleacher Report regarding certain media buys.

*Root Executes SOW #2 and CMO Silver's Fraud on Quantasy, LLC Continues*

77. On April 1, 2022, Quantasy, LLC and RIA entered into a second Scope of Work ("SOW #2") valued at $14.7 million, a true and accurate copy of which is attached hereto as **Exhibit 2.**

78. SOW #2 included an effective date of February 1, 2022 and provided that Root would pay Quantasy, LLC $7,350,000 by April 1, 2022, and another $7,350,000 by April 15, 2022. Campbell executed SOW #1 on behalf of Quantasy, LLC and CMO Silver executed SOW #1 on behalf of RIA. In determining the amount for SOW #2, CMO Silver requested a budget from Quantasy, LLC for the production of the concepts and materials, including the commercials and specific advertising materials that were presented to Root in SOW #1.

79. SOW #2 was created to reflect the time, effort and resources necessary to actually produce the work in the execution of the marketing plan. That production necessarily included the retention of third parties, such as television production companies, talent (celebrity and non-celebrities), music, photography, promotion agencies, content creators, and many more. It is common in the advertising industry for an advertiser to hire an advertising agency to provide a portfolio of advertising and marketing services all related to strategic and brand analysis, creative materials development, account management, research, business affairs and production. The advertising agency in turn retains third parties necessary to produce the "hard" advertising material (*e.g.*, television commercials, billboards, point of sale materials, digital advertisements, etc.) that bring to life the advertising "creative" approved by the advertiser. The advertising agency then supervises the production to ensure that the produced materials reflect its actual vision and ideas. Accordingly, a significant portion of the funds paid to an agency are so-called pass-through funds, *i.e.*, they pass through the agency to pay and fund the actual productions. It is further extremely

common for such funds to be paid up front in whole or in part. This is especially where the funds have to be used and dispensed quickly in execution of the timeline and project requirements. SOW #2 was no different. In SOW #2, the $14.7 million was originally allocated for the production and related costs and expenses of the total brand project that included multiple campaigns, promotions and programs spanning different advertising media from traditional media (television, radio, print and the like), digital media, social media, experiential media, out of home media and more; the negotiation, hiring and securing of talent (celebrity and actors), music, photography, third party rights for art, props and related materials; all of the relevant production costs like production crews, directors, cameras, special effects, and the many myriad elements necessary to make creative work come to life. This included, but was not limited to, the following:

(a)     videos and commercials featuring celebrity endorsers including NASCAR race car driver Bubba Wallace and Jack Black;

(b)     driving-related sports highlights in partnership with House of Highlights, the top sports social media outlet;

(c)     an original television series with featuring athletes and their cars (à la MTV's *Cribs*, except for cars);

(d)     an e-sports partnership with the Rocket League, one of e-sports' biggest driving games;

(e)     the Best Driver in America Challenge series, with a $1 million contest to find the best driver in America. The contest as envisioned by Quantasy, LLC would feature social media traffic and user-generated content, digital ads, in-app gamification to drive visits to the Root app, celebrity challenges featuring stars such as Snoop Dogg or Billie Eilish, friend challenges, whereby users could challenge other users to safe

driving challenges, leaderboards, brackets similar to March Madness, and a mini-movie called *The Passenger* starring Bubba Wallace and celebrity actor/comedian Kevin Hart as an overzealous driving coach for Bubba Wallace; and

(f)      supplementing these productions, Quantasy, LLC also proposed outdoor advertising, such as billboards, stunt advertising, and experiential events such as car wash takeovers.

From the $14.7 million, Collateral Damage's sports marketing plan was allocated $5.6 million, approximately $2.5 million was allocated to Quantasy, LLC for its fee on the project, and the remaining $6.6 million was allocated to celebrity retention and production costs detailed in (a)-(f) above.

80.     Throughout the process, Quantasy, LLC's advertising team worked closely with the Root marketing department. Over the course of the summer, members of the Quantasy, LLC team staffed on the Root project, including (at various times), David Rodriguez, Zander Borsiczky, and Lucas McGough, met each Tuesday by video conference with Root's marketing team, including Jeanny David, Root's Vice President of Brand and Product Marketing. In August, after Root determined to pause its advertising campaign, Root cancelled the weekly calls with Quantasy, LLC.

81.     Under SOW #2, the parties agreed that Quantasy, LLC would execute the recommendations and ideas developed pursuant to SOW #1.

82.     Section 12 of the SOW #2 stated, in pertinent part, that "[t]his Agreement shall be governed and construed in accordance with the laws of the State of California for contracts made and to be performed entirely therein, without reference to conflict of law principles."

83. In addition, Root agreed to indemnify Quantasy, LLC from claims related to the agreement. Specifically, Section 3(b) of the SOW #2 stated, in pertinent part, that:

> [RIA] agree[s] to indemnify, defend and hold harmless, [Quantasy, LLC] and [its] parent and affiliated companies, and [Quantasy, LLC's] and their employees, officers, directors, shareholders, licensees, assigns, and agents against any loss, cost, liability and expense (including reasonable attorneys' fees and costs) we or such other party may incur as the result of any claim, suit or proceeding made or brought against us or any of the indemnified parties … (iii) based upon any material or information supplied by [RIA] to [Quantasy, LLC]…

84. On April 1, 2022, Quantasy, LLC sent an email to Root and its invoicing department attaching two Quantasy, LLC invoices: invoice number 2307 for $3,450,000, and invoice number 2308 for $3,900,000, for a total of $7,350,000. Both invoices were due "on receipt."

85. Also on April 1, 2022, CMO Silver sent an iMessage to Quantasy, LLC stating "Let's get ready to crush this Q2 plan." The "Q2 plan" to which CMO Silver was referred to was the work detailed in SOW #2.

