# EXHIBIT 2

# SCOPE OF WORK AGREEMENT

This Statement of Work Agreement ("Agreement"), effective as of February 1, 2022 (the "Effective Date"), is entered into between Quantasy, LLC, a Limited Liability Company located at 312 S. Alameda Street, Suite 102A, Los Angeles, California and any of its affiliates that issue SOWs (collectively, "Quantasy," "Agency") and_____Root Insurance Agency, LLC.___, located at ____80 E RICH ST. COLUMBUS, OH 43215_____("Client"). Agency and Client are each a "Party" and collectively the "Parties"

## 1. Engagement
Client hereby engages Agency and Agency hereby accepts engagement to provide strategy, branding, media and/or production services and materials in the United States as outlined herein ("Services")

## 2. Term
The term of this Agreement shall be for the duration of the project as outlined below, effective upon the earlier of the execution of this Agreement or commencement of work by the Agency.

## 3. Program Contact.
The Parties designate the following persons as their respective program contacts (each, a "Program Contact") to manage the performance of Services and delivery of Deliverables set forth in this Agreement:

| Quantasy Contact | Client Contact |
| --- | --- |
| Name: Will Campbell | Name: BC Silver |
| Tel: 626.644.1525 | Tel: (415) 919-9131 |
| Email: will@quantasy.com | Email: bc.silver@joinroot.com |

## 4. Description of Services.
The parties agree that the services and materials to be provided shall include those specified below and Client agrees to provide the necessary information and approvals on a timely basis to complete the Services.

| | | | |
| --- | --- | --- | --- |
| 1. | Client Partnerships | **Client Services** | a. Thought leadership and liaison with clients to understand the challenges and opportunity gaps.<br>b. Leading and executing project briefs, timelines, production efficiencies and accounting procedures.<br>c. Manage projects through completion, including the preparation of work orders, supervision of timelines, and budgets.<br>d. Assure timely delivery of materials for approval on each step of execution.<br>e. Organize and participate in status meetings, as needed.<br>f. Provide post-meeting summaries/conference reports/emails as needed |

| | | | |
|---|---|---|---|
| | | | g. Obtain all approvals for creative |
| 2. | Brand Strategy | Building | a. **Brand Story:** Defining how we tell the core story of Root to new and existing users in a differentiating way<br>b. **Style Guide:** creative development and alignment which enables disruption in Insurance Category. |
| | | Management | a. **360 Campaign/GTM Strategy:** Create GTM Strategic plan to roll out the brand story across 360 channels, with key market roll out plan and within key interest categories (i.e. lifestyle, gaming, entertainment, tech etc) |
| | | Influencer /Endorsement | a. Define Influencer, Celebrity Endorsement and Sport Marketing Strategy. Lead contact and partnership negotiations. |
| 3. | Creative Services / Development Support | Web | a. **CRO:** Supporting CRO efforts from strategy to creative development to webdev and deployment in Optimizely<br>b. **Content Strategy:** Creating a comprehensive web content strategy including audience needs definition, content themes and Information Architecture<br>c. **Design + Copy:** Designing and writing an all-new web experience based on the content strategy and new brand strategy |
| | | Social | a. **New Channel Expansion:** Lead channel strategy optimization, and Creative Asset reformatting/sizing for each channel<br>b. **B2C Post Concepting:** Supporting in-house social team with post concepting based on new brand strategy<br>c. **B2B Post Creation:** Creating banks of social posts based on new brand strategy and concepting |
| | | Copy | a. **B2B Thought Leadership:** Creating a thought leadership platform for Root that advances the reputation of the brand and key leaders<br>b. **PR Support:** Support with press release writing as needed |
| | | Product | a. **Content Personalization Strategy:** Creating a personalization strategy for marketing content with the Root app |

4. **Agency Staffing Plan/Third-Party Services.**
   a. Agency will provide internal team resources in performing the Services
   b. Client acknowledges that Agency may subcontract third parties in Agency's discretion to perform certain Services (including without limitation physical production services, talent procurement, consulting and media services) to be provided pursuant to this Agreement. Agency shall be responsible for overseeing and delivering the complete performance of all Services provided by its subcontractors and agents in accordance with the terms and conditions hereof.

