UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION


ROOT, INC., ET AL.,                    )
                                       )
    PLAINTIFFS,                        )  CASE NO. 2:23-cv-512
                                       )
        vs.                        )
                                       )
BRINSON CALEB SILVER, ET AL.,          )
                                       )
  DEFENDANTS.                          )
_____            )


TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE SARAH D. MORRISON
WEDNESDAY, FEBRUARY 14, 2024; 10:01 A.M.
COLUMBUS, OHIO


FOR THE RECEIVER JERRY E. PEER, JR.:

      Peterson Conners
      By:  Gregory S. Peterson, Esq.
      Jerry E. Peer, Jr., Esq.
      Istvan Gajary, Esq.
      545 Metro Place South, Suite 435
      Dublin, Ohio 43017



  (Appearances continued, next page)

- - -

    Proceedings recorded by mechanical stenography, transcript produced by computer.

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*

**APPEARANCES CONT'D**

FOR THE PLAINTIFFS:

    Vorys Sater Seymour & Pease
    By:  William D. Kloss, Jr., Esq.
    Grace E. Saalman, Esq.
    Elizabeth S. Alexander, Esq.
    52 East Gay Street
    Columbus, Ohio 43215

FOR THE DEFENDANT WILLIAM CAMPBELL and QUANTASY:

    Thompson Hine LLP
    By:  Matthew D. Ridings, Esq.
    Jamar T. King, Esq.
    Joan E. Meyer, Esq.
    3900 Key Center  127 Public Square
    Cleveland, Ohio 44114

    Thompson Hine LLP
    By:  Jamar T. King, Esq.
    10050 Innovation Drive, Suite 400
    Miamisburg, Ohio 45342

    Thompson Hine LLP
    By:  Joan E. Meyer, Esq.
    1919 M Street NW, Suite 700
    Washington, DC 20036

    Davis & Gilbert LLP
    By:  Joshua H. Epstein
    1675 Broadway
    New York, New York 10019

                  - - -

3

Wednesday Morning Session

February 14, 2024

- - -

*The following proceeding held in chambers.*

- - -

1  THE COURT:  Good morning.  Good morning, everyone.

The gang is all here in Root, et al., versus B.C. Silver,

et al.

We'll begin by doing appearances.  Starting with counsel

for the receiver.

Of course, we have the receiver, Mr. Peer.

MR. PEER:  Good morning, Your Honor.  Jerry Peer, the

receiver.

MR. GAJARY:  Istvan Gajary with the receiver here.

MR. PETERSON:  Good morning, Judge.  Greg Peterson

with Jerry Peer.

THE COURT:  Good morning.

And then for the Root parties?

MR. KLOSS:  Bill Kloss for the Root parties.

MS. ALEXANDER:  Liz Alexander.

MS. SAALMAN:  Grace Saalman.

THE COURT:  Great.  And then we do have -- we -- just

for the record, Mr. Silver is not here, nor are any of his

entities, which we will talk about that in just a moment, and

we do have people here for Mr. Campbell and the Quantasy

1  entities, though.

2       MR. RIDINGS:  Yes, Your Honor.  Matt Ridings for the

3  Quantasy entities and Mr. Campbell.

4       THE COURT:  Great.

5       MR. KING:  Jamar King for the Quantasy entities and

6  Mr. Campbell.

7       THE COURT:  Great.  And we have people on the

8  telephone.  Who do we have on the phone?

9       MR. EPSTEIN:  Good morning, Your Honor.  This is

10 Josh Epstein of Davis & Gilbert, LLP.  I'm co-counsel for the

11 Quantasy parties and Mr. Campbell.

12      THE COURT:  Okay.

13      MS. MEYER:  And Joan Meyer from Thompson Hine.

14      THE COURT:  Okay.  Great.  Thank you.

15      All right.  Well, you know, we hadn't all been together

16 for quite a while.  I know that you've been talking to the

17 magistrate judge.

18      We've had a lot of motions and papers and things going

19 back and forth.

20      So I -- I thought it would be a good time to bring

21 everyone together and really wanted to start with you,

22 Mr. Peer, in terms of we've gotten your reports.  We know you

23 filed some motions.  You are selling property.  That's great.

24      But can you just give us a high level of where we are,

25 and what do you think your next steps are?

```
 1                MR. PEER:  Absolutely.  Thank you, Your Honor.

 2        So, from here going forward, our -- our last remaining

 3   responsibilities or duties or what I would say is on our

 4   checklist is to get this Bayshore property closed.

 5        This is the property down in Miami that had more or less

 6   been gutted down to the studs.

 7        It was originally believed to be worth roughly

 8   3.7 million in its current state, could be even up to and north

 9   of 5.5 if it was renovated.

10        However, the mortgagee for that property had filed a

11   foreclosure action, obtained relief from stay in this case, and

12   was intending to press forward on the foreclosure.

13        For that reason, we obviously don't have enough time to

14   renovate that property and try to realize the additional

15   proceeds that may -- may come as a -- as a sale for a fully

16   renovated property.

17        So, we entered into a contract for 3.7 million.  We are

18   currently scheduled to close on or before February 28th or

19   before.  We're aiming and we're hopeful that it will be before.

20        Thank you, Your Honor, for the order that came through

21   last night.

22        So, the wheels are in motion, and everybody is pushing

23   forward to try to get it closed as soon as possible.

24                THE COURT:  Okay.  Let me stop you on that, just

25   because I know there's an outstanding motion about like
```

```
 1   abandoning -- there's some personal property that was left at

 2   that property.

 3         We do -- we did send out the notice for the expedited

 4   briefing schedule.

 5         I'm going to guess that none of the represented parties

 6   care about any personal property left in the property.

 7         Is there anything that we ought to be worried about or

 8   anything of value?

 9         MR. PEER:  No, Your Honor.

10         There is nothing -- there was one room that was kind of

11   just stuffed full of shoes, clothing, suitcases, just

12   miscellaneous items, none of which I could walk into a thrift

13   store and get anything for.

14         THE COURT:  Okay.  Well, I know those tennis shoes now

15   have a great secondary market.

16         MR. PEER:  Well, and Mr. Silver had a -- a lot of

17   tennis shoes but, unfortunately, on the -- on the open market,

18   in a liquidation value, not --

19         THE COURT:  Okay.

20         MR. PEER:  -- not really worth anything.

21         THE COURT:  All right.  Great.  I just wanted to make

22   sure.  Thank you.

23         MR. PEER:  Yeah.

24         In addition to the Bayshore property, we have the Walnut

25   property.
```