86. On April 4, 2022, Root wired to Quantasy, LLC a total of $7,350,000 as payment for invoices 2307 and 2308.

87. The next day, April 5, 2022, CMO Silver sent Quantasy, LLC a WhatsApp message telling Campbell that "[p]ayments were sent out yesterday" and telling Campbell to "[l]et me know when you receive" because he will "have Lauren forward the invoice this morning." This statement was fraudulent. Upon information and belief, Lauren Lanskie was no longer an employee of Collateral Damage during any of the relevant times, or that he was misappropriating her name to further his fraud. CMO Silver fraudulently represented Lanskie as a current employee of Collateral Damage in order to maintain the illusion that Collateral Damage was a legitimate company and induce Quantasy, LLC to transfer funds to Collateral Damage in perpetuation of the fraud.

*CMO Silver Assured Quantasy, LLC of His Authority*

88.     Because CMO Silver had taken on the role of interacting directly with Collateral Damage, Quantasy, LLC wanted to ensure that its work with both Root and Collateral Damage was correctly documented.

89.     Thereafter, on April 6, 2022, Campbell sent an email to CMO Silver's private email account, "hello@bc-silver.com," informing CMO Silver that Quantasy, LLC had begun to prepare a subcontracting agreement between Quantasy, LLC and Collateral Damage. Campbell told CMO Silver that he wanted the subcontracting agreement to include either a clause whereby Root would affirmatively approve the relationship between Collateral Damage and Quantasy, LLC, or have a document separate from the subcontracting agreement in which Root would authorize Quantasy, LLC to employ Collateral Damage as a subcontractor. Campbell suggested that a person other than CMO Silver sign such an agreement. In a subsequent phone call, CMO Silver bristled at this suggestion and told Campbell that he did not need anyone else's authorization to issue statements of work, he had full authority to act on behalf of Root, and that Root had already approved of the subcontracting relationship with, and payments to, Collateral Damage. Campbell had also expressed to CMO Silver a concern that there had been some related party issues with subcontractors in the advertising industry, and he needed to know whether CMO Silver had any relationship with Collateral Damage. CMO Silver then followed this conversation up with a text message to Campbell on April 7, 2022, in which CMO Silver wrote that he had been "completely removed from any previous ownership of CD." Quantasy, LLC accepted the truth of CMO Silver's statement; however, CMO Silver's statements to Quantasy, LLC were false, and he made these statements with the intent to induce Quantasy, LLC to continue to send funds to Collateral Damage. But for CMO Silver's position as Root's CMO and his false representations about the

company, Quantasy, LLC would not have sent any money to Collateral Damage and would not have conducted any business with Collateral Damage.

*CMO Silver Continues to Instruct Quantasy, LLC to Pay Collateral Damage*

90.     On April 7, 2022, Root's CMO, apparently impersonating Lauren Lanskie, sent another Collateral Damage invoice to Quantasy, LLC. That invoice, numbered 04012021 and dated April 1, 2022, was for $2,800,000. At the time CMO Silver sent the invoice, he knew that Collateral Damage had not performed and did not intend to perform any of the services identified therein. In addition, the invoice was sent by CMO Silver with the intent to induce Quantasy, LLC to send further funds to Collateral Damage, all in perpetuation of the fraud.

91.     Upon review of Collateral Damage's invoice numbered 04012021, Quantasy, LLC rejected the invoice because of its lack of detail and vagueness. Specifically, the invoice's description of services simply stated it was for "Sport Marketing Strategy and implementation – NFL, NHL, Nascar and MLB":

| DESCRIPTION | PRICE | QUANTITY | AMOUNT |
|---|---|---|---|
| Campaign Management Support Sport Marketing Strategy and Implementation<br>-   NFL, NHL, Nascar and MLB | $2,800,000 | 1 | $2,800,000.00 |
|  |  |  | $2,800,000.00 |

\* 2% of total price will be apply for delay of payment per week.

92.     On April 7, 2022, Campbell via WhatsApp message asked CMO Silver to instruct Collateral Damage to "send over the services breakdown" for Collateral Damage's invoice number 04012021.

93.     On April 8, 2022, after Quantasy, LLC's rejection of Collateral Damage's invoice number 04012021, CMO Silver, falsely using the name of Lauren Lanskie, emailed a revised

version of invoice number 04012021 to Quantasy, LLC. This invoice included a more detailed

description of Collateral Damage's purported sport marketing services:

| DESCRIPTION | QUANTITY | AMOUNT |
|---|---|---|
| I. **A-List Pro Athlete Partnership:** CD will negotiate, secure and integrate athlete marketing partnership with A-list pro athlete Russell Wilson or pro athlete of similar stature (i.e. NFL, NHL, MLB, Nascar) and regard. Athlete will participate in content, social media posting and appearances including promotion of in-market activations in Colorado during Q2/Q3 2022. | 1 | $1,500,000 |
| II. **Sports Influencers:** CD will negotiate, secure and integrate up to ten but no less than six (6-10) athlete/influencer endorsements for Root Sports Influencer Marketing program. Athletes will participate in core campaign activations including online and in-market appearances | 1 | $1.100,000 |
| III. **Sports Teams and Venue Partnership Activations:** CD will negotiate, secure and integrate sports partnerships (i.e. NFL, NHL, MLB, Nascar) with sports teams and venues to activate against Root Insurance campaign creative. | 1 | $3,000,000 |
| IV. **Strategy and Implementation Support:** CD will provide strategy and execution services to integrate sport marketing programs across campaign elements including Best Driver in America Challenge, In-Market activations and takeovers, online integrations | 1 | **Included** |

\* 2% of total price will be apply for delay of payment per week.