**5. Project Budget and Payment Schedule.**

|   | Creative Production Costs |   |
|---|---|---|
| 1. | Video Talent Procurement and Management | $2,500,000 |
| 2. | Video Production Services and Management | $1,500,000 |
| 3. | Athlete Driver Content Series | $1,700,000 |
| 4. | Best Driver in America National Program Development | $1,200,000 |
|   | **Production Total** | **$6,900,000** |

|   | Media Activation and Distribution Costs |   |
|---|---|---|
| 5. | Media Activation (i.e. Bleacher Report/HoH) | $2,000,000 |
| 6. | Stream Team Activation and Athlete Endorsements (6-10 athletes) | $2,500,000 |
| 7. | E-Sports Activation | $1,000,000 |
| 8. | Driver Appreciation Program | $1,300,000 |
| 9. | In-Market Gas Station Takeover Activation | $1,000,000 |
|   | **Media Total** | **$7,800,000** |

In consideration for the Services, Client will pay to Agency the total project cost of **$14,900,000.00** (the **"Fee"**) due and payable as outlined below: Agency will follow Client's billing and invoicing procedures.

| Payment #1 | Payment representing the first 50% of the total Production project costs to be paid April 1, 2022 | $3,450,000 |
|---|---|---|
| Payment #2 | Payment representing the first 50% of the total Media project costs to be paid April 1, 2022 | $3,900,000 |
| Payment #3 | Payment representing the second 50% of the total Production project costs to be paid April 15, 2022 | $3,450,000 |
| Payment #4 | Payment representing the second 50% of the total Media project costs to be paid April 15, 2022 | $3,900,000 |

### 6. Additional Fees, Overages and Expenses.

At times, the Agency's work within this SOW may have additional expense and/or budget requirements outside of the aforementioned fees. Before making any expenditure in connection with the providing of deliverables or services as outlined herein, for or on your behalf, we will obtain your approval thereof. If possible, approvals will be in writing, but approvals can be oral with written confirmation (such as, conference reports) to follow. Approvals can also include your approval of previously submitted plans or roadmaps. Some costs may include, but not be limited to:

a. Changes and fee adjustments: In the event that Client requests additional changes to the aforementioned deliverables that would extend the Agency's agreed services, Agency will provide to Client for approval a change request including an estimate for the additional cost.
b. Costs and expenses may include but are not limited to the following
    i. Expanded research, surveys, focus groups or similar
    ii. Licenses for stock photography, stock video and music
    iii. Additional influencer and talent costs
    iv. Additional production services
    v. Travel and accommodations
    vi. Backups and hard drives
    vii. Postage and shipping

### 7. Additional Terms and Services

The Parties agree that this Agreement is subject to the Additional Terms and Services outlined below.

This Scope of Work Agreement is hereby executed below and effective as of the date first written above.

**Root Insurance**

By: *[signature]*
16F02303FFBC402...
Name: BC Silver
Title: CMO
Date: 4/1/2022

**Quantasy, LLC**

By: *Will Campbell*
ECCDE668A1104CA...
Name: Will Campbell
Title: CEO
Date: 4/2/2022

## ADDITIONAL TERMS AND CONDITIONS

1. **BILLING PRACTICE**
(a) The invoices for such fees and compensation will be due and payable as follows: Initial deposits will be due and payable upon commencement of work, final payments will be due and payable prior to final delivery and all other invoices will be due and payable thirty (30) days from the invoice date unless otherwise agreed to in writing by Client and Agency.