7

1          Our realtor that is out in California and our auctioneer

2    are working closely together to get that property ready.

3          That is the house that Ms. Laurie Mannette was residing

4    in with the children.  They have since vacated; however, she

5    did leave quite a bit of trash behind.

6          I've confirmed with her that that can all be disposed

7    of.  I expect that to be removed today.

8          The landscaping will also commence today, just to make

9    the house look a little bit nicer for the photos for the

10   auction.

11         I'm hoping that we have that closed in the next 60 days.

12         With any luck, we'll get a bid that we can all live

13   with.  It is subject to our approval, of course, and I'd reach

14   out to everyone to make sure that everybody can live with

15   whatever that price is.

16         We weren't as successful on Ramona's.  We had hoped.

17   But when you look at the stats and the numbers, it's the best

18   we could expect to get.

19         In addition to those two properties, there is still the

20   Mercedes.  The Court has granted us to sell that for $14,200.

21   I expect that to occur this week.  We'll get that done.

22         Our realtor out there is being very helpful.  He's

23   definitely going above and beyond what we've hired him to do,

24   and taking care of the Mercedes is one of those things.

25         The last potential remaining asset out there is this

1 Jakarta bank -- bank account. Unfortunately -- and I am all

2 ears if anyone in this room or outside this room has a way of

3 getting information from a bank in Jakarta.

4      Mr. Silver assures us that those funds were depleted to

5 zero or nearly zero for his, quote, unquote, living expenses

6 while he was in Indonesia.

7      We have absolutely no way to confirm that.

8      From that point on, the only thing, I think, we have got

9 left to do to wrap this up is to take care of the

10 administrative tax returns, get them prepared, and then we

11 would be moving the Court to terminate the receivership.

12      THE COURT: With regard to that Jakarta bank account,

13 is there an opportunity -- and I probably look more to

14 Mr. Peterson -- as part of the criminal case, to have

15 Judge Marbley order him to do something with that account?

16      MR. PETERSON: We could do that. We have met with

17 Mr. Silver on several occasions.

18      I mean, we had a -- we went to Butler where he was being

19 held, had a pretty open conversation.

20      I made it very, very clear to him that it was in his

21 best interests, both criminally and civilly, in this case, to

22 be forthright with us.

23      As -- I didn't have any Bibles to stack up in front of

24 him, but he assures us that the money is gone. He says there's

25 nothing there.

1    We certainly will pursue that with Mr. Templeton in the

2  criminal case, and Phil is aware of the importance of that and

3  the answer to that question.

4    And from my sort of heart-to-heart conversations with

5  Phil, he doesn't believe there's any money.

6    Our ability to get Jakarta -- we did issue them a

7  subpoena.

8        MR. GAJARY:  We did, which came back.

9        MR. PETERSON:  They -- they don't really -- they --

10  they were not very intimidated by our subpoena, Judge.

11    So, we will continue to pursue that, and certainly the

12  criminal case offers some leverage that we don't necessarily

13  have over him.

14        THE COURT:  Do you think if I went to Jakarta and,

15  like, personally served it?

16        (Laughter.)

17        MR. PETERSON:  And handed it to them, Judge.

18        MR. KLOSS:  Well, we've come this far.  It -- it

19  strikes me -- my idea would be ordering Silver to do whatever

20  he needs to do to access the account.

21    I'm not really in a -- I don't want to be a pain in the

22  neck, but he also didn't have three houses.

23    He also didn't have a variety of things along the way,

24  so he has got to have access to the account in some fashion.

25  It would --

10

1        THE COURT:  I agree, and that's actually maybe

2   indirectly what I was trying to say, where there may be -- in

3   the criminal case, there might be still that hammer of "I've

4   still got to sentence you."

5        MR. PETERSON:  Yes, ma'am.

6        THE COURT:  And so, whether it's me having a

7   heart-to-heart with him or Marbley for the criminal case, I

8   kind of think the chief now has more leverage with B.C. Silver

9   than I do.

10       MR. PETERSON:  Yes, ma'am.  We will absolutely tie up

11  that end --

12       THE COURT:  Okay.

13       MR. PETERSON:  -- before we terminate the

14  receivership.  Yes, ma'am.

15       THE COURT:  Okay.  Great.

16       Any other thoughts on that issue or questions for the

17  receiver?

18       I'll start with you, Mr. Kloss.

19       MR. KLOSS:  No.  I think that that -- you know, the

20  receiver has done a terrific job.

21       Obviously, we're interested in getting it wrapped up,

22  and that would be nice to get that final piece of the puzzle.