94. Nonetheless, at the time the revised invoice was sent, CMO Silver did not disclose

that he intended to, and did, in fact, use Collateral Damage to convert Root's funds for his own

personal benefit. CMO Silver misrepresented the invoice's origins to Mr. Campbell in order to

persuade him to send a portion of Root's Budget to Collateral Damage. Quantasy, LLC would not

have done so, and it would not have conducted business with Collateral Damage, but for CMO

Silver's instruction and his position as Root's CMO.

95. On April 11, 2022, in justifiable reliance on the representations made by CMO

Silver, Quantasy, LLC wired Collateral Damage $500,000. Two days later, on April 13, 2022,

also in justifiable reliance on such representations, Quantasy, LLC wired Collateral Damage

another $500,000. Quantasy, LLC would not have made these payments but for the instruction to do so from CMO Silver.

96.     On April 14, 2022, CMO Silver sent Quantasy, LLC a WhatsApp message outlining specific directions to follow when creating and sending invoices to Root. CMO Silver instructed Root's contractor, Quantasy, LLC, that it should "make sure invoices are less than $10M . . . [s]o they don't need board approval." CMO Silver made this statement in perpetration of his fraud.

97.     Later that same day, on April 14, 2022, Quantasy, LLC sent Root's invoicing department an email attaching two Quantasy, LLC invoices: invoice number 2316 for $3,450,000, and invoice number 2317 for $3,900,000, for a total of $7,350,000.

98.     On April 15, 2022, in justifiable reliance on the representations made by CMO Silver, Quantasy, LLC wired Collateral Damage another $500,000. Five days later, on April 20, 2022, also in justifiable reliance on such representations, Quantasy, LLC wired Collateral Damage an additional $1,300,000. Quantasy, LLC would not have made these payments but for the instruction to do so from CMO Silver.

99.     CMO Silver arranged a video conference between Quantasy, LLC and Collateral Damage on April 22, 2022. Campbell and David Rodriguez appeared on behalf of Quantasy, LLC; individuals who identified themselves as Eli Hiller, Cyntoria Williams, and Paige Lynette ("Purported Collateral Damage Employees") represented that they were employees of Collateral Damage. Quantasy, LLC does not know whether these individuals are who they claimed to be or, if not, their true identities.

100.    The Purported Collateral Damage Employees presented a slide deck that reflected the advertising work that Collateral Damage represented that it would perform in connection with

SOW #2. The presentation detailed Collateral Damage's apparent sports marketing plan for Root. Quantasy, LLC believed that the presentation was effective and met industry standards.

101.     On April 26, 2022, Quantasy, LLC received an email from Eli Hiller, one of the Purported Collateral Damage Employees. Among other things, the email stated Collateral Damage, "as part of the negotiation with the Cleveland Browns[, has] secured Roots placement on the backdrop that will be featured post-draft week for media sessions!" Upon information and belief, this email was fraudulent and actually sent by CMO Silver.

102.     On April 29, 2022, CMO Silver sent Quantasy, LLC a photo of Cleveland Browns representatives speaking at the NFL Draft in front of a step-and-repeat backdrop that featured the Root logo. CMO Silver sent this message to Quantasy, LLC so that it would believe that Collateral Damage was performing sports marketing work on behalf of Root.



103.     Quantasy, LLC has not been able to confirm whether the Purported Collateral Damage Employees were actually employees of Collateral Damage, or whether Collateral Damage performed any of the work it presented to Quantasy, LLC.

104.    On April 25, 2022, Root wired Quantasy, LLC $7,350,000 in payment of invoices 2316 and 2317.

105.    On April 27, 2022, CMO Silver, impersonating Lauren Lanskie, sent to Quantasy, LLC an email with two attachments—a W-9 tax form for Collateral Damage and another Collateral Damage invoice.  The invoice, numbered 04152021 and dated April 15, 2022, was for $5,600,000. The invoice states that Collateral Damage will "implement a sports marketing program integrating athletes and sports organizations . . . for Root Insurance in support of national awareness with an additional regional two-state focus in Colorado and Oklahoma." The invoice was fraudulent. CMO Silver did not disclose that he intended to, and did, in fact, use Collateral Damage to convert Root's funds for his own personal benefit.  CMO Silver misrepresented the invoice's origins to Mr. Campbell in order to persuade him to send a portion of Root's advertising budget to Collateral Damage.  Quantasy, LLC would not have done so, and it would not have conducted business with Collateral Damage, but for CMO Silver's instruction and his position as Root's CMO.

106.    On April 27, 2022, Quantasy, LLC wired $1.5 million to the Collateral Damage bank account that CMO Silver had provided. The next day, April 28, 2022, Quantasy, LLC wired a total of $1.3 million to that same account.  Quantasy, LLC would not have made these payments but for the instruction to do so from CMO Silver.

107.    Between April 28, 2022 and May 17, 2022, CMO Silver continued to message Quantasy, LLC on WhatsApp about the timing of the remaining wire payments from Quantasy, LLC to Collateral Damage.

108.    On May 11, 2022, CMO Silver sent a WhatsApp message to Campbell stating: "Ideal deployment schedule" for Quantasy, LLC's wires to Collateral Damage: "Wire May 11 -

$500k[;] May 12 - $500k[;] May 13 - $500k ACH[;] May 11 - $2M (Scheduled) arrival by May 13."

109.    On May 11, 2022, CMO Silver, impersonating Lauren Lanskie, sent another Collateral Damage invoice to Quantasy, LLC. The invoice, numbered 05092022 and dated May 1, 2022, was for $3,500,000. The invoice was fraudulent. CMO Silver did not disclose that he intended to, and did, in fact, use Collateral Damage to convert Root's funds for his own personal benefit. CMO Silver misrepresented the invoice's origins to Mr. Campbell in order to persuade him to send a portion of Root's Budget to Collateral Damage. Quantasy, LLC would not have done so, and it would not have conducted business with Collateral Damage, but for CMO Silver's instruction and his position as Root's CMO.