(b) We will bill for any third party services and materials that are part of or needed for our provision of services and materials as outlined herein. The billing for any such third party services and materials will be based on estimates to be approved as provided above. Third party services and materials, including, but not limited to, production services, talent, music, photography, art, and design, shall be billed to you and must be paid prior to final contracting for such services and materials, unless otherwise specifically agreed to in writing between the parties.

(c) You agree to pay us the lesser of one percent (1%) per month or the highest rate permitted by law as interest on all amounts that are overdue, except for such amounts that are the subject of a good faith dispute where you are acting reasonably and in effort to promptly resolve the good faith dispute. In the event any invoices are or become overdue, all subsequent payments may, at our option, first be applied by us toward those sums which are past due for the longest period of time until such time as all payments (and the interest thereon, if any) are up to date.

(d) You will be responsible for all applicable taxes, if any, including any sales, use, excise, value added and gross receipts taxes (excluding any taxes based on our income), import duties and fees and charges of any kind levied or imposed by governmental entities for materials or services as provided herein. You agree to pay or reimburse our payments of such taxes, fees and charges

(e) In addition, you agree that we will not be responsible for financing your digital, event, production, advertising and marketing activities and materials. As such, we must receive the corresponding funds from you prior to our making expenditures and commitments on your behalf.

2. **ACCESS**
All contracts, copy, files, records, accounts and other documents and materials in our possession or under our control that directly pertain to you will be open to examination on a confidential basis by credible, qualified independent auditors, agreeable to both you and us, at any time upon reasonable prior written notice during our regular business hours, subject to such auditors executing an appropriate confidentiality agreement. Any such audit or examination shall at no time involve the review of any of our employee's personnel records or salary histories, or any of our other proprietary or confidential materials of information or that of our other clients.

3. **OWNERSHIP AND CUSTODY OF MATERIAL**
(a) You will own all of your proprietary information and materials that you provide for us to use in the services and materials we provide to you. Since we are acting as your agent, all materials prepared for you or purchased for your account hereunder will, upon full payment by you of all sums due us, be your property exclusively, subject to such disclosed third party rights, limitations and ownership, and further subject to the terms of subparagraph (b) below.

(b) The services and materials that we provide to you will or may include programming code or other of our intellectual property that has otherwise been previously developed by us or is outside the scope of the applicable Scope of Work ("Quantasy Code and IP"). We expressly retain full ownership rights to the Quantasy Code and IP, including, but not limited to, all associated rights to use the Quantasy Code and IP; provided, however, we agree that you shall have a perpetual, non-exclusive right to use the Quantasy Code and IP, subject to the terms of the Agreement.

(c) We will take reasonable precautions to safeguard your property entrusted to our custody or control; provided, however, in the absence of gross negligence or willful act on our part, we are not to be held responsible for any loss, damage, destruction or unauthorized use of such property.

4. **RESPONSIBILITIES REGARDING CLAIMS**
(a) In the event that you acquire valid claims, arising out of any of our activities for or on your behalf hereunder, against any third party, we will (unless you otherwise direct) endeavor to collect, adjust or settle the claims, but you will pay our net cost for any legal services and other expenses that may be required in connection therewith. No lawsuit on any such claim will be instituted without your prior approval, nor will any such claim be adjusted or settled without your written consent.

(b) You will indemnify, defend and hold harmless, us and our parent and affiliated companies, and our and their employees, officers, directors, shareholders, licensees, assigns, and agents against any loss, cost, liability and expense (including reasonable attorneys' fees and costs) we or such other party may incur as the result of any claim, suit or proceeding made or brought against us or any of the indemnified parties (i) based upon any advertising or materials that we create or produce for you and which you approve before its publication, distribution, broadcast or use, regardless of the date of publication, broadcast, distribution or use, (ii) based upon any consumer's use or purchase of or injury from any of your products or services, (iii) based upon any materials or information supplied by you to us, (iv) based upon your breach of any provision of this Agreement, or (v) based upon the use of any materials by you or your designees in a manner inconsistent or in violation of the disclosed limitations on use or ownership.