23       I mean, he somehow -- he had to have access to it

24  somehow, so -- whether he has to sign a document or wire them

25  something.  So I think that's it.

```
1              THE COURT:  Okay.  All right.  Mr. Ridings?

2              MR. RIDINGS:  There was one other bank account, I

3    thought.  I -- I --

4              MR. KING:  Evolve.

5              MR. RIDINGS:  Evolve.  Yeah.  What is -- did you

6    discuss the status of that?  I'm sorry if I missed it.

7              MR. PEER:  I did not mention that.  I know that we had

8    sent them a subpoena.

9              MR. GAJARY:  Yeah.  We did have a subpoena to them.

10   They -- they have not responded.  I think we need to follow up

11   on that one.

12        There is about $14,000 there.  We were able to trace, at

13   least, the wires going out.

14        About $52,000 went to the bank in Jakarta -- which we

15   did issue them a subpoena.  That got sent back to us for

16   noncompliance according to their laws.

17        The one with Evolve Bank was around $14,000.  We just

18   need to follow up on that to figure out what happened with that

19   money.

20             MR. RIDINGS:  All right.

21             THE COURT:  All right.  I don't hear any further

22   questions, but thank you all.  We appreciate it.

23        I know you've been very diligent and had some

24   interesting ventures trying to get your arms around this

25   estate.
```

12

1        So, I'm pretty pleased with where we've ended up, so

2  thank you.

3        MR. PEER:  Thank you, Your Honor.

4        THE COURT:  In addition, I know that Root had some

5  specific things that they wanted to talk about, one of which

6  was also at the top of my list, and that does deal with the

7  Silver entities.

8        Of course, yesterday was the deadline for Mr. Silver's

9  corporate entities to retain counsel.  They have not.

10       And so, my request would be then for Root to file a

11  motion for entry of default based on their failure to defend.

12       I know also there's now cross-claims.  I didn't

13  double-check.  Are the cross-claims just against Mr. Silver, or

14  are they against his companies as well?

15       MR. RIDINGS:  Just against Mr. Silver personally,

16  Your Honor.

17       THE COURT:  Okay.  Okay.  And his answer date has not

18  run yet.

19       MR. RIDINGS:  Has not yet come.

20       THE COURT:  Okay.

21       MR. RIDINGS:  Correct.

22       THE COURT:  That does, though, lead me then to kind

23  of what -- what Mr. Silver is doing.

24       I know he is still housed, a guest of us, in

25  Butler County.

13

1          MR. PETERSON:  Yes, ma'am.

2          THE COURT:  Have you -- are you done with him from the

3    receiver's standpoint?

4          Is there ongoing discussions with him?

5          MR. PETERSON:  One of the interesting sort of threads

6    we pulled was this videotaped notarization service that he had

7    used, and we issued them a subpoena.

8          I believe there were about 16 different occasions where

9    he hired them to notarize documents.

10         This was during COVID.  And so it was -- it was a whole

11   video process.

12         I've actually spoken with -- what led us to that thread,

13   if you will recall, Judge, the Happy Jewelers and the watches

14   and all of that.

15         He used that to submit a statement to Happy Jewelers.

16   He used that video.

17         And I spoke with the notary, I guess it is.  It was out

18   in Las Vegas.  And he sent us the video.  We had the whole

19   thing.

20         So that led us to a -- that gave us a couple of other

21   follow-ups with him.

22         Other than the Jakarta and how we wrap that up -- which

23   he has said to us doesn't exist but I -- you know, with the

24   appropriate leverage, maybe he would change his answer, or we

25   can get his representation more formalized, but other than --

14

1    other than that, I don't know that there's any reason for us to

2    have any more contact with him.

3         I would say this:  For whatever it's worth, after

4    Mr. Templeton got involved, he was willing to sit down with us

5    as many times as we wanted.

6         I mean, he never -- I don't know -- you know, whether

7    he's telling the truth or not, he did answer all of our

8    questions.

9         There was no point at which where he said:  "I'm not

10   going to talk about that."

11        So, I don't know of any reason, really, for us to reach

12   back out to him unless this Jakarta issue --

13             THE COURT:  Okay.

14             MR. PETERSON:  -- leads us in another direction.

15             THE COURT:  All right.  Because I -- because I know

16   there's been discovery requests from the Root companies.

17        Have you served discovery as well, Mr. Ridings?

18             MR. RIDINGS:  Yes, Your Honor.

19        We served discovery during the expedited discovery

20   period, now near a year ago.

21        Those -- we have not received responses to any of those

22   discovery responses.

23             THE COURT:  I know you haven't either.

24             MR. KLOSS:  Not entirely correct.

25             THE COURT:  Okay.

15

1    MR. KLOSS:  We've received -- technically, we received

2    written responses, which in many instances were not responsive.

3    But in -- in many other instances, they refer to the

4    forthcoming document production, which we have never gotten.

5    THE COURT:  Okay.

6    MR. KLOSS:  So, I don't think he's -- there was --

7    there was a document served that said they were answers and

8    objections, but we haven't gotten anything further.

9    And, more importantly, we have no documents from him,

10   and he's never -- he's also -- I don't mean to harp on this,

11   but he's also never answered the second amended complaint.

12   I know he answered the first so --

13   THE COURT:  Right.  Well, and -- and the reason I ask

14   is I do want to -- yeah, I feel like I want to continue to get

15   his cooperation on the -- on the receiver piece; and to the

16   extent he's cooperating with the receiver, in my mind, he is

17   otherwise defending as required by Rule 55.

18   That's why I started with the question to Mr. Peterson

19   about is he still cooperating?  And he at least normally is.

20   So, I'm reluctant to talk about an entry of default

21   against Mr. Silver at least while we're trying to get this

22   done, because he is cooperating, and that, in my mind, is in

23   part defending against claims and cross-claims.