110.    Between May 11 and May 17, 2022, in justifiable reliance on the representations made by CMO Silver, Quantasy, LLC wired a total of $3.5 million to the Collateral Damage bank account provided as follows: (i) $500,000 on May 11; (ii) $1,000,000 on May 13; (iii) $500,000 on May 16; and (iv) $1,500,000 on May 17. Quantasy, LLC would not have made these payments but for the false statements made by, and instruction to do so, from CMO Silver.

111.    At or around the same time, Quantasy, LLC and Root learned that Jack Black declined to participate in Root's advertising campaign. Quantasy, LLC and Root considered using another celebrity in the place of Jack Black. Mr. Black's agent represented other celebrities and suggested other names, including Ken Jeong, but CMO Silver ultimately decided that none of the other celebrities had sufficient star power to replace Mr. Black. Instead, CMO Silver suggested that Russell Wilson, the quarterback of the Denver Broncos, be used as a celebrity endorser. Quantasy, LLC believed that Mr. Wilson would complement Root's sports theme and sponsorship of NASCAR race car driver Bubba Wallace. CMO Silver directed Quantasy, LLC to pause its

execution of SOW #2, including, without limitation, the production originally planned to feature Jack Black.  CMO Silver then informed Quantasy, LLC that Root would shift $3.5 million from the production costs (including the costs of Jack Black) to the sports marketing campaign purportedly to be performed by Collateral Damage.  The money would be used, in part, to hire Russell Wilson.  Accordingly, the new allocation for Root's production budget, as dictated by its Chief Marketing Officer, was $3.1 million for production (which was indefinitely delayed in favor of sports marketing), $9.1 million to Collateral Damage purportedly for sports marketing, including the hiring of Denver Broncos quarterback Russell Wilson, and $2.5 million to Quantasy, LLC for its fees.  CMO Silver's statement that Root intended to hire Russell Wilson was false, he knew that it was false, and he intended the statement to deceive Quantasy, LLC into sending additional funds to Collateral Damage.

*Root's Internal Conflict Results in Termination of SOW #2*

112.    On or around, June 2, 2022, a meeting was held between Root's CEO, CFO, CRO/COO, CTO, and CMO, and among other topics, the executive team discussed Root's marketing spend.  Among Root's governance failures, Root failed to prepare minutes of the meetings, despite that formal approval of the marketing budget was an agenda item.  Some weeks after the executive meeting, there was a disagreement amongst the executive team as to whether the executive team had approved (and for what amount it had approved) Root's second half 2022 marketing budget.  CMO Silver later asserted to the other members of the executive team that he understood that the team had approved H2 marketing spend of $13-18 million.  Other executives did not share this understanding, but because Root did not prepare minutes of the meeting, it could not confirm what decision had been made.

113. This internal disagreement within Root came to head in the summer of 2022 and resulted in Root executing Change Requests relating to SOW #2 to pause Root's marketing spend for 2H 2022 and to reduce the overall level of spend.

114. On or around July 25, 2022, at the request of Root, Quantasy, LLC voluntarily agreed to two Change Requests effective July 5, 2022 and July 12, 2022, respectively. CMO Silver signed the Change Requests on behalf of Root, and Campbell signed the Change Requests on behalf of Quantasy, LLC.

115. Under the Change Request, effective July 5, 2022, Root indicated that it wanted to shift its spend from branding marketing in Q2 to paid partnerships/ad programming in Q3/Q4. This shift in strategy meant that Root would indefinitely pause the television commercial campaign and shift instead to paid media, meaning Internet advertising on websites such as Bleacher Report:

**Project Name:**

| Root Insurance – 2022 Root for Good Drivers Marketing and Advertising Program |
| --- |

**Effective Date of Change:**

| July 5, 2022 |
| --- |

**Requested Change:**

| Original SOW Item(s) | Description of Change |
| --- | --- |
| Root for Good Drivers Marketing: Creative Production / Media Activation and Distribution | Client request to re-focus Q2 activation budgets from brand marketing to Q3/Q4 paid partnerships/ad programming across sports marketing and gaming partners and channels (pausing the Drive Slow and related creative production efforts). |

**Reason for Change:**

| Client request based on internal strategy shifts related to key markets and market conditions. |
| --- |

**Budget Change:**

| Original Contracted Amount | $14,700,000 |
| --- | --- |
| Net Budget Change (+/-) | $0 |
| Revised Contracted Amount | $14,700,000 |

At the time, Root never informed Quantasy, LLC that its CMO was acting without authority, or that Root had any concerns about its CMO's activities.

116.    Under the Change Request effective July 12, 2022, Root indicated that it wanted to reduce total paid media and partnership activation spends:

**Project Name:**

| Root Insurance – 2022 Root for Good Drivers Marketing and Advertising Program |
| --- |

**Effective Date of Change:**

| July 12, 2022 |
| --- |

**Requested Change:**

| Original SOW item(s) | Description of Change |
| --- | --- |
| Root for Good Drivers Marketing: Creative Production / Media Activation and Distribution | Client request for scope reduction to reduce total paid media and partnership activation spends. *(Note: Non-media previous committed/allocated spend/costs including program expenditures, agency fees, production cancellation costs, legal etc ~$2.7M).* |

**Reason for Change:**

| Client request based on internal strategy and budget shifts for unallocated budget/programs. |
| --- |

**Budget Change:**

| Original Contracted Amount | $14,700,000 |
| --- | --- |
| Net Budget Change (+/-) | (-)$1,200,000 |
| Revised Contracted Amount | $13,500,000 |

The parties agree that this Change Request is subject to the original Additional Terms and Services, unless otherwise outlined herein.