(c) We agree to indemnify, defend and hold you, your parent company, subsidiaries, affiliates, and their officers, directors, employees, shareholders, licensees, agents and assigns, harmless from and against any loss, cost, liability or expense (including reasonable attorneys' fees and costs) resulting from any claim, suit or proceeding made or brought against you or any of the indemnified parties, for (i) violation of the rights of privacy or publicity, copyright, trademark (excluding client-supplied trademarks), libel, slander, defamation or plagiarism, arising from advertising materials created and produced by us, which materials are used by you in the United States without modification, or (ii) our breach of any provision of this Agreement; provided, however, this indemnity shall not apply to any matter where your indemnity of us, as outlined in subparagraph (b) above, would apply.

(d) At any time before the completion of any work on any project, you will be entitled to direct that the work on such project be discontinued. Thereupon, we will endeavor to see that the work is promptly stopped; provided, however, you agree to assume our liability for all authorized commitments, to pay any and all of our proper charges and expenses incurred in connection with such work up to the time of its discontinuance, and any and all charges and expenses imposed on us as a result of cancellation of such commitments.

5. **USE**
The parties acknowledge that the materials created by us for you can be used by you in the manner, in the media, in the territory and for the time period as has been mutually agreed to by the parties, which shall be subject to third party rights and limitations as have been disclosed by us to you.

6. **RESERVATION AS TO AGENCY'S DUTIES**
Nothing herein contained shall be deemed to require that we undertake any campaign, prepare any material or provide any services, or cause the production or use of any materials which, in our judgment, would be misleading, indecent, libelous, unlawful, or otherwise prejudicial to our interests.

QUANTASY00000750

7. **EMPLOYMENT OF TALENT**
You agree that various union and guild agreements relating to the use of talent and music in advertising may apply, and if applicable, you agree to abide by the terms of these agreements and to pay all applicable fees and costs. If this Agreement is terminated for any reason, then any contract that we have entered into with talent, shall, simultaneously on the effective date of such termination, be automatically assigned to you. You shall assume all of the rights and obligations under said contracts arising thereafter and we shall be relieved of any further responsibility or liability with respect thereto. You shall indemnify, defend and hold us harmless from and against any loss, cost, liability or damage (including reasonable attorneys' fees and costs) resulting from any claim, suit or proceeding (threatened or otherwise) made or brought against us (i) based upon a claim arising after the assignment of said talent contract, or (ii) for use of any of the commercials produced by us, which use is by a third party, when such claim, suit or proceeding arises out of our obligations under the any union codes or contracts, if applicable. Notwithstanding the foregoing, you shall have the right to sign any contract entered into with talent as a principal.

8. **EFFECTIVE DATE AND TERMINATION**
(a) (i) This Agreement shall take effect as of the date first written above and shall continue thereafter until this Agreement is terminated in accord with the provisions as outlined herein.

(b) Upon the termination of this Agreement and payment of all sums due us as provided herein, we shall transfer, assign and make available to you, or your representative, all of your property and materials in our possession or control. We also agree to give all reasonable cooperation toward transferring, with the approval of third parties in interest, all reservations, contracts and arrangements with third parties for services, materials and/or rights yet to be used, and all rights and claims thereto and therein, upon being duly released from the obligations thereof. On the effective termination date of this Agreement, ideas or materials created by us and rejected by you or unused by you as of the date of termination of this Agreement shall remain our property.