24   MR. PETERSON:  It is interesting, Judge, because when

25   Peter Glenn-Applegate, the U.S. attorney who is handling it,

16

1  with -- with -- not to get into the weeds, but as the Court is

2  well aware, the -- the sentencing guidelines are very heavily

3  driven by the loss calculation.

4          THE COURT:  Yeah.

5          MR. PETERSON:  And so, they have tiered amounts.

6      And what Pete was sort of like, look, if we get over

7  this tier, we're never going to get to the next tier, so this

8  is where you fall.

9      So they pushed him to get specificity in that regard but

10  not down to a dollar figure like I can send -- tell you where

11  the money is.

12          THE COURT:  Right.

13          MR. PETERSON:  You know, so he had incentive to keep

14  the number low on the guideline calculation, but then he also

15  had an incentive to try to find that money on a restitution

16  order or anything else from Judge Marbley.

17      So, there's kind of cross-purposes there.

18      He's cooperative in the sense that he never told us that

19  he wouldn't talk to us.

20          THE COURT:  All right.

21          MR. PETERSON:  I think all three of us believe he is

22  maybe 75 percent, 80 percent -- I think he's probably as honest

23  as he is capable of being.

24          MR. PEER:  And I don't think he told us anything in

25  that meeting that we didn't already know.

17

1          MR. PETERSON:  Right.  He did not -- when -- for

2     example, when we found the third house, he never offered

3     anything like that after we began engaging with him.

4          It was more of a -- you had ordered him to cooperate.

5     He was doing that because he had the contempt issue that he was

6     trying to deal with at the same time.

7          THE COURT:  Well, here would be my suggestion, but I'm

8     happy to hear any other alternatives, and that is, let's pin

9     down the Jakarta bank issue just to make sure that there's not

10    money there, and I'll -- I'll talk with the receiver offline.

11         We can maybe coordinate with the criminal case about

12    what the best way to get an order on for him to provide, sit

13    down with you, whatever it takes, to get access to that Jakarta

14    account.  He's got to be able to access it somehow, one would

15    think.

16         MR. PETERSON:  One would think.

17         THE COURT:  And maybe we go back to the contempt

18    route.  I don't know.  I don't know what kind of hammer that is

19    over him at this point given the criminal proceedings, but

20    let's try to pin that down, because I would like -- I would

21    like to close that loop and see if there's any -- any other

22    cash out there.

23         MR. PETERSON:  And it's an interesting kind of

24    interpretation, Judge, if I might, is if he's being held on the

25    contempt, that's dead time, so he isn't getting credit towards

18

1   his ultimate criminal sentence.

2        So the longer that that process will play itself out and

3   he's under contempt orders, he isn't getting credit towards his

4   ultimate criminal sentence --

5        THE COURT:  Okay.

6        MR. PETERSON:  -- which may be some leverage depending

7   on how long it takes.

8        THE COURT:  Right.  And so that is -- that would be an

9   incentive for him to cooperate.

10       MR. PETERSON:  Yes, ma'am.

11       THE COURT:  Okay.  Well, I like that approach because

12  I do want to get that pinned down.

13       Once we do get that in some kind of shape, then we can

14  address the issue of his failure to comply with discovery, and

15  in his kind of -- what is he then doing to otherwise defend as

16  contemplated by Rule 55.

17       But until we get that pinned down, I prefer to defer

18  that issue.

19       MR. KLOSS:  Sure.  And since there's a cross-claim, is

20  that going to fall in the same bucket?

21       THE COURT:  Yes.

22       MR. KLOSS:  Okay.

23       THE COURT:  Yes.  I would put both claims against him

24  in the same bucket because, in my mind, reducing any ultimate

25  amount recovered from a civil case is defending -- is, in my

1    mind, defending the case.

2        But, like I said, I'm happy to hear from either of you

3    or, frankly, if any of you have any other thoughts or

4    suggestions of how we approach that and -- and get the case

5    moving forward.

6        MR. KLOSS:  No.  I -- I think that covers it from my

7    perspective.

8        I mean, the next issue we'll have to deal with, if we

9    were to go there, is ultimately deposition -- deposing him and

10   the logistics of that.

11       THE COURT:  Right.

12       MR. KLOSS:  But I'm not sure that discussion is for

13   today.

14       THE COURT:  All right.  Okay.  Well, I will say we

15   might want to think about that sooner rather than later too, in

16   part, because I am told -- you might have a different

17   opinion -- that Butler County now does have decent video

18   capability.

19       And so, if you want to depose him, we could arrange a

20   video deposition, I think, with him in Butler County.

21       And so, that might be something we want to do sooner

22   rather than later, because if he does get transferred into the

23   Bureau of Prisons, that might be harder.

24       Do you --

25       MR. PETERSON:  I would agree with that, Judge, and one

20

1  sort of -- I imagine the response you guys are going to get

2  from him is:  "I don't have any of these documents."

3          MR. KLOSS:  That's what I think.

4          MR. PETERSON:  We have his phones and his computer and

5  his laptop.  We made an image -- we have a hard drive that's

6  one of the big thick ones that has all of his electronic

7  information stored on it.  We've imaged all of that.

8          As much as everyone wants the receiver to step out of

9  this fight, we do have possession of those, and we certainly

10 will comply with however you direct us to provide that

11 wherever.

12         The interesting issue, I guess, is if, for example, an

13 interrogatory asks for specific documents, we're not going to

14 be able to sort through all of that and find, you know, and

15 respond in -- in what I would consider an appropriate way for

16 each discovery demand, but I imagine everybody would want to

17 look at all of that volume of stuff and try to find it

18 themselves.