At the time, Root never informed Quantasy, LLC that its CMO was acting without authority, or that Root had any concerns about its CMO's activities.

117.    On or around August 22, 2022, at Root's request, Campbell met with members of Root's internal audit team to discuss Quantasy, LLC's work under the SOWs #1.  Campbell was

forthcoming in this conversation, explaining Quantasy, LLC's various deliverables. CMO Silver did not attend this meeting.

118.    During the August 22, 2022 meeting, Campbell further explained that Quantasy, LLC had agreed to refund $1.2 million to Root consistent with Root's decision to reduce the marketing spend associated with the production. The effect of this was to reduce Root's production (now paid media) from $3.1 million to $1.9 million. Because further production was delayed, Quantasy, LLC's fees remained unchanged at $2.5 million, and Collateral Damage's sports marketing budget was unchanged at $9.1 million.

119.    Also, during the meeting, Root's internal auditors asked about the work that had been delayed on SOW #2 and asked how much of Root's funds, previously paid to Quantasy, LLC were uncommitted and, therefore, returnable to Root. The answer was unclear to Quantasy, LLC at the time because much of the funds paid by Root had been designated for paid media according to Root's prior instruction or transferred to Collateral Damage at CMO Silver's instruction. At the time, Root never informed Quantasy, LLC that its CMO was acting without authority, or that Root had any concerns about its CMO's activities.

120.    In light of the nature of the meeting, Root's repeated requests for refunds of money, and the fact that the pause on its performance of SOW #2 had not been lifted, Quantasy, LLC grew concerned about Root's intention to move forward under SOW #2 at all, and, therefore, contacted CMO Silver for assurances.

121.    On August 23, 2024, CMO Silver informed Campbell of Root's internal disagreement regarding the approval of marketing spend but assured him that, as long as Quantasy, LLC could "hold the line" by staying prepared to furnish the planned advertising services under SOW #2, Root had approved the expenditure of funds necessary to satisfy its payment obligations

to Quantasy, LLC.  This statement was fraudulent.  At the time of the statement, CMO Silver knew that Root had not approved the expenditure of funds necessary to satisfy Root's payments obligations under SOW #2.  In addition, upon information and belief, the statement was made by CMO Silver with the intent to induce Quantasy, LLC to continue furnishing advertising services to Root, all in perpetration of the fraud.  Quantasy, LLC relied on the statements made by CMO Silver because in his position as CMO, he was in a position to know and understand Root's advertising and marketing strategies and spending.

122.    That same day, via email, CMO Silver further instructed Quantasy, LLC, among other things, that ***Root*** would determine how much of the funds paid to Collateral Damage were uncommitted and available to be returned or shifted to paid media:

| From: | Hello BC <hello@bc-silver.com> |
| To: | Will Campbell <will@quantasy.com> |
| Sent: | 8/23/2022 2:50:18 PM |
| Subject: | Fwd: Strategy shift to 2023 |

Hello Will,

This is to confirm that I have sent instructions to Collateral Damage, the sports marketing agency we directed Quantasy to work with, to implement a shift in the currently existing and uncommitted funds that had originally been allocated to be spent on a range of advertising and marketing related activities, programs and materials from athlete partnerships, sports influencers, teams and venue partnerships, and the related strategy and implementation support, is to be shifted to paid media arrangements to be approved by Root in the future. This shift is to be made such that the paid media will tentatively be set to run in 1st Quarter 2023. See below the instructions to Collateral Damage. Please confirm with Collateral Damage to follow Root's instructions.

With respect to the and/all dollars currently being held by Quantasy. Please be advised that these funds should be shifted to paid media arrangements to be approved by Root in the future, which shift will tentatively be for media to be run in 1st Quarter 2023. This is consistent with the change request form.

With respect to any/all paid to Collateral that had been allocated to be spent on a range of advertising and marketing related activities, programs and materials from athlete partnerships, sports influencers, teams and venue partnerships, and the related strategy and implementation support, since Root has directed the relationship with Collateral, Root will determine how much of this sum is currently uncommitted and available to be shifted to paid media as outlined above.

Regards,
BC

123.    The statements in the email were fraudulent.  At the time of the statement, CMO Silver knew that Root had not approved the expenditure of funds necessary to satisfy Root's payments obligations under SOW #2.  In addition, the statement was made by CMO Silver with the intent to induce Quantasy, LLC to continue furnishing advertising services to Root and not to inquire as to his previous misrepresentations, all in perpetuation of the fraud.

124.    At or around this same time, on August 20, 2022, Quantasy, LLC and Collateral Damage executed a Subcontractor Agreement with an effective date of February 2, 2022. Campbell signed the Subcontractor Agreement on behalf of Quantasy, LLC and Paige Lynette signed the Subcontractor Agreement on behalf of Collateral Damage.  Quantasy, LLC and Campbell believed that Lynette was an employee of Collateral Damage and authorized to sign the subcontractor agreement.  The subcontractor agreement included a conflicts of interest provision, pursuant to which Collateral Damage represented that "it has not taken, is currently taking, or will take in action in furtherance of an offer, payment, gift, or anything else of value, directly or indirectly, to any person or third party, while knowing that all or some portion of the money or value will be offered, given, or promised to anyone to improperly obtain an improper advantage or reward favorable treatment in its own operations or business relationships."  This representation was false at the time it was made and was known to be false at the time it was made.  Quantasy, LLC would not have entered into the subcontractor agreement with Collateral Damage without such a representation, and the false statement was deliberately intended to induce Quantasy, LLC into signing the agreement.