(c) In the event you fail to make any payment due to us for thirty (30) days or more past the due date for such payment under this Agreement, we shall have the right to notify you in writing, and if such payment is not made within five (5) days following your receipt of such notice, we shall have the right to (i) suspend all future performance of our obligations under this Agreement, without limiting any of your obligations to us, until such time as you have made all such payments, or (ii) immediately terminate this Agreement, and all right, title and interest in any and all materials created and produced hereunder, including, without limitation all copyrights in all works of authorship, shall automatically revert to us for all uses and purposes whatsoever throughout the world in perpetuity. Our exercise or failure to exercise any of the foregoing rights will not be deemed a waiver or release of any other rights or remedies we may have at law or in equity.

9. **NON-SOLICITATION**
You agree that during the term of this Agreement and for a period of two (2) years thereafter, you shall not solicit for employment any of our employees without our prior written consent.

10. **NON-DISPARAGEMENT**
Client agrees that it will not, at any time, make, or cause to be made, any statement or communicate any information (whether oral or written) that disparages or reflects negatively on the Agency or its business, products, services or employees; provided, however, that this paragraph shall not prohibit Client from making any truthful statements that are required by applicable law or valid legal process, or that are protected by applicable law.

11. **DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITY**
EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE SERVICES AND MATERIALS ARE PROVIDED ON AN "AS IS" BASIS, AND THE PARTIES HEREBY SPECIFICALLY DISCLAIM ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE SERVICES, INCLUDING IMPLIED WARRANTIES ARISING FROM A COURSE OF DEALING OR COURSE OF PERFORMANCE, OR ANY IMPLIED WARRANTY OF MERCHANTABILITY OR NON-INFRINGEMENT OR WARRANTY THAT ANY SERVICE OR MATERIALS (I) IS OR WILL BE FIT FOR A PARTICULAR PURPOSE, (II) WILL CONTINUE TO OPERATE OR BE OFFERED IN CURRENT FORM, (III) WILL BE ACCESSIBLE OR OPERATIONAL WITHOUT INTERRUPTION, (IV) WILL MEET YOUR REQUIREMENTS OR EXPECTATIONS EXCEPT AS OTHERWISE SPECIFICALLY EXPRESSED IN WRITING, OR (V) WILL BE FREE FROM ERRORS, DEFECTS OR DESIGN FLAWS, EXCEPT AS OTHERWISE SPECIFICALLY EXPRESSED IN WRITING, AGENCY WILL NOT BE LIABLE TO CLIENT OR ANY THIRD PARTY FOR ANY ULTIMATE USE OF THE SERVICES OR MATERIALS OR THE OUTCOME OF ANY DECISION MADE BASED UPON THE SERVICES OR MATERIALS. WE SHALL HAVE NO LIABILITY TO YOU ARISING FROM OR RELATING TO ANY THIRD PARTY HARDWARE, SOFTWARE, TECHNOLOGY, MATERIALS OR SERVICES USED IN CONNECTION WITH THIS AGREEMENT

UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM ANY PROVISION OF THIS AGREEMENT, SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFIT OR LOST BUSINESS, COSTS OF DELAY OF FAILURE, OR LIABILITIES TO THIRD PARTIES ARISING FROM ANY SOURCE.

12. **FORCE MAJEURE**
Each party will be excused from the performance of its obligations under this Agreement if such performance is prevented by circumstances beyond such party's reasonable control, including but not limited to, Acts of God, government decree or executive order, terrorist attacks, Internet or computer related viruses, hacker attacks, malicious acts of a third party or other agents introduced by a third party, or any failure of the Internet, and/or other unavailability of required resources or labor strikes. The parties will resume performance as soon as possible after cessation of the force majeure event provided it is commercially practicable to do so.

13. **MISCELLANEOUS**
This Agreement shall not be assignable by either party hereto without the written consent of the other. This Agreement shall be governed and construed in accordance with the laws of the State of California for contracts made and to be performed entirely therein, without reference to conflict of law principles. This Agreement constitutes the entire agreement between you and us relating to the subject matter hereof, and no representation, promise or inducement not included herein shall be binding upon either party hereto. This Agreement cannot be changed, modified, or transferred except by an instrument in writing executed by you and us.