19         THE COURT:  Okay.  And that hasn't been produced?

20         MR. KLOSS:  We have --

21         MR. PETERSON:  They have the hard drive.  We're

22 happy to -- we probably would just seek some kind of a

23 protective order from the Court that we aren't -- I don't -- we

24 don't want to be turning over something we're not supposed to

25 be turning over, but it's practically impossible for us to look

1     through it and make sure that we're not.

2         MR. KLOSS:  That applies for us, too.

3         I mean, we have it, and there's been a bit of a stutter

4     step as to "I don't want to find us in a pickle."

5         I can't imagine, given what he's done, we would be in a

6     pickle for reviewing it, but goodness only knows what's on

7     there.

8         THE COURT:  Okay.  And I also think, though, that

9     under -- I mean, some of the things that occur to me that might

10     be on there, like just for -- I don't know that he's had any

11     privileged communications.  He's had a lawyer for only a

12     minute.  But you all know your professional responsibility

13     requirements if you come across something that's privileged

14     that is -- would be -- that I would probably consider

15     inadvertently produced.

16         MR. PETERSON:  These are -- as most of our devices

17     probably are, I mean, his business and his personal lives are

18     all -- and these are phones.

19         I mean, we have pictures of his little kids, and there's

20     all kinds -- and I have no idea -- you know, every time you

21     click, you kind of hold your breath because you don't know what

22     that next picture is going to be, and so it's a little

23     concerning.

24         MR. KLOSS:  Given some of the stuff that's been

25     found --

22

1           MR. PETERSON:  Yeah.

2           MR. KLOSS:  -- there is cause for concern.

3           MR. PETERSON:  There is reason to be concerned.

4           THE COURT:  Well, I -- let's do this, if -- and I'll

5   kind of look at the two lawyers, as opposed to the receiver,

6   why don't you two talk about what kind of protective order

7   might be appropriate to address this information that the

8   receiver has, so we can get it to you, Mr. Ridings.

9         It sounds like you've already seen some of it, and I

10  will certainly put on an appropriate order just addressing it.

11          MR. KLOSS:  We already have a protective order in

12  place --

13          THE COURT:  Oh, we do?

14          MR. KLOSS:  -- that we could just make all of this --

15  I don't remember.  There's -- there's labeling requirements.

16        I haven't -- it's a -- we could just make it all subject

17  to the -- is there an attorneys eyes only?

18          MR. RIDINGS:  I think there is a level.  Yeah.  And

19  there's a 502.

20          THE COURT:  But nobody is going to be -- but nobody is

21  going to be labeling this.

22          MR. KLOSS:  No.  We could -- we could -- I guess we

23  could just accept it as to at least the lower tier.

24          MR. RIDINGS:  Yeah.  I think --

25          THE COURT:  I'll tell you what, we'll put on an order

23

1  coming out of this conference -- it will just come from the

2  Court -- that pursuant to the conversation at the status

3  conference, the materials produced by the receiver that came

4  from Mr. Silver's files and computers and phones are subject to

5  the protective order without having to be designated as such.

6          MR. KLOSS:  Okay.

7          MR. RIDINGS:  Okay.

8          MR. KLOSS:  That's fine.  Yeah.

9          THE COURT:  Okay.

10          MR. KLOSS:  I think that gives us any cover fire in

11 case there's stuff on there that we -- who knows.  I refuse to

12 speculate what might be on there.

13          THE COURT:  Probably wise.

14          But -- but let's -- why don't do this:  Since you have

15 it -- you will have it soon, Mr. Ridings -- take some time to

16 go through that, and then with the goal of scheduling a

17 deposition of Mr. Silver, I'll say in the next month -- few

18 months -- do you have any sense of when he might be sentenced

19 by the chief?

20          MR. PETERSON:  I know that the plea agreement has been

21 filed.  I don't know when the sentencing would be.

22          I think they are going through the presentence report

23 process right now.

24          We would -- so, when we -- we received these devices --

25 and what was compelling about them is they were collected in

24

1    security -- if you recall, Judge, he was arrested coming

2    through security.  Those devices were collected, and then a

3    laptop was sent to Phil Templeton, and he turned all that over

4    to us.

5          We then turned it over to our IT people that we had

6    engaged to put all of this on one searchable storage device,

7    which we did.

8          There is probably -- as you guys had to go through, it's

9    very challenging to access this information.  You know, there's

10   different platforms.  There's different -- all kinds.

11         We would be more than happy to provide the guidance from

12   our IT people, who created it, to help you look at it --

13   because information isn't valuable at all if you can't digest

14   it.

15         And so to the extent, if there is a protective order

16   with regards to the information itself, if we could sort of

17   include something that we will provide the necessary IT support

18   to explain to them how to access what we had created.

19         THE COURT:  Okay.  And you still have the -- the

20   originals.

21         MR. PETERSON:  Yes, ma'am.

22         THE COURT:  So that if there's also an issue with the

23   originals, then the receiver is going to maintain that.

24         MR. PETERSON:  Yes, ma'am.

25         THE COURT:  Okay.

25

1          MR. PETERSON:  And it did -- in order to create this

2     document, it took several days.  It might have even been a few

3     weeks of downloading, 'cause there's at least two iPhones.

4     There's a laptop.

5          MR. GAJARY:  There's, like, 20-some emails, email

6     accounts.

7          MR. PETERSON:  Yeah.  Just the number of email

8     addresses was staggering.  And the text message -- it is a

9     massive amount of information.

10         So it took a long time to create, and I would imagine

11    equally as long and difficult to digest, which they have

12    already tried to do.

13         MS. ALEXANDER:  We -- we have it.  We have not yet

14    looked at it because we wanted to have this discussion and

15    ensure it was all available to everybody.

16         But, yes, we at least got it open and noticed that the

17    file structures are tricky.