125.    On September 29, 2022, Quantasy, LLC executed an Assignment that assigned the Subcontract Agreement to "Root Insurance Agency, Inc."  Campbell signed the Assignment on behalf of Quantasy, LLC, and Silver signed the Assignment on behalf of Root Insurance Agency,

LLC. Pursuant to the assignment, "Assignor [Quantasy, LLC] shall have no, and be released from any, further obligations, commitments, liabilities or benefits with respect to the terms and subject matter of the Assigned Agreement."

126. The Assignment further released Quantasy, LLC, and its employees, directors and officers "from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, obligations, costs, expenses, covenants, contracts, agreements, promises, claims and demands of every kind and nature, known or unknown, foreseen or unforeseen, at law or in equity which Assignee has or may have against Assignor and its employees, directors and officers, arising out of or related to the Assigned Agreement, or the services, materials, payments or subject matter referenced therein."

127. CMO Silver had actual and/or apparent authority to execute the Assignment on behalf of Root. CMO Silver, at the time the Assignment was executed, was employed by Root and acting as CMO, despite the internal investigation that was apparently occurring at Root. Quantasy, LLC was not told at this time, or any other time, that CMO Silver was not authorized to sign agreements on behalf of Root.

128. Thereafter, on or about October 4, 2022, Root issued a change request to its scope of work agreement with Collateral Damage. The scope of work agreement provides that "[Root is] shifting 2022 H2 Marketing plans to January 2023. All remaining budgets will be leveraged next year." The revised contracted amount remained at $9.1 million. CMO Silver provided a copy of this change order to Quantasy, LLC.

*Root's Deficient Controls Permitted CMO Silver To Perpetuate The Fraud.*

129. On February 22, 2023, Root filed its annual 10-K wherein it admitted that it "identified and disclosed control deficiencies as of December 31, 2022 that constituted a material

weakness." Specifically, Root stated that it "determined that there were control deficiencies within monitoring controls and the control environment, including the circumvention of control activities that aggregated to a material weakness."

130. Root went on to define "material weakness" as "a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis."

131. Moreover, Root stated that it:

determined that there were control deficiencies related to monitoring and the control environment, including the circumvention of control activities, that contributed to the suspected fraud perpetrated by a former senior marketing employee, and aggregated to a material weakness. Specifically, the material weakness relates to inadequate hiring practices for employees in senior leadership positions whose roles and responsibilities include the initiation of transactions with third parties; and ineffective control and monitoring activities, including the circumvention of certain control activities, related to the review, authorization and approval of third-party vendors, and associated contracts for services, and approval of third-party vendor payments.

132. The "former senior marketing employee" to which Root referred is CMO Silver.

133. Most importantly, Root unequivocally admits that its hiring and supervising of CMO Silver amounted to a "material weakness" which, in Root's own words, "related to the review, authorization and approval of third-party vendors . . . and approval of third-party vendor payments"; namely, Collateral Damage and the payments to Collateral Damage. At or around this time, Root's Chief Financial Officer was also terminated for cause.

134. Had Root adequately supervised CMO Silver, Quantasy, LLC would not have been defrauded.

## COUNT I: FRAUD
## AGAINST SILVER AND ROOT, INC.
### (Under California Law)

135.     Quantasy, LLC repeats and realleges each and every allegation contained in paragraphs numbered "1" through "134" as if as if fully set forth herein.

136.     Root, through its Chief Marketing Officer, an authorized employee, agent, and/or representative, made misrepresentations to Quantasy, LLC including, but not limited to:

(a)      That Root authorized an approximately a $14,700,000 budget to implement advertising, marketing and promotional campaigns;

(b)      That Collateral Damage was a sports marketing agency;

(c)      That Collateral Damage was planning on performing the work detailed on each of the invoices sent from Collateral Damage to Quantasy, LLC;

(d)      The amount of funds requested on Collateral Damage invoices numbers 12012021, 12022021, 0301202, 04012021, and 04152021;

(e)      Requiring Quantasy, LLC to pay $384,445 of the SOW #1 amount to Collateral Damage for sports marketing campaigns and initiatives purportedly performed by Collateral Damage pursuant to a subcontractor relationship;

(f)      Failing to inform Quantasy, LLC that Lauren Lanskie was no longer an employee of Collateral Damage and that CMO Silver was impersonating Lanskie as an employee of Collateral Damage to maintain the illusion that Collateral Damage was a legitimate company, and to induce Quantasy, LLC to transfer funds to Collateral Damage in perpetuation of the fraud;

(g)      Representing that CMO Silver had been "completely removed from any previous ownership of CD";

(h)     Representing that CMO Silver did not need anyone else's authorization to issue statements of work to any vendor of his choosing, that he had full authority to act on behalf of Root, and that everything CMO Silver and Collateral Damage had done had been proper;

(i)     Representing that Root had approved of the subcontracting relationship with and payments to Collateral Damage;

(j)     Representing that Lauren Lanskie, Eli Hiller, Paige McDaniel, and Cyntoria Williams were employees of Collateral Damage when in fact they were fictitious or used otherwise used by CMO Silver to perpetrate the fraud;

(k)     Representing that Collateral Damage would "implement a sports marketing program integrating athletes and sports organizations . . . for Root Insurance in support of national awareness with an additional regional two-state focus in Colorado and Oklahoma";

(l)     Representing that although Root disagreed internally regarding the approval of marketing spend, as long as Quantasy, LLC could "hold the line" by staying prepared to furnish the planned advertising services under SOW #2, Root had approved the expenditure of funds necessary to satisfy its payment obligations to Quantasy, LLC; and

(m)     Representing that Root had approved the expenditure of funds necessary to satisfy Root's payments obligations to Quantasy, LLC under SOW #2.