18         MR. PETERSON:  It is tricky.

19         If you would direct us, Judge, maybe we could just have

20    one conference call with all the parties and say look -- and

21    have our guy available and say, look, this is how you can

22    actually use the information that you have.

23         THE COURT:  I think that would be a good use of

24    everybody's time so --

25         MR. PETERSON:  Yes, ma'am.  We can do that.

26

1          THE COURT:  Okay.  Thank you.

2          All right.  On that topic, when I talk about everybody,

3    I do note, and I missed this when we did appearances, that

4    Ms. McDaniel did enter -- have counsel enter an appearance.

5          They are obviously not here.  We have not heard from

6    them.

7          Is anybody in communication with Ms. McDaniel's

8    counsel?

9          MR. KLOSS:  I had a brief conversation when the --

10   right around the time period when the appearance was made.

11         THE COURT:  Okay.

12         MR. KLOSS:  And I thought he was going to be here.

13         He asked -- he had some questions about the details of

14   the case and about his client's participation in the case,

15   but that -- but that's all I had.

16         THE COURT:  Okay.

17         MR. KLOSS:  That was really at or about -- for all

18   intents or purposes -- at or about the time the appearance was

19   filed.

20         THE COURT:  So you haven't tried to get information --

21   have them get information or discovery from Ms. McDaniel for

22   you?

23         MR. KLOSS:  She provided me -- before she was

24   represented by counsel -- not much, but something.

25         THE COURT:  Okay.  Okay.  Do we need to do anything to

1   address her role, involvement to -- and, really, to -- is your

2   cross-claim against Ms. McDaniel as well?

3          MR. RIDINGS:  No, Your Honor.

4          THE COURT:  So it's really your claim against her.

5          MR. KLOSS:  Yeah.  I -- I think we need to see where

6   it -- well, we know where this is going against Mr. Silver.

7          THE COURT:  Right.

8          MR. KLOSS:  I think this primary dispute, if we're

9   going to put a head on it, is with these guys, is Quantasy at

10  this point.

11         THE COURT:  Yeah.

12         MR. KLOSS:  And we've -- Matt and I have had a number

13  of conversations.  We've discussed -- we made a settlement

14  demand.

15         We've discussed potentially resolving it, but there was

16  discussion about mediation, so -- and that's been our focus, if

17  I'm going to be entirely honest.

18         THE COURT:  Great.  Okay.  I'm glad to hear it.

19  Mediation is always good.

20         MR. KLOSS:  Yeah.  Well, we haven't gotten there yet.

21         So -- and we haven't -- we haven't agreed to one yet,

22  but -- so I think our focus is going to continue on that

23  because, in the end, Ms. McDaniel, I'm not sure entirely what

24  her role was, and she's not going to be collectible anyway.

25         THE COURT:  Probably not, from what I've seen.  That

1    doesn't appear -- okay.

2            MS. ALEXANDER:  One issue, Your Honor, with McDaniel

3    and Silver, and it ties into perhaps this protective order,

4    neither of them have signed the protective order, and so we

5    have been a little bit in limbo as to what we send to them as

6    we were getting, you know, subpoenaed docket bank records, and

7    things like that, that we would typically share marked

8    confidential with all parties in the case or sealed filings.

9        We had a motion to quash that involved some sealed

10   filings with bank records.

11           THE COURT:  Okay.

12           MS. ALEXANDER:  And so we're looking for a little

13   direction from the Court on how to best handle that because we

14   are concerned about sending things like that to Butler County

15   or --

16           THE COURT:  Yeah.  I would be concerned about you

17   sending them to Butler County.

18       Yeah.  My suggestion would be that you don't send it

19   to -- and I -- and we can -- if you would be more comfortable,

20   we can put that in the order as well as, at this point, you are

21   not to share with Mr. Silver directly while he's in

22   Butler County or with Ms. McDaniel unless and until her lawyers

23   sign on to the protective order and then --

24           MS. ALEXANDER:  That would be great.

25           MR. KLOSS:  That would be great.  I don't want to have

1    anybody spring up and say you denied us access to this

2    information.

3        THE COURT:  Right.  Right.  And I think you are

4    denying pursuant to the court order, and if they -- and we'll

5    put in there language that if they sign on to the protective

6    order, we'll revisit it.

7        MR. KLOSS:  The notion of bank records going into

8    Butler County amazes me --

9        THE COURT:  Well, he's got 23 hours a day there to be

10   sitting in his cell.  He probably would enjoy the reading.

11       MR. KLOSS:  The question is how many hours a day or

12   how many hours a week does he have access to a computer --

13   which really frightens me.

14       THE COURT:  Okay.  So that -- so that kind of, I

15   think, at least gives us a pin, and -- and to the extent that I

16   suggested about thinking of deposing Mr. Silver, we can

17   probably get a little bit of information.

18       Do you want to talk to Mr. Glenn-Applegate and just let

19   counsel know an approximate timeline?

20       MR. PETERSON:  Yes, ma'am.

21       THE COURT:  Okay.  It looks like you two are working

22   well together in terms of getting Root's answer to the

23   counterclaim from Quantasy, so that's --

24       MR. KLOSS:  Well, that is one issue I would like to --

25   I would like to address.

30

1          THE COURT:  Okay.

2          MR. KLOSS:  We're going to -- as I suspect the Court

3     will not be surprised, we're going to file a motion to dismiss

4     the counterclaim.  We're going to need some more time.