137.    CMO Silver's misrepresentations were material and Quantasy, LLC would not have sent any money to Collateral Damage but for his misrepresentations. Quantasy, LLC also would not have authorized the subcontracting of Root's sports marketing plan to Collateral

Damage without the Chief Marketing Officer's confirmation that Collateral Damage was a legitimate entity authorized to execute Root's sports marketing plan.

138.    CMO Silver knew his misrepresentations were false, and he had knowledge of their falsity.  Despite his representations, CMO Silver was aware that Collateral Damage was a conduit for CMO Silver to funnel payments directly to himself.

139.    CMO Silver intended for Quantasy, LLC to rely on his false statements.

140.    Quantasy, LLC was justified in relying on CMO Silver's misrepresentations as they were confirmed by CMO Silver and Root, and Quantasy, LLC had no knowledge that Collateral Damage was apparently an entity created by CMO Silver to be used for his own benefit and that the information regarding Collateral Damage provided by CMO Silver was false information.

141.    Root enabled CMO Silver's fraud by appointing him as its Chief Marketing Officer. Quantasy, LLC relied on CMO Silver's position and authority as Root's Chief Marketing Officer when following CMO Silver's instructions and in relying on false statements that CMO Silver made regarding Collateral Damage, its work, and the advertising and marketing spend authorized by Root.  Root placed CMO Silver in a position of authority that allowed CMO Silver, while apparently acting within his authority as Root's Chief Marketing Officer, to commit a fraud on Quantasy, LLC.  CMO Silver's position as Root's CMO facilitated the consummation of the fraud, and absent that position, CMO Silver could not have defrauded Quantasy, LLC.

142.    If Quantasy, LLC had been aware of Collateral Damage's true ownership and purpose, Quantasy, LLC would not have entered into SOW #1 and SOW #2 with Root.

143.    Defendants' conduct was outrageous in that they acted with an evil motive and with reckless disregard to the rights of Quantasy, LLC.

144.     As a direct and proximate result of Root's fraud, Quantasy, LLC has suffered damages in amount to be determined at trial.

### COUNT II: NEGLIGENT SUPERVISION
### AGAINST ROOT, INC.
**(Under California Law)**

145.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "144" as if as if fully set forth herein.

146.     CMO Silver was the Chief Marketing Officer of Root.

147.     Root knew or should have known that CMO Silver was or may have been unfit or incompetent to properly carry out his job duties, and Root failed to adequately supervise his actions.

148.     Root negligently managed, supervised, and retained Silver, as to the performance of his job duties, including the formation of agreements with vendors, the issuance of invoices, the distribution of funds, and communications with vendors including Quantasy, LLC and Campbell.

149.     CMO Silver was unfit or incompetent in his job duties as CMO because CMO Silver was embezzling money from Root.

150.     Root knew or should have known that its CMO was in a position to make "material misstatements", and did, in fact, make such "material misstatements" that led to Quantasy, LLC experiencing significant harm and damages.

151.     Root failed to implement proper controls that, had they been implemented, would have detected Silver's fraud and prevented the damages to Quantasy, LLC.

152.     Specifically, CMO Silver's embezzlement of money and use of Collateral Damage as a conduit for the embezzlement of money has created a significant risk to Quantasy, LLC's business.

153. As a result of the negligent supervision by Root of CMO Silver, CMO Silver was enabled to take the actions described above including, among other actions:

(a) directing Quantasy, LLC to enter into a subcontractor agreement with Collateral Damage that directed the transfer of millions of dollars from Quantasy, LLC to Collateral Damage;

(b) furnishing Quantasy, LLC with alleged instructions from Root regarding SOW # 1 and SOW #2;

(c) issuing invoices to Quantasy, LLC from Collateral Damage, which enabled CMO Silver to receive millions of dollars in ill-gotten gains; and

(d) assuring Quantasy, LLC and Campbell, on multiple occasions, that Root approved of Quantasy, LLC and CMO Silver's business relationship with Collateral Damage, that the purported invoices issued by Collateral Damage were proper, authentic, and authorized, and that the actions taken by CMO Silver and Collateral Damage were completely valid.

154. As a direct and proximate result of Root's negligent supervision of CMO Silver, Quantasy, LLC have suffered damages in an amount to be determined at trial.

## COUNT III: FRAUDULENT CONCEALMENT
### AGAINST SILVER AND ROOT, INC.
### (Under California Law)

155. Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "154" as if as if fully set forth herein.

156. CMO Silver made representations to Quantasy, LLC regarding Collateral Damage and its performance of work on behalf of Root. CMO Silver, however, failed to disclose that he controlled and/or owned Collateral Damage, and that he intended to use Collateral Damage as a conduit to convert the money paid by Quantasy, LLC to Collateral Damage for CMO Silver's own

benefit. CMO Silver actively concealed the true nature of Collateral Damage from Quantasy, LLC by, among other things, sending emails that were purportedly written by employees of Collateral Damage, but were in fact prepared and sent by CMO Silver himself and arranging meetings with persons who represented themselves as Collateral Damage employees but, in fact, were not employees of Collateral Damage. Only CMO Silver knew that he intended to use Collateral Damage as a conduit through which he would convert millions of dollars, and Quantasy, LLC could not have reasonably discovered the true facts.

157.    Quantasy, LLC did not know that CMO Silver intended to use Collateral Damage as a conduit through which he would convert money that was intended to be used for Root's marketing and advertising plans.

158.    CMO Silver intended to deceive Quantasy, LLC by concealing the true nature of Collateral Damage.

159.    Had Quantasy, LLC known of the CMO's Silver intentions and the true nature of Collateral Damage, it would not have sent any money to Collateral Damage, or otherwise conducted business with Collateral Damage, and doing so caused harm to Quantasy, LLC.