5          We would like -- we have the original deadline as 2/21.

6     We would like to get it to -- push it to 3/22, if that's not --

7          MR. RIDINGS:  Yeah.  That's not an issue at all.

8          MR. KLOSS:  Okay.  Do you want us to file a motion

9     or --

10         THE COURT:  We'll put it in the order.

11         MR. KLOSS:  Okay.

12         THE COURT:  We'll do kind of an omnibus order coming

13     out of this.  Great.

14         Anything else on that?

15         You mentioned mediation.  You haven't agreed to it yet.

16         Is there anything I can do to facilitate the discussions

17     or mediation?

18         MR. RIDINGS:  Your Honor, the -- I'll -- I'll speak to

19     that --

20         MR. KLOSS:  Sure.

21         MR. RIDINGS:  -- and Bill can chime in if there's

22     anything else he would like to say.  But, yes, we, I think,

23     would like to go to mediation.

24         We have an insurance issue right now.  We have an

25     insurance company that has tentatively decided to cover, with a

1    reservation of rights.

2          We've had, I would say, a fair bit of difficulty in

3    getting the insurance company to respond and substantively

4    participate.

5          THE COURT:  Who is the insurer?

6          MR. RIDINGS:  The insurer is a company called Tokyo

7    Marine.

8          THE COURT:  Okay.

9          MR. RIDINGS:  The -- Mr. Kloss is -- we've been

10   speaking with this -- and with some frequency over the last

11   several months, and we have recently held -- they -- we had a

12   conference with the insurer, a video conference, where we've

13   discussed this and have expressed to the insurer that

14   this needs to be accomplished like now, and we need -- we need

15   to get a move on because this is -- you know, the case is

16   really starting to move, and this is the time if there's going

17   to be an early resolution for this.

18         THE COURT:  Yeah.

19         MR. RIDINGS:  So the insurance company, as it is, has

20   said they understand this.

21         I just sent an email to the insurer again yesterday in

22   advance of this conference saying:  Have you made a decision?

23   Please let us know.  We need to know.

24         I haven't checked my email this morning.  I was driving

25   down, but I did not receive a response to that email yesterday.

32

1    But we are putting all the pressure we can on the

2  insurance company to get them to participate in this because

3  that will materially make a difference --

4         THE COURT:  Sure.

5         MR. RIDINGS:  -- to settlement negotiations.

6    But we have -- you know, I recognize and have expressed

7  to everyone that Root's patience for this is not infinite, and

8  we are doing everything we can to make that happen.

9         THE COURT:  Okay.

10        MR. KLOSS:  Matt's summary is entirely correct.

11    The only thing I would add to it is this -- because I

12  want the Court to know the position that I took.

13    We originally made a settlement demand -- I don't

14  remember when it was.  It's been a while ago.  Probably back in

15  December-ish, December, January-ish.

16    There was a delay due to the inability to engage the

17  insurer.  The response was -- then this was pre-decision on the

18  summary -- on the motion to dismiss.

19    The response was we don't -- we like our case, and we

20  would be willing to mediate, but there was no -- we made an X

21  demand.  They didn't make a Y offer.

22    My response was there's a time and a place for

23  mediation, in my experience, but it's usually after we at

24  least have -- Matt's able counsel, at least we have some

25  preliminary negotiations to see how broad the gap and how wide

1    the gap is.

2          That has continued to be my position.

3          We had some -- I had some follow-up correspondence.  I

4    talked about using Frank Ray or Jim Arnold as a potential

5    mediator.  I thought both were decent choices, better than

6    decent choices, to be quite honest, but still I think it would

7    be helpful, probably to Matt's and -- an order of a deadline

8    for mediation, but it would be helpful for me to get a response

9    in terms of dollars and cents as to whether it's even -- even a

10   response I don't care for.

11         So I just add that to the -- to the mix there.

12          THE COURT:  Okay.

13          MR. RIDINGS:  And I just will say, I mean, the reason

14   we can -- we can provide a response, but I just don't know if

15   that response is going to be helpful in terms of -- I mean, we

16   know there's a $5 million insurance policy out there, and we

17   don't know from our perspective whether the insurer is going to

18   contribute zero dollars or $5 million to the pool of

19   settlement.

20         And so, I mean, that -- that, to me, makes a material

21   difference in what sort of offer we'll be able to make to

22   resolve the case.

23         If -- I mean, Bill -- and if you would like us to say,

24   look, please give us an offer, understanding that we don't have

25   final decision from the insurance company, I'm certainly -- I'm

34

1   certainly willing to do that to move it along.

2           THE COURT:  Would it be helpful if -- I'll be honest.

3   I did not review your counterclaim.

4           Would it be helpful to have a motion to dismiss the

5   counterclaim for the insurance company or for your -- from your

6   perspective going into mediation?

7           MR. RIDINGS:  I don't -- from -- no.  I don't think

8   so.

9           I mean, I think we're -- I think I certainly understand

10  what Mr. Kloss is going to argue in his motion to dismiss.

11          I don't think there's going to be any surprises in terms

12  of what he's going to say.

13          THE COURT:  Well, how about this then:  What if we

14  stay briefing, responsing -- any responses to your filing

15  until -- I am going to pick a date -- April 15th, with the

16  order that you either respond to the settlement demand or

17  schedule mediation within 30 days of today.

18          MR. RIDINGS:  That would be acceptable to us,

19  Your Honor, if --

20          THE COURT:  That's why I say, schedule.  Not have the

21  mediation within 30 days, but schedule it, because I know the

22  two mediators that you are talking about are going to be hard

23  to get on their calendar.

24          But if you -- if you can get it scheduled in the spring

25  but get it scheduled in the next 30 days, and that will put a

1  little -- at least put some timing for your purposes of -- I do

2  want this case to move forward.  It's already a year old.

3       We're going to -- the receiver does have an end in sight

4  for wrapping up.