160.    Root enabled and facilitated CMO Silver's fraud by appointing him as its Chief Marketing Officer. CMO Silver's position as Root CMO enabled him to carry out the fraud, as his authority and role as CMO gave Quantasy, LLC no reason to question the bona fide nature of Collateral Damage or that CMO Silver may be concealing material facts about his intentions to steal money or the true nature of Collateral Damage. Absent CMO Silver's position at Root, he could not have defrauded Quantasy, LLC.

## COUNT IV: EXPRESS CONTRACTUAL INDEMNITY
### AGAINST RIA
### (Under California Law)

161.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs numbered "1" through "160" as if as if fully set forth herein.

162.    SOW #1 and SOW #2 are written contracts between Quantasy, LLC and RIA that govern any disputes between the parties.

163.    Pursuant to the indemnification provisions in SOW #1 and SOW #2, RIA is required to indemnify and hold Quantasy, LLC harmless for any liability, loss, damage, cost, or expense, including attorneys' fees, arising out CMO Silver's directions to Quantasy, LLC.

164.    Specifically, Section 4(B) and Section 3(B) of SOW #1 and SOW #2, respectively, state, in pertinent part, that:

> [RIA] agree[s] to indemnify, defend and hold harmless, [Quantasy, LLC] and [its] parent and affiliated companies, and [Quantasy, LLC's] and their employees, officers, directors, shareholders, licensees, assigns, and agents against any loss, cost, liability and expense (including reasonable attorneys' fees and costs) we or such other party may incur as the result of any claim, suit or proceeding made or brought against [Quantasy, LLC] or any of the indemnified parties … (iii) based upon any material or information supplied by [RIA] to [Quantasy, LLC]…

165.    The indemnification clause is not limited to claims brought by third parties and is broadly written to cover any claim, suit, or proceeding.

166.    Quantasy, LLC has performed all the conditions, covenants, promises, and agreements required of it to invoke the indemnity provisions under the terms of SOW #1 and SOW #2.

167.    As a result of Root's lawsuit against, among others, Quantasy, LLC, Quantasy, LLC has been forced to incur hundreds of thousands of dollars of legal fees.

168.    Root's lawsuit against Quantasy, LLC is solely based on information provided by RIA and/or its agent, CMO Silver, to Quantasy, LLC related to the use of Collateral Damage, a subcontractor for sports marketing and promotional services.  Specifically, CMO Silver represented to Quantasy, LLC that Collateral Damage was a legitimate sports marketing agency and that it would perform work on behalf of Root at CMO Silver's direction.  Further, CMO Silver provided the banking information to which Quantasy, LLC wired money at CMO Silver's direction.  Had CMO Silver not provided the information and direction to subcontract with Collateral Damage, Root would have never brought its suit against Quantasy, LLC.

169.    As a direct and proximate result of RIA's and/or its agent's supply of information to Quantasy, LLC that led to Root's underlying lawsuit, Quantasy, LLC has suffered damages in an amount to be determined at trial.

## REQUESTED RELIEF

WHEREFORE, Quantasy, LLC respectfully requests that judgment be entered in its favor and against Root and CMO Silver.

A.    Compensatory damages, jointly and severally from all Defendants;

B.    Punitive damages jointly and severally from all Defendants;

C.    Awarding pre- and post-judgment interest;

D.    Attorneys' fees and costs;

E.    Granting such other and further relief as the Court deems just and proper.

Dated: January 31, 2024                  Respectfully submitted,


By:   /s/ Matthew D. Ridings
Matthew D. Ridings, Trial Attorney (0079402)
THOMPSON HINE LLP
127 Public Square
3900 Key Center
Cleveland, Ohio 44114
Telephone:  216.566.5561
Facsimile:  216.566.5800
Matt.Ridings@ThompsonHine.com

Joan E. Meyer
(Admitted *Pro Hac Vice*)
THOMPSON HINE LLP
1919 M Street, N.W.
Suite 700
Washington, D.C.  20036-3537
Telephone:  202.263.4115
Facsimile:  202.331.8330
Joan.Meyer@ThompsonHine.com

Jamar T. King (0091093)
THOMPSON HINE LLP
10050 Innovation Drive, Suite 400
Miamisburg, OH 45342
Telephone:  937.443.6852
Facsimile:  937.443.6635
Jamar.King@ThompsonHine.com

Karim Sabbidine
(Admitted *Pro Hac Vice*)
THOMPSON HINE LLP
335 Madison Avenue
12th Floor
New York, NY  10017
Telephone:  212.908.3944
Facsimile:  212.344.6101
Karim.Sabbidine@ThompsonHine.com

Joshua H. Epstein
(Admitted *Pro Hac Vice*)
Eva M. Jimenez
(Admitted *Pro Hac Vice*)

DAVIS+GILBERT LLP
1675 Broadway
New York, NY  10019
Telephone:  212.468.4869
jepstein@dglaw.com
ejimenez@dglaw.com

*Attorneys for Quantasy & Associates, LLC,
Quantasy, LLC, and William Campbell*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2024, a true and accurate copy of the foregoing was filed electronically. Notice of this filing has been sent to all represented parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

A copy was also sent by ordinary U.S. Mail, postage prepaid, on January 31, 2024 to the following non-represented parties:

Brinson Caleb Silver
Butler County Jail
Attn: Brinson Caleb Silver, Inmate No. 303850
705 Hanover Street
Hamilton, Ohio 45011

Collateral Damage, LLC
45 South Arroyo Parkway
Pasadena, CA 91105

Eclipse Home Design, LLC
651 N. Broad Street
Suite 201
Middletown, Delaware 19709

/s/ Matthew D. Ridings
Matthew D. Ridings