5       And so, that really does leave you two as the primary

6  parties.  So I would like to make that happen sooner rather

7  than later.

8            MR. RIDINGS:  Yes, Your Honor.  We agree.

9       And as I've -- as I've told Mr. Kloss, you know, my

10  client has a business to run, and so he would like to -- he

11  would like to get this wrapped up sooner rather than later too.

12       So that's acceptable to us, Your Honor, if it is to

13  Mr. Kloss.

14            MR. KLOSS:  That -- that's fine.

15            THE COURT:  Okay.

16            MR. KLOSS:  My concern is -- is, I guess, in the face

17  of the mediation, I've got to put confidence in the fact that

18  the insurer is going to wake up and is going to come with

19  something.

20       I don't want to -- I don't want to delay this case, and

21  then -- what I'm fearful of is if we have -- what we face now

22  is a demand that is not particularly or, excuse me, an offer,

23  which is not a particularly decent offer, that that's -- we're

24  just kicking it down the road, and if I'm going -- I'm going to

25  start a mediation with something that's not a particularly good

36

 1    offer, I would rather get that process over with.

 2              THE COURT:  Well, and that's why -- and that's why --

 3    and just so maybe I'll amend the scheduling order to say either

 4    schedule the mediation in 30 days or if the -- if the -- if

 5    there's not going to be serious negotiations, I want to know

 6    that, and we'll get into the case.

 7              MR. RIDINGS:  Yeah.  And, Your Honor, you know, I

 8    will -- you know, I think Mr. Kloss and I have had a good

 9    working relationship in this case, and I will be -- look, if I

10    think this isn't going to happen, I'm going to be frank with

11    you, Bill.

12              MR. KLOSS:  I have absolute confidence in that.  No

13    hesitation in that whatsoever.

14              THE COURT:  Okay.  Well, let's give it that 30 days

15    then to -- for you to have those discussions.  And if you come

16    back to me during that time period and say the mediation isn't

17    going to pan out, that's fine.  We'll move forward with the

18    case schedule.

19              MR. KLOSS:  Okay.

20              MR. RIDINGS:  Okay.

21              THE COURT:  I think the only thing that leaves is --

22    I know there's been -- you have had some discussions with

23    Judge Deavers about discovery issues.

24              Frankly, I would prefer to keep those on her part of the

25    plate.

```
 1                 MR. KLOSS:  That's what my checklist says is going to
 2      be your likely response.
 3                 THE COURT:  Yes.
 4            She's already started, and I don't want to step on her
 5      toes, and she's very capable.
 6            So unless there's anything specific you think would be
 7      helpful for -- in the context of this overall discussion --
 8                 MR. KLOSS:  No.  I think that -- I think we're --
 9      we're okay for that.
10                 THE COURT:  Okay.  All right.
11                 MR. PETERSON:  Can I go back to the deposition real
12      quick, Judge?
13                 THE COURT:  You may.
14                 MR. PETERSON:  I have some -- I've been texting back
15      and forth with Phil.
16            They did a psychological evaluation, and they are
17      waiting on the results of that to come back.
18                 THE COURT:  Okay.
19                 MR. PETERSON:  That then will trigger the final PSR
20      being filed.
21            And I asked him is Silver willing to be deposed, and he
22      said, hmm, we could talk about that.
23            I don't have -- I am assuming he is going to be pursuing
24      an acceptance reduction in the guidelines in his criminal case.
25            I wouldn't have any problem, and I had expected to write
```

38

1    in a letter to Judge Marbley about what his cooperation is, and

2    explain to Phil that, in order for that to be complete

3    cooperation, he's got to do a deposition in the civil case.

4    That would be included.

5          And he agreed, and so I will continue to pursue that and

6    do everything we can to --

7                THE COURT:  In the Jakarta account, right?

8                MR. PETERSON:  Yes, ma'am.

9                THE COURT:  Okay.  Okay.  Great.  I like when you get

10   that kind of response.  Great.

11         So that was all I had on my agenda.

12         Anything else that we ought to talk about from the

13   receiver's or counsel's standpoint?

14               MR. PEER:  The only thought I had, Your Honor, is that

15   there may be some benefit in making sure the deposition occurs

16   before we terminate the receivership in the event something

17   does come out about more assets --

18               THE COURT:  Great.

19               MR. PEER:  -- or any concerns, so we don't go through

20   a reappointment process.

21               THE COURT:  Okay.  That's probably wise.  Okay.

22         Mr. Kloss, anything?

23               MR. KLOSS:  No, ma'am.

24               THE COURT:  Mr. Ridings?

25               MR. RIDINGS:  No, Your Honor.

39

1    THE COURT:  All right.  Thank you all.  I feel like

2  we've accomplished a lot, slowly but surely, I'm sure, from

3  Root's standpoint, but we're getting there.

4    MR. KLOSS:  Yeah.

5    THE COURT:  Great.  All right.  Thank you all who are

6  on the phone.  I'm going to hang up.

7    MR. EPSTEIN:  Thank you, Your Honor.

8                       - - -

9    (Proceedings concluded at 10:40 a.m.)

10                      - - -

11              C E R T I F I C A T E

12

13    I, Allison A. Kimmel, do hereby certify that the

14  foregoing is a true and correct transcript of the proceedings

15  before the Honorable Sarah D. Morrison, Judge, in the United

16  States District Court, Southern District of Ohio, Eastern

17  Division, on the date indicated, reported by me in shorthand

18  and transcribed by me or under my supervision.

19

20

                             s/Allison A. Kimmel
21                           Allison A. Kimmel, FAPR, RDR, CRR, CRC
                             Official Federal Court Reporter
22                            February 16, 2024

23

24

25

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*